UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

SECURITIES AND EXCHANGE COMMISSION,

|  |  |  |
|---|---|---|
| | Plaintiff, | 07-CV-11387 (Judge Cote) |
| v. | | |
| BRIAN N. LINES, *et al.*, | | JURY TRIAL DEMANDED |
| | Defendants. | |

————————————————————————

### ANSWER OF DEFENDANT SCOTT G.S. LINES

Defendant Scott G.S. Lines answers the Complaint as follows:

1.  Admits that shares of Sedona Software Solutions, Inc. and SHEP

Technologies, Inc. were quoted and traded on the Over-the-Counter Bulletin Board.

Otherwise denies the allegations of Paragraph 1.

2.  Admits that Brian N. Lines is the brother of Scott Lines, and that accounts

controlled and directed by W. Todd Peever and P. James Curtis were at certain times

LOM customers. Otherwise denies the allegations of Paragraph 2.

3.  Admits that on or about December 27, 2002, the privately-held Renaissance

Mining Corp. entered into a "mutually binding agreement" to acquire, subject to due

diligence, three Central American gold-mining properties (since proven commercially

successful) from the privately-held Central American Mine Holdings Limited (CAMHL)

for cash and stock, with Renaissance obliged to go public by a reverse merger into a

"publicly trading" shell company.  Further admits that on or about January 14, 2003,

Renaissance  entered into a "mutually binding agreement" to complete such a reverse

merger with Sedona Software Solutions, Inc., a public shell company current in its SEC periodic reporting.  Further admits that on or about January 15, 2003, Renaissance entered into an agreement with LOM Capital (orally but shortly afterwards confirmed in writing) for a private placement with "non-US" accredited investors, conditioned on completion of both the Renaissance-Sedona merger and due diligence "to the sole satisfaction" of LOM Capital, to raise a minimum of $3 million and a maximum of $6 million for the cash component of the mine purchase and working capital.  Refers to the foregoing agreements for their full content and meaning.  Further admits that these transactions were designed so that the resulting public company would be owned 49% by former CAMHL shareholders, 26% by former Renaissance shareholders, 12% by new private placement shareholders, and 13% by the former Sedona shell company's shareholders.  Further admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts.  Avers that Scott Lines was in England between approximately December 14, 2002 and January 13, 2003; that to the best of his recollection he had no awareness concerning Renaissance or Sedona until after his return to Bermuda; that his involvement in the proposed Renaissance private placement was to obtain so-called "indications of interest" from sophisticated and highly valued non-US LOM customers; that the placement was never consummated; and that

these LOM customers never signed a subscription agreement committing to invest, never actually invested any funds, and consequently lost no money. Otherwise denies the allegations of Paragraph 3.

4. Admits that as a public company, Sedona was required by SEC Regulation S-K (Item 101) and Form 8-K (Items 1.01, 5.01 and 5.06) to disclose the material proposed transactions described above. Further admits that on January 21, 2003, Sedona disseminated through the Bloomberg wire and other means a press release that, on information and belief, accurately disclosed that Sedona had signed a "letter of intent" to merge with Renaissance; that Sedona itself had no assets; that the closing of the merger with Renaissance was "subject to" negotiation of documentation "and satisfaction of other contingencies"; that Renaissance itself had signed a separate "letter of intent to acquire" gold mining properties that "upon consummation of the transaction" would leave Renaissance "poised to become" a significant intermediate gold producer; that Renaissance's $6 million private placement (a key element) was "subject to satisfactory completion of due diligence" by LOM Capital; and that the proposed transactions, if successfully completed, would result in a public company that would be owned 49% by former CAMHL shareholders, 26% by former Renaissance shareholders, 12% by new private placement shareholders, and 13% by the former Sedona shell company's shareholders. Refers to the press release for its full content and meaning. Further admits that Anthony Wile presented himself to be an officer of Renaissance. Lacks knowledge or information sufficient to form a belief as to activities of newsletter writers, but avers on information and belief that the sharp rise in the price of gold and gold-related stocks during that period made Sedona's proposed merger with a gold production venture

inherently attractive to investors and rendered any alleged touting of Sedona or

Renaissance immaterial.  Otherwise denies the allegations of Paragraph 4.

5.  Admits on information and belief that on January 21, 2003, following

Sedona's press release, investors in the OTCBB market began bidding for Sedona stock,

that the ICH account at LOM began selling Sedona stock in response to that demand, that

the demand for the stock was at a level higher than $8.25, and that the stock closed at

$9.35 that day on a volume of 314,100 shares.  Lacks knowledge or information

sufficient to form a belief as to any communications between or among Brian Lines,

Tony Wile and Wayne E. Wile relating such trading.  Expressly denies that Scott Lines

sold Sedona stock, and avers that he had no signatory power over and did not direct

trading in the ICH account.  Otherwise denies the allegations of Paragraph 5.

6.  Admits that between January 21 and January 29, 2003, Brian Lines directed

the ICH account's sale of approximately 159,300 shares of Sedona, representing

approximately 20% of the total volume, through registered U.S. broker-dealers at

prevailing market prices, yielding over $1 million in proceeds; that on information and

belief these sales were generally at prices that simply responded to existing demand

without pushing the price higher, and that demand would have supported additional sales;

and that companies beneficially owned by certain Lines family members, business

colleagues and customers continued to hold and did not sell a substantial amount of

Sedona stock.  Expressly denies that Scott Lines sold Sedona stock, and avers that he had

no signatory power over and did not direct trading in the ICH account.  Otherwise denies

the allegations of Paragraph 6.

7.  Admits that Brian Lines directed the ICH account's sale of Sedona stock

through an LOM Ltd. account with a registered U.S. broker-dealer, and that at the U.S. broker-dealer, Ryan Leeds was a registered representative who effected transactions for this account.  Expressly denies that Scott Lines sold Sedona stock, and avers that he had no signatory power over and did not direct trading in the ICH account.  Otherwise denies the allegations of Paragraph 7.

8.  Admits that the SEC suddenly and unexpectedly suspended trading in Sedona securities on January 29, 2003, and that the suspension prevented the merger of Sedona and Renaissance, prevented the completion of the Renaissance private placement, and caused shareholders of the Sedona shell company – including companies beneficially owned by certain Lines family members, business colleagues and customers, and to a far lesser extent American and other investors who bought Sedona stock in the OTCBB market between January 21 and 29, 2003 – to lose substantially all of the value of their Sedona stock.  Avers that within months the Renaissance transaction in substantially the same structure was offered to others and resulted in a significant commercial success, as will be proved at trial.  Otherwise denies the allegations of Paragraph 8.

9.  Admits that corporate entities over which Peever and Curtis had signatory power engaged in transactions in securities of Inside Holdings Inc. and SHEP Ltd. through accounts at LOM, and that other accounts at LOM transacted in SHEP stock. Lacks knowledge or information sufficient to form a belief as to any alleged arrangements involving Peever and Curtis respecting these securities.  Expressly denies that Scott Lines "collaborated" with Peever and Curtis respecting these securities. Otherwise denies the allegations of Paragraph 9.

10.  Admits that corporate entities over which Peever and Curtis had signatory

power engaged in sales transactions in securities of Inside Holdings Inc. and SHEP Ltd. through accounts at LOM, and that other accounts at LOM transacted in SHEP stock. Lacks knowledge or information sufficient to form a belief as to any alleged arrangements involving Peever and Curtis respecting these securities. Expressly denies that Scott Lines sold SHEP stock for his own account. Otherwise denies the allegations of Paragraph 10.

11.  Lacks knowledge or information sufficient to form a belief as to the obligations of Peever, Curtis and Brian Lines to file reports with the SEC, and their compliance with any such obligations, respecting transactions in IHI and SHEP securities. Expressly denies that Scott Lines had any such obligations. Otherwise denies the allegations of Paragraph 11.

12.  Admits that accounts at LOM engaged in sales transactions in securities of SHEP Ltd., and that certain sales were made through an account of LOM Ltd. with a registered U.S. broker-dealer. Otherwise denies the allegations of Paragraph 12.

13.  Admits that the SEC seeks the relief requested in this paragraph. Expressly denies that there is a basis for any such relief as to Scott Lines. Otherwise denies the allegations of Paragraph 13.

14.  Expressly denies that Scott Lines, a citizen of the United Kingdom and Bermuda, has engaged in any unlawful conduct in violation of the American securities laws, within the territory of the United States or elsewhere, respecting the securities identified in the Complaint. Apart from vague and unsupportable general allegations, the Complaint pleads with particularity only that Scott Lines obtained "indications of interest" from valued "non-U.S." LOM customers for possible investment in an

unconsummated offshore private placement in the privately-held Renaissance –
allegations with do not subject him to liability under the U.S. securities laws.  Otherwise
denies the allegations of Paragraph 14.

15.  Expressly denies that Scott Lines, a citizen of the United Kingdom and
Bermuda, has made use of the means and instrumentalities of interstate commerce of the
United States or of the U.S. mails in connection with any unlawful conduct.  Otherwise
denies the allegations of Paragraph 15.

16.  Expressly denies that Scott Lines, a citizen of the United Kingdom and
Bermuda, has engaged in any unlawful conduct in the Southern District of New York.
Otherwise denies the allegations of Paragraph 16.

17.  Admits that the plaintiff is the Securities and Exchange Commission and that
it claims to bring this civil action pursuant to the provisions cited.  Otherwise denies the
allegations of Paragraph 17.

18.  Admits the allegations of Paragraph 18.

19.  Admits that Scott Lines is a citizen of the United Kingdom and Bermuda, that
he is currently the President of LOM Holdings and its subsidiaries named in the
Complaint, and that he was previously the Managing Director of these entities.  Objects
to and moves to strike the balance of Paragraph 19 pursuant to Fed. R. Civ. P. 12(f), as it
contains scandalous and impertinent matter that is not relevant to the SEC's claim and
that is intended solely to diminish Scott Lines' reputation publicly and before this Court.

20.  Admits that LOM Holdings is the Bermuda-based parent of a group of
financial services companies founded by Brian Lines and Scott Lines, that its stock is
publicly traded on the Bermuda Stock Exchange, and that it is Bermuda's largest non-

bank broker-dealer and ninth largest public company.  Otherwise denies the allegations of Paragraph 20.

21.  Admits the entities named are direct or indirect subsidiaries of LOM Holdings.  Otherwise denies the allegations of Paragraph 21.

22.  Admits that Anthony Wile presented himself to be an officer of Renaissance. Otherwise, lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 22.

23.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 23.

24.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 24.

25.  Admits that Peever had account signatory power and directed securities transactions through accounts at LOM entities.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 25, and refers to LOM's records for their content and meaning.

26.  Admits that Curtis had account signatory power and directed securities transactions through accounts at LOM entities.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 26, and refers to LOM's records for their content and meaning.

27.  Admits that Leeds was a registered representative with a U.S. broker-dealer at which LOM Ltd. maintained an account, that it used this account to execute certain transactions in Sedona and SHEP securities for LOM customers, and that Leeds was the account representative for this account.  Lacks knowledge or information sufficient to

form a belief as to Leeds' age and residence.  Otherwise denies the allegations of

Paragraph 27.

28.   Admits that Sedona was a Nevada corporation, that its stock was registered

with the SEC and was quoted and traded on the OTCBB under the ticker symbol SSSI,

and that on January 29, 2003 the SEC suspended trading in Sedona securities for ten

days.  Otherwise lacks knowledge or information sufficient to form a belief as to the

allegations of Paragraph 28.

29.   Admits that Renaissance was a privately-held Delaware corporation.

Otherwise lacks knowledge or information sufficient to form a belief as to the allegations

of Paragraph 29.

30.   Admits on information and belief that SHEP is a public company, that it

owned intellectual property for a vehicle braking technology, that it was formed through

the reverse merger of the privately-held SHEP Ltd. and Inside Holdings Inc., a public

shell company, and that SHEP's stock was quoted on the OTCBB during the period

discussed in the Complaint.  Otherwise lacks knowledge or information sufficient to form

a belief as to the allegations of Paragraph 30.

31.   Admits that the LOM entities operated as foreign broker-dealers outside the

United States; that they primarily served non-U.S. clients and did not solicit U.S. clients

or business; that on behalf of their non-U.S. clients, they and virtually all other foreign

broker-dealers had to interact with securities markets in many countries, including the

U.S.; and that their interaction with the U.S. market, like other foreign broker-dealers,

included maintaining accounts and executing transactions through U.S. brokerage,

clearing and trust companies.  Expressly denies that the need for virtually every foreign

broker-dealer to interact with the U.S. market automatically results in their being deemed to be "doing business" in the United States and the Southern District of New York. Otherwise denies the allegations of Paragraph 31.

32.  Incorporates the response to the allegations of Paragraph 32 set forth in the Answer filed by the LOM Defendants.

33.  Expressly denies that LOM solicited brokerage and mutual fund customers in the U.S.  Otherwise incorporates the response to the allegations of Paragraph 33 set forth in the Answer filed by the LOM Defendants.

34.  Admits on information and belief that the privately-held Renaissance entered into a December 27, 2002 letter of intent to acquire CAMHL, a privately-held Belize company that owned three gold mining properties in Nicaragua and Panama that have since been successfully developed by others.  Further admits that Tony Wile presented himself as being an officer of Renaissance.  Lacks knowledge or information sufficient to form a belief as to the circumstances of its formation, and as to the relationships between Tony Wile and others described.  Otherwise denies the allegations of Paragraph 34.

35.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 35.

36.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 36.

37.  Admits on information and belief that the privately-held Renaissance entered into a December 27, 2002 letter of intent to acquire CAMHL, a privately-held Belize company that owned three gold mining properties in Nicaragua and Panama that have since been successfully developed by others.  Further admits that Renaissance entered

into a January 14, 2003 letter of intent to go public through a so-called "reverse" merger with the U.S. publicly-traded Sedona Software Solutions, Inc.  Further admits that Sedona was then an inactive company, and that Sedona was current in filing its quarterly and annual reports with the SEC.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 37.

38.  Admits that the privately-held Renaissance determined to raise between $3 and $6 million through a best efforts private placement, subject to due diligence and other conditions, that LOM would sell in Bermuda to qualified "non-U.S." investors, and that this meant that LOM would not solicit or sell to U.S. investors.  Lacks knowledge or information sufficient to form a belief as to the content and meaning of conversations between Brian Lines and others not involving Scott Lines.  Otherwise denies the allegations of Paragraph 38.

39.  Admits that the privately-held Renaissance entered into a December 27, 2002 letter of intent to acquire CAMHL, a privately-held Belize company that owned three gold mining properties in Nicaragua and Panama that have since been successfully developed by others, and refers to the letter of intent for its content and meaning. Otherwise denies the allegations of Paragraph 39.

40.  Admits that the privately-held Renaissance entered into a December 27, 2002 letter of intent to acquire CAMHL, a privately-held Belize company that owned three gold mining properties in Nicaragua and Panama that have since been successfully developed by others, and refers to the letter of intent for its content and meaning. Otherwise denies the allegations of Paragraph 40.

41.  Admits that some portion of the Sedona shell company's stock was held by

companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to the content and meaning of conversations between Brian Lines and others not involving Scott Lines. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 41.

42. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts and the ICH "A" account, and refers to LOM's records for their content and meaning. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to

12

LOM's records for their content and meaning. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 42.

43. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 43.

44. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and

customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 44.

45. Denies the allegations of Paragraph 45.

46. Denies the allegations of Paragraph 46.

47. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to the

content and meaning of conversations between Brian Lines and others not involving Scott Lines. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 47.

48. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Expressly denies that Scott Lines personally owned any Sedona stock, that Scott Lines directed trading in Largo's accounts, and that the Vancouver attorneys represented Scott Lines. Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning. In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint. Otherwise denies the allegations of Paragraph 48.

49. Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings,

which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts.  Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning.  In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint.  Otherwise denies the allegations of Paragraph 49.

50.  Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts and the ICH account.  Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning.  In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not

return to his office at LOM in Bermuda until on or about January 13, 2003, and that

between those dates and to the best of his recollection, he had no involvement in and no

communications with Brian Lines or others concerning the matters alleged in the

Complaint. Otherwise denies the allegations of Paragraph 50.

51. Admits that some portion of the Sedona shell company's stock was held by

companies beneficially owned by certain Lines family members, business colleagues and

customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings,

which in turn was owned by a family trust in which Scott Lines had a one-third beneficial

interest. Expressly denies that Scott Lines personally owned any Sedona stock, and while

admitting that Scott Lines had signatory power on certain Largo accounts, denies that he

directed trading in Largo's accounts. Lacks knowledge or information sufficient to form

a belief as to specific arrangements for the acquisition of Sedona shares and as to

conversations between Brian Lines and others not involving Scott Lines, and refers to

LOM's records for their content and meaning. In this regard, avers that Scott Lines left

for England on or about December 14, 2002, that he did not return to his office at LOM

in Bermuda until on or about January 13, 2003, and that between those dates and to the

best of his recollection, he had no involvement in and no communications with Brian

Lines or others concerning the matters alleged in the Complaint. Otherwise denies the

allegations of Paragraph 51.

52. Admits that some portion of the Sedona shell company's stock was held by

companies beneficially owned by certain Lines family members, business colleagues and

customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings,

which in turn was owned by a family trust in which Scott Lines had a one-third beneficial

interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts.  Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning.  In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint.  Admits that DTC is a central securities repository for U.S. brokerage firms that is used to settle securities transactions.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 52.

53.  Admits that some portion of the Sedona shell company's stock was held by companies beneficially owned by certain Lines family members, business colleagues and customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts.  Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning.  In this regard, avers that Scott Lines left

for England on or about December 14, 2002, that he did not return to his office at LOM

in Bermuda until on or about January 13, 2003, and that between those dates and to the

best of his recollection, he had no involvement in and no communications with Brian

Lines or others concerning the matters alleged in the Complaint.  Otherwise denies the

allegations of Paragraph 53.

54. Admits that some portion of the Sedona shell company's stock was held by

companies beneficially owned by certain Lines family members, business colleagues and

customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings,

which in turn was owned by a family trust in which Scott Lines had a one-third beneficial

interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while

admitting that Scott Lines had signatory power on certain Largo accounts, denies that he

directed trading in Largo's accounts.  Lacks knowledge or information sufficient to form

a belief as to specific arrangements for the acquisition of Sedona shares and as to

conversations between Brian Lines and others not involving Scott Lines, and refers to

LOM's records for their content and meaning.  In this regard, avers that Scott Lines left

for England on or about December 14, 2002, that he did not return to his office at LOM

in Bermuda until on or about January 13, 2003, and that between those dates and to the

best of his recollection, he had no involvement in and no communications with Brian

Lines or others concerning the matters alleged in the Complaint.  Otherwise denies the

allegations of Paragraph 54.

55. Admits that some portion of the Sedona shell company's stock was held by

companies beneficially owned by certain Lines family members, business colleagues and

customers, including Largo Flight Limited, which was 50% owned by Kashmir Holdings,

which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest.  Expressly denies that Scott Lines personally owned any Sedona stock, and while admitting that Scott Lines had signatory power on certain Largo accounts, denies that he directed trading in Largo's accounts.  Lacks knowledge or information sufficient to form a belief as to specific arrangements for the acquisition of Sedona shares and as to conversations between Brian Lines and others not involving Scott Lines, and refers to LOM's records for their content and meaning.  In this regard, avers that Scott Lines left for England on or about December 14, 2002, that he did not return to his office at LOM in Bermuda until on or about January 13, 2003, and that between those dates and to the best of his recollection, he had no involvement in and no communications with Brian Lines or others concerning the matters alleged in the Complaint.  Otherwise denies the allegations of Paragraph 55.

56.  Paragraph 56 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

57.  Paragraph 57 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

58.  Denies the allegations of Paragraph 58.

59.  Denies the allegations of Paragraph 59.

60.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 60.

61.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of

Paragraph 61.

62.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 62.

63.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 63.

64.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 64.

65.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 65.

66.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 66.

67.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 67.

68.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 68.

69.  Lacks knowledge or information sufficient to form a belief as to the activities

of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 69.

70.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile, Renaissance and others here alleged.  Otherwise denies the allegations of Paragraph 70.

71.  Lacks knowledge or information sufficient to form a belief as to the awareness of Brian Lines and the activities of Wile, Robert Chapman and others here alleged.  Otherwise denies the allegations of Paragraph 71.

72.  Admits that the privately-held Renaissance determined to raise between $3 and $6 million through a private placement that LOM would sell in Bermuda on a best efforts basis to qualified "non-U.S." investors, and that this meant that LOM would not solicit or sell to U.S. investors.  Further admits that Renaissance entered into a December 27, 2002 letter of intent to acquire CAMHL, a privately-held Belize company that owned three gold mining properties in Nicaragua and Panama that have since been successfully developed by others.  Further admits that Renaissance entered into a January 14, 2003 letter of intent to go public through a so-called "reverse" merger with the U.S. publicly-traded Sedona, then an inactive company that was current in filing its quarterly and annual reports with the SEC.  Otherwise denies the allegations of Paragraph 72.

73.  Admits on information and belief that the January 17, 2003 Renaissance press release accurately stated (i) that Renaissance had entered into a "letter of intent" to merge itself into Sedona, "a publicly traded company with no assets," subject to negotiation of documentation and satisfaction of "other contingencies" contained in the letter of intent; (ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private

placement, but "subject to satisfactory completion of due diligence"; (iii) that Renaissance had entered into a previous "letter of intent" to acquire Central American gold mining properties, and as a result "stands poised to become a significant intermediate gold producer" and had an "opportunity to develop into" a leading intermediate producer, but that this would involve "risks and uncertainties" including those related to "exploration, the establishment of reserves, the recovery of any reserves, future gold production and production costs" and other risks and uncertainties; and (iv) that assuming completion of all of the transactions described, the surviving entity would have 16,442,300 shares outstanding, with the former Central American mining property holders owning 49% of the venture (8,000,000 shares), the former Renaissance shareholders owning 26% (4,307,300 shares), the private placement investors owning 12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares).  Refers to the press release for its full content and meaning.  Otherwise denies the allegations of Paragraph 73.

74.  Lacks knowledge or information sufficient to form a belief as to the posting and dissemination of the January 17, 2003 Renaissance press release.  Otherwise denies the allegations of Paragraph 74.

75.  Admits on information and belief that the January 17, 2003 Renaissance press release accurately stated (i) that Renaissance had entered into a "letter of intent" to merge itself into Sedona, "a publicly traded company with no assets," subject to negotiation of documentation and satisfaction of "other contingencies" contained in the letter of intent; (ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private placement, but "subject to satisfactory completion of due diligence"; (iii) that

Renaissance had entered into a previous "letter of intent" to acquire Central American gold mining properties, and as a result "stands poised to become a significant intermediate gold producer" and had an "opportunity to develop into" a leading intermediate producer, but that this would involve "risks and uncertainties" including those related to "exploration, the establishment of reserves, the recovery of any reserves, future gold production and production costs" and other risks and uncertainties; and (iv) that assuming completion of all of the transactions described, the surviving entity would have 16,442,300 shares outstanding, with the former Central American mining property holders owning 49% of the venture (8,000,000 shares), the former Renaissance shareholders owning 26% (4,307,300 shares), the private placement investors owning 12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares). Refers to the press release for its full content and meaning. Otherwise denies the allegations of Paragraph 75.

76. Admits on information and belief that the January 17, 2003 Renaissance press release accurately stated (i) that Renaissance had entered into a "letter of intent" to merge itself into Sedona, "a publicly traded company with no assets," subject to negotiation of documentation and satisfaction of "other contingencies" contained in the letter of intent; (ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private placement, but "subject to satisfactory completion of due diligence"; (iii) that Renaissance had entered into a previous "letter of intent" to acquire Central American gold mining properties, and as a result "stands poised to become a significant intermediate gold producer" and had an "opportunity to develop into" a leading intermediate producer, but that this would involve "risks and uncertainties" including

those related to "exploration, the establishment of reserves, the recovery of any reserves, future gold production and production costs" and other risks and uncertainties; and (iv) that assuming completion of all of the transactions described, the surviving entity would have 16,442,300 shares outstanding, with the former Central American mining property holders owning 49% of the venture (8,000,000 shares), the former Renaissance shareholders owning 26% (4,307,300 shares), the private placement investors owning 12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares). Refers to the press release for its full content and meaning. Otherwise denies the allegations of Paragraph 76.

77. Lacks knowledge or information sufficient to form a belief as to the drafting of the January 17, 2003 Renaissance press release and the awareness of Wile and others. Otherwise denies the allegations of Paragraph 77.

78. Admits on information and belief that the January 17, 2003 Renaissance press release accurately stated (i) that Renaissance had entered into a "letter of intent" to merge itself into Sedona, "a publicly traded company with no assets," subject to negotiation of documentation and satisfaction of "other contingencies" contained in the letter of intent; (ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private placement, but "subject to satisfactory completion of due diligence"; (iii) that Renaissance had entered into a previous "letter of intent" to acquire Central American gold mining properties, and as a result "stands poised to become a significant intermediate gold producer" and had an "opportunity to develop into" a leading intermediate producer, but that this would involve "risks and uncertainties" including those related to "exploration, the establishment of reserves, the recovery of any reserves,

future gold production and production costs" and other risks and uncertainties; and (iv) that assuming completion of all of the transactions described, the surviving entity would have 16,442,300 shares outstanding, with the former Central American mining property holders owning 49% of the venture (8,000,000 shares), the former Renaissance shareholders owning 26% (4,307,300 shares), the private placement investors owning 12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares).  Refers to the press release for its full content and meaning.  Lacks knowledge or information sufficient to form a belief as to whether Brian Lines reviewed the release prior to its issuance.  Otherwise denies the allegations of Paragraph 78.

79. Admits on information and belief that the January 17, 2003 Renaissance press release accurately stated (i) that Renaissance had entered into a "letter of intent" to merge itself into Sedona, "a publicly traded company with no assets," subject to negotiation of documentation and satisfaction of "other contingencies" contained in the letter of intent; (ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private placement, but "subject to satisfactory completion of due diligence"; (iii) that Renaissance had entered into a previous "letter of intent" to acquire Central American gold mining properties, and as a result "stands poised to become a significant intermediate gold producer" and had an "opportunity to develop into" a leading intermediate producer, but that this would involve "risks and uncertainties" including those related to "exploration, the establishment of reserves, the recovery of any reserves, future gold production and production costs" and other risks and uncertainties; and (iv) that assuming completion of all of the transactions described, the surviving entity would have 16,442,300 shares outstanding, with the former Central American mining property

holders owning 49% of the venture (8,000,000 shares), the former Renaissance

shareholders owning 26% (4,307,300 shares), the private placement investors owning

12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares). Refers

to the press release for its full content and meaning. Otherwise denies the allegations of

Paragraph 79.

     80. Admits on information and belief that the January 21, 2003 Sedona press

release accurately stated (i) that Renaissance had entered into a letter of intent to merge

itself into Sedona, "a publicly traded company with no assets," subject to negotiation of

documentation and satisfaction of "other contingencies" contained in the letter of intent;

(ii) that LOM had agreed to assist Renaissance to raise up to $6 million through a private

placement, but "subject to satisfactory completion of due diligence"; (iii) that

Renaissance had entered into a previous "letter of intent" to acquire Central American

gold mining properties, and as a result "stands poised to become a significant

intermediate gold producer" and had an "opportunity to develop into" a leading

intermediate producer, but that this would involve "risks and uncertainties" including

those related to "exploration, the establishment of reserves, the recovery of any reserves,

future gold production and production costs" and other risks and uncertainties; and (iv)

that assuming completion of all of the transactions described, the surviving entity would

have 16,442,300 shares outstanding, with the former Central American mining property

holders owning 49% of the venture (8,000,000 shares), the former Renaissance

shareholders owning 26% (4,307,300 shares), the private placement investors owning

12% (2,000,000 shares), and others collectively owning 13% (2,135,000 shares). Avers

that as a public company, Sedona was required by SEC Regulation S-K (Item 101) and

Form 8-K (Items 1.01, 5.01 and 5.06) to disclose the material proposed transactions described above.  Refers to the press release for its full content and meaning.  Otherwise denies the allegations of Paragraph 80.

81.  Admits that the draft Renaissance Private Offering Memorandum stated that shares were offered to qualified sophisticated investors under "the exemption from registration requirements ... provided by Section 4(2) of the [Securities] Act [of 1933] and Regulation D."  Lacks knowledge or information sufficient to form a belief as to Renaissance's plans for its proposed private placement, which was cancelled without any sales having been consummated.  To the extent Paragraph 81 pleads the SEC's legal conclusions, no responsive pleading is required.  Otherwise denies the allegations of Paragraph 81.

82.  Expressly denies that Scott Lines was responsible for the information contained in the press releases described, and expressly denies that Scott Lines unlawfully offered and sold Renaissance securities.  Otherwise denies the allegations of Paragraph 82.

83.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 83.

84.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 84.

85.  Refers to Chapman's report for its content and meaning.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 85.

86.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 86.

87. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 87.

88. Refers to Chapman's report for its content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 88.

89. Refers to Chapman's report for its content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 89.

90. Denies that Scott Lines owned the Sedona shell company. Refers to Wile's email and its attachment for their content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 90.

91. Admits that LOM files indicate that Brian Lines forwarded an email from Wile to an LOM broker distribution, which may have included Scott Lines. Avers that Scott Lines cannot recall whether or not he received and read it at that time. Otherwise, lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 91.

92. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 92.

93. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 93.

94. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 94.

95. Admits that Renaissance's agreement with LOM Capital was for a private placement on a best efforts basis of up to two million restricted shares at $3 per share to "non-U.S." investors, subject to due diligence, and that LOM Capital would receive a fee

29

of 7% upon successful conclusion of the placement, and refers to the draft Renaissance Private Placement Memorandum for the terms of the placement. Otherwise denies the allegations of Paragraph 95.

96.  Admits that Renaissance prepared a Private Placement Memorandum, and refers to the memorandum for its content and meaning. Lacks knowledge or information sufficient to form a belief as to the involvement of Tony Wile and others in the preparation of the memorandum, and as to any alleged dissemination of the memorandum to potential U.S. investors. Avers that LOM undertook to offer the private placement only to "non-U.S." investors, as specified in its agreement with Renaissance, and that the offering was cancelled with no subscription agreements having been signed, no funds having been paid by investors, and no shares having been sold. Otherwise denies the allegations of Paragraph 96.

97.  Admits that, while the draft Renaissance Private Placement Memorandum disclosed that Tony Wile owned 22.3% of Renaissance directly or through a family trust, that Sedona had "no material assets," and that its stock was "not actively traded," the memorandum incorrectly stated that its last recorded trade was at $5. Refers to the draft Renaissance Private Placement Memorandum for its content and meaning. Avers that Scott Lines did not receive the memorandum until on or about January 23, 2003, that on information and belief LOM Capital did not deliver the memorandum to prospective non-U.S. investors in connection with obtaining their "indications of interest" in the proposed placement, and that the proposed placement was cancelled with no subscription agreements having been signed, no funds having been paid by investors, and no shares having been sold. Otherwise denies the allegations of Paragraph 97.

98.  Admits that, while Brian Lines may have received the draft Renaissance Private Placement Memorandum by January 22, 2003, Scott Lines did not receive the memorandum until on or about January 23, 2003, that on information and belief LOM Capital did not deliver the memorandum to prospective non-U.S. investors in connection with obtaining their "indications of interest" in the proposed placement, and that the proposed placement was cancelled with no subscription agreements having been signed, no funds having been paid by investors, and no shares having been sold.  Otherwise denies the allegations of Paragraph 98.

99.  Lacks knowledge or information sufficient to form a belief as to activities of Wile, Renaissance and IMG described in this paragraph.  Avers that LOM files reflect that Brian Lines explicitly directed an LOM employee to refuse to discuss the proposed Renaissance placement with a U.S. investor who contacted LOM about a possible investment in Renaissance.  Otherwise denies the allegations of Paragraph 99.

100.  Admits that beginning on or about January 20, 2003, Scott Lines communicated with certain sophisticated and regular LOM investors with significant accounts focused on junior gold stocks concerning the proposed Renaissance private placement.  Further admits that in these communications with these loyal and valued LOM investors, Scott Lines described Renaissance and its expected gold production profiles and cash flow, stressed that the investment would be "stiff" (could not be sold) for a year, and told those who gave an indication of interest that he would subscribe on their behalf only after LOM Capital had completed its due diligence on the offering. Further admits that over the next several days, he obtained indications of interest totaling about $3.5 million, but that the offering was cancelled before completion of LOM

Capital's due diligence, that no subscription agreements were signed, that no funds were paid by investors, and that no shares were sold, with the result that these LOM investors lost nothing. Expressly denies that Scott Lines knowingly or recklessly provided false or misleading information to these long-term and valued customers of LOM, or that he failed to disclose material information to these LOM customers. Otherwise denies the allegations of Paragraph 100.

101. Admits that beginning on or about January 20, 2003, Scott Lines communicated with certain sophisticated and regular LOM investors with significant accounts focused on junior gold stocks concerning the proposed Renaissance private placement. Further admits that in these communications with these loyal and valued LOM investors, Scott Lines described Renaissance and its expected gold production profiles and cash flow, stressed that the investment would be "stiff" (could not be sold) for a year, and told those who gave an indication of interest that he would subscribe on their behalf only after LOM Capital had completed its due diligence on the offering. Further admits that over the next several days, he obtained indications of interest totaling about $3.5 million, but that the offering was cancelled before completion of LOM Capital's due diligence, that no subscription agreements were signed, that no funds were paid by investors, and that no shares were sold, with the result that these LOM investors lost nothing. Expressly denies that Scott Lines knowingly or recklessly provided false or misleading information to these long-term and valued customers of LOM, or that he failed to disclose material information to these LOM customers. Otherwise denies the allegations of Paragraph 101.

102. Admits that beginning on or about January 20, 2003, Scott Lines

communicated with certain sophisticated and regular LOM investors with significant accounts focused on junior gold stocks concerning the proposed Renaissance private placement. Further admits that in these communications with these loyal and valued LOM investors, Scott Lines described Renaissance and its expected gold production profiles and cash flow, stressed that the investment would be "stiff" (could not be sold) for a year, and told those who gave an indication of interest that he would subscribe on their behalf only after LOM Capital had completed its due diligence on the offering. Further admits that over the next several days, he obtained indications of interest totaling about $3.5 million, but that the offering was cancelled before completion of LOM Capital's due diligence, that no subscription agreements were signed, that no funds were paid by investors, and that no shares were sold, with the result that these LOM investors lost nothing. Expressly denies that Scott Lines knowingly or recklessly provided false or misleading information to these long-term and valued customers of LOM, or that he failed to disclose material information to these LOM customers. Otherwise denies the allegations of Paragraph 102.

103. Admits that Scott Lines received a phone call directly from SEC attorneys on or about January 23, 2003, and that he referred the SEC attorneys to LOM's in-house attorney. Further admits that beginning on or about January 20, 2003, Scott Lines communicated with certain sophisticated and regular LOM investors with significant accounts focused on junior gold stocks concerning the proposed Renaissance private placement. Further admits that in these communications with these loyal and valued LOM investors, Scott Lines described Renaissance and its expected gold production profiles and cash flow, stressed that the investment would be "stiff" (could not be sold)

for a year, and told those who gave an indication of interest that he would subscribe on

their behalf only after LOM Capital had completed its due diligence on the offering.

Further admits that over the next several days, he obtained indications of interest totaling

about $3.5 million, but that the offering was cancelled before completion of LOM

Capital's due diligence, that no subscription agreements were signed, that no funds were

paid by investors, and that no shares were sold, with the result that these LOM investors

lost nothing.  Expressly denies that Scott Lines knowingly or recklessly provided false or

misleading information to these long-term and valued customers of LOM, or that he

failed to disclose material information to these LOM customers.  Otherwise denies the

allegations of Paragraph 103.

104.  Expressly denies that Scott Lines solicited any U.S. investors for the

Renaissance private placement.  Otherwise denies the allegations of Paragraph 104.

105.  Lacks knowledge or information sufficient to form a belief as to the

activities of Renaissance and its agents alleged in this paragraph.  Expressly denies that

any LOM customer executed a subscription agreement, paid any funds, bought any

Renaissance stock or lost any money in connection with the proposed Renaissance

placement.  Otherwise denies the allegations of Paragraph 105.

106.  Lacks knowledge or information sufficient to form a belief as to the

activities of Tony Wile, Wayne Wile and Brian Lines alleged in this paragraph.

Expressly denies that Scott Lines orchestrated, participated in or was aware of any

manipulative trade in Sedona stock.  Otherwise denies the allegations of Paragraph 106.

107.  Admits that Scott Lines, among others, had trading authority for certain

LOM Ltd. accounts with other broker dealers, which he did not exercise.  Lacks

knowledge or information sufficient to form a belief as to the activities of Brian Lines and the ICH account alleged in this paragraph. Expressly denies that Scott Lines placed an order to sell Sedona stock as alleged and that he "controlled" or even had signatory power over the ICH account. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 107.

108. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 108.

109. Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines and the ICH account alleged in this paragraph. Expressly denies that Scott Lines placed a cancellation order and another order to sell Sedona stock as alleged. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 109.

110. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 110.

111. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 111.

112. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 112.

113. Lacks knowledge or information sufficient to form a belief as to the activities of Wayne Wile and Brian Lines alleged in this paragraph. Expressly denies that Scott Lines placed an order to sell Sedona stock as alleged. Otherwise denies the allegations of Paragraph 113.

114. Lacks knowledge or information sufficient to form a belief as to the

allegations of Paragraph 114.

115.  Lacks knowledge or information sufficient to form a belief as to the activities of Ryan Leeds, Wayne Wile and Brian Lines alleged in this paragraph. Expressly denies that Scott Lines placed an order to sell Sedona stock as alleged. Otherwise denies the allegations of Paragraph 115.

116.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 116.

117.  Denies the allegations of Paragraph 117.

118.  Lacks knowledge or information sufficient to form a belief as to the activities of Wile and Chapman alleged in this paragraph.  Otherwise denies the allegations of Paragraph 118.

119.  Admits that at some point on or after January 21, 2003, Scott Lines learned of the sales of Sedona stock, but avers that Scott Lines was not aware that the sales allegedly violated the laws of the United States or any other nation.  Further admits that LOM records show that between January 21 and January 29, 2003, Brian Lines directed the ICH account's sale of 159,300 Sedona shares – approximately 20% of Sedona's 747,400 share volume over these seven trading days – from the "ICH account" at LOM, and that records indicate that the sales were largely through Leeds; that Scott Lines did not direct trading in the ICH account; that on information and belief during the sales, Brian Lines made no public statement about Sedona, and simply sold at prices that satisfied market demand without pumping the price, and that market demand would have supported additional sales.  Expressly denies that Scott Lines sold Sedona stock as alleged, that he "controlled" or even had signatory power over the ICH account, and that

he acted as an underwriter or engaged in a distribution in violation of U.S. laws. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 119.

120. Admits that at some point on or after January 21, 2003, Scott Lines learned that of the sales of Sedona stock, but avers that Scott Lines was not aware that the sales allegedly violated the laws of the United States or any other nation. Further admits that LOM records show that between January 21 and January 29, 2003, Brian Lines directed the ICH account's sale of 159,300 Sedona shares – approximately 20% of Sedona's 747,400 share volume over these seven trading days – from the "ICH account" at LOM, and that records indicate that the sales were largely through Leeds; that Scott Lines did not direct trading in the ICH account; that on information and belief during the sales, Brian Lines made no public statement about Sedona, and simply sold at prices that satisfied market demand without pumping the price, and that market demand would have supported additional sales. Expressly denies that Scott Lines sold Sedona stock as alleged, that he "controlled" or even had signatory power over the ICH account, and that he acted as an underwriter or engaged in a distribution in violation of U.S. laws. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 120.

121. Admits that at some point on or after January 21, 2003, Scott Lines learned of the sales of Sedona stock, but avers that Scott Lines was not aware that the sales allegedly violated the laws of the United States or any other nation. Further admits that LOM records show that between January 21 and January 29, 2003, Brian Lines directed the ICH account's sale of 159,300 Sedona shares – approximately 20% of Sedona's

747,400 share volume over these seven trading days – from the "ICH account" at LOM, and that records indicate that the sales were largely through Leeds; that Scott Lines did not direct trading in the ICH account; that on information and belief during the sales, Brian Lines made no public statement about Sedona, and simply sold at prices that satisfied market demand without pumping the price, and that market demand would have supported additional sales. Expressly denies that Scott Lines sold Sedona stock as alleged, that he "controlled" or even had signatory power over the ICH account, and that he acted as an underwriter or engaged in a distribution in violation of U.S. laws. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 121.

122. Admits that at some point on or after January 21, 2003, Scott Lines learned of the sales of Sedona stock, but avers that Scott Lines was not aware that the sales allegedly violated the laws of the United States or any other nation. Further admits that LOM records show that between January 21 and January 29, 2003, Brian Lines directed the ICH account's sale of 159,300 Sedona shares – approximately 20% of Sedona's 747,400 share volume over these seven trading days – from the "ICH account" at LOM, and that records indicate that the sales were largely through Leeds; that Scott Lines did not direct trading in the ICH account; that on information and belief during the sales, Brian Lines made no public statement about Sedona, and simply sold at prices that satisfied market demand without pumping the price, and that market demand would have supported additional sales. Expressly denies that Scott Lines sold Sedona stock as alleged, that he "controlled" or even had signatory power over the ICH account, and that he acted as an underwriter or engaged in a distribution in violation of U.S. laws. Refers

to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 122.

123. Admits that Scott Lines would on occasion receive calls in the absence of Brian Lines, and that he may have received such a call from Ryan Leeds after becoming aware that Brian Lines had begun selling Sedona stock and that Leeds was acting as broker for such sales. Expressly denies that Scott Lines gave Leeds an order to sell any particular quantity of Sedona stock, and expressly denies that Scott Lines gave Leeds an open order to sell Sedona stock without limitations. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 123.

124. Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines and other LOM Ltd. accounts alleged in this paragraph. Expressly denies that Scott Lines sold Sedona stock as alleged. Refers to the relevant account records for a statement of their transactions, but denies that LOM Ltd. sold Sedona stock for its own account. Otherwise denies the allegations of Paragraph 124.

125. Incorporates the response to the allegations of Paragraph 32 set forth in the Answer filed by the LOM Defendants. Expressly denies that Scott Lines sold Sedona stock as alleged. Refers to the account records of the LOM accounts for a statement of their transactions. Otherwise denies the allegations of Paragraph 125.

126. Denies the allegations of Paragraph 126.

127. Admits that Brian Lines, with the knowledge of Scott Lines, privately sold 100,000 Sedona shares to certain LOM customers and employees at $4 per share at the time Sedona shares could be publicly sold for $9 per share, but that most of the sales at $4 were rescinded after the SEC's trading suspension. Lacks knowledge or information

sufficient to form a belief as to other activities of Brian Lines alleged in this paragraph. Expressly denies that Scott Lines sold Sedona stock as alleged and that he controlled or even had signatory power over the ICH account. Refers to the account records of the ICH account for a statement of its transactions. Otherwise denies the allegations of Paragraph 127.

128. Admits that LOM records show that certain customers sold the stock, and refers to the account records of the LOM accounts for a statement of their transactions. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 128.

129. Admits that the SEC suddenly and unexpectedly suspended trading in Sedona securities on January 29, 2003; that the suspension prevented the merger of Sedona and Renaissance and caused Sedona investors to lose substantially all of the value of their investment; and that within months the Renaissance transaction in substantially the same structure was offered to others and resulted in a significant commercial success, as will be proved at trial. Otherwise denies the allegations of Paragraph 129.

130. Admits that the SEC suddenly and unexpectedly suspended trading in Sedona securities on January 29, 2003; that the suspension prevented the merger of Sedona and Renaissance and caused Sedona investors, including American investors, to lose substantially all of the value of their investment; that Scott Lines acknowledged this fact in contemporaneous conversations; and that within months the Renaissance transaction in substantially the same structure was offered to others and resulted in a significant commercial success, as will be proved at trial. Otherwise denies the allegations of Paragraph 130.

131.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 131.

132.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 132.

133.  Lacks knowledge or information sufficient to form a belief as to the activities or intentions of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 133.

134.  Lacks knowledge or information sufficient to form a belief as to the activities or intentions of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 134.

135.  Lacks knowledge or information sufficient to form a belief as to the activities or intentions of Brian Lines and LOM employees alleged in this paragraph.  Otherwise denies the allegations of Paragraph 135.

136.  Admits that the SEC suddenly and unexpectedly suspended trading in Sedona securities on January 29, 2003; that the suspension prevented the merger of Sedona and Renaissance and caused Sedona investors to lose substantially all of the value of their investment; and that within months the Renaissance transaction in substantially the same structure was offered to others and resulted in a significant commercial success, as will be proved at trial.  Further admits that, with the knowledge of Scott Lines, LOM responded by rescinding the private sale of shares at $4 per share to certain LOM customers and employees, in order to save the customers and employees from the loss the SEC's trading suspension would have caused them.  Otherwise denies the allegations of

Paragraph 136.

137.  Admits that beginning on or about January 20, 2003, Scott Lines communicated with certain sophisticated and regular LOM investors with significant accounts focused on junior gold stocks concerning the proposed Renaissance private placement.  Further admits that in these communications with these loyal and valued LOM investors, Scott Lines described Renaissance and its expected gold production profiles and cash flow, stressed that the investment would be "stiff" (could not be sold) for a year, and told those who gave an indication of interest that he would subscribe on their behalf only after LOM Capital had completed its due diligence on the offering.  Further admits that over the next several days, he obtained indications of interest totaling about $3.5 million, but that following Scott Lines February 4, 2003 letter to Renaissance advising that due diligence was not completed to LOM's satisfaction, the offering was cancelled and that these LOM investors lost nothing.  Otherwise denies the allegations of Paragraph 137.

138.  Denies the allegations of Paragraph 138.

139.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 139.

140.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 140.

141.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of

Paragraph 141.

142.  Denies the allegations of Paragraph 142.

143.  Paragraph 143 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

144.  Denies the allegations of Paragraph 144.

145.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 145.

146.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 146.

147.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 147.

148.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 148.

149.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 149.

150.  Admits that LOM Cayman records show that it held accounts in the names of Golden Accumulator Ltd. and Nomad Trading, Ltd.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 150, and refers to LOM's records for their content and meaning.

151.  Admits on information and belief that the Golden account was beneficially owned by Peever, that the Nomad account was beneficially owned by Curtis, and that the Nomad account was transferred from LOM Cayman to LOM Bahamas in or about

November 2002.  Further admits that Brian Lines and Scott Lines were for administrative convenience listed as co-brokers on many accounts, including the Golden and Nomad accounts at LOM, but denies that the fact that they were listed as co-brokers necessarily means that they jointly acted as brokers for the Golden and Nomad accounts in practice. Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph.  Otherwise denies the allegations of Paragraph 151.

152.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 152.

153.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 153.

154.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 154.

155.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines, Peever and Curtis alleged in this paragraph.  Otherwise denies the allegations of Paragraph 155.

156.  Admits that in early 2002, SHEP Ltd. was a private company that owned certain automobile-related intellectual property.  Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 156.

157.  Lacks knowledge or information sufficient to form a belief as to the activities of Peever and Curtis alleged in this paragraph.  Otherwise denies the allegations of Paragraph 157.

158.  Lacks knowledge or information sufficient to form a belief as to the

allegations of Paragraph 158.

159.  Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and the SHEP CEO alleged in this paragraph.  Otherwise denies the allegations of Paragraph 159.

160.  Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and the SHEP CEO alleged in this paragraph.  Otherwise denies the allegations of Paragraph 160.

161.  Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines, Peever and Curtis alleged in this paragraph.  Otherwise denies the allegations of Paragraph 161.

162.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 162.

163.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 163.

164.  Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph, and refers to LOM's records for their content and meaning.  Expressly denies that Scott Lines directed transactions in the Largo Flight Ltd. and Monashee Ltd. accounts respecting SHEP stock. Avers that Scott Lines had no interest in Monashee Ltd. and no signatory power over its accounts, and that Largo Flight Limited was 50% owned by Kashmir Holdings, which in turn was owned by a family trust in which Scott Lines had a one-third beneficial interest. Otherwise denies the allegations of Paragraph 164.

165.  Lacks knowledge or information sufficient to form a belief as to the

activities of Peever, Curtis and Brian Lines alleged in this paragraph. Expressly denies that Scott Lines controlled or directed transactions in SHEP shares as alleged. Otherwise denies the allegations of Paragraph 165.

166. Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph. Expressly denies that Scott Lines acted as alleged with knowledge or recklessness, that he acquired control over or directed transactions in IHI/SHEP, and that he was required to make disclosures or file beneficial ownership reports. Otherwise denies the allegations of Paragraph 166.

167. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 167.

168. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 168.

169. Refers to the reports cited for their content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 169.

170. Refers to the reports cited for their content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 170.

171. Refers to the reports cited for their content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 171.

172. Refers to the reports cited for their content and meaning. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph

172.

173.  Lacks knowledge or information sufficient to form a belief as to the
activities of Peever, Curtis and Brian Lines alleged in this paragraph.  Expressly denies
that Scott Lines acted as alleged with knowledge or recklessness, and that he was
required to make disclosures or file beneficial ownership reports.  Otherwise denies the
allegations of Paragraph 173.

174.  Admits that Scott Lines would on occasion receive calls in the absence of
Brian Lines, that he may have received such a call from Peever relating to sales of SHEP
stock, and that the conversations alleged demonstrate that Scott Lines acted as a passive
listener to Peever's complaints about short sellers on three days in February 2003 and
commented that the writings of stock promoters can lead to short selling.  Otherwise
lacks knowledge or information sufficient to form a belief as to the allegations of
Paragraph 174.

175.  Admits that Scott Lines would on occasion receive calls in the absence of
Brian Lines, that he may have received such a call from Peever relating to sales of SHEP
stock, and that the conversations alleged demonstrate that Scott Lines acted as a passive
listener to Peever's complaints about short sellers on three days in February 2003 and
commented that the writings of stock promoters can lead to short selling.  Otherwise
lacks knowledge or information sufficient to form a belief as to the allegations of
Paragraph 175.

176.  Admits that Scott Lines would on occasion receive calls in the absence of
Brian Lines, that he may have received such a call from Peever relating to sales of SHEP
stock, and that the conversations alleged demonstrate that Scott Lines acted as a passive

listener to Peever's complaints about short sellers on three days in February 2003 and commented that the writings of stock promoters can lead to short selling. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 176.

177. Admits that Scott Lines would on occasion receive calls in the absence of Brian Lines, that he may have received such a call from Peever relating to sales of SHEP stock, and that the conversations alleged demonstrate that Scott Lines acted as a passive listener to Peever's complaints about short sellers on three days in February 2003 and commented that the writings of stock promoters can lead to short selling. Otherwise lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 177.

178. Admits that LOM records show that from late February through June 2003, sales of SHEP securities were made from the Golden, Nomad, Monashee and Largo Flight accounts at LOM. Lacks knowledge or information sufficient to form a belief as to other activities of Brian Lines, Peever and Curtis respecting these securities, and refers to LOM's records for their content and meaning. Expressly denies that Scott Lines sold SHEP stock for his own account, and that Scott Lines or LOM received illegal proceeds. Otherwise denies the allegations of Paragraph 178.

179. Admits that LOM records show that from late February through June 2003, sales of SHEP securities were made from the Golden, Nomad, Monashee and Largo Flight accounts at LOM. Lacks knowledge or information sufficient to form a belief as to other activities of Brian Lines, Peever and Curtis respecting these securities, and refers to LOM's records for their content and meaning. Expressly denies that Scott Lines sold

SHEP stock for his own account, and that Scott Lines or LOM received illegal proceeds. Otherwise denies the allegations of Paragraph 179.

180.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 180.

181.  Admits that LOM records show that from late February through June 2003, sales of SHEP securities were made from the Golden, Nomad, Monashee and Largo Flight accounts at LOM.  Lacks knowledge or information sufficient to form a belief as to other activities of Brian Lines, Peever and Curtis respecting these securities, and refers to LOM's records for their content and meaning.  Expressly denies that Scott Lines sold SHEP stock for his own account, and that Scott Lines or LOM received illegal proceeds. Admits that LOM Ltd. maintained an account with Paragon Capital Markets, Inc., a registered U.S. broker-dealer in New York, but on information and belief denies that Scott Lines ever gave an order to Paragon.  Otherwise denies the allegations of Paragraph 181.

182.  Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 182.

183.  Admits that LOM records show that from late February through June 2003, sales of SHEP securities were made from the Golden, Nomad, Monashee and Largo Flight accounts at LOM.  Lacks knowledge or information sufficient to form a belief as to other activities of Brian Lines, Peever and Curtis respecting these securities, and refers to LOM's records for their content and meaning.  Expressly denies that Scott Lines sold SHEP stock for his own account, that Scott Lines or LOM received illegal proceeds, and that LOM failed to conduct a reasonable inquiry as alleged.  Otherwise denies the

allegations of Paragraph 183.

184. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 184.

185. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 185.

186. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 186.

187. Lacks knowledge or information sufficient to form a belief as to the allegations of Paragraph 187.

188. Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph, and refers to LOM's records for their content and meaning. Expressly denies that Scott Lines controlled or directed transactions in SHEP stock, acted as a "group" with Peever and Curtis, sold SHEP stock for his own account, and was required to file reports as alleged. Otherwise denies the allegations of Paragraph 188.

189. Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph, and refers to LOM's records for their content and meaning. Expressly denies that Scott Lines controlled or directed transactions in SHEP stock, denies that he transacted in SHEP stock for his own account, and denies that he was required to file reports as alleged. Otherwise denies the allegations of Paragraph 189.

190. Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph, and refers to

LOM's records for their content and meaning. Expressly denies that Scott Lines controlled or directed transactions in SHEP stock, denies that he transacted in SHEP stock for his own account, and denies that he was required to or did file reports as alleged. Otherwise denies the allegations of Paragraph 190.

191. Denies the allegations of Paragraph 191.

192. Denies the allegations of Paragraph 192.

193. Lacks knowledge or information sufficient to form a belief as to the activities of Peever, Curtis and Brian Lines alleged in this paragraph. Otherwise denies the allegations of Paragraph 193.

194. Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph. Expressly denies that Scott Lines directed LOM Ltd. to facilitate payments as alleged. Otherwise denies the allegations of Paragraph 194.

195. Lacks knowledge or information sufficient to form a belief as to the activities of Brian Lines alleged in this paragraph. Expressly denies that Scott Lines controlled or directed transactions in SHEP stock, and denies that he transacted in SHEP stock for his own account. Otherwise denies the allegations of Paragraph 195.

196. Denies the allegations of Paragraph 196.

197. Paragraph 197 pleads only the SEC's legal conclusions, as to which no responsive pleading is required. Expressly denies that Scott Lines engaged in any conduct that violated the laws of the U.S. or other nations in connection with transactions in SHEP stock.

198. Repeats and realleges the above responses to Paragraphs 1 though 197.

199.  Denies the allegations of Paragraph 199.

200.  Denies the allegations of Paragraph 200.

201.  Denies the allegations of Paragraph 201.

202.  Repeats and realleges the above responses to Paragraphs 1 though 197.

203.  Denies the allegations of Paragraph 203.

204.  Denies the allegations of Paragraph 204.

205.  Repeats and realleges the above responses to Paragraphs 1 though 197.

206.  Denies the allegations of Paragraph 206.

207.  Denies the allegations of Paragraph 207.

208.  Repeats and realleges the above responses to Paragraphs 1 though 197.

209.  Denies the allegations of Paragraph 209.

210.  Paragraph 210 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

211.  Denies the allegations of Paragraph 211.

212.  Denies the allegations of Paragraph 212.

213.  Repeats and realleges the above responses to Paragraphs 1 though 197.

214.  Denies the allegations of Paragraph 214.

215.  Denies the allegations of Paragraph 215.

216.  Denies the allegations of Paragraph 216.

217.  Repeats and realleges the above responses to Paragraphs 1 though 197.

218.  Denies the allegations of Paragraph 218.

219.  Denies the allegations of Paragraph 219.

220.  Denies the allegations of Paragraph 220.

221.  Repeats and realleges the above responses to Paragraphs 1 though 197.

222.  Paragraph 222 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

223.  Denies the allegations of Paragraph 223.

224.  Repeats and realleges the above responses to Paragraphs 1 though 197.

225.  Paragraph 225 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

226.  Denies the allegations of Paragraph 226.

227.  Repeats and realleges the above responses to Paragraphs 1 though 197.

228.  Denies the allegations of Paragraph 228.

229.  Denies the allegations of Paragraph 229.

230.  Repeats and realleges the above responses to Paragraphs 1 though 197.

231.  Denies the allegations of Paragraph 231.

232.  Paragraph 232 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

233.  Denies the allegations of Paragraph 233.

234.  Denies the allegations of Paragraph 234.

235.  Repeats and realleges the above responses to Paragraphs 1 though 197.

236.  Denies the allegations of Paragraph 236.

237.  Denies the allegations of Paragraph 237.

238.  Denies the allegations of Paragraph 238.

239.  Repeats and realleges the above responses to Paragraphs 1 though 197.

240.  Denies the allegations of Paragraph 240.

241.  Denies the allegations of Paragraph 241.

242.  Repeats and realleges the above responses to Paragraphs 1 though 197.

243.  Denies the allegations of Paragraph 243.

244.  Paragraph 244 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

245.  Denies the allegations of Paragraph 245.

246.  Denies the allegations of Paragraph 246.

247.  Repeats and realleges the above responses to Paragraphs 1 though 197.

248.  Denies the allegations of Paragraph 248.

249.  Denies the allegations of Paragraph 249.

250.  Denies the allegations of Paragraph 250.

251.  Repeats and realleges the above responses to Paragraphs 1 though 197.

252.  Paragraph 252 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

253.  Denies the allegations of Paragraph 253.

254.  Repeats and realleges the above responses to Paragraphs 1 though 197.

255.  Denies the allegations of Paragraph 255.

256.  Paragraph 256 pleads only the SEC's legal conclusions, as to which no responsive pleading is required.

257.  Denies the allegations of Paragraph 257.

258.  Denies the allegations of Paragraph 258.

259.  Denies the allegations contained in the topic headings of the Complaint to the extent they state or suggest that Scott Lines violated the American securities laws or

otherwise acted unlawfully.

## FIRST AFFIRMATIVE DEFENSE

260.  The Complaint fails to state a claim upon which relief can be granted. Among other things, the SEC has not pled a factual foundation that would satisfy the legal elements of deceptive conduct, scienter, materiality and causation with respect to its claims against Scott Lines.

## SECOND AFFIRMATIVE DEFENSE

261.  This Court lacks jurisdiction over the subject matter of the claims against Scott Lines and LOM, as there is no basis for extraterritorial application of the American securities laws to a Bermuda-based financial services company, its subsidiaries and its president on the facts of this matter.

## THIRD AFFIRMATIVE DEFENSE

262.  This Court lacks personal jurisdiction over Scott Lines, who is a citizen of the United Kingdom and Bermuda.  Scott Lines owns no property in the United States, conducts no business in the United States, has never lived in the United States, and has not visited the United States in the last four years.  On his last visit, in April 2004 to consult a cardiologist for his heart condition, government agents pulled him off his plane and photographed him as he was purportedly served with SEC investigative subpoenas; he now seeks medical treatment elsewhere.

263.  Scott Lines is the President of LOM Holdings and its subsidiaries named in the Complaint, and he was previously the Managing Director of these entities.  LOM is the largest non-bank provider of retail investment services in Bermuda, and it is a part owner and trading and listing member of the Bermuda Stock Exchange.  It provides a full

range of investment and financial services to high-net-worth and institutional clients not located in the United States.  LOM has no physical presence in the United States, and it engages in no marketing or sales efforts in the United States.  Since 2001, LOM has not even accepted accounts from the United States, and it limits its activity to introducing its clients' securities trades to registered United States broker-dealers when such trades are to be executed on United States exchanges.  If such activity subjected LOM and its officers to jurisdiction in the Southern District of New York – which it plainly does not – then every broker-dealer in the world would be subject to such jurisdiction.

264.  Scott Lines did not sell the securities described in the Complaint to United States citizens, nor did he make statements to United States purchasers concerning these securities.  Scott Lines' activities consisted of obtaining indications of interest from wealthy non-U.S. clients of LOM for the Renaissance private placement.  Following the SEC's suspension of trading in Sedona stock, the Renaissance private placement was never completed, and these LOM customers lost no money.  Scott Lines thus did not use United States instrumentalities and means to allegedly violate the United States securities laws.

### FOURTH AFFIRMATIVE DEFENSE

265.  The Complaint is barred in whole or in part by the five-year statute of limitations contained in 28 U.S.C. §2462.

### FIFTH AFFIRMATIVE DEFENSE

266.  The Complaint is barred in whole or in part by the doctrine of laches, as well as fundamental notions of fairness and due process.  The SEC commenced its investigation in January 2003, and two and a half years later the SEC advised in June

2005 that it was prepared to file civil fraud charges against Brian Lines and LOM, but the SEC did not give such a notice to Scott Lines. A year later, in July 2006, the SEC changed its mind and advised Scott Lines that it would also sue him. The SEC then waited an additional year and a half, and filed this Complaint on December 19, 2007, almost five years after it began its investigation.

267. After being contacted by the SEC, the Bermuda Monetary Authority (the BMA), which is the primary regulator of LOM and Scott Lines, opened its own investigation of this matter, using a forensic investigation team from Deloitte in London. After completing its investigation and reaching its conclusions, the BMA resolved the matter with LOM and Scott Lines. Additionally, LOM accepted the resignation of its former president, Brian Lines. After initially contacting the BMA and after the BMA thoroughly investigated the matter and reached a resolution in its role as the primary regulator, the SEC is now apparently not satisfied with the BMA's resolution. This matter has already cost LOM millions in legal fees, staff costs and lost business, and it should not be dragged on for still more years.

268. With the passage of years, and with the substantial change in circumstances, it is unjust, unfair and inequitable for the SEC to belatedly commence fraud litigation against both Scott Lines and LOM, which is Bermuda's largest non-bank broker-dealer and its ninth largest public company.

### SIXTH AFFIRMATIVE DEFENSE

269. The Complaint is barred in whole or in part to the extent the Complaint is based on documents unlawfully obtained pursuant to an invalid investigative subpoena and an order issued by a court that lacked subject matter jurisdiction to enforce the

subpoena.

## SEVENTH AFFIRMATIVE DEFENSE

270.  The Complaint is barred by the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

271.  The Complaint is barred in whole or in part by the doctrine of international comity to the extent the requirements of United States law conflict with the domestic law of Scott Lines' and the LOM Defendants' respective home jurisdictions.

## NINTH AFFIRMATIVE DEFENSE

272.  Scott Lines and the LOM Defendants were exempt from any requirement of registration under Exchange Act Rule 15a-6.

## TENTH AFFIRMATIVE DEFENSE

273.  The LOM Defendants and Scott Lines were exempt from Section 5 of the Securities Act under Section 4(1) and Section 4(2) of the Securities Act and Regulation D promulgated thereunder.

## ELEVENTH AFFIRMATIVE DEFENSE

274.  Scott Lines and LOM Holdings are not liable as control persons under Section 20(a) of the Exchange Act because they acted in good faith and did not directly or indirectly induce the act or acts constituting any violation or cause of action.

**WHEREFORE** Defendant Scott Lines prays that the Complaint be dismissed as to him and LOM with prejudice, and that he be awarded his costs, disbursements and such other and further relief as may be just and proper.

**JURY DEMAND**

Defendant Scott Lines demands trial by jury on all issues so triable.

Dated:  May 16, 2008

/s/ Stephen J. Crimmins
Stephen J. Crimmins (SC-2714)
**MAYER BROWN LLP**
1909 K Street NW
Washington DC 20006-1101
202.263.3883 (Crimmins)
scrimmins@mayerbrown.com

**CERTIFICATE OF SERVICE**

I certify that on May 16, 2008, I caused a copy of the forgoing to be served by U.S. Mail, postage prepaid, on: **(i)** Plaintiff's counsel, David Williams, Esq., Securities and Exchange Commission, 100 F Street NE, Washington DC 20549; **(ii)** Defendant Brian Lines' counsel, Philip M. Smith, Esq., Patton Boggs LLP, 1185 Avenue of the Americas, 30th floor, New York, NY 10036; and **(iii)** Defendant LOM's counsel, Reid M. Figel, Esq., Kellogg Huber Hansen Todd Evans & Figel PLLC, 1615 M Street NW, Washington DC 20036.  I also caused a courtesy copy to be delivered to counsel by email directed to williamsdav@sec.gov, pmsmith@pattonboggs.com, and rfigel@khhte.com.

/s/ Richard D. Reed
Richard D. Reed