Philip M. Smith (PS 8132)
PATTON BOGGS LLP
1185 Avenue of the Americas, 30th Floor
New York, New York 10036
Telephone: (646) 557-5100
Email: pmsmith@pattonboggs.com
*Attorneys for Defendant Brian N. Lines*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x

**SECURITIES AND EXCHANGE**              :
**COMMISSION**,                          :
                                         :
                    Plaintiff,           :
                                         :          Index No. 07 CV 11387 (DLC)(DF)
         -against-                       :
                                         :
**BRIAN N. LINES, et al.**,              :
                                         :
                    Defendants.          :
                                         :
-------------------------------------------------- x

**MOVING DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR ISSUANCE OF LETTERS OF REQUEST TO FOREIGN COURTS**

I.      **INTRODUCTION**

         Defendants LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd.,

LOM Securities (Bermuda) LTD., LOM Securities (Cayman) Ltd., LOM Securities (Bahamas)

Ltd., (collectively, "LOM" or the "LOM Defendants"), defendant Brian N. Lines, and defendant

Scott G. S. Lines, (collectively, the "Moving Defendants"), hereby apply to this Court, pursuant

to Federal Rule of Civil Procedure 28(b), for the issuance of Letters of Request to the (1) Ontario

Superior Court of Justice, Toronto, Ontario, Canada; (2) the Supreme Court of British Columbia,

British Columbia, Canada; (3) the Alberta Court of Queen's Bench, Alberta, Canada; and (4) the

Senior Master of the Queen's Bench Division of the Supreme Court of England and Wales,

2943

Royal Courts of Justice, London, England (collectively, the "Foreign Courts"), requesting the Foreign Courts to compel the attendance of the individuals and companies identified below before persons in Toronto, Vancouver, Calgary and London authorized to administer oaths and a qualified stenographer and videographer, to be examined by the parties in this action and to produce, at or prior to the examination the documents identified herein and in the respective Letters of Request:

1.   Malcolm P. Burke

2.   Tracy Moore

3.   Michael Taylor

4.   SHEP Technologies Inc.

5.   Paul Carroll

6.   SHEP Technologies (UK) Limited

7.   Marshalsea Hydraulics Limited

8.   W. Ray Evans

9.   Peter R. Humphries

10.   John D. Hopkins

11.   Peter Chalk

12.   Pi Shurlok

13.   Ian Redhead

14.   West Surrey Racing Ltd.

15.   Clive A. Bowen

16.   Dick Bennetts

17.   David Skarica*

18.   Lawrence Roulston

19.   John E. Cooper

20.    Phillip James Curtis*

21.    Jeffrey B. Lightfoot

22.    Michael L. Seifert

23.    Ian G. Park

24.    Robert E. Van Tassell

25.    Colin R. Bowdidge

26.    Barry James Price*

27.    Thomas W. Lough

28.    James Randall Martin

29.    Denis Francoeur*

30.    Wayne G. Beach*

31.    Peter Marrone

32.    Jennings Capital Inc.

33.    Canaccord Capital Corporation

34.    Fasken Martineau DuMoulin LLP

35.    PricewaterhouseCoopers LLP

36.    Yamana Gold, Inc.

37.    RNC Gold, Inc.

38.    David Surmon

As explained more fully below, each of the individuals and companies listed above have

information regarding the transactions at issue in plaintiff Securities and Exchange

---

* These individuals have not been located and, therefore, the Moving Defendants will not be able to submit letters of request to the Court until they are located. When these addresses are obtained, the Moving Defendants will promptly submit letters of request for each of these individuals.

Commission's Complaint in this action.  The SEC does not oppose this request for letters of request.

## II.     THE LETTERS OF REQUEST SOUGHT ARE AUTHORIZED BY FEDERAL RULE OF CIVIL PROCEDURE 28(b)

Federal Rule of Civil Procedure 28(b) authorizes the taking of depositions in foreign countries "under a letter of request, whether or not captioned a 'letter rogatory.'"  FED. R. CIV. P. 28(b)(1)(B).  Letters of request can be issued "after an application and notice of it."  FED R. CIV. P. 28(b)(2)(A)-(B).

If the above-named witnesses were within the subpoena power of the Southern District of New York, testimony and documents for trial from the above-named deponents could be initiated under the Federal Rules of Civil Procedure without prior court approval or intervention. Because, on information and belief, these deponents are beyond such subpoena power, they can be compelled to testify and produce documents only by Letters of Request to counterpart courts in Ontario, British Columbia, Alberta and the UK.

Letters of Request for the above-named individuals, companies and firms (with the exception of the Letters of Request for the individuals who have not been located to date) will be submitted to the Court for execution should the Moving Defendants' motion be granted.  Notice of this application has been given to plaintiff Securities and Exchange Commission ("SEC").

## II.     THE LETTERS OF REQUEST ARE WARRANTED AND NECESSARY

On December 19, 2007, after an investigation lasting almost five years, the SEC filed the Complaint with this Court alleging that the Moving Defendants participated in two separate, allegedly fraudulent schemes to manipulate the stock prices of Sedona Software Solutions, Inc. ("Sedona") and SHEP Technologies, Inc. ("SHEP"), on the Over-the-Counter Bulletin Board. Both transactions involved reverse takeovers of private ventures by public shell companies.

Renaissance Mining Corporation, Inc. ("Renaissance"), a private mining company that was about to acquire valuable mining rights to three Central American mines, was to merge with the publicly-traded Sedona. SHEP, a private company developing a new automotive technology merged with Inside Holdings Inc. ("IHI"), a publicly-held shell company.

In general, the SEC alleges that Moving Defendants were substantially involved in the Sedona and SHEP fraudulent schemes by failing to disclose the acquisition of publicly-traded shell companies, using nominees to conceal the beneficial ownership and control of Sedona and SHEP, using paid touters to promote Sedona and SHEP stock, misrepresenting the assets of the merged companies and significant trading in the U.S. market in Sedona and SHEP entities by companies allegedly controlled by Brian and Scott Lines. Brian Lines was the President and Scott Lines was a Managing Director of the LOM Defendants.

With respect to the Sedona transaction, defendant LOM Capital Ltd. was engaged by Renaissance to raise up to $6 million in a private to be used as part of the consideration for the subject mining properties and for working capital. The SEC alleges that the LOM Defendants offered unregistered shares in Renaissance to its customers by fraudulent means. At the same time, the SEC alleges that companies controlled by Brian Lines acquired control of Sedona and, when news of the impending Renaissance-Sedona merger entered the market, the companies controlled by Brian Lines sold Sedona shares in a manipulative and fraudulent manner, in part by the allegedly false promotional statements that misrepresented the value of Renaissance assets.

With respect to the SHEP transaction, the SEC alleges that the Moving Defendants aided the promoters of SHEP in acquiring control of SHEP without proper disclosure. The SEC also alleges that companies controlled by Brian and Scott Lines acquired and then sold SHEP shares after the market for SHEP was fraudulently inflated by SHEP's promoters.

The SEC asserts sixteen claims for relief including claims of violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, violations of Section 17(a) of the Securities Act of 1933, and other violations of reporting and disclosure obligations the Exchange Act and the Securities Act.

As more fully set forth below, the Complaint demonstrates that each of the Letters of Request sought herein is eminently reasonable, necessary and appropriate to allow the Moving Defendants to obtain evidence for use at trial, and should be executed by the Court as submitted.

## A.    The Letters of Request Are Necessary to Obtain Evidence Concerning the Sedona Allegations for Use at Trial.

The SEC alleges that the Sedona transaction was a scheme to defraud investors. Specifically, the SEC alleges that the planned merger of Renaissance into Sedona was part of a "pump-and-dump" scheme by alleging that Renaissance had "no revenues, no non-cash assets, and no business activities."  *See* Compl. ¶ 9.  In order to challenge the SEC's allegations, the Moving Defendants need to be able to show that the Renaissance-Sedona merger would have created a company with valuable mining assets.  The testimony of certain of the individuals and companies listed above is critical to the Moving Defendants' ability to prove that the three Central American gold mines that Renaissance was to acquire were highly profitable mines and that therefore the Renaissance-Sedona merger was not a "fraudulent scheme."  Compl. ¶ 3.  For example, some of the individuals and companies listed above have in-depth knowledge of the mining assets in question and their testimony and documents will be vital to the Moving Defendants' ability to establish the value of the mining rights at trial.  The Moving Defendants are also asking for Letters of Request to obtain the testimony and documents of individuals and companies with knowledge of the performance of the mining assets after they were purchased by

RNC Gold Inc. ("RNC Gold"), which merged with the publicly-traded Tango Mineral Resources Inc. ("Tango") in a reverse merger similar to the planned Renaissance-Sedona transaction. Later, RNC Gold was sold to Yamana Gold Inc. and the participants in that transaction can provide evidence of the value of RNC Gold's assets. Essentially, the testimony of the above-referenced individuals and corporations is necessary for the Moving Defendants prove that this was a legitimate business transaction that would have benefited Sedona and Renaissance investors had it not been thwarted by the SEC's trading suspension on January 29, 2003.

The Complaint also alleges that the Moving Defendants engaged in a scheme to disseminate false and misleading information about the Renaissance-Sedona merger in order to artificially inflate the value of Sedona's stock. The SEC alleges that this "touting" was integral to the fraudulent scheme since it enabled the Moving Defendants to profit by selling into the rising demand. *See* Compl. ¶¶ 71, 121. The individuals referenced above include newsletter writers who have knowledge of the terms of the business relationships, if any, they had with Sedona, Renaissance, and LOM. Their testimony is necessary to counter the unfounded allegations that the Moving Defendants paid newsletter writers to publish misleading information and artificially inflate the value of Sedona stock.

**B.** **The Letters of Request Are Necessary to Obtain Evidence Regarding the SHEP Allegations for Use at Trial.**

The testimony and documents sought through the Letters of Request are also crucial to allow the Moving Defendants to obtain evidence for use at trial relevant to the allegations against them regarding the SHEP transaction. The SEC alleges that the SHEP transaction was a scheme to defraud investors, essentially a "pump-and-dump." Compl. ¶ 144. The SEC also alleges that the Moving Defendants participated in the acquisition of control of IHI, the pubic shell, through the use of undisclosed nominees. Finally, the SEC alleges that the Moving Defendants insisted

that SHEP use certain newsletter writers to promote SHEP stock after the merger with IHI and then sold SHEP shares to yield a profit. Compl. ¶¶ 159, 178.

The testimony and documents from the witnesses listed above will yield evidence that is necessary to prove at trial that SHEP had bona fide and promising automotive technology that the market perceived as valuable, that the Moving Defendants had no involvement in the specific public statements concerning SHEP that the SEC alleges are inaccurate, and that the Moving Defendants were merely executing trades on behalf of LOM customers and were not involved in a "fraudulent scheme." The Moving Defendants also intend to use the testimony and documents obtained from these Letters of Request to show Brian Lines' involvement in SHEP was limited to his role as an investment advisor to LOM customers.

## PROPOSED DEPONENTS

Set forth below is a more detailed description of each proposed deponent's role and relevant knowledge and information which would be obtained pursuant to the Letters of Request. The following facts are derived from the contents of the SEC's investigative files, internal documents in LOM's files, other published articles and reports, and the Moving Defendants' knowledge.

**1.     Malcolm P. Burke, SHEP Technologies Inc., Tracy Moore, Michael Taylor, Paul Carrol, SHEP Technologies (UK) Limited, Marshalsea Hydraulics Limited, W. Ray Evans, Peter R. Humphries, John D. Hopkins, Peter Chalk, Pi Shurlock, Ian Redhead, West Surrey Racing Ltd., Clive Bowen, and Dick Bennetts**

Proposed deponent Malcolm P. Burke ("Burke") is a citizen of Canada and is a resident of Vancouver, British Columbia. The SEC deposed Burke during their investigation of the SHEP transaction, but he was not subject to cross-examination by the Moving Defendants. As the Chief Executive Officer of SHEP, Burke is a key figure whose testimony should be admissible evidence at trial. Proposed deponent SHEP is a Canadian corporation with offices

located in Vancouver, British Columbia, Canada.  SHEP was one of the parties to the transaction at issue in this litigation and has documents and information necessary for the Moving Defendants to establish the bona fides of SHEP's business at trial.  Proposed deponent Tracy Moore was SHEP's Chief Financial Officer and, like Burke, was intimately involved with both the capitalization of SHEP that is at the center of the SEC's allegations and SHEP's bona fide business prospects that the SEC's allegations assume were not present and/or inflated by SHEP's promoters.  Proposed deponent Michael Taylor was SHEP's outside counsel during the relevant time period and, like Burke and Moore, has relevant knowledge concerning SHEP capitalization, bona fide business prospects, and reporting compliance.

Proposed SHEP Technologies (UK) ("SHEP (UK)") also pursued the development of SHEP's automotive technologies in the UK, and operated out of proposed deponent Marshalsea Hydraulics Limited's facilities.  SHEP (UK) entered into documented business transactions with Marshalsea Hydraulics to combine their innovative e automotive products into a prototype.  SHEP (UK)'s officers include proposed deponents W. Ray Evans (Chairman), Peter Humphries (Managing Director), John Hopkins (Finance Director), and Peter Chalk (Chief Engineering and Marketing Officer).

Proposed deponents Pi Shurlok (f/k/a "Pi Technology") and Ian Redhead were outside consultants to SHEP (UK) and Mr. Redhead, on behalf of Pi Shurlok, was a industry partner with SHEP (UK) and produced certain analyses of SHEP's developing automotive braking technologies and worked with SHEP to develop a prototype of the regenerative braking technology developed by SHEP.  Proposed deponents West Surrey Racing Ltd. is or was during the relevant time period also an industry partner with SHEP and a rapid prototyping and engineering consultancy which reviewed and reported on SHEP's technological progress and

prospects.    Proposed deponents Clive Bowen and Dick Bennetts were reported to be the individuals at West Surrey Racing who worked with SHEP (UK).  (Malcolm P. Burke, SHEP Technologies Inc., Tracy Moore, Michael Taylor, Paul Carrol, SHEP Technologies (UK) Limited, Marshalsea Hydraulics Limited, W. Ray Evans, Peter R. Humphries, John D. Hopkins, Peter Chalk, Pi Shurlock, Ian Redhead, West Surrey Racing Ltd., Clive Bowen, and Dick Bennetts are collectively referred to as the "SHEP Witnesses").

The SHEP Witnesses have knowledge of, and documents reflecting, the promising nature of the proprietary automotive technology SHEP was developing to capture energy used during vehicle braking and use it for acceleration.  The SHEP Witnesses can testify to the excitement of all investors, including the Moving Defendants and others involved in the SHEP merger regarding this new automotive technology.  Additionally, Burke was intimately involved with the merger negotiations between IHI and SHEP and his testimony is necessary for the Moving Defendants to establish the bona fides of the transaction.  Burke's knowledge of interactions with Brian Lines and LOM makes his testimony necessary to prove at trial that the Moving Defendants did not defraud investors.

Further, the knowledge of Burke, Moore and Taylor concerning the negotiations surrounding the reverse merger agreement is necessary to refute allegations by the SEC that "LOM and the IHI majority shareholders were insisting that the merged IHI/SHEP entity use the services of certain newsletter writers recommended by LOM to tout the stock following the merger." Compl. ¶ 159.  Specifically, Burke's testimony is needed for the Moving Defendants to demonstrate that the stock's promoters were not told what to write.   Finally, Burke has knowledge of Brian Lines' and the other Moving Defendants' minimal or non-existent involvement in the SHEP transaction and business.

The following documents need to be requested of the SHEP Witnesses and they are divided into two groups as follows:

      a.    **Documents to be Requested – Burke, SHEP Technologies, Moore and Taylor**

1.  The letter of intent between Inside Holdings Inc. and SHEP Limited (referred to in IHI/SHEP's 6/25/02 press release on SEDAR).

2.  The May 22, 2002 letter agreement and subsequent amendments (referred to in IHI/SHEP's 9/17/02 press release on SEDAR).

3.  The agreement in principle between SHEP Technologies Inc. and Pi Technology (referred to in SHEP's 3/6/03 press release on SEDAR).

4.  Documents prepared for SHEP to apply for a listing on the London Stock Exchange's Alternative Investment Market (referred to in SHEP's 6/10/03 press release on SEDAR).

5.  A statement or document reflecting the identity and location of the UK-based chartered accountant and business advisory firm retained by SHEP (referred to in SHEP's 6/10/03 press release on SEDAR).

6.  The May 21, 2003 agreement, the July 7, 2003 agreement, and other agreements between Pi Technology and SHEP.

7.  The milestone report by Pi Technology (referred to in SHEP's 9/2/03 press release on SEDAR), the Phase II report by Pi Technology (referred to in SHEP's 12/2/03 press release on SEDAR), and other reports or reviews by Pi Technology concerning SHEP.

8.  Agreements between West Surrey Racing and others concerning SHEP.

9.  The initial technology review by West Surrey Racing (referred to in SHEP's 9/2/03 press release on SEDAR) and other reports or reviews by West Surrey Racing concerning SHEP.

10. The July 1, 2003 agreement, the February 1, 2004 agreement, and other agreements between Marshalsea Hydraulics Ltd. and SHEP.

11. The letter of intent for SHEP to acquire Marshalsea Hydraulics Ltd. (referred to in SHEP's 5/26/04 press release on SEDAR).

12. A statement or document reflecting any valuations, as of any period during 2002 through 2004, of SHEP, its shares, and/or any of SHEP's assets.

13. Written and electronic communications with the United States Securities and Exchange Commission concerning Sedona Software Solutions, Inc., Renaissance Mining Corporation, Inc., Inside Holdings Inc., SHEP Technologies Inc. and/or any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York. (Defendants in this case are Brian N. Lines, Scott G.S. Lines, LOM

(Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., LOM Securities (Bahamas) Ltd., Anthony W. Wile, Wayne E. Wile, Robert J. Chapman, William Todd Peever, Phillip James Curtis, and Ryan G. Leeds.)

14. Written and electronic communications with any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.

**b. Documents to be Requested – SHEP (UK), Marshalsea Hydraulics, Evans, Humphrey, Hopkins, Chalk, Pi Shurlok, Redhead, West Surrey Racing, Bowen and Bennetts**:

1. The letter of intent between Inside Holdings Inc. and SHEP Limited (referred to in IHI/SHEP's 6/25/02 press release, filed in the Canadian Securities Administrators' System for Electronic Document Analysis and Retrieval, known as "SEDAR" and available at www.sedar.com).

2. The May 22, 2002 letter agreement and subsequent amendments (referred to in IHI/SHEP's 9/17/02 press release on SEDAR).

3. The agreement in principle between SHEP Technologies Inc. and Pi Technology (referred to in SHEP's 2/6/03 press release on SEDAR).

4. The listing application and supporting documents prepared for SHEP to apply for a listing on the London Stock Exchange's Alternative Investment Market (referred to in SHEP's 6/10/03 press release on SEDAR).

5. A statement of the identity and location of the UK-based chartered accountant and business advisory firm retained by SHEP (referred to in SHEP's 6/10/03 press release on SEDAR).

6. The May 21, 2003 agreement between Pi Technology and SHEP; the July 7, 2003 agreement between Pi Technology and SHEP; and other particular agreements between Pi Technology and SHEP.

7. The milestone report by Pi Technology (referred to in SHEP's 9/2/03 press release on SEDAR); the Phase II report by Pi Technology (referred to in SHEP's 12/2/03 press release on SEDAR); and other particular reports or reviews by Pi Technology concerning SHEP.

8. The agreement whereby West Surrey Racing undertook to perform services relating to SHEP, and in particular as to the development of SHEP's prototype vehicle (referred to in SHEP's 9/2/03 press release on SEDAR), and other particular agreements concerning SHEP between or among West Surrey Racing, SHEP and Pi Technology.

9. The initial technology review by West Surrey Racing (referred to in SHEP's 9/2/03 press release on SEDAR), and other particular reports or reviews by West Surrey Racing concerning SHEP.

10. The July 1, 2003 agreement between Marshalsea Hydraulics Ltd. and SHEP; the February 1, 2004 agreement between Marshalsea Hydraulics Ltd. and SHEP; and other particular agreements between Marshalsea Hydraulics Ltd. and SHEP.

11. The letter of intent for SHEP to acquire Marshalsea Hydraulics Ltd. (referred to in SHEP's 5/26/04 press release on SEDAR).

12. A statement or document reflecting any valuations, as of any period during 2002 and 2003, of SHEP, its shares, and/or any of SHEP's assets.

### 2. *Lawrence Roulston, David Skarica*

Lawrence Roulston ("Roulston") and David Skarica ("Skarica") are believed to be Canadian citizens. Roulston is believed to be a resident of Vancouver, British Columbia, Canada, but neither Roulston nor Skarica provided their full address in their SEC testimony. The SEC deposed both Roulston and Skarica during their investigation of the Renaissance-Sedona transaction, but they were not subject to cross-examination by the Moving Defendants. As newsletter writers covering the Renaissance-Sedona merger, Skarica and Roulston are key figures whose testimony should be admissible at trial.

The SEC alleges that the Moving Defendants employed newsletter writers to promote and artificially inflate the value of Sedona stock. Specifically, the Complaint asserts that Brian Lines was aware that defendants Wile and Chapman were "coordinating a substantial effort" to "prime the market" before the "Renaissance/Sedona merger announcement." Compl. ¶ 71. Further, the SEC alleges, "Brian Lines knew, or was reckless in not knowing, that these newsletter reports on Renaissance contained false and misleading information and omitted material facts." Compl. ¶ 93. Moving Defendants intend to show at trial that they did not compensate newsletter writers with Sedona stock or cash payments to issue positive reports regarding Sedona. The Moving

Defendants will need the testimony of Roulston and Skarica to challenge these allegations and prove that they did not improperly pressure Roulston and Skarica to "tout" Sedona stock. The testimony of Roulston and Skarica is necessary for the Moving Defendants to show at trial that the newsletter writers genuinely believed what they wrote about the proposed merger and the underlying mining assets, and they simply informed the market of their views through their newsletters bearing the requisite disclosure.

### a.    Documents to be Requested

1.        Written and electronic communications with the United States Securities and Exchange Commission concerning Sedona Software Solutions, Inc., Renaissance Mining Corporation, Inc., Inside Holdings Inc., SHEP Technologies Inc. and/or any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York. (Defendants in this case are Brian N. Lines, Scott G.S. Lines, LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., LOM Securities (Bahamas) Ltd., Anthony W. Wile, Wayne E. Wile, Robert J. Chapman, William Todd Peever, Phillip James Curtis, and Ryan G. Leeds.)

2.    Written and electronic communications with any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.

### 3.    *John E. Cooper*

Proposed deponent John E. Cooper ("Cooper") is believed to be a Canadian citizen and is a resident of Vancouver, British Columbia. Cooper was the Chief Executive Officer of Sedona. The SEC deposed Cooper during their investigation of the Renaissance-Sedona transaction, but he was not subject to cross-examination by the Moving Defendants. As the Chief Executive Officer of Sedona, Cooper is a key witness whose testimony should be admissible at trial.

The complaint alleges that, "[o]n or about January 6, 2003, LOM Ltd. received … 245,000 Sedona shares, which the Sedona CEO had sent directly to Brian Lines by overnight courier." Compl. ¶ 49. The SEC further alleges that Cooper has intimate knowledge of the sale

2943                                   14

of Sedona in general.  *See* Compl. ¶¶ 41-51.  The Moving Defendants intend to prove that they did not control the Sedona shares they received from Jack Cooper, as the Complaint implies.  Specifically, we believe Cooper's testimony will aid the Moving Defendants in demonstrating that Cooper sent Brian Lines the control shares in Sedona pursuant to an escrow arrangement.  Cooper's testimony will provide trial evidence to support the Moving Defendant's position that while Brian Lines retained the control shares of Sedona up to the merger date, he intended to return them to the combined Renaissance-Sedona management for cancellation as part of the merger, for the benefit of Sedona and Renaissance shareholders.  Cooper's testimony will establish that no party ever intended for Brian Lines or LOM to take control of Sedona, all parties believed Renaissance would control Sedona at the end of the transaction, and that the shares transferred in six tranches to accounts at LOM were acquired from non-affiliated shareholders of Sedona.  Cooper also has knowledge concerning the truthful information Sedona disclosed to the market before trading in Sedona began at the beginning of 2003.

### 4.    *Jeffrey B. Lightfoot, Michael L. Seifert*

Proposed deponents Jeffrey B. Lightfoot ("Lightfoot") and Michael L. Seifert ("Seifert"), are attorneys at Maitland & Co., who are believed to be citizens and residents of Vancouver, British Columbia, Canada.  Lightfoot and Seifert acted as attorneys for Sedona during the Renaissance-Sedona merger negotiations.

The Moving Defendants intend to prove that the Renaissance-Sedona transaction was a legitimate business transaction and the testimony of Lightfoot and Seifert, who have knowledge of the terms and mechanics of the proposed reverse merger, are uniquely positioned to provide admissible evidence of its legitimacy and structure.  Lightfoot's and Seifert's testimony will also be critical to the Moving Defendants in refuting allegations of scienter since we believe their testimony will demonstrate that the Renaissance-Sedona reverse acquisition was a legitimate

2943    15

business transaction and that all parties to the transaction were using their best efforts to ensure that the transaction was executed properly and lawfully.  Further, the evidence obtained from Lightfoot and Seifert is necessary for the Moving Defendants to rebut the SEC's allegations that Brian Lines controlled Sedona stock by proving Brian Lines held the control block in escrow. *See* Compl. ¶ 49.  Further, Lightfoot's and Seifert's evidence is necessary to establish that the non-control shares transferred to accountholders at LOM were purchased from non-affiliated shareholders in Sedona, contrary to the SEC's allegation.

**5.    *Ian G. Park, Robert E. Van Tassell, Colin R. Bowdidge, Barry James Price***

Proposed deponent Ian G. Park ("Park") is believed to be a Canadian citizen and is a resident of Toronto, Ontario.  Park was the CEO and President of Renaissance.  Park's focus during his time at Renaissance was on the Central American mining assets that Renaissance was to acquire from Central American Mine Holdings Limited ("CAMHL").  The SEC deposed Park during their investigation of the Renaissance-Sedona transaction, but he was not subject to cross-examination by the Moving Defendants.  As the CEO and President of Renaissance, Park is a key figure whose testimony should be admissible at trial.

Proposed deponent Robert E. Van Tassell ("Van Tassell") is believed to be a Canadian citizen and is a resident of High River, Alberta.  Van Tassell was a director of Renaissance and Renaissance's Geologist, with over 40 years of experience in mine exploration and development, including locating Canada's prolific Red Lake, Ontario mining district.  Proposed deponent Colin R. Bowdidge ("Bowdidge") is believed to be a Canadian citizen and is a resident of Toronto, Ontario.  Bowdidge was the Vice President of Exploration for Renaissance.  When he joined Renaissance, Bowdidge had 32 years of mineral exploration experience and had served as an officer or director of seven publicly traded mining and exploration companies.  Proposed

deponent Barry James Price ("Price") is believed to be a Canadian citizen and resident who acted as Renaissance's Consulting Geologist.   Before joining Renaissance, Price had 29 years of experience as a geological consultant to major and junior exploration companies.

Park, Van Tassell, Bowdidge, and Price (collectively, the "Renaissance Geologists") are professionals with experience in mining operations who were formerly involved with exploration and geology for Greenstone Resources, a Toronto Stock Exchange company that had previously owned certain mining rights involved in the proposed Renaissance venture.   The Moving Defendants intend to prove that the mining resources that Renaissance was about to acquire were extremely valuable.   We believe the testimony of the Renaissance Geologists will be necessary to prove the value of the three Central American mines to which Renaissance would have acquired mining rights, but for the SEC's trading suspension in Sedona securities on January, 29 2003.   Van Tassell's testimony will give the Moving Defendants an opportunity to prove that the Renaissance's intent was also to acquire valuable mining assets in the Red Lake Region of Canada.   Finally, the Renaissance Geologists will help the Moving Defendants demonstrate at trial that the mining resources involved in the proposed Renaissance venture were known to sophisticated gold investors, who were excited about their return to the market.

Collectively, the expertise of the Renaissance Geologists themselves and their testimony regarding their business activities on behalf of Renaissance will allow the Moving Defendants to refute the SEC's allegations that Renaissance was a sham operation.   *See* Compl. ¶ 4.

### a.     Documents to be Requested

3.   A statement or document reflecting, as of December 2002 and January 2003, the direct or indirect ownership of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

4.   A statement or document reflecting, as of December 2002 and January 2003, the officers and directors of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

5.  A statement or document reflecting, as of December 2002 and January 2003, the ownership, commercial and/or other relationships between or among (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

6.  A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Desarrollo Minero de Nicaragua, S.A. (a/k/a "Desminic") and/or the La Libertad gold mining property in Nicaragua.

7.  A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Hemco de Nicaragua, S.A. and/or the Bonanza gold mining property in Nicaragua.

8.  A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, the Cerro Quema gold mining property in Panama.

9.  A statement or document reflecting any valuation, as of December 2002 and January 2003, of any interest in, or right with respect to, (i) Desarrollo Minero de Nicaragua, S.A. (a/k/a "Desminic") and/or the La Libertad gold mining property in Nicaragua; (ii) Hemco de Nicaragua, S.A. and/or the Bonanza gold mining property in Nicaragua; AND/OR (iii) Cerro Quema gold mining property in Panama.

10. Written and electronic communications with the United States Securities and Exchange Commission concerning Sedona Software Solutions, Inc., Renaissance Mining Corporation, Inc., Inside Holdings Inc., SHEP Technologies Inc. and/or any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.  (Defendants in this case are Brian N. Lines, Scott G.S. Lines, LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., LOM Securities (Bahamas) Ltd., Anthony W. Wile, Wayne E. Wile, Robert J. Chapman, William Todd Peever, Phillip James Curtis, and Ryan G. Leeds.)

11. Written and electronic communications with any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.

**6.    *Yamana Gold Inc., RNC Gold Inc., Thomas W. Lough, James Randall Martin, Denis Francoeur, Wayne G. Beach and Peter Marrone***

Proposed deponent RNC Gold developed the assets that Renaissance attempted to acquire

as part of the private placement in Renaissance shares and the reverse merger into Sedona.

Proposed deponent Yamana Gold Inc. ("Yamana") became the successor in interest to proposed

deponent RNC Gold, after Yamana acquired RNC in 2005.  Yamana and RNC Gold are Canadian corporations with offices located in Toronto, Ontario.  RNC Gold and Yamana, as RNC Gold's successor, acquired and exploited the mining assets that would have been acquired by the merged Renaissance-Sedona entity.  Specifically, three months after the termination of the Renaissance-Sedona venture, the privately-held RNC Gold and the publicly-traded Tango announced that they would merge, conduct a private placement for Canadian $7.5 million, and absorb the very same mining assets previously available to the Renaissance-Sedona venture.

RNC Gold and Yamana, as RNC Gold's successor, produce testimony and documents that are necessary for the Moving Defendants to prove at trial the value of the three Central American mines at issue.  Specifically, we believe RNC Gold and/or Yamana will have documents illustrating that RNC Gold's revenues increased from US $14.8 million in 2003 to US $32.2 million in 2004 and its gold sales increased from 39,095 ounces in 2003 to 78,966 ounces in 2004.  Those documents will also evidence the value placed on RNC's assets by Yamana, an established gold production company.  This evidence is necessary for the Moving Defendants to prove the value of the mining assets that would have gone to Renaissance and therefore demonstrate that the Renaissance-Sedona merger was a bona fide and valuable business transaction that would have more than justified both the private placement in Renaissance shares and the market price for Sedona shares prior to the SEC suspension in trading.

Proposed deponent Thomas W. Lough ("Lough") is believed to be a Canadian citizen and is a resident of Toronto, Ontario.  Lough was the Vice President of Finance for RNC Gold. The SEC deposed Lough during their investigation of the Renaissance-Sedona transaction, but he was not subject to cross-examination by the Moving Defendants.  As RNC Gold's Vice President

of Finance, Lough is a key figure whose testimony should be admissible at trial on the foregoing subjects.

Proposed deponent James Randall Martin ("Martin") is believed to be a Canadian citizen and a resident of Toronto, Ontario, Canada. Martin was the Chairman and Chief Executive Officer of RNC Gold. Proposed deponent Denis Francoeur ("Francoeur") is believed to be a Canadian citizen and a resident of Toronto, Ontario, Canada. Francoeur is the former president of Tango and was Vice President of Gold Exploration at RNC Gold. Proposed deponent Wayne G. Beach ("Beach") is believed to be a Canadian citizen and a resident of Ontario, Canada. Beach is a director of RNC and a former director of Tango. Proposed deponent Peter Marrone is believed to be a Canadian citizen and resident of Ontario, Canada. Marrone was the President and CEO of Yamana Gold when it acquired RNC Gold in 2005.

Lough, Martin, Francoeur, Beach, and Marrone (collectively, the "RNC and Yamana Proposed Deponents") are necessary witnesses for the Moving Defendants to establish the value of the mining assets and the economic benefit those assets had on their business, benefits that could have accrued to the merged Renaissance-Sedona entity. Not only were the mines themselves valuable, but gold as a commodity was trading at historic highs and the RNC and Yamana Proposed Deponents' testimony will help the Moving Defendants establish the effect this had on RNC Gold and Yamana. The RNC and Yamana Proposed Deponents are specifically important to the Moving Defendant's ability to prove at trial that the three Central American mines Renaissance was to acquire from CAMHL were legitimate mines that enabled RNC Gold to produce 100,000 ounces of gold in 2005, and to prove that Renaissance's promotional materials and offering document leading up to the planned Renaissance-Sedona merger were substantially true and accurate because the projected mining production was actually attained.

The RNC and Yamana Proposed Deponents are the only potential witnesses who have first-hand knowledge of the mines' production rates and full value.

### a.   Documents to be Requested

1.    A statement or document reflecting, as of December 2002 and January 2003, the direct or indirect ownership of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

2.    A statement or document reflecting, as of December 2002 and January 2003, the officers and directors of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

3.    A statement or document reflecting, as of December 2002 and January 2003, the ownership, commercial and/or other relationship between or among (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

4.    A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Desarrollo Minero de Nicaragua, S.A. ("Desminic") and/or the La Libertad gold mining property in Nicaragua.

5.    A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Hemco de Nicaragua, S.A. and/or the Bonanza gold mining property in Nicaragua.

6.    A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, the Cerro Quema gold mining property in Panama.

7.    The letter of intent between RNC Gold Inc. and Tango Mineral Resources Inc. (referred to in Tango's 5/12/03 press release on SEDAR).

8.    The engagement letter between RNC Gold Inc. and Jennings Capital Inc. (referred to in Tango's 5/12/03 press release on SEDAR).

9.    The RNC Gold Inc. reorganization agreement (referred to in Tango's 5/12/03 press release on SEDAR).

10.    The agreement between RNC Gold Inc. and a syndicate of investment dealers led by Jennings Capital Inc. (referred to in Tango's 6/9/03 press release on SEDAR).

11.    The July 25, 2003 agreement between RNC Gold Inc. and Auric Resources Corp. providing for RNC to acquire Auric's interests in Desarrollo Minero de Nicaragua, S.A. ("Desminic") and Hemco de Nicaragua, S.A. ("Hemco") and for RNC Gold to acquire the portion of the Leslie Coe debt owed by Desminic to Auric (referred to in RNC Gold's 7/5/04 press release on SEDAR).

12.   The RNC Gold Inc. agreement to increase its equity interest in the Cerro Quema property from 10% to 60% (referred to in Tango's 11/19/03 press release on SEDAR).

13.   The securities exchange agreement between the securities holders of RNC Gold Inc. and Tango Mineral Resources Inc. (referred to in Tango's 12/3/03 press release on SEDAR).

14.   The agreement between RNC Gold Inc. and Yamana Gold Inc. providing for Yamana to acquire RNC Gold (referred to in RNC Gold's 12/4/05 press release on SEDAR).

15.   A statement or document reflecting the 2003 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

16.   A statement or document reflecting the 2004 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

17.   A statement or document reflecting the 2005 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

### 7.   *Jennings Capital Inc., Canaccord Capital Corporation, Fasken Martineau DuMoulin LLP, PricewaterhouseCoopers LLP*

Proposed deponent Jennings Capital Inc. ("Jennings Capital") is a Canadian corporation with offices located in Calgary, Alberta as well as elsewhere in Canada.  Jennings Capital acted as RNC Gold's financial advisor, and they will assist the Moving Defendants in determining the actual value of the mines that would have gone into the Renaissance-Sedona venture.  Notably, Jennings Capital performed a role that was similar to the role LOM was to play as financial advisor to Renaissance.

Proposed deponent Canaccord Capital Corporation ("Canaccord") is a Canadian corporation with offices located in Vancouver, British Columbia, as well as elsewhere in Canada.  Canaccord also acted as RNC Gold's financial advisor.  Proposed deponent Fasken Martineau

DuMoulin LLP ("Fasken Martineau") is a Canadian firm with offices located in Toronto, Ontario, as well as elsewhere in Canada. Fasken Martineau served as RNC Gold's counsel. Proposed deponent PricewaterhouseCoopers LLP ("PricewaterhouseCoopers") is a Canadian firm with offices located in Toronto, Ontario, as well as elsewhere in Canada. PricewaterhouseCoopers acted as RNC's auditors.

The Moving Defendants believe Jennings Capital, Canaccord, Fasken Martineau, and PricewaterhouseCoopers will have documentary evidence the Moving Defendants will need to prove the value of Renaissance's assets (later RNC Gold's assets). The only way for the Moving Defendants to obtain this evidence, necessary for trial, is through these Letters of Request.

The documents to be request of these entities will be the same as the documents requested of RNC Gold itself. The Moving Defendants expect to be able to coordinate discovery among these entities, RNC Gold and Yamana to obtain the documents and testimony in an efficient and non-duplicative manner.

### a.    **Documents to be Requested**

1.  A statement or document reflecting, as of December 2002 and January 2003, the direct or indirect ownership of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

2.  A statement or document reflecting, as of December 2002 and January 2003, the officers and directors of (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

3.  A statement or document reflecting, as of December 2002 and January 2003, the ownership, commercial and/or other relationships between or among (i) RNC Gold Inc.; (ii) RNC Resources, Limited; and (iii) Central American Mine Holdings Limited.

4.  A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Desarrollo Minero de Nicaragua, S.A. (a/k/a "Desminic") and/or the La Libertad gold mining property in Nicaragua.

5.    A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, Hemco de Nicaragua, S.A. and/or the Bonanza gold mining property in Nicaragua.

6.    A statement or document reflecting, as of December 2002 and January 2003, the nature and percentage of any direct or indirect ownership of, or rights to exploit resources of, the Cerro Quema gold mining property in Panama.

7.    A statement or document reflecting any valuation, as of December 2002 and January 2003, of any interest in, or right with respect to, (i) Desarrollo Minero de Nicaragua, S.A. (a/k/a "Desminic") and/or the La Libertad gold mining property in Nicaragua; (ii) Hemco de Nicaragua, S.A. and/or the Bonanza gold mining property in Nicaragua; AND/OR (iii) Cerro Quema gold mining property in Panama.

8.    The letter of intent between RNC Gold Inc. and Tango Mineral Resources Inc. (referred to in Tango's 5/12/03 press release on SEDAR).

9.    The engagement letter between RNC Gold Inc. and Jennings Capital Inc. (referred to in Tango's 5/12/03 press release on SEDAR).

10. The RNC Gold Inc. reorganization agreement (referred to in Tango's 5/12/03 press release on SEDAR).

11. The agreement between RNC Gold Inc. and a syndicate of investment dealers led by Jennings Capital Inc. (referred to in Tango's 6/9/03 press release on SEDAR).

12. A statement or document reflecting any valuation, at any time from May through June 2003 of RNC Gold Inc. and/or any of its assets.

13. The July 25, 2003 agreement between RNC Gold Inc. and Auric Resources Corp. providing for RNC to acquire Auric's interests in Desarrollo Minero de Nicaragua, S.A. ("Desminic") and Hemco de Nicaragua, S.A. ("Hemco") and for RNC Gold to acquire the portion of the Leslie Coe debt owed by Desminic to Auric (referred to in RNC Gold's 7/5/04 press release on SEDAR).

14. A statement or document reflecting any valuation of the interest acquired by RNC Gold Inc. from Auric Resources Corp. in Desarrollo Minero de Nicaragua, S.A. ("Desminic") and Hemco de Nicaragua, S.A. ("Hemco") and the portion of the Leslie Coe debt owed by Desminic to Auric (referred to in RNC Gold's 7/5/04 press release on SEDAR).

15. The RNC Gold Inc. agreement to increase its equity interest in the Cerro Quema property from 10% to 60% (referred to in Tango's 11/19/03 press release on SEDAR).

16. A statement or document reflecting any valuation, as of November 2003 of any interest in the Cerro Quema mining property.

17. The securities exchange agreement between the securities holders of RNC Gold Inc. and Tango Mineral Resources Inc. (referred to in Tango's 12/3/03 press release on SEDAR).

18. A statement or document reflecting any valuation of RNC Gold Inc. or its shares as of December 2003.

19. The agreement between RNC Gold Inc. and Yamana Gold Inc. providing for Yamana to acquire RNC Gold (referred to in RNC Gold's 12/4/05 press release on SEDAR).

20. A statement or document reflecting any valuation of RNC Gold Inc., its shares, and/or its assets as of 2005.

21. A statement or document reflecting the 2003 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

22. A statement or document reflecting the 2004 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

23. A statement or document reflecting the 2005 gold production (total and percentage attributable to RNC Gold Inc.) of (i) the La Libertad gold mining property in Nicaragua; (ii) the Bonanza gold mining property in Nicaragua; and (iii) the Cerro Quema gold mining property in Panama.

24. Written and electronic communications with the United States Securities and Exchange Commission concerning Sedona Software Solutions, Inc., Renaissance Mining Corporation, Inc., Inside Holdings Inc., SHEP Technologies Inc. and/or any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.  (Defendants in this case are Brian N. Lines, Scott G.S. Lines, LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., LOM Securities (Bahamas) Ltd., Anthony W. Wile, Wayne E. Wile, Robert J. Chapman, William Todd Peever, Phillip James Curtis, and Ryan G. Leeds.)

25. Written and electronic communications with any of the defendants in the case of *SEC v. Lines*, No. 07CV11387, pending in the United States District Court for the Southern District of New York.

**8.    *David Surmon***

David Surmon ("Surmon") is believed to be a Canadian citizen and is a resident of Calgary, Alberta.  Surmon was LOM's in-house attorney and has knowledge of the Moving Defendants' involvement in both the Sedona and SHEP transactions.  We believe Surmon will testify that both transactions were real and substantial ventures, one to exploit valuable mining rights and the other to exploit a promising new automotive technology.

2943

25

Surmon's testimony will help the Moving Defendants establish at trial that LOM simply confirmed to Sedona and Renaissance the accuracy of the portion of the January 21, 2003 press release that referenced LOM Capital Limited's participation in the transaction. This will enable the Moving Defendants to refute the SEC's allegations that they participated in Renaissance's promotional activities or disseminated false and misleading information to potential investors.

Additionally, the SEC alleges that the Moving Defendants used nominee accounts and signature directors "to execute documents apparently to shield Brian and Scott's identities, and/or the identities of certain LOM customers, such as defendants Peever and Curtis, who also used these LOM nominees to secretly acquire shares of issuers." Compl. ¶ 46. The SEC further states, "Brian Lines allowed Peever and Curtis to use LOM-controlled nominees to conceal their purchase of the IHI shell, and charged fees for their use." Compl. ¶ 193. We believe Sermon will help the Moving Defendants establish at trial that the use of nominee accounts is customary and legal in Bermuda and that the SEC mischaracterizes the use of nominees.

Surmon's testimony is also necessary to establish that LOM Capital's role as financial advisor to Renaissance in connection with the planned private placement required LOM to conduct due diligence into Renaissance which Surmon was in the process of doing when the transaction was terminated following the SEC's trading suspension.

Surmon's testimony is necessary to the Moving Defendants' case at trial to show that the full extent of Brian Lines' involvement with the SHEP-IHI transaction was as a broker for LOM clients. We believe Surmon's testimony will show that the two accounts for which Brian Lines acted as a broker gradually sold their holdings in SHEP, with approximately 95% of the sales occurring six months or more after the initial investment. This trial evidence will be necessary

for the Moving Defendants to establish that they were not engaged in fraudulent activity with respect to the SHEP-IHI transaction.

## CONCLUSION

For the foregoing reasons, the identified individuals and corporations have documents and evidence relevant to the merits of this case and are necessary to do justice at the trial of this proceeding.  Thus, the Moving Defendants respectfully request that the Court issue Letters of Request to the Foreign Courts in the forms to be submitted to the Court for execution.  Since these depositions will be conducted by U.S. counsel for use in a U.S. proceeding, we also request that the Court in the Letters of Request ask the Foreign Courts to authorize that any deposition ordered in recognition of such a Letter be conducted in accordance with the Federal Rules of Civil Procedure.

If required to do so, the Moving Defendants will bear the reasonable costs associated with the attendance of each proposed deponent at his or her examination, and will bear the reasonable costs of locating and producing documents requested in connection with such examination.

Dated: August 20, 2008

**PATTON BOGGS LLP**

By: /s/ Philip M. Smith
Philip M. Smith (PS-8132)
1185 Avenue of the Americas
New York, NY 10036
646-557-5145
pmsmith@pattonboggs.com

*Attorneys for Defendant Brian N. Lines*

**MAYER BROWN LLP**

By:  /s/ Stephen J. Crimmins
Stephen J. Crimmins (SC-2714)
1909 K Street, N.W.
Washington, DC 20006-1101
202-263-3883
scrimmins@mayerbrown.com

*Attorneys for Defendant Scott G.S. Lines*

**KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL PLLC**

By:  /s/  Reid M. Figel
Reid M. Figel (RF-8663)
1615 M Street, N.W., Suite 400
Washington, DC 20036
202-326-7918
rfigel@khhte.com

*Attorneys for the LOM Defendants*