UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>v.<br><br>BRIAN N. LINES, et al.,<br><br>                    Defendants. | No. 1:07-cv-11387 ( DC )<br><br>**DECLARATION OF<br>SCOTT F. WEISMAN** |

       I, Scott F. Weisman, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. §1746, that the following is true and correct, and further that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters stated herein:

       1.     I am an attorney in the Division of Enforcement ("Division") of the Securities and Exchange Commission ("Commission"), and I submit this declaration in support of Plaintiff's *Memorandum of Law in Support of Its Application to Compel Production of Brian Lines Interview*.

      2.     I have been practicing law since September 1998.

      3.     Since 1998, I have been a member in good standing of the Bars of New York State and the District of Columbia.

      4.     Notwithstanding the arguments contained in Defendant Brian N. Lines' *Memorandum of Law in Opposition to Plaintiff SEC's Motion to Compel*, I have never before been accused of breaching a professional ethics rule or standard.

      5.     From October 2001 through December 2007, I was a staff attorney/senior counsel in the Division. In January 2008, I was promoted to Branch Chief, a supervisory position in the

Division, and I continue to serve in that capacity. At all relevant times, my primary responsibility has been to investigate potential violations of the federal securities laws on behalf of the Commission.

6. In January 2003, I and certain of my Division colleagues (collectively, the "Staff") commenced an investigation into certain trading in the stock of Sedona Software Solutions, Inc. ("Sedona"). The trading in question coincided with the public announcement ("Announcement") of a proposed reverse takeover of Sedona by Renaissance Mining Corporation, Inc. ("Renaissance"), a private company purportedly engaged in gold mining.

7. Renaissance and Sedona's Announcement stated, among other things, that a firm named LOM Capital Ltd. (collectively with its affiliates, "LOM") was serving as Renaissance's investment banker for a separate $6 million capital raising transaction.

8. I recall that my colleagues and I were unfamiliar with LOM at that time.

9. On or about January 23, 2003, my colleague Stacey Nahrwold and I placed a telephone call to LOM. It was a routine call to verify LOM's relationship with Renaissance, and to obtain additional information about the $6 million capital raising transaction described in the Announcement. We were transferred to Scott Lines, then the Managing Director of LOM, who took the call. At the beginning of the call, we provided Scott Lines with the Commission's standard warnings, which typically describe the voluntary nature of the interview, the right of the interviewee to have counsel present, and the interviewee's obligation to provide truthful information. After a brief discussion about Renaissance, Bermudian regulatory requirements, and client confidentiality rules, Scott Lines referred the Staff to an in-house counsel at LOM named David Surmon. Scott Lines said that he would have Mr. Surmon contact the Staff.

10. Later that same day, January 23, 2003, Ms. Nahrwold and I received a telephone call from David Surmon. I recall Mr. Surmon introducing himself as in-house counsel or general

counsel at LOM. Mr. Surmon described LOM's securities business in general. He then requested that the Staff put its questions to LOM into a faxed letter, so that he could forward the Staff's questions to the proper individuals at LOM for response. Mr. Surmon then stated that either he, or the relevant person with knowledge of the matter, would transmit written responses back to the Staff. Mr. Surmon also stated that it was LOM's policy in dealing with regulators, even its own Bermudian regulator, to require all questions in writing so that LOM could comply with customer confidentiality laws.

11. To the best of my recollection, at no point during that January 23, 2003 call did Mr. Surmon state that he was representing LOM and/or its principals as their lawyer for purposes of the Staff's investigation. Rather, in requesting the Staff's questions in writing, Mr. Surmon gave me the impression that he was performing a regulatory compliance function. I did not form an impression that Mr. Surmon was formally representing LOM and/or its principals as their lawyer for purposes of the Staff's investigation.

12. Consistent with Staff's general practice in the early stages of an investigation, the Staff did not send written questions to LOM as Mr. Surmon had requested. The Staff had no further contact with LOM until February 3, 2003.

13. On February 3, 2003, the Staff received an unexpected telephone call from Brian Lines, then the President of LOM. I happened to be in, or nearby, the office of my supervisor, Branch Chief Michael Ungar, at the moment Mr. Ungar received Brian Lines' call. I participated in the call.

14. I recall being surprised that Brian Lines had called the Staff, because Mr. Surmon had previously requested that the Staff send its questions to LOM in writing. I also recall being confused during the start of the call about whether the caller was Brian Lines or Scott Lines.

15. I further recall that, during the start of the call, either Mr. Ungar or I brought to Brian Lines' attention the fact that the Staff had previously been referred to Mr. Surmon, and that Mr. Surmon had made a procedural request of the Staff. I recall that in response, Brian Lines affirmatively downplayed Mr. Surmon's role either at the firm or in this matter, and said that LOM wanted to be cooperative with the Staff.

16. At that point in time, I did not believe or know that LOM and/or Brian Lines were being represented by Mr. Surmon for purposes of the Staff's investigation.

17. I further recall that, prior to any substantive discussions with Brian Lines during the February 3, 2003 call, Mr. Ungar provided Brian Lines with the Commission's standard warnings, which typically describe the voluntary nature of the interview, the right of the interviewee to have counsel present, and the interviewee's obligation to provide truthful information. I further recall that Mr. Lines understood and accepted Mr. Ungar's warnings, and agreed to proceed with the call that he had initiated.

18. There was no intention on my part to have an inappropriate *ex parte* conversation with Brian Lines. I did not believe or know that LOM and/or Brian Lines were being represented by Mr. Surmon for purposes of the Staff's investigation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of October 2009.

_Scott Weisman_
Scott F. Weisman
Branch Chief, Division of Enforcement
Securities and Exchange Commission