UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

v.

BRIAN N. LINES, et al.,

                    Defendants.

No. 07-CV-11387 ( DC )

**DECLARATION OF MICHAEL A. UNGAR**

---

I, Michael A. Ungar, do hereby declare under penalty of perjury, in accordance with 28 U.S.C. §1746, that the following is true and correct, and further that this declaration is made on my personal knowledge, and that I am competent to testify as to the matters stated herein:

1. I am a Branch Chief with the Division of Enforcement of the Securities and Exchange Commission ("Commission"), and I submit this declaration in support of Plaintiff U.S. Securities and Exchange Commission's Memorandum of Law In Support of Its Application To Compel Production of Brian Lines Interview

2. I have been employed by the Commission since 1998, and prior to that, I practiced at several large law firms. In my sixteen years of practicing law, I have never been accused of violating an attorney ethics rule, with the exception of this matter. I have never knowingly or intentionally communicated with a represented party, and as discussed below, I did not do so with respect to Brian Lines.

**Background**

3. On January 8, 2003, Renaissance Mining Corporation, Inc. ("Renaissance") issued a press release headlined "Renaissance Acquires a Major Portfolio of Gold Producing Assets in Latin America" that contained statements regarding the size of the gold reserves of the mines

that Renaissance had purportedly acquired, and the volume of gold that those mines would produce in future years.

4.    On January 17, 2003, Renaissance issued a press release announcing that it had signed a letter of intent with Sedona Software Solutions, Inc. ("Sedona"), pursuant to which Sedona was to acquire all of Renaissance's issued and outstanding shares and change its name to Renaissance Mining Holding Corporation.

5.    On January 21, 2003, the price of Sedona stock opened at around $8 per share, an approximately 26,000 percent increase over its previous closing price of $0.03 per share. By the next day, the staff began an investigation to determine if the federal securities laws were being violated.

6.    The January 17th press release noted that LOM Capital Limited "had agreed to assist Renaissance, by serving as its investment banker" with a $6 million stock offering of Renaissance shares. Subsequently, two staff members, Scott Weisman and Stacy Nahrwold, called LOM to obtain information for our investigation. Prior to this investigation, I had never heard of LOM.

7.    I was not on the calls with LOM. After Mr. Weisman and Ms. Nahrwold contacted LOM, the staff did not have any further contact with LOM until February 3, when Brian Lines called us.

8.    On January 29, 2003, the SEC suspended trading in Sedona's stock. The Trading Suspension Release stated:

> The Commission temporarily suspended trading in the securities of Sedona Software Solutions, Inc. because of questions concerning the accuracy and completeness of information about Sedona on Internet websites, in press releases, and in other sources publicly available to investors concerning, among other things, Sedona's planned merger

2

with Renaissance Mining Corp. ("Renaissance"), a privately-held company; the assets and business operations of Renaissance; and trading in Sedona common stock in connection with the announced merger.

**The Telephone Call From Brian Lines**

9. On February 3, 2003, at approximately 12:35 pm, I received an unsolicited call from Brian Lines.[1] I was not expecting the call. I think Scott Weisman was already in my office at the time.

10. At no time during the call, did I ever believe that we were speaking to someone who was represented by counsel. In fact, no one had ever informed me that Brian Lines was represented by counsel. Also, at the time of the call, I did not know whether LOM was represented by counsel in this matter.

11. From listening to the excerpt of the recording, it is clear that we were surprised by Brian Lines' call to us. The recording reflects that the staff thought we had previously spoken to Brian Lines when, in reality, Mr. Weisman and Ms. Nahrwold had actually spoken to Scott Lines. According to the recording, Brian Lines then corrected us and said that we had not called him and instead, we had called Scott Lines. (In fact, we did not call Brian Lines prior to him calling us on February 3, 2003.)

12. On the call, Brian Lines introduced himself to me as the president of LOM. According to the recording, Mr. Weisman and I then brought up the prior call with LOM's general counsel, David Surman. Mr. Weisman told Brian Lines that Mr. Surman had told the staff to pursue our requests through the Bermuda regulator. Brian Lines was dismissive of what Mr. Surman had

---

[1] I have listened to an excerpt of the recording of the call between Brian Lines and the staff. Counsel for Brian Lines previously provided this excerpt to us. It consists of the first couple of minutes of the call.

told us, and he told us that LOM wanted to cooperate.[2] At the time, I believed that Brian Lines, as the president of LOM, had made the decision on behalf of LOM to provide us with information for our investigation. I believed that it was appropriate to speak with him.

13.     We then proceeded to give Brian Lines a standard introduction ("warnings") that we typically provide to witnesses prior to voluntary interviews. Specifically, we informed Mr. Lines that the interview was voluntary; that he had the right to counsel; that we would be taking notes; and that there were criminal penalties for lying to us during the interview.

14.     Several days prior to receiving the call from Brian Lines, we learned that large blocks of Sedona shares had been sold to customers of LOM, but we did not learn the identity of the LOM customers who bought them, or if any of them had been selling Sedona shares. According to the recording, when we began the interview, the first question we asked was: "do you know of anyone that sold shares of Sedona in the last two weeks?"

15.     During the course of the interview, we never intended to trick or mislead Mr. Lines in any way. We just wanted to learn and understand the facts. Because we were not expecting Mr. Lines' call, we had no questions prepared. Accordingly, I asked the questions that came to mind and asked follow up questions based on Mr. Lines' answers.

16.     On February 21, 2003, I received an email from Phil Smith. In pertinent part, Phil Smith stated: "We have just been retained by Brian Lines of Hamilton, Bermuda." This was the first time that I learned that Brian Lines was represented in this matter. Shortly thereafter, we made a voluntary request for documents from Brian Lines through Mr. Smith.

---

[2]     Mr Smith's transcript of the call has brackets and question marks around the words ""he is, it's neither here nor there." When I listened to the recording, I believed Mr. Lines actually stated: "so that is not a you know heither [sic] neither here nor there so to speak."

4

17. On March 13, 2003, we received a call from Phil Smith and Mr. Murdoch, another attorney at Mr. Smith's firm. They indicated that Brian Lines would produce the documents that we previously requested. They also assured the staff that Brian Lines intended to cooperate fully with the staff's requests. At the same time, they indicated that Reid Figel (of the law firm of Kellogg, Huber, Hansen, Todd and Evans) had been retained by LOM. This was the first time that I learned that LOM was represented by counsel in this matter.

18. Subsequently, we made several requests for documents through either Mr. Figel's firm or through Mr. Smith's firm. In response, LOM and Brian Lines voluntarily produced some documents to the staff.[3]

19. Sometime after the Brian Lines interview, we learned that certain of the information that he provided to the staff during his interview was not truthful.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of October 2009.

_____
Michael A. Ungar
Branch Chief
Securities and Exchange Commission

---

[3] Starting in July 2003, based on a request from LOM, we began seeking documents from LOM and its employees (including Brian Lines) through LOM's foreign regulator.