```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                          :
SECURITIES AND EXCHANGE COMMISSION,       :
                                          :
                    Plaintiff,            :   07 Civ. 11387 (DLC)
                                          :
           -v-                            :   OPINION & ORDER
                                          :
BRIAN N. LINES, SCOTT G.S. LINES, LOM     :
(HOLDINGS) LTD., LINES OVERSEAS           :
MANAGEMENT LTD., LOM CAPITAL LTD., LOM    :
SECURITIES (BERMUDA) LTD., LOM            :
SECURITIES (CAYMAN) LTD., LOM             :
SECURITIES (BAHAMAS) LTD., ANTHONY W.     :
WILE, WAYNE E. WILE, ROBERT J. CHAPMAN,   :
WILLIAM TODD PEEVER, PHILLIP JAMES        :
CURTIS, and RYAN G. LEEDS,                :
                                          :
                    Defendants.           :
-----------------------------------------X
```

Appearances:

For Plaintiff:
David Williams
Justin Chretien
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

For Defendant Brian N. Lines:
Philip Smith
Kate Woodall
Patton Boggs LLP
1185 Avenue of the Americas
30th Floor
New York, NY 10036

DENISE COTE, District Judge:

Invoking Rule 4.2(a) of the American Bar Association's Model Rules of Professional Conduct, defendant Brian N. Lines ("Lines") has moved for a protective order to avoid producing a

tape recording of his conversation with the Securities and Exchange Commission ("SEC") during its investigation of stock manipulation. For the following reasons, Lines's motion is denied.

Background

The SEC alleges that defendants in this case engaged in two separate but related fraudulent schemes to manipulate the stock prices of publicly-traded shell companies, Sedona Software Solutions, Inc. ("Sedona") and SHEP Technologies, Inc. Both alleged schemes took place between 2002 and mid-2003. Among the defendants alleged to have participated in these schemes are LOM (Holdings) Ltd., and its subsidiaries Lines Overseas Management Ltd., LOM Capital Ltd. ("LOM Capital"), LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., and LOM Securities (Bahamas) Ltd. (collectively, "LOM"). Lines was the President of LOM Holdings and each of its defendant subsidiaries. LOM Capital was the investment bank for the Sedona transaction.

On January 21, 2003, the SEC began investigating trading related to Sedona securities. The price of the securities on that day was at "price levels thousands of times the previous price of Sedona stock." On January 23, the SEC called an LOM office and was put in contact with Scott Lines, who was then the Managing Director of LOM Holdings and each of its defendant

2

subsidiaries.  The SEC advised Scott Lines of the voluntary nature of the call and began asking questions about matters related to Sedona.  When Scott Lines announced that "we do not engage in voluntary exchange of information with the SEC," the SEC asked to be put in touch with the company's in-house counsel for further explanation of that policy.  LOM's in-house counsel, David Surmon ("Surmon"), explained that all investigative inquiries should be made in writing pursuant to company policy and that either he or the appropriate person within LOM would respond.  The SEC alleges, and Lines does not dispute, that Surmon did not make any clear statements that he was representing anyone in this investigation.  The SEC did not submit any written questions to Surmon or to anyone else at LOM.  On January 29, the SEC suspended trading in Sedona securities.

On February 3, Jack Cooper ("Cooper"), the individual who sold the Sedona shell corporation to Brian and Scott Lines,[1] urged Lines to call the SEC because "the quicker they can find out with certainty [who purchased the stock], probably the quicker we're going to get up trading and everyone get on with their lives."  Cooper gave Lines the name and number of an SEC attorney.

---

[1] The SEC alleges that Brian and Scott Lines used LOM entities and another entity to disguise their purchase of Sedona.

3

About two hours later, Lines called the SEC and introduced himself as the president of LOM.  The following is an excerpt of the transcript of the beginning of the call:[2]

> Lines:  I was speaking with [Cooper] basically and he said that we would be uncooperative, which was definitely not our agenda basically.
>
> . . . .
>
> SEC Attorney Ungar:  What he [Scott Lines] basically told us, he transferred us to the general counsel.
>
> SEC Attorney Weissman:  He transferred me to Mr. Surmon.
>
> Lines:  Well he is our in-house legal counsel, right.
>
> SEC Attorney Weissman:  And Mr. Surmon said that everything had to go through the uh, the Bermuda Monetary Exchange and had to be pursuant to a strict process and that you weren't . . .
>
> Lines:  Yeah I think basically when you, but uh, I think the idea is that we want to be cooperative, basically, so that is not uh, [he is, it's neither here nor there??] so to speak.[3]
>
> SEC Attorney Ungar:  Well as long as you want to be cooperative, I mean that's what we want.
>
> Lines:  I am trying to figure out what the issue is here and obviously the issue seems to be more Tony's uncle basically, than anything else seems to be.

---

[2] Lines has provided a tape and transcript of the beginning of the call to the SEC.

[3] The square brackets and question marks appear in the original transcript of the call produced by Lines.

4

>    SEC Attorney Ungar:  Ah, well let me just, before we begin we do have some questions for you.
>
>    Lines:  Right.
>
>    SEC Attorney Ungar:  There is a standard set of introductions that we give to everyone who . . . have you ever gotten called by the SEC before?
>
>    Lines:  No.
>
>    SEC Attorney Ungar:  Okay, well there is a standard set of introductions, I'd like to just give it to you.  You are not being singled out, whether it was you or the Pope calling us, we give him the same introduction.  Okay?
>
>    Lines:  Yep.
>
>    SEC Attorney Ungar:  Okay, first thing it's voluntary, that means you do not have to answer our questions and uh and you have the right to counsel, we're going to be taking notes.
>
>    Lines: Yeah.

Lines proceeded to talk to the SEC for over an hour.  It is the recording of this call that is at issue.

The SEC received notification sometime after February 3 that Patton Boggs had begun representing Lines and that Kellogg, Huber, Hansen, Todd, Evans & Figel P.L.L.C. had begun its representation of LOM.[4]  It is undisputed that after receiving

---

[4] At a conference on September 29, 2009, Patton Boggs reported that Lines was represented by a Bermuda lawyer and by Patton Boggs in connection with this investigation beginning in early February.  Counsel did not report the exact date in February on

5

these notifications the SEC directed all investigative inquiries through the appropriate attorneys.

The SEC has made a number of requests for the February 3 recording. Lines has refused to produce that recording and he moved for a protective order on October 8, 2009. This motion became fully submitted on October 19.

DISCUSSION

Although disciplinary rules and rules of professional responsibility are not statutorily mandated, "federal courts enforce professional responsibility standards pursuant to their general supervisory authority over members of the bar." United States v. Hammad, 858 F.2d 834, 837 (2d Cir. 1988); see also Southern District of New York, Local Rules, Rule 1.5(b)(5). Lines argues that the SEC violated Rule 4.2(a), which provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.[5]

---

which he and the Bermudan lawyer began representing Lines in this investigation.

[5] Prior to New York's adoption of the Model Rules in 2008, Disciplinary Rule ("DR") 7-104(A)(1) of the ABA's Model Code of Professional Responsibility, which New York had adopted, imposed a similar prohibition by providing that
> A. During the course of the representation of a client a lawyer shall not:
> 1. Communicate or cause another to communicate on the subject of the representation with a party the

6

Rule 4.2 applies to SEC attorneys.  28 U.S.C. § 530B(a); Securities and Exchange Commission Division of Enforcement, Enforcement Manual at 3.3.5.3.3., available at http://www.sec.gov/divisions/enforce/ enforcementmanual.pdf.

Comment 8 to the Rule requires actual knowledge of the representation.  It provides:

> The prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed.  This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances.  Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious.

Rule 4.2 protects against inappropriate communications with both individuals and organizations, regardless of who initiates the communication.  Comment 3 to the Rule provides that "[t]he Rule applies even though the represented person initiates or consents to the communication."  Comment 7 establishes that in the case of an organization, Rule 4.2 protections extend to a high-level employee "who supervises, directs or regularly consults with the organization's lawyer concerning the matter or

---

> lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so.

The parties acknowledge that there are no substantive differences between Rule 4.2(a) and DR 7-104(A)(1), and refer to both formulations of the rule as "Rule 4.2." This Opinion does likewise.

7

has authority to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." Accord Miano v. AC & R Adver., Inc., 148 F.R.D. 68, 76-77 (S.D.N.Y. 1993). An organization is not necessarily "represented," however, simply because it has general counsel; it must have an attorney-client relationship with respect to the matter at issue. See Id. at 80.

SEC attorneys are charged with conducting investigations to determine if someone has violated securities laws. 15 U.S.C. § 78u(a)(1). Comment 5 to Rule 4.2 acknowledges that "investigative activities of lawyers representing governmental entities . . . prior to the commencement of . . . civil enforcement proceedings" may, in some instances, constitute communications that are authorized by law; communications authorized by law are exempted from Rule 4.2.

Because the terms of the Rule are "vague," the Second Circuit has cautioned that it "should be construed narrowly in the interests of providing fair notice to those affected by the Rule." Simels, 48 F.3d at 650. Nonetheless, courts have acknowledged that its precepts may apply to investigations before litigation has formally been commenced. See Hammad, 858 F.2d at 838 (in criminal context); accord Miano, 148 F.R.D. at 77 (in civil context). Care must be used in deciding, however,

8

that Rule 4.2 applies to investigative communications.  In the criminal context, the Second Circuit "urge[s] restraint in applying the rule to criminal investigations to avoid handcuffing law enforcement officers in their efforts to develop evidence."  Hammad, 858 F.2d at 838.  The Rule may therefore be limited in the pre-litigation phase to those cases where the attorney and represented parties have an adverse or a "ripening adverse" relationship.  2 Geoffrey C. Hazard, Jr. & William Hodes, The Law of Lawyering, A Handbook on The Model Rules of Professional Conduct § 38.6 (2005).

The Second Circuit has declined to offer bright-line rules delineating specific conduct or situations that violate Rule 4.2.  Determining whether the Rule has been violated in a particular instance instead "require[s] a case-by-case determination."  Grievance Comm. for S. Dist. of N.Y. v. Simels, 48 F.3d 640, 649 (2d Cir. 1995).

If a party is found to have violated Rule 4.2, a court may exercise its discretion to exclude the resulting statements from evidence. United States v. Thompson, 35 F.3d 100, 104 (2d Cir. 1994); Hammad, 858 F.2d at 840; Miano, 148 F.R.D. at 89-90.  But, "suppression of evidence is an extreme remedy that may impede legitimate investigatory activities," Hammad, 858 F.2d at 837, and "[e]xclusion . . . is not required in every case."  Id. at 842.  The Second Circuit has expressed its "confidence that

9

district courts will exercise their discretion cautiously and with clear cognizance that suppression imposes a barrier between the finder of fact and the discovery of truth." Id. at 842. See Miano, 148 F.R.D. at 90 (discretion to suppress should be "exercised cautiously").

The policies underlying Rule 4.2 guide this exercise of discretion. See Simels, 48 F.3d at 645 ("[W]here, as in the case of DR 7-104(A)(1), neither the plain meaning nor the intent of the drafters can be discerned from the face of the rule, matters of policy are appropriately considered in determining its scope."); Hammad, 858 F.2d at 840 ("[I]n light of the underlying purposes of the Professional Responsibility Code . . . . , suppression may be ordered in the district court's discretion."). The rule is "primarily a rule of professional courtesy" designed to protect a represented party from "the danger of being tricked into giving his case away by opposing counsel's artfully crafted questions." Simels, 48 F.3d at 647 (citation omitted). The Second Circuit has noted that the Rule also serves the purposes of:

> protecting the client from disclosing privileged information or from being subject to unjust pressures; helping settle disputes by channeling them through dispassionate experts; rescuing lawyers from a painful conflict between their duty to advance their clients' interests and their duty not to overreach an unprotected opposing party; and providing parties with the rule that most would choose to follow anyway.


Id. (citation omitted).

In light of these policy considerations, the Second Circuit has endorsed the exclusion of evidence obtained in violation of Rule 4.2 when that evidence adds "serious prejudice" or "taint" to the proceedings. United States v. Dennis, 843 F.2d 652, 657 (2d Cir. 1988). When the attorney's conduct falls short of tainting the proceedings, the Second Circuit has declined to require exclusion of the relevant evidence. See, e.g., United States v. DeVillio, 983 F.2d 1185, 1192 (2d Cir. 1993).

The facts of this case present strong arguments that the SEC committed no violation of Rule 4.2. First, it is not clear that the SEC was bound by Rule 4.2 in its communication with Lines on February 3. The telephone conversations occurred during a government investigation and prior to the commencement of civil enforcement actions. The SEC had commenced its investigation of Sedona only two weeks prior to this call, and had contacted LOM in its capacity as Sedona's investment banker. Lines has not shown that as of that date there was an unambiguously adverse relationship, or even a ripening adverse relationship, between the SEC and either LOM or Lines.

Even if Rule 4.2 could be said to apply to the SEC in these opening weeks of its investigation, Lines has not shown that the SEC "knew" Lines was represented in this investigation at the

time of the February 3 call. When the SEC advised Lines during the February 3 phone call that he had a right to counsel, Lines did not indicate that he was represented by counsel. Indeed, Lines has still not asserted that he or LOM ever sought legal advice from Surmon in connection with this investigation. Lines relied instead on outside counsel for his legal advice in this investigation. Lines's current counsel, Patton Boggs, has indicated that it and a Bermuda attorney began representing Lines in early February 2003, but has not asserted that the SEC had any reason to know of their representation of Lines on February 3.[6] Nor did Surmon clearly indicate that he was representing LOM in connection with the investigation when he told the SEC that either he <u>or the appropriate person</u> within LOM would reply to any written inquiries submitted by the SEC.

In any event, even if Lines could show that the SEC's decision to take Lines's telephone call and to continue to speak to Lines after he gave his consent constituted a violation of Rule 4.2, he has not shown that this Court should exercise its discretion to allow him to withhold this highly pertinent

---

[6] At a recent conference, Patton Boggs referred to conversations that Lines had with Corey Dean during the SEC's investigation in this case. It described Dean as Lines's corporate lawyer in Canada. Thus, in addition to Patton Boggs and a Bermuda attorney, it is possible that Lines was represented on February 3 by a Canadian attorney as well. Lines does not, however, suggest that the SEC was aware on February 3 that Lines had retained any of these attorneys.

12

evidence. Lines initiated the February 3 call to further his own interests with respect to the SEC investigation. After being warned that his participation was voluntary and that he had a right to have counsel, Lines talked to the SEC for over an hour in an effort to influence the SEC to allow Sedona securities to resume trading. Having placed the call to win an advantage during the unraveling of what the SEC seeks to prove was a stock manipulation scheme, Lines may not now withhold the tape recording of the call. Fairness considerations analogous to those at issue when a party attempts to assert a privilege as both "a shield and a sword," In re Sims, 534 F.3d 117, 132 (2d Cir. 2008) (citation omitted), support disclosure.

Lines principally argues that a person can not waive Rule 4.2 protections, even by initiating contact with the attorney. Lines cites Comment 3 to Rule 4.2, supra, and a line of cases to support this position. See Parker v. Pepsi-Cola Gen. Bottlers, Inc., 249 F. Supp. 2d 1006 (N.D. Ill. 2003); Hammond v. City of Junction City, Kansas, 167 F. Supp. 2d 1271, 1287 (D. Kan. 2001); In re Doe, 801 F. Supp. 478, 480 (D.N.M. 1992); In re Grant Broad. of Phila., 71 B.R. 655, 660 (E.D. Pa. 1987). These cases do not help Lines. None of these cases addresses a communication with a government attorney during a government investigation. Each addresses contacts with represented parties after litigation has been filed, and only Doe raises the issue

13

of misconduct by a government lawyer at that stage.  While there was a dispute in Hammond over the attorney's knowledge that the party was represented, in the other three cases there was no ambiguity that the party was represented at the time of the communication.  In sum, these cases give little guidance on the issues at stake here.

It is significant that the SEC's conduct did not run afoul of any of Rule 4.2's purposes.  The SEC did not engage in this communication to try to trick Lines into giving away information crucial to its case.  Quite the contary, Lines initiated the call and he volunteered information in an effort to get the Sedona trading ban lifted.  Thus, the SEC's participation in this communication will not taint these proceedings.  Indeed, it would run counter to the interests of justice to allow Lines to withhold the tape recording of this call.  Having failed to achieve his goal of getting the ban on trading lifted, Lines is not entitled to bar evidence of those efforts.

Taken to their logical conclusion, Lines's arguments in support of withholding the tape recording of the February 3 conversation would similarly support a yet-to-be-filed motion to suppress trial testimony from the SEC participants in the conversation to their recollection of Lines's statements.  On the record adduced to date, such a motion would have to be denied.  It is in the interest of justice to give the fact-

14

finder access to the most reliable evidence of what Lines volunteered to the SEC in the midst of these swiftly unfolding events, and that evidence is the recorded call.

CONCLUSION

Lines's October 8, 2009 motion for a protective order is denied.

SO ORDERED:

Dated:   New York, New York
         November 13, 2009

                                     _____
                                         DENISE COTE
                                    United States District Judge