UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

SECURITIES AND EXCHANGE COMMISSION          :
                                            :   Case No: 07-CV-11387 (DLC)
                          Plaintiff,         :
                                            :   DECLARATION OF WAYNE E.
                v.                          :   WEW IN SUPPORT OF HIS
                                            :   MOTION FOR SUMMARY
BRIAN N. LINES, et al.,                      :   JUDGMENT
                                            :
                          Defendants.        :
                                            :
------------------------------------------------------------------------ x

        WAYNE E. WEW, declares under penalty of perjury:

        1.      I am a citizen of Canada and I have been sued in this action under my former name, Wayne E. Wile.  I legally changed my name from Wayne Eldridge Wile to Wayne Eldridge Wew in Canada on January 12, 2005.  I submit this declaration in support of my motion for summary judgment on all of the claims asserted against me by plaintiff, The Securities and Exchange Commission ("SEC").

        2.      I am a citizen of Canada and a legal resident of Switzerland.

        3.      Attached to this declaration as Exhibit A are excerpts from the transcript of the deposition that I gave in this action on January 19, 2010.

        4.      Attached to this declaration as Exhibit B are copies of order tickets that I obtained from Canacord Capital Corp., my broker, in 2003.  These tickets reflect all of the trades that I placed in Sedona Software Solutions, Inc., trading under the symbol SSSI.  Those trades were placed through a company that I own called Industrias Balmes.  I have owned Industrias Balmes and used it for day trading since approximately 2001.

5.     Attached to this declaration as Exhibit C is a signed statement that I obtained from my broker at Canacord Capital Corp., Ron Warrington.

6.     As I explained at my deposition in this litigation, I am a day trader and I have been a day trader since the mid-1980s. My trading technique is one that is sometimes referred to as "streaming." I watch the stream of orders for a particular security throughout the day and based on my experience and knowledge of trading patterns, I buy that security at the point where I think it is near its low price for the day and I sell it when I think it is at or near its high price for the day. When I am "streaming" a stock I do not intend to hold on to that stock past the end of the trading day. Therefore, the long term investment potential of that stock is not of particular interest to me. I am interested in the ebb and flow of the price of the stock during the course of the trading day. Stocks that experience substantial price variations during a single day – which is often the case with initial offerings – present trading opportunities for me.

7.     I purchased SSSI on January 21, 2003, because it was a new issue from a junior mining company. While I have traded the securities of companies in many different industries over the years, in 2003, when the price of gold began to recover, junior mining companies were of interest to me. Of course, I had heard about SSSI from my nephew, Anthony Wile, and I was familiar with some of the Central American mining assets that SSSI intended to acquire from previous investment experiences, but that knowledge was not relevant to my decision to buy SSSI on January 21. I was not looking for a long term investment. I was only interested in day trading SSSI.

8.     Between pages 76 and 107 of my deposition I explain how and why I placed an order for SSSI on the morning of January 21, 2003.

2

9.      The next day, January 22, I did the same thing that I did on January 21.  At the start of the trading day I thought that I saw an opportunity to make money in a day trade on SSSI and placed a bid for 2000 shares of SSSI at $9.10. A couple of hours later I also placed a bid for 2000 shares of SSSI at $8.25.  The second order was not filled.  I placed an order to sell SSSI at $9.35, but that order was not filed on January 22 and I ended the day with the stock still in my account.  On January 23, I tried to sell the stock for $9.75.  I lowered my price throughout the day and eventually sold out my position at $9.30.  At that point I decided that SSSI was no longer suitable for my trading style and I stopped following the stock.

10.      I never knew and had no control over the market maker to which my orders for SSSI were routed, how those orders would be filled, or who would be on the other side of those trades.  I never know that information about any trade that I ever do.  I rely on my brokers to execute the trades as efficiently as possible.

11.      There was nothing unusual about the trades that I made on January 21, 2003, and nothing unusual about the type of trading I did that day, that week, or that month.  As the SEC knows – since it has subpoenaed my trading records from every account that I can remember – I am a day trader and buy many stocks every day and sell those same stocks on the day I buy them or the day after.

12.      At my deposition the SEC claimed that my nephew Anthony tried to call me nine times on January 21, 2003.  I have seen no evidence of this, but it would not surprise me if he did so.  On days when my nephew was particularly excited about something he called me many times a day.  He still does so today.  I do not recall any particular conversation with my nephew on January 21, although I do recall speaking to him in the morning, when he told me how excited he was about taking Renaissance public.

13. I am absolutely certain that I never discussed with my nephew Anthony Wile my decision to purchase SSSI or the prices at which I would bid for or offer to sell SSSI. I can recall only one conversation with my nephew in which he asked me if I intended to invest in his new project. That conversation took place days before January 21, 2003, and I specifically recall telling him that I would NOT buy the stock (I do not recall if we referred to the stock in that conversation as "Renaissance" or "Sedona" or "SSSI").

14. I never spoke to or communicated with Brian Lines, Scott Lines, or any employee of the LOM companies about Renaissance, Sedona, or SSSI.

15. I never participated in nor was I aware of any effort by anyone to "manipulate" the price of SSSI.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: January 25, 2010

_____
WAYNE E. WEW

4

# EXHIBIT A

Wayne Eldridge Wew                                                  January 19, 2010

Page 1

 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE COMMISSION,

 5            Plaintiff,

 6       vs.                        Case No. 07 cv 11387(DLC)

 7   BRIAN N. LINES; SCOTT G.S. LINES;
     LOM (HOLDINGS) LTD.; LINES OVERSEAS
 8   MANAGEMENT LTD.; LOM CAPITAL LTD.;
     LOM SECURITIES (BERMUDA) LTD.; LOM
 9   SECURITIES (CAYMAN) LTD.; LOM
     SECURITIES (BAHAMAS) LTD.; ANTHONY
10   W. WILE; WAYNE E. WILE; ROBERT J.
     CHAPMAN; WILLIAM TODD PEEVER;
11   PHILLIP JAMES CURTIS; AND RYAN G.
     LEEDS,
12
            Defendants.
13   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

14

15          VIDEOTAPED DEPOSITION OF

16            WAYNE ELDRIDGE WEW

17

18            January 19, 2010

19              10:03 a.m.

20

21          555 West Beech Street
                 Suite 111
22          San Diego, California

23

24   Debby M. Gladish, RPR, CLR, CSR

25            CSR No. 9803

Page 2

1                    APPEARANCES OF COUNSEL

2

3        For the Plaintiff:

4              U.S. SECURITIES AND EXCHANGE COMMISSION
               JUSTIN CHRETIEN, ESQ.
5              100 F Street, N.E.
               Washington, DC  20549-4010
6              202.551.4953
               202.772.9245 Fax
7              chretienj@sec.gov

8

         For the Witness:
9
               SATTERLEE STEPHENS BURKE & BURKE LLP
10             MARIO AIETA, ESQ.
               230 Park Avenue
11             New York, New York  10169
               212.818.9200
12             212.818.9606 Fax
               maieta@ssbb.com
13

14       For the Defendant Scott Lines:

15             K&L GATES LLP
               STEPHEN J. CRIMMINS, ESQ.
16             599 Lexington Avenue
               New York, New York  10022
17             212.536.3987
               212.536.3900 Fax
18             stephen.crimmins@klgates.com

19

         For the Defendnat LOM:
20
               KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, P.L.L.C.
21             DEREK T. HO, ESQ.
               1615 M Street, N.W.
22             Suite 400
               Washington, D.C.  20036
23             202.326.7931
               202.326.7999 Fax
24             dho@khhte.com

25

Page 3

```
 1              APPEARANCES OF COUNSEL (Continued)

 2

 3      For Defendant Brian Lines:

 4          PATTON BOGGS LLP
            PHILIP M. SMITH, ESQ.
 5          1185 Avenue of the Americas
            30th Floor
 6          New York, New York  10036
            626.557.5145
 7          626.557.5101 Fax
            (TELEPHONIC APPEARANCE)
 8

 9      For Defendant Anthony Wile:

10          AKERMAN SENTERFITT
            LEONARD H. BLOOM, ESQ.
11          One Southeast Third Avenue
            25th Floor
12          Miami, Florida  33131-1714
            305.374.5600
13          305.374.5095 Fax
            (TELEPHONIC APPEARANCE)
14

15      Also Present:

16          DANA BACHMANN, Videographer

17

18

19

20

21

22

23

24

25
```

Wayne Eldridge Wew                                        January 19, 2010

1

2                       INDEX OF EXAMINATION

3

4     WITNESS:   WAYNE ELDRIDGE WEW

5     EXAMINATION                              PAGE

6     By Mr. Chretien                       7, 111

7        By Mr. Crimmins                        93

8     By Mr. Ho                               108

9     By Mr. Aieta                            109

10

11

12

13

14        QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

15                        Page    Line

16                         (None)

17

18

19

20

21

22

23

24

25

Wayne Eldridge Wew                                                    January 19, 2010

Page 5

1                                    INDEX TO EXHIBITS

2

3       Exhibit                    Description                    Page

4       No. 278   New Account Tracking Sheet, 18 pages          50

5       No. 279   Letter dated September 9, 2003, from          57
                  Lehman Brothers to Stephen P.
6                 Glascoe, 1 page

7       No. 280   Lehman Brothers Client Statement,             58
                  July 1 - July 31, 2002, 14 pages
8
        No. 281   Lehman Brothers Client Statement,             60
9                 January 1 - January 31, 2003, 16
                  pages
10
        No. 282   LOM Securities (Cayman) Limited               61
11                Client Statement, 1 page

12      No. 283   Lehman Brothers new account                   63
                  information, 10 pages
13
        No. 284   Lehman Brothers Client Statement,             65
14                January 1 - January 31, 2003, 9 pages

15      No. 285   Subscriber Information, AT&T                   69
                  Wireless, 15 pages
16
        No. 286   Copy of driver's license and                 88
17                passport, 1 page

18      No. 287   Copy of Canadian passport, 1 page             89

19      No. 288   W.E.W. Consultores account                    89
                  information, 5 pages
20
        No. 289   LOM Securities (Bahamas) Limited              92
21                Client Statement, 5 pages

22

23

24              (Original exhibits attached to original

25                         transcript.)

```
 1                  SAN DIEGO, CALIFORNIA

 2              January 19, 2010; 10:03 A.M.

 3

 4          THE VIDEOGRAPHER:  Good morning.  This is Tape

 5      No. 1 to the videotaped deposition of Wayne Eldridge

 6      Wew in the matter of the Securities and Exchange

 7      Commission vs. Brian Lines, et al., being heard before

 8      the U.S. District Court, Southern District of New York.

 9              This deposition is taking place at 555 West

10      Beech Street, Suite 111, San Diego, California 92101.

11      Today's date is January 19th, 2010, at approximately

12      10:03 a.m.

13              My name is Dana Bachmann.  I'm the

14      videographer with Esquire.  Our court reporter today is

15      Debby Gladish.

16              Counsel, will you please introduce yourselves

17      and state your affiliations for the record.

18          MR. CHRETIEN:  Justin Chretien for SEC,

19      Plaintiff.

20          MR. CRIMMINS:  Steve Crimmins from K&L Gates,

21      LLP, representing Scott Lines.

22          MR. HO:  Derek Ho from Kellogg, Huber, Hansen,

23      Todd, Evans & Figel representing LOM Holdings Ltd.,

24      Lines Overseas Management Ltd., LOM Capital Ltd., LOM

25      Securities Bermuda Ltd., LOM Securities Cayman Ltd.,
```

Page 37

 1    three-year period, whatever you mentioned earlier.

 2         Q.    Did your FCSI give you those trading rights,

 3    allow you to trade in Canada?

 4         A.    No, it has -- it has nothing to do with

 5    trading in Canada.  It's an -- it's an educational

 6    level.  You're allowed to trade in -- like any

 7    individual is allowed to trade securities in Canada

 8    unless, of course, you're barred.

 9         Q.    Okay.  Once you obtained the FCSI, where were

10    you employed?

11         A.    I was employed in Canada.

12         Q.    For what -- for an institution or what?

13         A.    Brokerage firm.

14         Q.    What brokerage?

15         A.    Midland Duwardy.

16         Q.    What time period?

17         A.    Late '60s through the mid-'80s.

18         Q.    You were a broker for them?

19         A.    Yes.

20         Q.    Where did you go after you left Midland

21    Duwardy?

22         A.    I just went on my own, became a consultant.

23         Q.    Have you been a consultant since then?

24         A.    Yes.

25         Q.    Well, I'm a little bit confused.  I understand

Page 38

1    you obtained your FCSI as a result of study and passing

2    courses, I -- I take it.  Do you have a certificate in

3    Canada to be a broker?

4        A.    Now?  No.

5        Q.    How about then?

6        A.    Yes.  You have a license.

7        Q.    Okay.

8        A.    It's called a license in Canada.

9        Q.    And your license was revoked two to three

10   years based on the civil proceeding; is that correct?

11       A.    No, it was not.  No, there wasn't any revoking

12   of my license.  I had quit the brokerage business.  I

13   wasn't involved in the brokerage business when I --

14   when this trading ban was instigated.

15       Q.    Okay.  What kind of consulting do you do?

16       A.    I -- actually, it's a terminology.  I don't

17   consult for anyone.  I'm a -- I'm a day trader for my

18   own account.

19       Q.    Which account are you referring to?

20       A.    Me, Wayne Wile, Wayne Wew.

21       Q.    Are all of your trading accounts now under the

22   name Wew or are some still under Wile?

23       A.    Some still -- I don't know whether there are

24   any under Wile.  I really don't.  I don't believe so.

25       Q.    In January 2003 were you a day trader?

Wayne Eldridge Wew                                                    January 19, 2010

Page 60

```
 1      A.   Yes.

 2      Q.   Is that -- was that a rented office or a

 3  leased?

 4      A.   Yes.

 5      Q.   Do you still have it rented?

 6      A.   Yes.

 7           (Defendants' Exhibit No. 281 was marked.)

 8           MR. CHRETIEN:  Exhibit 381.

 9           THE REPORTER:  281, Counsel.

10           MR. CHRETIEN:  281.  I'm sorry.

11  BY MR. CHRETIEN:

12      Q.   This is another group exhibit -- I take

13  Mr. Ho's exception to the use of group exhibits --

14  beginning with SEC Bates number 22956, ending with

15  22611.

16           Do you recognize the document, Mr. Wew?

17      A.   Yes.

18      Q.   It's an account statement for the W.E.W.

19  Consultores Lehman Brothers account; is that correct?

20      A.   That's correct.

21      Q.   For the month of January 2003; correct?

22      A.   Correct.

23      Q.   W.E.W. Consultores also had an account, a

24  trading account at LOM Securities Cayman; correct?

25      A.   That's correct.
```

1             (Defendants' Exhibit No. 282 was marked.)

2     BY MR. CHRETIEN:

3         Q.    Let me show you 282, I believe.

4         A.    Thank you.

5         Q.    Have you had a chance to review the document?

6         A.    Yes.

7         Q.    And that is -- what is that document?

8         A.    It's a portion of a client account statement.

9         Q.    And do you recognize it as the account

10    statement for the account in the name of W.E.W.

11    Consultores?

12        A.    Yes.

13              MR. CRIMMINS:   Objection.

14    BY MR. CHRETIEN:

15        Q.    Your account representative was Andrew

16    Golding?

17        A.    That is correct.

18        Q.    Have you spoken to him in person on the phone

19    at any time?

20        A.    Yes.

21        Q.    In January 2003, do you remember if you spoke

22    with Mr. Golding?

23        A.    No, I do not recall.

24        Q.    Would it have been -- how often did you speak

25    to him on an annual basis?  Let's take the time frame

Wayne Eldridge Wew                                                      January 19, 2010

Page 62

1    around January 2003.

2        A.    If I were living in Cayman at the time, which

3    I believe I was, I probably spoke to him several times

4    a week.

5        Q.    Would you have spoken to him with respect to

6    the purchase of shares through Industria Bomez?

7            MR. AIETA:  Objection.

8            MR. HO:  Objection.

9            THE WITNESS:  No.

10           MR. AIETA:  Got to give us time to object.

11           THE WITNESS:  Oh, okay.  Sorry.  I still have

12   to answer?

13           MR. AIETA:  You do, yes.

14   BY MR. CHRETIEN:

15       Q.    The Canaccord account through which Industria

16   Bomez traded, who is the account representative for

17   Canaccord?

18       A.    Ron Warrington.

19       Q.    Did you speak to him on a regular basis?

20       A.    Yes.

21       Q.    Now, I'm talking back in January of 2003.

22       A.    Yes.

23       Q.    Would you have spoken to Ron before making the

24   purchase through Industria Bomez?

25           MR. AIETA:  Objection.

Wayne Eldridge Wew                                      January 19, 2010

Page 67

1      Q.    I think it was a previous exhibit.

2      A.    Oh, okay.  Yes, Jimenez.

3      Q.    Would he have worked out in -- of that office?

4      A.    At that particular time, I'm not sure because

5   the employees came and went in this corporation, not

6   this corporation, but in the business office itself.

7      Q.    Okay.  Did that business office house other

8   businesses other than Transatlantic Co. and W.E.W.

9   Consultores?

10      A.    Definitely, yes.

11      Q.    So there were a number of office -- number of

12   businesses operating out of the same address?

13      A.    That is correct.

14      Q.    Okay.  And the purpose of those two companies

15   was for trading?

16      A.    Yes.

17      Q.    Anybody else trade through those two

18   companies?

19      A.    No.

20      Q.    So on January 21st, 2003, you purchased Sedona

21   stock through the Industria Bomez account; correct?

22      A.    Yes.

23            MR. HO:  Objection.

24   BY MR. CHRETIEN:

25      Q.    By the way, have you talked to Tony Wile in

Page 68

1    the last month?

2        A.    Yes.

3        Q.    Since his deposition?

4        A.    Yes.

5        Q.    What did he say to you?

6        A.    What did he say to me?  We -- we speak quite

7    often on personal -- personal things.  I mean, we have

8    had many conversations.

9        Q.    What did he say about his deposition?

10       A.    Said he thought it went very well.

11       Q.    What did he say about your upcoming deposition

12   today?

13       A.    Said it should go very well.

14       Q.    Where does he reside?

15       A.    He resides in -- I'm not quite sure whether

16   his actual residence is in Canada or in Switzerland at

17   this particular point, one or the other.

18       Q.    Does he have a residence in Switzerland?

19       A.    You mean does he have a home in Switzerland?

20       Q.    Yes.

21       A.    I'm not -- I don't think so at this point, no.

22       Q.    Would he stay with you when he'd --

23       A.    No, no.  He rents a -- he rents -- the last

24   time he was here, he rented a home.

25       Q.    Okay.  Your cell phone number, do you have a

Page 75

```
 1      A.    No.

 2            MR. AIETA:  Objection.

 3            MR. CRIMMINS:  Objection.

 4            MR. BLOOM:  Objection.

 5   BY MR. CHRETIEN:

 6      Q.    What is your recollection of the phone calls

 7   made between you and Tony in the weeks leading up to

 8   the January 21st transaction?

 9            MR. BLOOM:  Objection; time frame.

10   BY MR. CHRETIEN:

11      Q.    In the two weeks from January 8th to

12   January 21.

13      A.    There were numerous calls.

14      Q.    What was the subject of the calls?

15      A.    Could have been anything.

16      Q.    Including Sedona?

17      A.    Could have been, yes.

18      Q.    How did you hear about Sedona?

19      A.    From my nephew.

20      Q.    From Tony?

21      A.    I heard about Renaissance from Tony.

22      Q.    What did he tell you about Renaissance?

23      A.    He told me what he -- that he was in a -- in a

24   situation whereby he was acquiring assets and he called

25   the company Renaissance.
```

Page 76

1    Q.    Did he ask you to invest in it?

2    A.    No.   He -- he told me about the properties.

3    Q.    He suggested -- well, what did he tell you

4    about the properties?

5    A.    Just told me what they were doing, what

6    they -- how they were -- they were acquiring them and

7    they were gold properties that had been in production

8    and he thought they had a great opportunity, a great

9    future.

10    Q.    Did he send you press releases?

11    A.    Not that I'm aware of, no.

12    Q.    Is that the basis upon which you purchased the

13    5,000 shares?

14         MR. AIETA:  Objection.

15         MR. HO:  Objection.

16    BY MR. CHRETIEN:

17    Q.    Go ahead.

18    A.    I purchased the shares for a day trade,

19    nothing -- nothing more or less.

20    Q.    But your knowledge came originally from Tony?

21         MR. AIETA:  Objection.

22    BY MR. CHRETIEN:

23    Q.    Correct?

24    A.    Regarding Renaissance?

25    Q.    Yes, sir.

Wayne Eldridge Wew                                          January 19, 2010

1      A.   Yes.

2      Q.   Did you do any investigation regarding

3   Renaissance?

4      A.   No.

5      Q.   How did you come upon a price per share of

6   $8.25?

7      A.   The market -- the market was opening at $8 bid

8   offered at 9 or -- as I recall, there was a market bid

9   ask.  At the time I placed my order, I simply topped

10   the bid.

11      Q.   What was your understanding at the time of

12   Tony's role in Renaissance?

13      A.   My understanding was that he was putting

14   together a portfolio of gold mining properties into

15   Renaissance.

16      Q.   Was it your understanding that he owned --

17   that Renaissance owned the properties or were in the

18   process of acquiring the properties?

19      A.   They were in the process of acquiring them.

20   They had an option to acquire.

21      Q.   What did Tony tell you about the share price

22   or what he expected of the share price?

23      A.   He told me they expected the share price, when

24   it went public, to be in the 8 to $10 range.

25      Q.   You put in your bid at 9.25, I believe?

Wayne Eldridge Wew                                              January 19, 2010

Page 78

 1        A.   I'm not sure.  It's in the record.

 2        Q.   But it was before the market opened?

 3        A.   According to the record, yes.

 4        Q.   Why would you do that?

 5        A.   The bid was called.  I wanted to be first in

 6   line.  I over- -- I topped the previous bid, so if

 7   there was any stock being sold, I would be first in

 8   line to buy it.

 9        Q.   Tony talked to you that morning, though;

10   correct?

11        A.   He did.

12             MR. AIETA:  Objection.

13   BY MR. CHRETIEN:

14        Q.   Was it about the Sedona transaction?

15        A.   I don't recall what it was specifically, but

16   he would have been very exuberant about the fact that

17   his assets were going public on that day.  I don't know

18   what -- the exact things that he would have said to me.

19        Q.   Your purchase followed, according to my

20   records, a phone call from Tony just a few minutes

21   before.  Do you recall that?

22        A.   I recall him calling me in the --

23             MR. BLOOM:  I'm sorry.  I couldn't hear the

24   question.

25             MR. CHRETIEN:  Could you read the question

Page 79

1    again?

2            (Record read.)

3            THE WITNESS:  I recall him calling me before I

4    put the order in, yes.

5    BY MR. CHRETIEN:

6        Q.   Okay.  And what was the substance of that

7    call?

8        A.   Again, exuberance -- sorry.  Exuberance about

9    the company going public and opening day and very

10   exuberant.

11       Q.   What was your assessment of Sedona as an

12   investment opportunity as of the time you invested?

13       A.   I had no knowledge of what it was -- what --

14   the criteria of investment was in Sedona.  I simply

15   made a trade.  A new issue coming out, I made a trade,

16   a day trade.

17       Q.   The only information you had, though, was from

18   Tony; correct?

19       A.   That's correct.

20       Q.   You thought it was a sound investment?

21       A.   I didn't say a sound investment.  I said it

22   was a trading opportunity, which is what I do.  I

23   didn't buy the stock for a sound investment.  I bought

24   it for a trade.

25       Q.   And you ended up selling -- selling all your

Wayne Eldridge Wew                                                          January 19, 2010

Page 80

```
1    shares the same day; correct?
2         A.    All of my shares -- I bought 5,000 shares and
3    I sold 5,000 shares, yes.
4         Q.    How much did you make from the trade?
5         A.    I think roughly $5,000.
6         Q.    Did you have any conversations with Ian Park
7    in the month prior to the purchase on January 21?
8         A.    I don't believe so.
9         Q.    As of January 2003, January 21, did you know
10   Brian Lines?
11        A.    Yes.
12        Q.    Had spoken to him on several occasions?
13             MR. AIETA:  Objection.
14   BY MR. CHRETIEN:
15        Q.    Is that correct?
16        A.    That's correct.
17             MR. BLOOM:  Objection.
18   BY MR. CHRETIEN:
19        Q.    When was the last time you spoke to Brian
20   Lines prior to January 21?
21        A.    A couple years earlier.
22        Q.    In what context?
23        A.    I was in Bermuda.
24        Q.    How did you know Brian Lines?
25        A.    I was introduced to him in Bermuda.
```

Wayne Eldridge Wew                                           January 19, 2010

Page 81

1      Q.   How about Scott Lines?

2      A.   Same time.

3           MR. HO:  Objection to the last question.

4   BY MR. CHRETIEN:

5      Q.   Did you have any conversation with Scott Lines

6   in the month prior --

7      A.   No.

8      Q.   -- to the purchase?

9      A.   No.

10          MR. AIETA:  Wait for the question to be

11  completed.

12          THE WITNESS:  Well, yeah.

13  BY MR. CHRETIEN:

14     Q.   Did you have any conversations with anybody at

15  any of the LOM brokerages in the month prior to the

16  January 21, 2003, purchase.

17          MR. AIETA:  Objection.

18          THE WITNESS:  Not to my knowledge.

19  BY MR. CHRETIEN:

20     Q.   Who else would you have talked to, if there

21  was such a person, in that month prior?

22          MR. AIETA:  Objection.

23          MR. HO:  Objection.

24          MR. BLOOM:  Objection.

25          THE WITNESS:  There wouldn't have been any

Page 82

1    person I would have spoken to.

2    BY MR. CHRETIEN:

3        Q.    Who else do you know at -- as of January 2003,

4    who else did you know on a name-by-name basis at LOM?

5        A.    The only person I knew on a name-by-name basis

6    is Andrew Golding.

7        Q.    When did you first meet Andrew?

8        A.    When I first went to Cayman a few years

9    earlier.

10       Q.    Did you speak to Andrew in the month prior to

11   the January 21 purchase?

12           MR. CRIMMINS:  Objection.

13           THE WITNESS:  Quite possibly, yes.

14   BY MR. CHRETIEN:

15       Q.    Would you have spoken to him about the --

16   about Sedona?

17       A.    No.

18           MR. AIETA:  Objection.

19   BY MR. CHRETIEN:

20       Q.    You expected the price of the stock to rise

21   obviously, because you wouldn't have bought it

22   otherwise; correct?

23       A.    That's right.

24       Q.    Why did you think the stock was going to rise?

25       A.    My trading experience indicates to me that day

Wayne Eldridge Wew                                                    January 19, 2010

Page 83

1    one on a new issue, they usually rise, so I usually buy

2    new issues on day one and trade them out.

3        Q.   What did Tony say about his title or position

4    at -- at Renaissance?

5        A.   I don't think he ever discussed it with me.  I

6    don't know what his position was.

7        Q.   What is your understanding today, as you sit

8    here, of Tony's role in putting together the deal?

9        A.   I think that's -- that's the role that he had,

10   putting together the deal, securing the assets, lining

11   up the financing that was required to take the company

12   public.

13       Q.   Have you since had an opportunity to review

14   the press releases issued in the two weeks prior to the

15   January 21 purchase?

16       A.   I probably saw them at some time, but not

17   recently.

18       Q.   Is there anything significant in those press

19   releases to you?

20       A.   Not that I noticed.

21            MR. HO:  Objection to the last question.

22   BY MR. CHRETIEN:

23       Q.   What made you sell at the time you did?

24       A.   Day trade, simply a thing to do.  I was making

25   money on my trade and I took it.

Page 84

1        Q.   Why did you use Industria Bomez to buy the

2    shares instead of an account under your own name?

3            MR. AIETA:   Objection.

4            THE WITNESS:   It was the account that I had at

5    Canaccord.

6    BY MR. CHRETIEN:

7        Q.   Why did you have to use a Canaccord account?

8            MR. AIETA:   Objection.

9            THE WITNESS:   It's where I do my -- the bulk

10   of my business is done through Canaccord.

11   BY MR. CHRETIEN:

12       Q.   Through Industria Bomez?

13       A.   Yes, uh-huh.

14       Q.   Why not have an account under your own name?

15           MR. AIETA:   Objection.

16           THE WITNESS:   No need.   I already had an

17   account.

18   BY MR. CHRETIEN:

19       Q.   Okay.

20       A.   I'd like you to -- would you ask that question

21   again?

22           MR. CHRETIEN:   I'll have the court reporter

23   ask it again.

24           (Record read.)

25           THE WITNESS:   I'd like to speak to that.

Wayne Eldridge Wew                                    January 19, 2010

Page 85

```
 1    BY MR. CHRETIEN:

 2        Q.    Sure.

 3        A.    The reason I trade through corporations is to

 4    keep my name off of what we call sucker lists.  When --

 5    when people find out -- promoters, what have you --

 6    that you trade in this type of stock, they begin to

 7    hound you and send you promotional materials and try to

 8    get you to buy their product.  I didn't want that in my

 9    life, so I traded through these accounts.

10        Q.    Did Tony mention to you the press releases

11    that were being issued in the weeks preceding the

12    January 21 purchase?

13        A.    He may have.  He may have.  I don't recall.

14        Q.    Did he indicate his role in drafting them?

15        A.    No, he did not.

16        Q.    From what you're saying, it seems that the

17    primary reason you bought Sedona shares was based on

18    the information you received over the telephone from

19    Tony; is that fair?

20            MR. AIETA:  Objection.

21            MR. HO:  Objection.

22    BY MR. CHRETIEN:

23        Q.    As opposed to reading about it or --

24        A.    That's fair.

25        Q.    -- reading press releases?
```

Wayne Eldridge Wew                                                  January 19, 2010

1        A.    That's fair.

2        Q.    Okay.  When you purchased the shares, what was

3    your understanding as to where the shares would be

4    coming from?

5        A.    I had no understanding of where the shares

6    were coming from.

7        Q.    Since that time have you come to an

8    understanding?

9        A.    I read the material and -- and supposedly no

10   one else knows where they came from, that the bulk of

11   the shares were -- were sold from someplace.  I don't

12   know.

13       Q.    Mr. Jimenez, does he work for you with respect

14   to any other companies for which you were the

15   beneficial owner?

16       A.    I don't think so.

17       Q.    How about Julio Flores, who's that?

18       A.    He's another nominee for one of my accounts.

19       Q.    What account is that?

20       A.    I don't know.

21       Q.    That's not one of the ones we discussed?

22       A.    No.

23       Q.    How about Pilar Pikado [ph]?

24       A.    I know her.

25       Q.    Nominee?

Page 94

1    questions just by way of follow up for you.

2             As I indicated earlier, my client is Scott

3    Lines.

4        A.   Yes.

5        Q.   Did you at any time ever talk about Sedona

6    with Brian Lines?

7        A.   No.

8        Q.   Did you ever talk about Renaissance with Brian

9    Lines?

10       A.   No.

11       Q.   Did you ever, ever talk with Scott Lines about

12   either Sedona or Renaissance?

13       A.   No.

14       Q.   You indicated earlier that your LOM broker

15   where you had an LOM account was an individual named

16   Andrew Golding?

17       A.   That's correct.

18       Q.   Am I right that your LOM account was not in

19   Bermuda where LOM is headquartered, but, rather, at

20   their branch in Cayman?

21       A.   That is correct.

22       Q.   Now, your personal LOM account representative,

23   Andrew Golding, is he based in Cayman?

24       A.   Yes, he is.

25       Q.   He lives in Cayman and works in Cayman?

Page 95

1    A.    Yes.

2    Q.    And when you deal with him, to your

3    knowledge, he's in Cayman?

4    A.    Yes.

5    Q.    So he's not at the LOM headquarters in

6    Bermuda?

7    A.    No.

8    Q.    Did you ever discuss Sedona or Renaissance

9    with Andrew Golding, your account representative?

10    A.    Not to my knowledge.

11    Q.    Did you ever discuss Sedona or Renaissance

12    with anyone at LOM?

13    A.    No.

14    Q.    Now, you've indicated a little earlier in

15    terms of describing what you do for a living that

16    you're a day trader and that's a common expression, but

17    so we have a clear record for the jury and the court,

18    can you just explain briefly what a day trader is just

19    in kind of ordinary language?

20    A.    The terminology is streaming and the

21    terminology is momentum.  I'm a momentum trader, a

22    streamer and a streaming -- a streamer looks at all

23    trades that take place on a specific stock continually

24    day after day and when you do that you can figure out a

25    pattern of what the stock does at certain times of the

Wayne Eldridge Wew                                              January 19, 2010

Page 96

1    day.  And if the stock is volatile enough you have the

2    opportunity to buy and to sell on the same day and take

3    the profit and if you're incorrect you have the ability

4    to sell it on the day and take your loss.

5         That's what a day trader does.  It's not a

6    long-term investment.  You don't have to look at the

7    principals of why -- or the investment criteria of the

8    corporation.  You're simply trading it on a streaming

9    basis or a momentum basis.

10        Q.   I think it's really obvious your answer, but

11   just so we're sure it's crystal clear, how do you make

12   money doing that?

13        A.   How do you make money doing that?  You buy

14   it -- you buy it and sell it at a higher price or you

15   sell it short of that at a price and buy it cheaper,

16   either way.  You take the spread.

17        Q.   Okay.  Right.  Now, counsel earlier asked you

18   about why you bought Sedona on January 21st, 2003.  You

19   indicated something about it being a new issue.  Could

20   you explain for us what that means?

21        A.   Well, a new issue is the first time a company

22   starts to trade and in my profession I've noticed that

23   when they start to trade, that's when they get their

24   initial kick on the upside.  If it's a lousy issue, it

25   opens below.  If it opens below -- a new issue, for

1    example, if it opens below the issue price, it normally

2    craters and that's when you would short it and do a day

3    trade on the short side.

4         If a company opens at $8 and starts to trade

5    up, it's a good sign that the -- that the company has a

6    following and that there's some liquidity and that is a

7    positive stance on the upside.

8    Q.   So just looking at those technical aspects as

9    you -- aspects as you've described, that would be a

10   reason for you to jump in and buy Sedona?

11   A.   Yes.

12   Q.   Well, then why did you sell it the same day?

13   A.   I made money.  That's what a day trader does.

14   Q.   Could you explain?

15   A.   Yes.  I bought it at 8.25 and sold 9 and --

16   whatever it was, 9.40, I believe it was, and I made

17   $5,000.  I was overjoyed.  It was a great -- a great

18   trade.

19   Q.   So what a day trader does is after it goes up

20   a little bit, then you sell it and take the profit

21   within the day?

22   A.   Exactly.

23   Q.   Okay.  Now, this stock, Sedona, trading around

24   8 or $9 a share on January 21st had been traded at

25   pennies over the preceding months.  Why would you ever

Page 98

1    buy a stock that went from pennies to 8 or $9?

2        A.   It didn't go from pennies to 8 or $9.  The

3    company was a dormant corporation.  It had no assets.

4    When you -- on these reverse rollovers or -- they

5    put -- when you put assets into a dormant company, you

6    have to assess it on the value of the assets that go in

7    it, so it's not from pennies to $8 overnight.

8        Q.   So for that reason it didn't seem odd to be

9    buying a stock --

10       A.   No.

11       Q.   -- that had previously traded at pennies?

12       A.   No, of course not.  It happens all the time.

13       Q.   Okay.  You mentioned that you talked to your

14   nephew Tony Wile by telephone?

15       A.   Yes.

16       Q.   And counsel directed your attention to the

17   period of about two weeks before Sedona began trading

18   on January 21, 2003, and he said based on looking at

19   some phone records, what he counted up, there would be

20   some days you'd talk to your nephew Tony once,

21   sometimes two, three, even four times a day.  Do you

22   remember that?

23       A.   Yes, I remember that.

24       Q.   Was that the only time that you talked to

25   your -- was that the only time that you talked to your

1    nephew Tony with that degree of frequency?

2        A.   No.  My -- my nephew Tony treats me as a

3    father figure.  He calls me about everything in the

4    world that's going on, personal -- a great amount of

5    the time it's personal.  It's things that he's doing.

6    In those days, Tony was single, and he was out and

7    about on the town quite a bit.  And he shared some of

8    his experiences with me, many times, in the middle of

9    the night, the morning, the market's open, closed.  It

10   didn't matter.

11       Q.   So in that period before January 2003, as you

12   described, you would have days when you'd talk to your

13   nephew Tony two or three times a day?

14       A.   Or even more than that, even more than that.

15       Q.   And how about the period after January 2003,

16   did you again keep in touch with Tony on a pretty

17   regular basis?

18       A.   Yes, I did.

19       Q.   So there was nothing unusual, then, I take it,

20   in having multiple calls in a particular day during

21   January 2003 with your --

22       A.   No.

23       Q.   -- nephew Tony?

24       A.   No, absolutely not.

25       Q.   Now, when you talked about beginning to trade

Wayne Eldridge Wew                                                                January 19, 2010

1    Sedona or actually buying Sedona stock on the morning

2    of January 21, 2003, counsel mentioned that you bought

3    it at $8.25 and you said that you simply topped the

4    bid.

5        A.   Yes.

6        Q.   I'm wondering if you can explain in a

7    layperson's language for all of us what that means,

8    "simply top the bid," what you were doing there.

9        A.   The stock had a bid of $8.  Someone was

10   bidding $8 a share for the stock, and I felt that I

11   should pay 8.25.  I'd be first in line if anyone was a

12   seller in that range, and that's what happened.

13       Q.   So, in other words, you would be basically --

14       A.   Topping the bid.

15       Q.   -- topping -- okay.  So they'd come to you

16   hopefully to --

17       A.   Well, go to the broker, wherever -- wherever

18   the order was placed, the highest bid, they're supposed

19   to look for the best price to execute your trade,

20   whether on the purchase or on the sell side.

21       Q.   Now, how did you get the information as to

22   what the bids were in this particular stock?

23       A.   I have a professional computer set up called

24   Stockwatch, which I have all the bids, all the stocks

25   worldwide.

1      Q.    So in this case, we've heard about market

2    makers that post bid as quotes for the market?

3      A.    Right.

4      Q.    You're actually able to see that on your

5    computer screen, your personal computer screen?

6      A.    You're able to see the bids, what they are,

7    yes.  There was a bid of $8 offered at 9 and change.

8    Yeah, I'm able to see that.  We also have what we call

9    market depth that you can look and see who's bidding,

10   for example, at 9 -- not who's bidding, but the 2,000

11   bid at 9.5 and 8, blah, blah, blah, so you can take a

12   look at both sides of the screen and see where you

13   should be placing your orders to try to make your day

14   trade.  It's common knowledge.  It's -- it's open to

15   anywhere.  You know, Scottrade and all of those things

16   provide it to the client for free.

17     Q.    Is this something that a day trader does on

18   kind of a day-to-day basis --

19     A.    Oh, no.

20     Q.    -- or is this a rare thing?

21     A.    No.  That's something they do every day.

22   Their -- their whole life is consumed by day trading.

23   They're up, they read, they look, they're in the little

24   day trading offices and that's what they do, where they

25   trade from home on their computer.

Wayne Eldridge Wew                                                                    January 19, 2010

 1        Q.    Is that what you did, looking at your

 2     screen -- looked at the screen and see what those

 3     quotes were?

 4        A.    Exactly.

 5        Q.    So this was just an ordinary day for you?

 6        A.    Just an ordinary day for me.

 7        Q.    You were looking as these kinds of quotes as

 8     part of your trading all day, every day?

 9        A.    All day, every day.

10        Q.    That's how you made a living?

11        A.    That's how I made a living.

12        Q.    Now, when you decided you wanted to buy Sedona

13     stock that morning and decided you were going to simply

14     top the bid by going a little bit higher than the bid

15     you saw on your computer screen, did any other person

16     tell you what to bid?

17        A.    No.

18        Q.    How did you get the number?

19        A.    How did I get the number?  I saw the number on

20     the screen.  I saw it was 8 bid.  I bid 8.25.

21        Q.    Okay.  That's just a little bit above, that

22     would be a standard increment above --

23        A.    Right.

24        Q.    -- for somebody to bid?

25        A.    It could have been -- it could have been an

```
 1    eighth, it could have been a quarter, could have been a
 2    half.  It didn't matter.  It was what I thought I would
 3    bid for the stock.
 4         Q.   Did you consult with anybody --
 5         A.   No.
 6         Q.   -- on what your bid would be?
 7         A.   I -- I consult with no one on any bids I do.
 8    I phone my broker and say, "Buy me X amount of shares
 9    at this particular price," and hang up.
10         Q.   Did you prearrange what your bid would be with
11    anybody?
12         A.   No.
13         Q.   How about in selling the stock later in the
14    day, did anybody tell you to sell the stock?
15         A.   No, no.
16         Q.   How about in determining what price you'd sell
17    it at?  Did anybody tell you what price to sell it at?
18         A.   No.
19         Q.   How did you decide what to sell it at?
20         A.   It was offered.  Whatever the offering was, I
21    went beneath the offering, so if anyone purchased the
22    stock, they would buy mine ahead of the offering that
23    was in there.
24         Q.   And that is typically what a day trader does
25    in --
```

Wayne Eldridge Wew                                            January 19, 2010

1       A.    Absolutely.

2       Q.    -- on a day-to-day basis?

3       A.    Absolutely.

4       Q.    Counsel also asked you about why you were

5    using the name Industria Bomez --

6       A.    Uh-huh.

7       Q.    -- as your account name at the brokerage firm

8    Canaccord that you used and you said that you didn't

9    want to use your own name, you wanted to use a

10   corporate name, Industria Bomez, because you wanted to

11   keep your name off sucker lists.

12      A.    Exactly.

13      Q.    What -- what -- could you explain that to us

14   in lay terms?

15      A.    A sucker list is when a brokerage firm or an

16   organization sells the names of its clients to a

17   promotional firm that sends you promotional material

18   and calls you day and night and asks you to buy shares

19   or buy cosmetics or whatever.

20      Q.    Is that kind of like at suppertime when I get

21   telemarketers after me?

22      A.    Exactly, exactly.  Where did they get your

23   name from?  They got it from -- someone sold them the

24   list with your name on it, whether you were buying

25   drugs at the drugstore and you used the little card.

Wayne Eldridge Wew                                              January 19, 2010

1    They collect all that information and they sell it and

2    they get good money for it and then people start

3    hounding you and calling you.  I don't want that.

4        Q.   So using a corporate name as the name for your

5    account is kind of like me having caller ID on my

6    phone, so --

7        A.   Exactly.

8        Q.   -- I don't pick it up?

9        A.   Exactly.  And they can't go to the corporation

10   that you're dealing with and ask them who the

11   beneficial owner is of that particular account.  They

12   can't do -- they can't get that information, but they

13   can get the name of the account.

14       Q.   So this is your way to keep the telemarketers

15   of the stock world off your back?

16       A.   Exactly.

17       Q.   Now, this brokerage firm that you used to do

18   your trading or do a lot of your trading, I guess,

19   Canaccord, where are they based?

20       A.   Vancouver -- well, they're based in Canada.

21       Q.   Okay.  And why did you decide to use them as

22   your broker?

23       A.   I'm a Canadian.  I used to live there.

24       Q.   You were satisfied with their services?

25       A.   Pretty much so.

Wayne Eldridge Wew                                              January 19, 2010

1      Q.    Okay.

2      A.    Great executions and that's all I require.

3      Q.    Okay.  That's important to a day trader?

4      A.    Definitely is.  If I can't get my executions,

5    I don't trade there.

6      Q.    Looking at some of the account statements that

7    counsel showed you a little earlier, I just scanned

8    down some of them, but I noticed there were other

9    mining stocks listed on those account statements.  Is

10   that an area that you are particularly interested in?

11     A.    Yes.

12     Q.    Can you tell us about that?

13     A.    I could.

14     Q.    Is it -- let me rephrase that.  That was a bad

15   question.

16           Is that a -- is that a particular area that

17   you concentrate your trading on, mining stocks?

18     A.    No.  Junior -- junior situations are easier to

19   stream, number one.  I trade a lot of other things, not

20   just junior mining companies.  Those things didn't -- I

21   trade S&Ps and puts and calls and commodities and

22   everything under the sun I trade.

23     Q.    Okay.  Are mining stocks a fairly significant

24   part of --

25     A.    Used to be much more than it is now.

Wayne Eldridge Wew                                              January 19, 2010

Page 107

1      Q.    Okay.  And how about the time frame around

2   January 2003 or plus or minus a year, were mining

3   stocks something you were interested in?

4      A.    Definitely, yes.

5      Q.    When you bid for and bought Sedona stock on

6   the morning of January 21, 2003, was that part of any

7   scheme to manipulate the price of Sedona stock?

8      A.    No.

9      Q.    Was that in any way part of any fraudulent or

10  improper conduct?

11     A.    No.

12     Q.    And that was just normal day trading activity?

13     A.    Yes.

14     Q.    Nobody told you to make the purchase?

15     A.    No.

16     Q.    You made your own decision?

17     A.    I always do.

18           MR. CRIMMINS:  Nothing further.  Thank you.

19           MR. CHRETIEN:  Phil or Lenny?

20           MR. SMITH:  I don't have any questions.  This

21      is Phil.

22           MR. CRIMMINS:  Do we have anyone from Akerman?

23           MR. BLOOM:  I have no questions.

24           MR. CHRETIEN:  Mario, do you have any?

25           MR. HO:  I have got maybe two or three.

Wayne Eldridge Wew                                    January 19, 2010

1             MR. CHRETIEN:  Okay.

2                         EXAMINATION

3    BY MR. HO:

4        Q.   Mr. Wew, my name is Derek Ho.  I represent the

5    LOM entities in this case.  I have just a couple of

6    additional questions.

7             We've been discussing a couple of trades that

8    you made on January 21st, 2003.

9             Other than those two trades, the purchase of

10   5,000 shares of Sedona and the sale later that day of

11   5,000 shares of Sedona, did you have any involvement

12   whatsoever in any other trades of Sedona on that day?

13       A.   Not on that date.

14       Q.   Did you have any contacts with anybody at --

15   strike that.

16            Are you familiar with a market maker named V

17   Finance?

18       A.   No.

19       Q.   Did you have any contact whatsoever with

20   anyone at V Finance on January 21, 2003, regarding

21   Sedona?

22       A.   No.

23       Q.   When you placed your trades in Sedona Software

24   Solutions on January 21, 2003, did you have any control

25   over what counterparty your order would be directed to?

Wayne Eldridge Wew                                                    January 19, 2010

Page 109

1          A.    No.

2          Q.    You had three accounts at one of the LOM

3     brokerage companies, one in the name of Lucian Winds,

4     the other -- another in the name of W.E.W. Consultores

5     and the third in the name of Industria Bomez; is that

6     correct?

7          A.    Uh-huh.

8          Q.    Those were three companies that you were the

9     beneficial owner of?

10         A.    Correct.

11         Q.    Did those companies exist prior to the time

12    that you opened your accounts in the name of those

13    companies at LOM?

14         A.    Yes.

15         Q.    Were those companies companies that LOM had

16    any involvement in creating?

17         A.    No.

18               MR. HO:  I have nothing further.

19               MR. CHRETIEN:  Do you have anything?

20               MR. AIETA:  Yeah, just quick.

21

22                          EXAMINATION

23    BY MR. AIETA:

24         Q.    Mr. Wew, although I'm sitting to your left, I

25    would ask that you answer the questions looking at

 1    fulfilled, which I have every expectation that it will

 2    be.

 3            MR. AIETA:  Absolutely.  We have done so and I

 4    appreciate it.

 5            MR. CHRETIEN:  Okay.  Anybody else?

 6            Mr. Wew, thank you.  Thank you for coming

 7    today.  I appreciate it, and that concludes the

 8    deposition.

 9            THE VIDEOGRAPHER:  This concludes today's

10    deposition of Wayne Eldridge Wew.  The master video

11    will be maintained by Esquire Deposition Solutions.

12    We're off the record at 12:59 p.m.

13            (Deposition concluded at 12:59 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**Canaccord Capital Corp.**

| 030121-02816 | | | | | | 00052834 |
|---|---|---|---|---|---|---|

| ORDER TO | QUANTITY | SECURITY | | ORDER PRICE | GOOD TIL | DAY |
|---|---|---|---|---|---|---|
| **BUY** | 5000 | SEDONA SFTWR SOLNS INC | | 8.25 | 01/21/03 | X OPEN |
| TIME ENTERED: 13:01:58 | CLIENT | INDUSTRIAS BALM | | NEW ACCT. | SEC. CODE SSSI | OFD |

| ENTERED BY / AUTH BY | ACCOUNT | | TRI | QUANTITY | PRICE | CLRG BKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | | VRRW | 5000 | 8.25 | | 0 | 01/21/03 |
| MARKET Ⓐ UU | COMMISSION 400.00 | SPLIT OR PREFIG | BRT | | | | | |
| MARKET P | INV TRANSFER PRICE 0 | | INV ACCT | | | | | |
| EXCHANGE RATE 0.00 | VALUE DATE M    D | OPTION CODE | HM NO | DISC/GIC | | | | |
| # AB & WHEN 12 | SHORT SALE 0 | LK DIV 3 | TOR BOND 4 | CON- FULT 7 | INT FLAT 8 | MKT 9 | TICKET CHARGE | KP TRAILER |

**BROKER SIDE**

| ACCOUNT | TRI | | TU | | | | SPLIT OR PREFIG | | EXCHANGE RATE | TAX | HM | OC | GOOD TRAILER | TICKET CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107-178D-2 | VUUT | Ⓣ | N | | | | | | | | NO | | | |
| KP TRAILER | | | | | | | | | | | | | | |

**PREFIGURED**

| | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| Client | 0.00 | 0.00 | 400.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**ORDER NOTES**

| |
|---|
| 01/21/03 06:24:49  ORDER CREATED |
| 01/21/03 06:24:49  NEW ORDER SENT TO BRSS DATE:01/21/03 |
| 01/21/03 06:24:52  # 2816 ON 01/21/03 ACKNOWLEDGED BY ATS |
| 01/21/03 06:31:55  FILL RECEIVED: 5000 @ 8.25 LEAVING 0 |
| 01/21/03 13:01:51  Commission changed from  TO 400.00 |
| 01/21/03 13:01:51  POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/21/03 13:01:58  Running ticket status changed from yes to no |
| 01/21/03 13:01:58  POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/21/03 13:19:46  POST-EXECUTION QUICK APPROVAL |
| 01/21/03 13:19:57  ORDER CONTRACTED |
| 01/21/03 17:00:27  ORDER ARCHIVED |

## Canaccord Capital Corp.

| 030121-05090 | | CFO | | 00052834 | |
|---|---|---|---|---|---|

| ORDER TO | QUANTITY | SECURITY | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|
| **SELL** | 1000 | SEDONA SFTWR SOLNS INC | 9.40 | 01/21/03 | X / OPEN |
| TIME ENTERED: 13:05:30 | CLIENT | INDUSTRIAS BALM | NEW ACCT. | SFC CODE SSSI | GTC X |

| ORDER ENTRY/ENTRY | ACCOUNT | RR | QUANTITY | PRICE | CLRG BKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | VRRW | 1000 | 9.4 | | 0 | 01/21/03 |

| MARKET | | | SPLIT OR PRORD | | | | |
|---|---|---|---|---|---|---|---|
| Ⓐ UU | X | | | | | | |
| P | INV TRANSFER PRICE 0 | | INV ACCT | | | | |
| EXCHANGE RATE 0.00 | VALUE DATE M D | OPTION CODE | RM NO | DISCARD | | | |

| IF AB & WI LN | SHORT SALL | LR DIV | FOR BYND | CON FLICT | INT FLAT | MKT | TICKET CHARGE | |
|---|---|---|---|---|---|---|---|---|
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | KP TRAILER | |

### BROKER SIDE

| ACCOUNT 107-167D-5 | RR VUUT | TO Ⓣ N | | | SPLIT OR PRG NO | | EXCHANGE RATE | TAX | RM NO | GG | GOOD TRAILER | TICKET CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

KP TRAILER

### PREFIGURED

| Client | GROSS 0.00 | ACCRUED INT 0.00 | COMMISSION 0.00 | NY TAX 0.00 | TICKET CHG 0.00 | OTHER TAX TYPE | OTHER TAX 0.00 | EXCHANGE 0.00 |
|---|---|---|---|---|---|---|---|---|
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

### ORDER NOTES

| | | |
|---|---|---|
| 01/21/03 | 11:54:15 | Sell order will cause the account to go short. |
| 01/21/03 | 11:54:15 | ORDER CREATED |
| 01/21/03 | 11:54:16 | NEW ORDER SENT TO BRSS DATE:01/21/03 |
| 01/21/03 | 11:54:18 | # 5090 ON 01/21/03 ACKNOWLEDGED BY ATS |
| 01/21/03 | 12:52:37 | CFO PRICE CHANGED FROM 9.90 TO 9.40 |
| 01/21/03 | 12:52:37 | Sell order will cause the account to go short. |
| 01/21/03 | 12:52:37 | REPLACEMENT ORDER SENT TO BRSS DATE:01/21/03 |
| 01/21/03 | 12:52:39 | CFO # 5090 ON 01/21/03 ACKNOWLEDGED BY ATS |
| 01/21/03 | 12:54:19 | FILL RECEIVED: 1000 @ 9.40 LEAVING 0 |
| 01/21/03 | 13:05:30 | Commission changed from  TO 0 |
| 01/21/03 | 13:05:30 | Surcharge Fee status from yes to no |
| 01/21/03 | 13:05:30 | ORDER CHANGED |
| 01/21/03 | 13:05:30 | POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/21/03 | 13:14:55 | POST-EXECUTION QUICK APPROVAL |
| 01/21/03 | 16:00:55 | ORDER CONTRACTED |
| 01/21/03 | 16:00:55 | FORCED CONTRACTING WITHOUT REQUIRED APPROVAL OR RUNNING TIC CONTRACTED |
| 01/21/03 | 17:00:37 | ORDER ARCHIVED |

**Canaccord Capital Corp.**

| 030121-02993 | CFO | | 00052834 |
|---|---|---|---|

**ORDER TO SELL**

| QUANTITY | SECURITY | ORDER PRICE | GOOD TILL | DAY OPEN |
|---|---|---|---|---|
| 1500 | SEDONA SFTWR SOLNS INC | 9.40 | 01/21/03 | X |

TIME ENTERED: 13:05:47

| CLIENT | NEW ACCT. | SRC. CODE | CFO |
|---|---|---|---|
| INDUSTRIAS BALM | | SSSI | X |

| ENTERED BY / AUTH BY | ACCOUNT | TIN | QUANTITY | PRICE | CHRG BKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | VRRW | 500 | 9.49 | | 1000 | 01/21/03 |
| MARKET Ⓐ UU | SPLIT OR FILL TC | TKR | 1000 | 9.4 | | 0 | 01/21/03 |
| MARKET P | INV TRANSF LT PRICE | INV ACCT | | | | | |
| EXCHANGE RATE 0.00 | VALUE DATE 0 | OPTION CODE | RM NO | DISC/GRD | | | |
| | | | NO | | KP TRAILER | | |

| T AG & WHEN | SHORT SALE | LX DIV | FOR SYND | CON-FLICT | INT FLAT | MKT | TICKET CHARGE |
|---|---|---|---|---|---|---|---|
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | |

**BROKER SIDE**

| ACCOUNT | BR | TR | | | SPLIT OR PREPD | | EXCHANGE RATE | TAX | RM | OC | CODED TRAILR | TICKET O WRLL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107-940D-5 | VUUT | Ⓣ | N | | | | | | NO | | | |

KP TRAILER

**PREFIGURED**

| Client | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKT CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**ORDER NOTES**

```
01/21/03  06:45:24  Sell order will cause the account to go short.
01/21/03  06:45:24  ORDER CREATED
01/21/03  06:45:25  NEW ORDER SENT TO BRSS DATE:01/21/03
01/21/03  06:45:27  # 2993 ON 01/21/03 ACKNOWLEDGED BY ATS
01/21/03  11:34:58  CFO PRICE CHANGED FROM 9.50 TO 9.49
01/21/03  11:34:58  Sell order will cause the account to go short.
01/21/03  11:34:58  REPLACEMENT ORDER SENT TO BRSS DATE:01/21/03
01/21/03  11:35:03  CFO # 2993 ON 01/21/03 ACKNOWLEDGED BY ATS
01/21/03  12:16:30  FILL RECEIVED: 500 @ 9.49 LEAVING 1000
01/21/03  12:56:34  CFO PRICE CHANGED FROM 9.49 TO 9.40
01/21/03  12:56:34  Sell order will cause the account to go short.
01/21/03  12:56:34  REPLACEMENT ORDER SENT TO BRSS DATE:01/21/03
01/21/03  12:56:51  CFO # 2993 ON 01/21/03 ACKNOWLEDGED BY ATS
01/21/03  13:00:45  FILL RECEIVED: 1000 @ 9.40 LEAVING 0
01/21/03  13:05:47  Commission changed from  TO 0
01/21/03  13:05:47  Running ticket status changed from yes to no
01/21/03  13:05:47  Surcharge Fee status from yes to no
01/21/03  13:05:47  ORDER CHANGED
01/21/03  13:05:47  POST EXECUTION APPROVAL REQUIRED - Prefigured Commission
01/21/03  13:15:01  POST-EXECUTION QUICK APPROVAL
01/21/03  13:15:11  ORDER CONTRACTED
```

**ORDER NOTES**

01/21/03 17:00:49 ORDER ARCHIVED

**Canaccord Capital Corp.**

| 030121-02914 | | | | | | | 00052834 |
|---|---|---|---|---|---|---|---|

| ORDER TO | QUANTITY | SECURITY | | | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|---|---|
| **SELL** | 2500 | SEDONA SFTWR SOLNS INC | | | 9.25 | 01/21/03 | X GTCN |
| TIME ENTERED: 13:07:13 | CLIENT | INDUSTRIAS BALM | | | NEW ACCT. | REC. CODE SSSI | CFO |

| ENTERED BY/AUTHBY | ACCOUNT | | HH | QUANTITY | PRICE | CLRG BRH | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | | VRRW | 1000 | 9.25 | | 1500 | 01/21/03 |
| (A) MARKET UU | COMMISSION 400.00 | | BRH | 1000 | 9.25 | | 500 | 01/21/03 |
| P MARK LY | INV TRANSFER PRICE 0 | | INV ACCT | 300 | 9.25 | | 200 | 01/21/03 |
| EXCHANGE RATE 0.00 | VALUE DATE M    D | OPTION CODE | HH NO | 200 | 9.26 | | 0 | 01/21/03 |
| STAS A WHEN 12 | SHORT SALE 0 | TX DIV 3 | TION SYND 4 | CONF FLICT 7 | INT RAT 8 | MKT 9 | TKNT CHARGE | KP TRAILER |

**BROKER SIDE**

| 107-167D-5 | TIR VUUT | TD (T) | N | | | SPLIT OR PRC FIG. | | EXCHANGE RATE | TAX | HH NO | DG | GOOD TRAILER | TICKET CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KP TRAILER | | | | | | | | | | | | | |

**PREFIGURED**

| Client | GROSS 0.00 | ACCRUED INT 0.00 | COMMISSION 400.00 | NY TAX 0.00 | TICKET CHG 0.00 | OTHER TAX TYPE | OTHER TAX 0.00 | EXCHANGE 0.00 |
|---|---|---|---|---|---|---|---|---|
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**ORDER NOTES**

| 01/21/03 06:37:13 Sell order will cause the account to go short. |
|---|
| 01/21/03 06:37:13 ORDER CREATED |
| 01/21/03 06:37:16 NEW ORDER SENT TO BRSS DATE:01/21/03 |
| 01/21/03 06:37:31 # 2914 ON 01/21/03 ACKNOWLEDGED BY ATS |
| 01/21/03 06:37:56 FILL RECEIVED: 1000 @ 9.25 LEAVING 1500 |
| 01/21/03 06:37:57 FILL RECEIVED: 1000 @ 9.25 LEAVING 500 |
| 01/21/03 06:38:57 FILL RECEIVED: 300 @ 9.25 LEAVING 200 |
| 01/21/03 06:45:25 FILL RECEIVED: 200 @ 9.26 LEAVING 0 |
| 01/21/03 13:07:13 Commission changed from  TO 400.00 |
| 01/21/03 13:07:13 Running ticket status changed from yes to no |
| 01/21/03 13:07:13 ORDER CHANGED |
| 01/21/03 13:07:13 POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/21/03 13:15:48 POST-EXECUTION QUICK APPROVAL |
| 01/21/03 13:16:17 ORDER CONTRACTED |
| 01/21/03 17:00:50 ORDER ARCHIVED |

**Canaccord Capital Corp.**

| 030122-07087 | | | | | | | 00052834 |
|---|---|---|---|---|---|---|---|

| ORDER TO | QUANTITY | OR QUANTITY | | | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|---|---|
| **BUY** | 2000 | SEDONA SFTWR SOLNS INC | | | 8.25 | 01/22/03 | **X** OPEN |
| TIME ENTERED: 08:55:10 | COUNT INDUSTRIAS BALM | | | | NEW ACCT. | REC. CODE SSSI | O/O |

| ENTERED BY / AUTH BY | ACCOUNT | | HIT | QUANTITY | PRICE | CLRG BKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | | VRRW | | | | | |
| MARKET UU | COMMISSION SPLIT OR PRE-FD | | UNIT | | | | | |
| Ⓐ P MARKET | INV TRANSFER PRICE 0 | | INV ACCT | | | | | |
| EXCHANGE RATE 0.00 | VALUE DATE M D | OPTION CODE | RM NO | OBO/OSO | | | | |

| IFAE & WRTN | SHORT SALE | EX DIV | FOR BIND | CON FLICT | INT FLAT | MKT | TICKET CHARGE | KP TRAILER |
|---|---|---|---|---|---|---|---|---|
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | | |

**BROKER SIDE**

| ACCOUNT | RR | TR | | | SPLIT OR PRE-FD | | EXCHANGE RATE | TAX | RM | EX | CLRG TRAILER | TICKET CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| KP TRAILER | | T | N | | | | | | | | | |

**PREFIGURED**

| | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| Client | | | | | | | | |
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**ORDER NOTES**

```
01/22/03  08:55:11  ORDER CREATED
01/22/03  08:55:11  NEW ORDER SENT TO BRSS DATE:01/22/03
01/22/03  08:55:12  #7087 ON 01/22/03 ACKNOWLEDGED BY ATS
01/22/03  17:00:16  ORDER ARCHIVED
01/22/03  17:01:18  ORDER EXPIRED
```

# Canaccord Capital Corp.

**030122-08509**                  **00052834**

| ORDER TO | QUANTITY | SECURITY | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|
| **SELL** | 2000 | SEDONA SFTWR SOLNS INC | 9.35 | 01/22/03 | X OPEN |

| TIME ENTERED: 12:42:59 | CLIENT | | NEW ACCT. | SEC. CODE | CFO |
|---|---|---|---|---|---|
| | INDUSTRIAS BALM | | | SSSI | |

| ENTERED BY / AUTH BY | ACCOUNT | RR | QUANTITY | PRICE | CLRG BKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|
| vtrrxw | 31F-465F-5 | VRRW | | | | | |

| | MARKET | COMMISSION | SPLIT OR PREFIG | UNIT | | | | |
|---|---|---|---|---|---|---|---|---|
| (A) | UU | | | | | | | |

| MARKET | INV TRANSFER TO FROM | INV ACCT | | | | |
|---|---|---|---|---|---|---|
| P | 0 | | | | | |

| EXCHANGE RATE | VALUE DATE M O | OPTION CODE | RR | DISC/ORIG | | | |
|---|---|---|---|---|---|---|---|
| 0.00 | | | NO | | | | |

| IF AS & WHEN | SHORT SALE | EX DIV | FGN SYND | CON-FLICT | INT FLAT | MKT | TRANT CHARGE | KP TRAILER |
|---|---|---|---|---|---|---|---|---|
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | | |

## BROKER SIDE

| ACCOUNT | RR | TN | | SPLIT OR PREFIG | | FGN/NAT RATE | TAX | RR | OO | GOOD TRAILER | TICKLY CHARGE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| KP TRAILER | | | | | | | | | | | |

## PREFIGURED

| Client | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

## ORDER NOTES

01/22/03  12:42:59  Sell order will cause the account to go short.
01/22/03  12:42:59  ORDER CREATED
01/22/03  12:43:00  NEW ORDER SENT TO BRSS DATE:01/22/03
01/22/03  12:43:02  # 8509 ON 01/22/03 ACKNOWLEDGED BY ATS
01/22/03  17:00:28  ORDER ARCHIVED
01/22/03  17:01:18  ORDER EXPIRED

**Canaccord Capital Corp.**

| 030122-05957 | | | | 00052834 | |
|---|---|---|---|---|---|

| ORDER TO | QUANTITY | SECURITY | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|
| **BUY** | 2000 | SEDONA SFTWR SOLNS INC | 9.10 | 01/22/03 | X |
| TIME ENTERED: 12:53:28 | CLIENT INDUSTRIAS BALM | | NEW ACCT. | SEC. CODE SSSI | |

| | ENTERED BY / AUTH BY | ACCOUNT | RR | QUANTITY | PRICE | CLRG BKR | RANGE | TIME FILLED |
|---|---|---|---|---|---|---|---|---|
| Ⓐ | vtrrxw | 31F-465F-5 | VRRW | 2000 | 9 | | 0 | 01/22/03 |
| | MKTRL T | COMMISSION | DR S | | | | | |
| | UU | 135.00 | | | | | | |
| P | MARKET | INV TRANSFER PRICE | INV ACCT | | | | | |
| | | 0 | | | | | | |
| | EXCHANGE RATE | VALUE DATE | OPTION CODE | RR | ONO/ORO | | | |
| | 0.00 | M        D | | NO | | | | |
| IF AS & WHEN | SHORT SALE | CK | AGR SYND | CONF FLICT | INT FLAT | MKT | TICKT COMMIS | |
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | | KP TRAILER |

**BROKER SIDE**

| ACCOUNT | RR | TR | BR ON PR/FIG | EXCHANGE RATE | TAX | TIM | CC | GOOD TRAILER | TICKET CHARGE |
|---|---|---|---|---|---|---|---|---|---|
| 107-167D-5 | VUUT | Ⓣ  N | | | | NO | | | |
| KP TRAILER | | | | | | | | | |

**PREFIGURED**

| | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CRG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| Client | 0.00 | 0.00 | 135.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CRG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**ORDER NOTES**

| |
|---|
| 01/22/03  06:22:17  ORDER CREATED |
| 01/22/03  06:22:17  NEW ORDER SENT TO BRSS DATE:01/22/03 |
| 01/22/03  06:22:29  # 5957 ON 01/22/03 ACKNOWLEDGED BY ATS |
| 01/22/03  08:41:08  FILL RECEIVED: 2000 @ 9.00 LEAVING 0 |
| 01/22/03  12:53:28  Commission changed from  TO 135.00 |
| 01/22/03  12:53:28  POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/22/03  13:25:56  POST-EXECUTION QUICK APPROVAL |
| 01/22/03  16:00:10  ORDER CONTRACTED |
| 01/22/03  16:00:10  FORCED CONTRACTING WITHOUT REQUIRED APPROVAL OR RUNNING TIC CONTRACTED |
| 01/22/03  17:00:21  ORDER ARCHIVED |

**Canaccord Capital Corp.**

| 030123-00318 | | CFO | | | 00052834 |
|---|---|---|---|---|---|

**ORDER TO**

**SELL**

| QUANTITY | 1000 | SECURITY | SEDONA SFTWR SOLNS INC | ORDER PRICE | 9.30 | GOOD TILL | 01/23/03 | DAY | X |
|---|---|---|---|---|---|---|---|---|---|

| TIME ENTERED: 13:16:55 | CLIENT | INDUSTRIAS BALM | | | NEW ACCT. | | SEC. CODE | SSSI | OPEN | X |
|---|---|---|---|---|---|---|---|---|---|

| ENTERED BY/ENTITY | vtrrxw / | ACCOUNT | 31F-465F-5 | RR | VRRW | QUANTITY | 1000 | PRICE | 9.3 | CORO BKR | | BALANCE | 0 | TIME FILLED | 01/23/03 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| (A) | MARKET | UU | | COMMISSION | SPLIT OR PREFIG | 200.00 | | | DR# | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| P | MARKET | | INV TRANSFER PRICE | 0 | INV ACCT | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| EXCHANGE RATE | 0.00 | VALUE DATE | M D | OPTION CODE | RR | NO | OBS/UOD | |
|---|---|---|---|---|---|---|---|---|

| IF AS & WHEN | 12 | STRAT SALE | 0 | FX | 3 | FOR SYND | 4 | CONT PLICY | 7 | INT PLAY | 8 | MKT | 9 | TICKET CHARGE | | KP TRAILER | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**BROKER SIDE**

| 107-002D-4 | RR | VUUT | (T) | TR | N | | | SPLIT OR PREFIG | | | | EXCHANGE RATE | | TAX | | CC | NO | COORD TRAILER | HRLY CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

KP TRAILER

**PREFIGURED**

| Client | GROSS | 0.00 | ACCRUED INT | 0.00 | COMMISSION | 200.00 | NY TAX | 0.00 | TICKET CHG | 0.00 | OTHER TAX TYPE | | OTHER TAX | 0.00 | EXCHANGE | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Broker | GROSS | | ACCRUED INT | | COMMISSION | | NY TAX | | TICKET CHG | | OTHER TAX TYPE | | OTHER TAX | | EXCHANGE | |

**OPERATIONS NOTES**

OKM

**ORDER NOTES**

| | | |
|---|---|---|
| 01/23/03 | 06:51:10 | Possible duplicate order - an open order in the order book matches the account and security of this order. |
| 01/23/03 | 06:51:10 | ORDER CREATED |
| 01/23/03 | 06:51:11 | NEW ORDER SENT TO BRSS DATE:01/23/03 |
| 01/23/03 | 06:51:12 | # 318 ON 01/23/03 ACKNOWLEDGED BY ATS |
| 01/23/03 | 06:52:59 | CFO PRICE CHANGED FROM 9.75 TO 9.40 |
| 01/23/03 | 06:52:59 | Possible duplicate order - an open order in the order book matches the account and security of this order. |
| 01/23/03 | 06:52:59 | REPLACEMENT ORDER SENT TO BRSS DATE:01/23/03 |
| 01/23/03 | 06:53:01 | CFO # 318 ON 01/23/03 ACKNOWLEDGED BY ATS |
| 01/23/03 | 07:05:16 | CFO PRICE CHANGED FROM 9.40 TO 9.30 |
| 01/23/03 | 07:05:16 | Possible duplicate order - an open order in the order book matches the account and security of this order. |
| 01/23/03 | 07:05:17 | REPLACEMENT ORDER SENT TO BRSS DATE:01/23/03 |
| 01/23/03 | 07:05:19 | CFO # 318 ON 01/23/03 ACKNOWLEDGED BY ATS |
| 01/23/03 | 07:07:18 | FILL RECEIVED: 1000 @ 9.30 LEAVING 0 |
| 01/23/03 | 12:59:56 | Commission changed from  TO 200.00 |
| 01/23/03 | 12:59:56 | Running ticket status changed from yes to no |

## ORDER NOTES

```
01/23/03 12:59:56 Surcharge Fee status from yes to no
01/23/03 12:59:56 POST EXECUTION APPROVAL REQUIRED - Prefigured Commission
01/23/03 13:16:55 Operations Note added: OKM
01/23/03 13:16:55 ORDER CHANGED
01/23/03 13:16:55 POST EXECUTION APPROVAL REQUIRED - Prefigured Commission
01/23/03 13:17:11 POST-EXECUTION QUICK APPROVAL
01/23/03 13:17:13 ORDER CONTRACTED
01/23/03 17:00:42 ORDER ARCHIVED
```

**Canaccord Capital Corp.**

| 030123-00313 | | CFO | | | 00052834 |
|---|---|---|---|---|---|

| ORDER TO | QUANTITY | SECURITY | ORDER PRICE | GOOD TILL | DAY |
|---|---|---|---|---|---|
| **SELL** | 1000 | SEDONA SFTWR SOLNS INC | 9.30 | 01/23/03 | X |
| | CLIENT | | NEW ACCT. | DLC CODE | OPEN |
| TIME ENTERED: 13:17:03 | INDUSTRIAS BALM | | | SSS1 | CFO X |

| ENTERED BY / AUTHY | ACCOUNT | RR | QUANTITY | PRICE | CLRG MKR | BALANCE | TIME FILLED |
|---|---|---|---|---|---|---|---|
| vtrrxw / | 31F-465F-5 | VRRW | 1000 | 9.3 | | 0 | 01/23/03 |

| MARKET | | | | COMMISSION | SPLIT OR PRI/AG | | | | | | |
|---|---|---|---|---|---|---|---|
| Ⓐ UU | | | | 0.00 | | | |

| MARKET | INV TRANSFER PRICE | INV ACCT |
|---|---|---|
| P | 0 | |

| EXCHANGE RATE | VALUE DATE M D | OPTION CODE | HM | DISC/OSC |
|---|---|---|---|---|
| 0.00 | | | NO | |

| IF AS A WHEN | SHORT SALE | EX DIV | FOR GVND | CONF FLICT | INT FLAT | BUY | TICKET CHANGE |
|---|---|---|---|---|---|---|---|
| 12 | 0 | 3 | 4 | 7 | 8 | 9 | |

KP TRAILER

**BROKER SIDE**

| ACCOUNT | RR | TR | | | SPLIT OR PRI/AG | | EXCHANGE RATE | TAX | HM | OO | COMM TRAILER | TICKET CHANGE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 107-493D-5 | VUUT | Ⓣ N | | | | | | | NO | | | |

KP TRAILER

**PREFIGURED**

| | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |
|---|---|---|---|---|---|---|---|---|
| Client | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | 0.00 | 0.00 |
| Broker | GROSS | ACCRUED INT | COMMISSION | NY TAX | TICKET CHG | OTHER TAX TYPE | OTHER TAX | EXCHANGE |

**OPERATIONS NOTES**

ADDED TO 318 OKM

**ORDER NOTES**

| | |
|---|---|
| 01/23/03 06:50:24 | ORDER CREATED |
| 01/23/03 06:50:24 | NEW ORDER SENT TO BRSS DATE:01/23/03 |
| 01/23/03 06:50:26 | # 313 ON 01/23/03 ACKNOWLEDGED BY ATS |
| 01/23/03 07:05:28 | CFO PRICE CHANGED FROM 9.50 TO 9.30 |
| 01/23/03 07:05:28 | REPLACEMENT ORDER SENT TO BRSS DATE:01/23/03 |
| 01/23/03 07:05:30 | CFO # 313 ON 01/23/03 ACKNOWLEDGED BY ATS |
| 01/23/03 07:06:18 | FILL RECEIVED: 1000 @ 9.30 LEAVING 0 |
| 01/23/03 13:00:22 | Commission changed from  TO 0.00 |
| 01/23/03 13:00:22 | Operations Note added: ADDED TO 318 |
| 01/23/03 13:00:22 | POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/23/03 13:16:46 | Surcharge Fee status from yes to no |
| 01/23/03 13:16:46 | ORDER CHANGED |
| 01/23/03 13:16:46 | POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/23/03 13:17:03 | Surcharge Fee status from no to yes |
| 01/23/03 13:17:03 | Operations Notes changed from ADDED TO 318 to ADDED TO 318 OKM |
| 01/23/03 13:17:03 | ORDER CHANGED |
| 01/23/03 13:17:03 | POST EXECUTION APPROVAL REQUIRED - Prefigured Commission |
| 01/23/03 13:17:07 | POST-EXECUTION QUICK APPROVAL |

**ORDER NOTES**

01/23/03  16:00:15  ORDER CONTRACTED
01/23/03  16:00:15  FORCED CONTRACTING WITHOUT REQUIRED APPROVAL OR RUNNING TIC
                    CONTRACTED
01/23/03  17:00:42  ORDER ARCHIVED

# EXHIBIT C

TO WHOM IT MAY CONCERN

DEAR SIRS

ORDER ENTRY

UPON RECEIVING CLIENT ORDERS FOR US EQUITIES I ENTER THE ORDERS ON OUR COMPUTERIZED OMS SYSTEM. THEY ARE THEN ELECTRONICALLY SENT TO BRSS WHICH IS A ROUTING SYSTEM. THEY ARE EITHER AUTOMATICALLY ROUTED OR OUR US DFSK ROUTES THEM TO THE MOST APPROPIATE BROKER IN THAT PARTICULAR STOCK THE CLIENT HAS NO CONTROL NOR DO I AS TO WHERE THE ORDER IS ROUTED OR TO WHERE THE STOCK IS TRADED

RON WARRINGTON
CANACCORD CAPITAL

WW000013