UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION        :

                                            Plaintiff,        :   Case No: 07-CV-11387 (DLC)

                                                       :

                    v.        :   **DECLARATION OF MARIO**
                                                       :   **AIETA IN SUPPORT OF**

BRIAN N. LINES, <u>et al.</u>,        :   **WAYNE E. WEW'S MOTION**
                                                     :   **FOR SUMMARY JUDGMENT**

                                     Defendants.        :

------------------------------------------------------------------------x

MARIO AIETA, declares under penalty of perjury:

        1.        I am a partner in Satterlee, Stephens, Burke & Burke LLP, counsel to Defendant Wayne E. Wew ("Wew") (sued herein under his former name "Wayne Wile"). I am familiar with these proceedings and the parties' submissions herein, and I submit this declaration in support of Wew's motion for summary judgment on all of the claims asserted against him by The Securities and Exchange Commission.

        2.        Attached to this declaration as Exhibit A are excerpts from the transcript of the deposition given by James Cangiano in this action on December 15 and 16, 2009.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:  January 25, 2010

_____/s/ Mario Aieta_____
MARIO AIETA

# EXHIBIT A

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2
            CASE NO. 07-CV-11387 (JUDGE COLS)
3
   SECURITIES AND EXCHANGE COMMISSION
4
         Plaintiff,
5
   vs.
6
   BRIAN N. LINES, et al.,
7
         Defendants.
8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _X

9

10

11

12                   VOLUME I

13     VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO

14          200 South Biscayne Boulevard

15                  Suite 3900

16               Miami, Florida

17          Tuesday, December 15, 2009

18                  9:15 a.m.

19

20

21

22

23   Job #169836

24   Pages 1-297

25   Reported By:  Carol Williams

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 2

```
 1              A P P E A R A N C E S

 2    For the Plaintiff:

 3            JUSTIN CHRETIEN, ESQUIRE
              Securities and Exchange Commission
 4            Division of Enforcement
              100 F Street, N.E.
 5            Washington, DC  20549-4030

 6    For the Defendant Brian N. Lines:

 7            PHILIP M. SMITH, ESQUIRE
              DAN MURDOCK, ESQUIRE (via phone.)
 8            Patton Boggs LLP
              1185 Avenue of the Americas, 30th Floor
 9            New York, New York  10036

10    For the Defendant Brian Scott Lines:

11            STEPHEN J. CRIMMINS, ESQUIRE
              K&L Gates, LLP
12            1601 K Street, N.W.
              Washington, D.C.  20006

13

      For Anthony Wile:
14
              LEONARD H. BLOOM, ESQUIRE
15            WILLIAM NORTMAN, ESQUIRE (via phone)
              Akerman Senterfitt
16            One Southeast Third Avenue, 25th Floor
              Miami, Florida  33131-1714

17

      For Wayne Wew:
18
              MARIO AIETA, ESQUIRE (via phone)
19            Satterlee Stephens Burke & Burke, LLP
              230 Park Avenue, Suite 1130
20            New York, New York  10169

21    For the Defendant Scott Lines:

22            STEPHEN L. CRIMMINS, ESQUIRE
              K&L Gates, LLP
23            1601 K Street, N.W.
              Washington, D.C.  20006

24

25
```

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 3

```
 1    For the Defendant Brian N. Lines:

 2            PHILIP M. SMITH, ESQUIRE
              Patton Boggs LLP
 3            1185 Avenue of the Americas, 30th Floor
              New York, New York  10036
 4
      For the LOM Companies:
 5
              REID M. FIGEL, ESQUIRE
 6            JEFFREY HARRIS, ESQUIRE
              DEREK T. HO, ESQUIRE
 7            Kellogg, Huber, Hansen, Todd, Evans &
                 Figel, PLLC
 8            1615 M Street, N.W., Suite 400
              Washington, D.C.  20036
 9

10    Also Present:  David Marcus

11                    Scott Quinn, Videographer

12

13                    I N D E X

14    WITNESS                         Direct

15    James M. Cangiano

16      By Mr. Figel                  6, 140

17

18

19

20

21

22

23

24

25
```

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 4

1                    E X H I B I T   I N D E X

2      Exhibit                Description              Page No.

3        228     Cangiano expert report                  69

4        229     Response to the report of               69

5                Jennifer E. Bethel

6        230     21(a) report                            117

7        231     New York Times article 1/11/93          128

8        232     Transcript                              150

9        233     Footnote Document                       175

10       234     Composite                               181

11       235     Form 20-F filing by Greenstone          256

12                   Resources

13       236     2003 Annual Report of RNC Gold          272

14       237     NASD quote movement report for          275

15               Sedona

16       238     SSSI trade inquire report for           275

17               Sedona

18

19

20

21

22

23

24

25

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 5

1              THE VIDEOGRAPHER:  Here begins

2      videotape number 1 in the deposition of James

3      Cangiano in the matter of Securities and

4      Exchange Commission, plaintiff, versus Brian

5      N. Lines, et al., defendants in the United

6      States District Court, Southern District of

7      New York.

8              Today's date is December 15, 2009.  The

9      time is 9:15 a.m.  I am Scott Quinn, the

10     video operator.  The video deposition is

11     taking place at K&L Gates in Miami, Florida.

12             Would counsel please voice identify

13     themselves and state whom you represent.

14             MR. CHRETIEN:  Justin Chretien on

15     behalf of plaintiff Securities and Exchange

16     Commission.

17             MR. FIGEL:  Reid Figel, Derek Ho, and

18     Jeffrey Harris representing the LOM entities.

19             MR. CRIMMINS:  Steve Crimmins from K&L

20     Gates representing Scott Lines.

21             MR. SMITH:  Philip Smith from Patton

22     Boggs representing defendant Brian Lines.

23             MR. BLOOM:  Leonard Bloom and William

24     Nortman from Akerman Senterfitt representing

25     defendant Anthony Wile.

Page 231

1    Q.    Why not?

2    A.    I don't think it was material to my

3  finding.  We knew that there was present -- we

4  knew that short sellers were present, or at

5  least, you know, Mr. Peever and Mr. Lines thought

6  so.

7    Q.    Which transaction are we talking about

8  now?

9    A.    Oh, I don't know.  There is a whole

10  bunch of short sale transaction.

11    Q.    Are we talking about SHEP or Sedona?

12    A.    Oh, I'm sorry.  I got -- I got lost

13  there for a minute.  I apologize.

14    Q.    Bad question.  I want to make sure the

15  record is clear.

16    A.    It's getting to be 4:30.  My brain

17  quits functions at 10 after 4:00.  I'm sorry.

18        MR. CHRETIEN:  Do you want him to

19    repeat the question?

20        THE WITNESS:  Yeah.

21    Q.    Did you do any investigation to

22  determine whether there was any illegal short

23  selling in connection with the transactions in

24  SHEP?  And then the next question was, after you

25  said no, why not?

Page 232

1      A.    Okay.  And I think I answered it really

2    wasn't integral to my opinion or something like

3    that.

4      Q.    And why didn't -- why didn't you

5    conduct any investigation into the short selling

6    in Sedona?

7      A.    I just didn't feel it was material in

8    my opinion.  As a matter of fact, on the

9    contrary.  It -- to me, it kind of enforced my

10   opinion that this, in fact, was a pump and dump.

11     Q.    You didn't think it would be --

12   withdrawn.

13          Is it fair to say that short selling

14   can have the effect of depressing the reported

15   price of a stock?

16     A.    It can, yes.

17     Q.    And wouldn't it be important to your

18   opinion to know whether any of the price

19   movements that you claim existed as a result of

20   the promotional activities of the defendants in

21   this case were impacted by the presence of short

22   selling?

23     A.    Are you talking Sedona, SHEP, or both?

24     Q.    Both.

25     A.    No.  As a matter of fact, it would be

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 233

1    exactly the opposite of that.  I think the

2    presence of short sellers fostered my belief that

3    they were -- as I said, they are pretty smart

4    people and they know where to hone in and where

5    they can make some money in these kinds of deals.

6         Q.    So the presence of short sellers was a

7    fact you relied on to support your opinion that

8    there was what you call a pump and dump?

9         A.    I think so, yeah.  I think it's an

10   indication that, in addition to me, some savvy

11   traders knew what was going on.

12        Q.    Do people take short positions for

13   reasons other than their belief that there is a

14   pump and dump?

15        A.    Sure.

16        Q.    What might some of those reasons be?

17        A.    They think the stock is going down.

18   They don't feel that the issuer is going to meet

19   their earnings.  It could be a million different

20   negative things about the company.

21        Q.    So how do you determine, when you see

22   the presence of short selling, whether the

23   motivation for the short sellers is their belief

24   that there is a pump and dump as opposed to some

25   of the fundamentals about the company or the

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 1
CONDUCTED ON TUESDAY, DECEMBER 15, 2009

Page 293

1    market, established the bid and offer,

2    established both sides of the market, by the way,

3    as the $8 bidder and the 9.50 offerer, and that

4    as a consequence of those quotes, verified by

5    Wayne Wile's transaction, the $9.50 offering was

6    lifted.

7              MR. FIGEL:  All right.  I think,

8         unfortunately, we are out of time for today.

9              MR. CHRETIEN:  Come back in the

10        morning.

11             THE VIDEOGRAPHER:  Going off the

12        record.  The time is 5:58.

13             (Whereupon, deposition adjourned.)

14

15

16

17

18

19

20

21

22

23

24

25

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 305

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2
          CASE NO. 07-CV-11387 (JUDGE COLS)
3
   SECURITIES AND EXCHANGE COMMISSION
4
          Plaintiff,
5
   vs.
6
   BRIAN N. LINES, et al.,
7
          Defendants.
8  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _X

9

10                   VOLUME III

11     VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO

12          200 South Biscayne Boulevard

13                  Suite 3900

14                Miami, Florida

15

16          Wednesday, December 16, 2009

17                  8:12 a.m.

18

19

20

21

22

23  Job No.:  169838

24  Pages 305-567, Volume 3

25  Reported By:

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 306

```
 1              A P P E A R A N C E S

 2    For the Plaintiff:

 3         JUSTIN CHRETIEN, ESQUIRE
           Securities and Exchange Commission
 4         Division of Enforcement
           100 F Street, N.E.
 5         Washington, DC  20549-4030

 6    For the Defendant Brian N. Lines:

 7         PHILIP M. SMITH, ESQUIRE  (via phone)
           DANIEL R. MURDOCK, ESQUIRE (via phone)
 8         Patton Boggs LLP
           1185 Avenue of the Americas, 30th Floor
 9         New York, New York  10036

10    For the Defendant Brian Scott Lines:

11         STEPHEN J. CRIMMINS, ESQUIRE
           K&L Gates, LLP
12         1601 K Street, N.W.
           Washington, D.C.  20006

13

14    For Anthony Wile:

15         LEONARD H. BLOOM, ESQUIRE (via phone)
           WILLIAM NORTMAN, ESQUIRE (via phone)
           Akerman Senterfitt
16         One Southeast Third Avenue, 25th Floor
           Miami, Florida  33131

17

18    For Wayne Wew:
           MARIO AIETA, ESQUIRE (via phone)
19         Satterlee Stephens Burke & Burke, LLP
           230 Park Avenue, suite 1130
20         New York, New York  10169

21     For the LOM Companies:

22          REID M. FIGEL, ESQUIRE
            DEREK T. HO, ESQUIRE
23         Kellogg, Huber, Hansen, Todd, Evans & Figel
            1615 M Street, N.W., Suite 400
24         Washington, D.C.  20036

25
```

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 307

1    Also Present:  David Marcus

2                   Scott Quinn, Videographer

3

4

5                    I N D E X

6    WITNESS                    Direct    Cross   Redirect   Recross

7    James M. Cangiano

8      By Mr. Figel              309                497

9      By Mr. Chretien                     441                561

10     By Mr. Aieta                        462

11     By Mr. Nortman                      469                533

12     By Mr. Smith                        484      543

13

14

15              E X H I B I T   I N D E X

16    Exhibit           Description         Page No.

17     239      Lawrence Roulston's Resource    321

18              Opportunities

19
       240      Addicted to Profits             322
20
       241      Invoices from Wildcat Consulting 342
21
       242      Press release of inside holdings 393
22              9/17/02

23     243      Form SK                         393

24     244      SHEP press release 10/7/02      394

25     245      6-K filing with SEC 10/10/02    394

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 308

1    246    SHEP press release 11/7/02         394

2

3              E X H I B I T    I N D E X

4    Exhibit            Description           Page No.

5    247    SHEP press release 12/2/02        394

6    248    Press release 2/6/03              394

7    249    Press release 2/7/03              395

8    250    Press release 3/6/03              395

9    251    Form 6-K fileing4/9/03            395

10   252    Form 6-K filing 4/30/03           395

11   253    Press release 5/28/03             395

12   254    Press release 6/10/03             396

13   255    Form 6-K filing 7/10/03           396

14   257    Composite                         450

15   258    October invoice to SEC            529

16

17

18

19

20

21

22

23

24

25

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 309

1          THE VIDEOGRAPHER:  We're back on the

2      record.  Today's date is December 16, 2009.

3      The time is 8:12 a.m.  This is a continuation

4      of deposition of James Cangiano.

5              You may continue, please.

6  THEREUPON:

7                  JAMES M. CANGIANO,

8  was called as a witness and, being first duly

9  sworn, was examined and testified as follows:

10          DIRECT EXAMINATION (Continuing)

11  BY MR. FIGEL:

12      Q.    Good morning, Mr. Cangiano.

13      A.    Good morning.

14      Q.    Welcome back.

15      A.    Thank you.

16      Q.    When we were -- when we broke

17  yesterday, we were talking about some of the

18  trading that you observed in your report.  I

19  would like to direct your attention back to page

20  22 of your report.  Do you have that in front of

21  you?

22      A.    Certainly.

23      Q.    On the third paragraph from the bottom

24  of page 22, you're talking about what you refer

25  to as the dump portion of a pump and dump.

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 462

1      A.    I believe the press releases that I did
2  not review and that she did related to SHEP.
3            MR. NORTMAN:  Thank you.
4            MR. CHRETIEN:  I'm going to pass the
5        witness subject to redirect on my part if any
6        of new matters come up during the examination
7        by you folks.
8            MR. AIETA:  Shall I go ahead?
9            MR. FIGEL:  Sure.
10                 CROSS-EXAMINATION
11  BY MR. AIETA:
12      Q.    Good afternoon, Mr. Cangiano.  My name
13  is Mario Aieta from Satterlee Stephens Burke &
14  Burke, and I'm representing defendant Wayne Wew.
15  I just have a couple of questions for you.
16            You testified during the course of your
17  deposition yesterday and today that you did not
18  do any investigation of your own in connection
19  with your opinion, correct?
20      A.    That's correct.  Other than, as I
21  mentioned before, independent research on various
22  websites, such as SEC.gov, FINRA.com -- dot org,
23  I guess.  I'm sorry.  But no, I primarily relied
24  on the SEC documents.
25      Q.    Okay.  And the independent research

Page 463

1    that you did, Mr. Cangiano, did any of that

2    relate to Wayne Wew?

3         A.    It did not.

4         Q.    Would it be fair to say, then, that

5    there is nothing in your expert report that you

6    claim is a fact about Wayne Wew that you

7    established on your own?

8         A.    That's correct.

9         Q.    Mr. Cangiano, do you know what a day

10   trader is?

11        A.    I do.

12        Q.    Would you tell me what a day trader is,

13   please.

14        A.    A day trader is somebody who utilizes,

15   you know, advanced trading technology to trade

16   for his own account.  Usually doesn't hold

17   positions overnight, but is in and out of stocks.

18        Q.    And you would agree with me, would you

19   not, there is nothing illegal in being a day

20   trader, right?

21        A.    No, not necessarily.

22        Q.    Okay.  You testified yesterday that --

23   concerning a market maker called Nite.  Do you

24   remember that?

25        A.    Yes.

Page 464

1      Q.    You indicated that the bids that you

2   were reviewing placed by Nite were not being made

3   for the purpose of investment.  Do you remember

4   that?

5      A.    Yes.

6      Q.    You said that Nite traded securities,

7   right?

8      A.    That's correct.

9      Q.    And as far as you -- it's not your

10  opinion that there is something inherently wrong

11  with that, is there?

12     A.    That Nite trades securities?

13     Q.    Right.

14     A.    No.

15     Q.    And you would agree with me there is

16  nothing inherently wrong with somebody trading

17  securities who was not a long-term investor,

18  right?

19     A.    That's correct.

20     Q.    You also testified concerning trades

21  made by short sellers?

22     A.    Yes.

23     Q.    At one point you stated that short

24  sellers who were placing trades with respect to

25  Sedona may have known what was going on.  Do you

Page 465

1    remember that?

2        A.    I think my testimony was I didn't know

3    whether there was short selling going on in

4    Sedona.  I think that's what Mr. Figel asked.

5        Q.    Okay.  You -- in your opinion you rely

6    on the fact that there was some short selling as

7    an indicator of a pump and dump situation.  Do

8    you remember that?

9        A.    In the general background, yes.

10        Q.    And I think you testified yesterday

11    that the presence of short sellers indicated to

12    you, and I'll quote, "that some savvy traders

13    knew what was going on."  Do you remember saying

14    that yesterday?

15        A.    Yes.

16        Q.    And when you said "knew what was going

17    on," what did you mean?

18        A.    I think my testimony was that these

19    short sellers make a living out of identifying

20    artificially inflated stocks and shorting them.

21        Q.    Okay.  Is that illegal?

22        A.    No.

23        Q.    Is there anything wrong with that, as

24    far as you can tell?

25        A.    No, providing they comply with all the

Page 466

1    short sale regulations with respect to market

2    making and delivery of the securities.

3        Q.    You would agree with me, would you not,

4    Mr. Cangiano, there is also nothing wrong with a

5    day trader who identifies activity in the stock

6    by Sedona and purchases that stock in order to

7    make some money on it, right?

8        A.    Nothing wrong with that.

9        Q.    Do you recall yesterday, early on in

10    the day, you were asked to explain under what

11    circumstances raising a bid one time might

12    constitute manipulation of the stock?  Do you

13    remember that?

14        A.    Yes.

15        Q.    And do you remember testifying that

16    raising a bid one time might constitute

17    manipulating the price of a stock if it was done

18    for the purposes of artificially influencing the

19    market?  Do you remember that?

20        A.    Yes.

21        Q.    Okay.  And if raising a bid was not

22    done for the purpose of artificially influencing

23    the market, would it be manipulation?

24        A.    If there was no manipulative intent

25    involved and in a standalone context, probably

Page 467

1    not.

2        Q.    You would agree with me, then, that it

3    was the trader's intent that determined whether

4    or not raising a bid is manipulative?

5        A.    Yeah, trader's intent combined with the

6    other facts surrounding that particular bid.

7        Q.    Well, would those other facts have to

8    be facts known to the trader who was placing that

9    particular bid?

10       A.    I would say if he knew of the

11   circumstances that he was participating in a pump

12   and dump scheme and preconditioning a market, I

13   would say that's a no-no.  But if he was just

14   putting in a bid independent of that, that's

15   fine.

16       Q.    All right.  Now, let me break that

17   down.  When you say known of the circumstances,

18   if he knew of the circumstances.  Are you trying

19   to say that if he knows of the circumstances but

20   is not participating in some sort of scheme,

21   that's still a no-no, as you said?

22       A.    No.  What I'm saying is if he's not

23   participating in a scheme and raises the bid, I

24   don't see any issue with that.

25       Q.    Okay.  Even if he knows of the

Page 468

1    circumstances, for example, like the short

2    sellers, that's not a problem, right?

3        A.    That's right.

4        Q.    And to participate in the scheme, would

5    you agree with me that the person placing the bid

6    would have to have reached some sort of overt

7    agreement with somebody else?

8        A.    I think what I say in my report is that

9    what I call preconditioning of the market

10   sometimes has that kind of activity, such as wash

11   trades, matched orders, et cetera, and that is a

12   prearrangement.  I agree with you there.

13       Q.    Absent a prearrangement, somebody

14   placing a bid on a stock could not be

15   manipulating the market, could he?

16       A.    Again, not unless he was a participant

17   in the pump and dump scheme and did it with the

18   express intent of setting the opening price in

19   the market.

20            MR. AIETA:  I don't have any other

21       questions.

22            THE WITNESS:  Thank you.

23            MR. CHRETIEN:  Who's up?

24

25

VIDEOTAPED DEPOSITION OF JAMES M. CANGIANO - VOLUME 3
CONDUCTED ON WEDNESDAY, DECEMBER 16, 2009

Page 563

1           MR. CHRETIEN:  Thank you.  Any further

2      questions?

3           MR. NORTMAN:  I just want to follow up

4      on the request I made about getting copies of

5      the drafts that were reviewed by the SEC

6      staff attorneys.

7           MR. CHRETIEN:  I've got that written

8      down.

9           MR. NORTMAN:  Okay.  So you will let me

10     know.

11          MR. CHRETIEN:  All right.  I will.

12     That concludes the deposition.

13          THE VIDEOGRAPHER:  This deposition is

14     concluded at 3:01.

15          (Whereupon, deposition concluded.)

16

17

18

19

20

21

22

23

24

25