UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.                                                 07-CV-11387 (Judge Cote)

BRIAN N. LINES, *et al.*,

Defendants.

_____

_____

**MEMORANDUM SUPPORTING BRIAN AND SCOTT LINES'
MOTION FOR SUMMARY JUDGMENT**

_____

January 25, 2010

# TABLE OF CONTENTS

LEGAL STANDARD ................................................................................................ 2

I.   CLAIMS INVOLVING SALES OF SEDONA STOCK ................................... 3

    A.   Undisputed Facts Relating to Sedona ...................................................4
    B.   Sedona's Fair Disclosure of Planned Transactions ...................................10
    C.   Non-Manipulative Trading in Sedona Shares...........................................14
    D.   Trading Market Aware of Sedona Concentration......................................17

        (i)   Concentration Already Disclosed ................................18
        (ii)  Legacy Sedona Owners Highly Diluted............................19
        (iii) No Representation Concerning Evaluation........................20

II.  CLAIMS INVOLVING RENAISSANCE PRIVATE PLACEMENT........................... 21

    A.   Undisputed Facts Relating to Renaissance Placement ..............................21
    B.   No "Purchase or Sale" of Securities .......................................24
    C.   No "Offer or Sale" of Securities .........................................24

III. CLAIMS INVOLVING CUSTOMER SALES OF SHEP STOCK ............................ 27

    A.   Undisputed Facts Relating to SHEP Technologies...................................28
    B.   No Misrepresentations and No Manipulation...........................................32

IV.  CONCLUSION ........................................................................................ 34

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

   v.          07-CV-11387 (Judge Cote)

BRIAN N. LINES, *et al.*,

       Defendants.

_____


# MEMORANDUM SUPPORTING BRIAN AND SCOTT LINES' MOTION FOR SUMMARY JUDGMENT

  Defendants Brian N. Lines and Scott G.S. Lines submit this memorandum in support of their motion under Fed. R. Civ. P. 56(b) for partial summary judgment dismissing the First, Third, Fourth, Eleventh, Twelfth and Thirteenth Claims in the Securities and Exchange Commission's Complaint. With these claims dismissed, the remaining claims will likely be resolved.[1]

  LOM (Holdings) Ltd. is the Bermuda-based parent of a group of financial services companies founded 17 years ago by Brian and Scott Lines[2] that provides a complete range of investment services and products to its primarily high net-worth individual and institutional customers in over 75 countries around the world. It provides brokerage, asset management and corporate finance services through its regulated

---

[1] Brian and Scott Lines understand that Defendants LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., and LOM Securities (Bahamas) Ltd. (collectively "LOM") intend to adopt this memorandum. Brian Lines, Scott Lines and LOM are collectively called the "Lines Defendants." Deposition excerpts (cited as "Dep.") and deposition exhibits (cited as "Ex.") are being furnished in a separate binder. A Statement of Undisputed Facts (cited as "SF") under Local Rule 56.1 is also being filed separately.

[2] During the relevant period, Brian Lines was LOM's president, and Scott Lines was its managing director.

subsidiaries in Bermuda, Bahamas and Cayman, and an office in London. Its stock is publicly traded on the Bermuda Stock Exchange, and its primary regulator is the Bermuda Monetary Authority. LOM Holdings is Bermuda's largest non-bank broker-dealer and is Bermuda's ninth largest domestic public company. Its board members have included Bermuda's current Premier, Dr. Ewart Brown, and its chairman is Donald Lines, who has been honored by Queen Elizabeth II with the Order of the British Empire. [SF ¶1-10]

### Legal Standard Governing This Motion

A party may move for summary judgment by showing that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The non-moving party must then come forward with "specific facts" showing a genuine factual issue for trial. *Masushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Summary judgment will be granted where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).

The Second Circuit applied these principles just three months ago in *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2009), in which it affirmed this Court's grant of summary judgment in a case where the plaintiffs failed to come forward with admissible evidence to support an essential element of their case. The Second Circuit commented that in evaluating summary judgment, "we must test plaintiffs' evidence," and that a "district court deciding a summary judgment motion 'has broad discretion in choosing whether to admit evidence.'" 583 F.3d at 260, 264 (citation omitted).

This Court's opinion affirmed in that case had also noted that a party opposing summary judgment "cannot rest on the 'mere allegations' of the pleadings," and that "the evidence put forth by the non-movant to survive summary judgment must be admissible and the 'principles governing admissibility of evidence do not change on a motion for summary judgment.'" *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 662 (S.D.N.Y. 2006) (Cote, J.), *quoting Raskin v. Wyatt*, 125 F.3d 55, 66 (2d Cir. 1997). *See also Auscape Int'l v. Nat'l Geographic Soc'y*, 2008 U.S. App. LEXIS 13640, at **2-3 (2d Cir. June 27, 2008) ("[a] party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial, for in doing so he risk the possibility that there will be no trial"), quoting *Donnelly v. Guion*, 467 F.2d 290, 293 (2d Cir. 1972).

As discussed below, after investigating this matter since January 2003 and taking discovery since filing this action in December 2007, the SEC still lacks evidence to support its fraud claims involving sales of Sedona Software Solutions, Inc. stock (**Point I** below); a proposed private placement for Renaissance Mining Corp. (**Point II**); and sales of SHEP Technologies Inc. stock (**Point III**).

## I. CLAIMS INVOLVING SALES OF SEDONA STOCK

The SEC lacks evidence to support its First, Third and Fourth Claims, which contend that the Lines Defendants violated Securities Act §17(a), 15 U.S.C. §77q(a), Securities Exchange Act §10(b), 15 U.S.C. §78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240-10b-5, and that they aided and abetted Defendant Anthony Wile, by offering and selling shares of Sedona Software Solutions, Inc. As discussed below, (i) Sedona fairly disclosed its proposed new mining venture in a release it was required to broadly

disseminate on the eve of the commencement of trading in its stock on January 21, 2003; (ii) subsequent trading in Sedona stock was orderly with a stable price, extensive market maker and broker participation, and no indication of wash sales, matched orders or other indicia of manipulation; (iii) Sedona had previously disclosed in SEC filings that its share ownership was 98% concentrated; and (iv) after the SEC suspended trading in Sedona, the mining venture went forward using essentially the same deal structure (but with Sedona dead, a different public company for the reverse merger), and enjoyed years of successful mining activities and ultimate acquisition by a NYSE-listed company.

## A. Undisputed Facts Relating to Sedona[3]

Greenstone Resources Ltd., an exchange-listed public company, operated the Bonanza and La Libertad gold mines in Central America during the 1990s and achieved a $1 billion market cap, while carrying $100 million in debt. When gold cratered to around $250 an ounce, Greenstone went bankrupt and the mines reverted to local owners in Nicaragua.[4] [Lough Dep. 15-18] Some of Greenstone's former management (its COO Randall Martin and VP-Finance Thomas Lough) formed Central American Mine Holding Ltd. ("CAMHL"), operated the Greenstone mines for the local owners, and ultimately acquired a 50% interest in the mines. [Lough Dep. 17-25] Others in Greenstone's former management (Greenstone's founder Ian Park and Colin Bowdidge, both geologists) formed Renaissance Mining Corp. to explore in a proven gold belt in Ontario,

---

[3] A more detailed statement of these facts with record citations is contained in Paragraphs 28 through 202 of the Lines Defendants' Statement of Undisputed Facts, filed in support of this motion under Local Rule 56.1.

[4] In 1999, gold crashed to around $250 per ounce. By early 2003, gold was back above $350 and predicted to go higher. Around the end of 2005, gold crossed the $500 barrier, and it presently trades around $1,100 per ounce. [Ex. 1, 9, 10]

but also continued to believe that the Greenstone operation could be fully brought back and expanded once the price of gold recovered. [Lough Dep. 13-14, 33-34] [SF ¶39-47]

By late 2002, CAMHL was running the two principal former Greenstone mines – Bonanza, in production since 1939, and La Libertad, then undergoing refurbishment with $3.5 million in new bank financing. [Lough Dep. 28] Gold prices began to soar at the end of 2002,[5] and both Bonanza and La Libertad held proven gold resources that had been confirmed in technical studies by qualified independent experts used to obtain the bank financing. [Ex. 270, Expert Report of Bernard Guarnera, pp. 9-13] [SF ¶48-49]

CAMHL planned to increase its 50% ownership of these former Greenstone properties by acquiring an additional interest held by Auric Resources (controlled by an individual named Donald MacGregor) – thereby boosting CAMHL's ownership to 90% of the La Libertad mine and 80% of the Bonanza mine – and also wanted to go public to raise additional capital. Auric agreed to sell its interest to CAMHL for $5.5 million, with half payable on February 28, 2003 and half a year later. [Ex. 2; Lough Dep. 29, 32-33] [SF ¶50-53]

Ian Park, the former Greenstone geologist and founder then with Renaissance, and his partner Anthony Wile approached Park's former Greenstone colleagues at CAMHL and proposed that Renaissance and CAMHL join forces to raise the capital to finance the first payment to Auric Resources and to take their combined venture public through the

---

[5] "Commencing in the mid to later part of 2002 there was an increasing level of interest by investors in gold mining and exploration companies. This increase in interest was being driven primarily by the increasing gold price and the belief that gold prices might be increasing in the future. The increase in gold price in early 2003 was driving an unusually high level of interest in gold equities. The gold-equities market is driven by the physical-gold market, and tends to be more volatile than the physical-gold market because of (1) the operating leverage to the gold price; and (2) the increase (or decrease) of economically mineable resources due to the increase (or decrease) of the gold price. In 2002 and 2003, as mining companies were announcing increases in reserves due to higher gold prices, investors recognized that gold shares offered a form of an option on future increases in the gold price." [Ex. 270, Expert Report of Bernard Guarnera, p. 6]

SEC-approved technique of a "reverse" merger with a public shell company.[6] The Renaissance proposal offered exactly what CAMHL wanted, so the former Greenstone management got back together to revive the Greenstone mines in Central America (and also develop Renaissance's exploration properties in Ontario's gold belt) in the new environment of soaring gold prices. [Ex. 3, 4, 20; Lough Dep. 34-38] [SF ¶54, 59]

The plan was essentially for Renaissance to do a private placement to raise $5-6 million (up to 2 million shares at $3), which it would use to pay the first $2.75 million to Auric Resources for the other half of the mines that CAMHL did not already own, with the balance to be used for working capital. Renaissance would go public through a reverse merger with a public shell company, and CAMHL would transfer the mines to Renaissance in exchange for 49% ownership of Renaissance. Renaissance stock would then be owned 49% by CAMHL, 26% by legacy Renaissance shareholders, 12% by Renaissance private placement investors, and 13% by legacy shell company shareholders. [Ex. 3, 4; Lough Dep. 41-42, 50-54] [SF ¶60, 62, 64]

This all had to be done quickly, as the first payment to Auric Resources was due on February 28, 2003. Park and Wile approached Brian Lines at LOM and asked that LOM assist by selling the Renaissance private placement to non-U.S. customers of LOM. LOM had done numerous successful mining deals and had a stable of wealthy non-U.S. individual customers who regularly invested in mining deals. Significantly, these were

---

[6] Of critical importance to small and developing companies, reverse mergers are faster and less expensive than full IPOs. [Ex. 270, Expert Report of Bernard Guarnera, p. 15] The SEC has acknowledged that it is appropriate for privately-held companies to go public by merging into public shell companies. In its release adding new Item 5.06 to Form 8-K, *Use of Form S-8, Form 8-K, and Form 20-F by Shell Companies,* Release Nos. 33-8587 & 34-52038 (July 15, 2005) (available at www.sec.gov), the SEC noted "that companies and their professional advisors often use shell companies for many legitimate corporate structuring purposes." *Id.* at 3. In particular, the SEC noted that, in "the most common type" of these reverse transactions, "the private business merges into the shell company, with the shell company surviving and the former shareholders of the private business controlling the surviving entity." *Id.* at 4.

"very good" and long-time customers whom LOM could never afford to cheat or disadvantage in any way. These were "influential" and sophisticated people, and as LOM's president testified, "If we sold our client a bad investment intentionally, or had any expectation that it was not a good investment, our business would be over." Moreover, the proposed private placement investors would have to hold their stock for a year, so the venture had to be good at the offering and good for at least 12 months thereafter. [S. Lines Dep. 206-07] [SF ¶¶53, 66, 70, 72, 73]

LOM agreed to assist in the private placement, and by mid-January 2003, LOM was seeking non-binding "indications of interest" from its wealthy foreign customers to see if there was sufficient interest before actually offering the private placement. Had LOM actually offered the private placement, its next step would have been to send a private placement memorandum with detailed information to the customers, as well as a subscription agreement. The customers would only be obligated if, after receiving these materials, they signed and returned the subscription agreements with their payment, which would be held in escrow until the placement closed. [S. Lines Dep. 297-98] [SF ¶¶74-76]

Brian Lines also arranged for the needed public shell company. He had recently organized a group of Bermuda friends who regularly invested with him to acquire Sedona. Sedona had been a software development company but was no longer active, and its shareholders had "instructed" its president John Cooper to sell the company as a shell. [7] [Cooper Dep. 11-12, 88-90] Cooper had an agreement to sell Sedona for

---

[7] Sedona was a so-called "clean" shell, meaning that it was current in filing periodic reports with the SEC. It had filed its most recent annual report on Form 10-KSB on the SEC's EDGAR system on September 30, 2002. [Ex. 29; Cooper Dep. 55-56] [SF ¶31]

$380,000 for use in a reverse merger being organized by a senior corporate partner at the Proskauer Rose LLP law firm in New York [Ex. 25; Cooper Dep. 14-26], but that deal collapsed in late 2002, and Cooper then negotiated with Brian Lines to sell the Sedona shell for the same $380,000 that the Proskauer group was to have paid. [Cooper Dep. 27, 81, 86-87] [SF ¶77-80]

Renaissance posted a couple of releases describing the new mining venture on its website in early and mid-January 2003. But the big announcement came when the public company Sedona itself issued a release in the early hours of January 21, 2003. Sedona's release mirrored a Renaissance website release a few days earlier (reviewed and edited by U.S. securities counsel), but Sedona transmitted its release across the markets through Business Wire, Dow Jones and Bloomberg. [SF ¶82, 99-100, 112-14] Significantly, SEC regulations required Sedona to broadly disseminate a release advising all market participants of the proposed material changes in its business that would take it from being a shell trading for pennies to a mining company with substantial assets and operations.

Gold and gold stocks were soaring at the beginning of 2003. And when the markets opened nine hours after Sedona's January 21, 2003 release, market makers were already posting $8 to $10 quotes for Sedona in anticipation of the completion of the transactions described in the release. Sedona traded as high as $9.50 that day, both shortly after the opening and again around the close.[8] Rather than withholding supply of Sedona stock to "squeeze" the market and push prices higher, Brian Lines responded to this demand by authorizing the sale of 143,000 shares – a relatively small portion of the Sedona stock held in accounts at LOM, mostly on January 21 and 22, 2003, with much

---

[8] This was considerably above the $3 price for the Renaissance private placement, but shares purchase in the private placement would be subject to a one-year holding period. [SF ¶155]

smaller sales on January 24 and 27, 2003. The prices stayed level over most of the seven days that Sedona traded. With the stock trading around $9, LOM separately sold 100,000 shares internally to valued LOM customers and a few managers at $4 as a goodwill gesture, but only 16,300 of these shares were ever resold into the trading market. [SF ¶¶152-54, 166-67, 170, 175-76]

The SEC began investigating the activity in Sedona almost immediately. It conducted phone interviews with Anthony Wile, Ian Park, Brian Lines and others. It also began calling investors, and as the only investor witness deposed put it, they "scared [him] right out of" the stock and caused him to sell out his entire Sedona position immediately. [Miller Dep. 56] After only seven trading days, the SEC suspended trading, issued a press release questioning the mining assets and business, and commenced a subpoena-empowered investigation that stretched from January 2003 to the filing of this action in December 2007. With Sedona suspended and a major investigation underway, the Sedona-Renaissance venture was dead.[9] [Lough Dep. 96-97] [SF ¶¶195-99]

Within months, CAMHL decided to proceed with the deal using a Toronto-listed shell called Tango Mineral Resources and a deal structure highly similar to that planned for Sedona-Renaissance. Jennings Capital of Toronto assisted in selling the private placement, the role intended for LOM had the Sedona-Renaissance transaction been allowed to proceed. [Lough Dep. 112-16] Canadian regulators did not interfere, and the

---

[9] At this point, LOM bought back the Sedona stock it had sold internally to favored customers and managers at $4. Additionally, LOM escrowed the proceeds from its sales of 143,000 Sedona shares into the trading market during the seven days Sedona had traded, and those funds remain in escrow today. As noted above, LOM only sought "indications of interest" for the Renaissance private placement and did not offer or sell any Renaissance shares to its wealthy non-U.S. customers. Renaissance on its own – and without involvement by LOM – had apparently obtained funds from U.S. investors for its private placement, but promptly refunded these amounts on cancellation of the venture with Sedona.

resulting company, RNC Gold, proved to be a successful gold producer.  After two-and-a-half years, RNC Gold was taken over by a much larger gold producer, Yamana Gold, which is listed on the Toronto, New York and London Stock Exchanges.  [Lough Dep. 122-26]  [SF ¶147-50]

## B. Sedona's Fair Disclosure of Planned Transactions

As noted above, on January 21, 2003, shortly after midnight, Sedona used Business Wire, Dow Jones and Bloomberg to widely disseminate a release (Ex. 77) describing the series of transactions underway to form a promising mining venture combining Sedona, Renaissance and CAMHL.  [SF ¶99-100]  As this information had already been the subject of limited and selective disclosure by Renaissance,[10] SEC Regulation FD (17 C.F.R. §243.100 *et seq*.) required Sedona as a public company to make this broad disclosure to assure that market participants had equal access to information.[11]  Sedona's January 21, 2003 release informed the market that:

- Sedona, the publicly-traded company issuing the release, itself had "no assets and no outstanding liabilities."  It was simply a shell company.

- Sedona had signed a "letter of intent" to merge with the privately-held Renaissance Mining Corp.  [Ex. 28]  The public shell Sedona would be the surviving company – making the transaction a "reverse" merger, essentially a way for Renaissance to go public without the time and expense of an IPO.  The merger was "subject to negotiation of definitive purchase documentation, and satisfaction of other contingencies as set forth in the LOI."

---

[10] The Sedona release was "substantially identical" to a January 17, 2003 release that Renaissance, the private company, had posted on its website and emailed to a limited audience.  [Complaint ¶80, Ex. 137]  Renaissance had also made selective disclosure to newsletter writers, LOM personnel and others.  Renaissance and Sedona then shared the same management – Anthony Wile and Ian Park.

[11] Such disclosure is also consistent with SEC Regulation S-K (Item 101) and Form 8-K, including Items 1.01 (material agreement), 7.01 (Regulation FD disclosures) and 8.01 (information the issuer "deems of importance to security holders," which obviously included this information).

- LOM Capital Ltd. had agreed to assist Renaissance with a private placement of "up to" 2 million shares at $3 per share. [Ex. 136] LOM Capital's agreement to assist was "subject to satisfactory completion of due diligence" by LOM.

- Renaissance had signed a separate "letter of intent" [Ex. 3, 4] to acquire from CAMHL certain Central American gold producing properties, which "upon consummation of the transaction" would leave Renaissance "poised to become" a significant intermediate gold producer.

- "Following the completion of the merger, the private equity placement, and the CAMHL mining property acquisition" described above, the "new post merger company" would have 16,442,300 common shares. CAMHL would hold 8,000,000 of these shares (49%); legacy Renaissance owners would hold 4,307,300 shares (26%); investors in the Renaissance private placement would hold up to 2,000,000 shares (12%); and legacy shareholders of the Sedona shell company would hold 2,135,000 shares (13%). [SF ¶103-11]

The content of Sedona's release had been reviewed and edited by U.S. securities counsel. [A. Wile Dep. 197-99, 203; Ex. 137; Complaint ¶80] And it contained appropriate cautionary language, including that the transaction was "subject to negotiation of definitive purchase documentation," and that LOM's assistance to the private placement was "subject to satisfactory completion of due diligence." [Ex. 77] [SF ¶112]

The information in Sedona's January 21, 2003 release was accurate. The letters of intent actually did provide for the transactions described. [Ex. 2, 3, 4, 28] [SF ¶120] And the Central American mining assets were real and substantial:

- Standard Bank, as part of due diligence in financing the upgrade to the La Libertad mine, had an experienced and independent mine consulting firm do a technical audit, which concluded on November 21, 2002 that La Libertad was a viable operation that would produce gold at a profit and that supported CAMHL's production forecasts. [Ex. 270, Expert Report of Bernard Guarnera, pp. 10-13] On May 28, 2003, another technical report validated these conclusions. [Ex. 5; Lough Dep. 59-65]

- The Bonanza mine had a 60-year history of continuous gold production that validated the operation's ability to continue production from indicated gold resources and that supported CAMHL's production forecasts. [Ex. 270, Expert

Report of Bernard Guarnera, pp. 11-13]  On June 20, 2003, a technical report validated these conclusions.  [Ex. 6; Lough Dep. 66-69]

Renaissance management and CAMHL management had worked together at Greenstone for years, and they had extensive experience with the Greenstone assets intended to be revived in the new venture.  [Lough Dep. 13-14, 33-34]  Thomas Lough, CAMHL's part owner and CFO, testified that up until the very day of the SEC's trading suspension, CAMHL had every intention of proceeding with the Sedona-Renaissance venture.  [Lough Dep. 97; Cooper Dep. 52]  [SF ¶120-21, 202]

The SEC's principal complaint concerning the January 21, 2003 release appears to be that it did not fully set forth on a *pro forma* basis the proposed combined mining venture's assets (mining properties, facilities and equipment in Central America and Ontario), liabilities (bank debt and any other obligations), income statement (cash flow and expenses), projections, MD&A, etc.  However, the release [Ex. 77] disclosed the letter of intent (subject to contingencies) for a merger of Sedona and Renaissance [Ex. 28], and detailed financial and other information about the transaction, its components and the proposed mining venture would obviously have been forthcoming in, among other things, Sedona's detailed proxy materials that would necessarily have preceded and been a prerequisite to its merger with Renaissance.[12]

Neither can the SEC support a claim that the January 21, 2003 Sedona disclosure defrauded investors purchasing Sedona shares in market transactions by pointing to the following events that came *before* the release:

---

[12] The letter of intent for the merger of Sedona and Renaissance [Ex. 28] specified that the closing would be effective as of the date Sedona "has delivered an Information Statement to its shareholders in compliance with Rule 14c" under the Exchange Act.  *See also* SEC Form 8-K, Item 2.01 (requiring reporting of detailed information following significant transactions).

- The SEC complains that the private company Renaissance "falsely claimed that all of Sedona's officers and directors had already resigned and been replaced by" Renaissance's officers and directors. [Complaint ¶75] But the evidence shows that the shell company Sedona's officers and directors did tender signed resignations [Ex. 27, 28], and Sedona's founder John Cooper testified that all of Sedona's officers and directors resigned as of January 3, 2003. [Ex. 27; Cooper Dep. 43-44, 69-70, 114] While questions later arose whether all corporate formalities had been observed, there is no dispute that as of January 3, 2003, Anthony Wile and Ian Park were in fact managing the affairs of both Sedona and Renaissance.

- The SEC complains that Renaissance posted a January 8, 2003 release (and other statements) on its website with a headline that Renaissance "acquires" the CAMHL gold producing assets. (Complaint ¶63) But the very first sentence under that headline in the release made clear that Renaissance had "signed a letter of intent ... to acquire" the assets. To the extent the headline caused any confusion, the release corrected itself. [Ex. 8; Lough Dep. 228-29] In other respects, the Renaissance release was accurate. [Lough Dep. 73-78, 80-86, 90] Renaissance then posted a January 17, 2003 release on its website that repeated it had a "letter of intent to acquire" the assets. (Ex. 137)

- The SEC complains that Anthony Wile (chairman of Renaissance and Sedona) sent a January 20, 2003 email to an unspecified number of people that attached a third party newsletter saying, among other things, that Renaissance "acquired" the mining assets. (Complaint ¶88-90) But the newsletter likewise self-corrected by referring to attached releases saying Renaissance was "to acquire" the assets under a "letter of intent." (Ex. 202)

- The SEC complains that the newsletter attached to Wile's January 20, 2003 email also said that Sedona was trading at $10 and "could eventually reach" $62. (Complaint ¶88-90) But the next trading day, Sedona was quoted at $10 and traded at $9.50. And the newsletter disclosed the methodology for its $62 prediction – simply dividing Greenstone's $1 billion market cap by the number of shares planned for the new Sedona-Renaissance venture. (Ex. 202)[13] [SF ¶122-23, 83-87, 89-93]

What is fundamentally important is that the *only* statement by the public company Sedona – its January 21, 2003 release, which came later in time – got the facts concerning the status of the transactions right and contained no price predictions. And, it was Sedona's January 21, 2003 release that was the statement broadly disseminated via

---

[13] The evidence shows simply that Brian Lines received this newsletter, but not that any of the Lines Defendants caused its publication. (Complaint ¶91) [SF ¶94]

Business Wire, Dow Jones and Bloomberg. Alternatively, the January 21, 2003 Sedona release, issued only nine hours before the seven days of trading began, served as "corrective" disclosure to allay any hypothetical confusion over any earlier statement by Renaissance. [Bethel Expert Dep. 130-39; Ex. 221, ¶34-38] [SF ¶115-19]

## C. Non-Manipulative Trading in Sedona Shares

The Lines Defendants retained an economist – indeed the former Chief Economist of the SEC's Division of Corporation Finance, Professor Jennifer Bethel – to review the trading data for Sedona over the seven days it traded, January 21 through 29, 2003. From these data, Professor Bethel observed the following objective facts that demonstrate that the market for Sedona stock was not a manipulated market:

- Over 90 brokers traded Sedona during the seven days. (Ex. 221, ¶20)[14] Over 20 market makers posted quotes for Sedona, with 10 posting quotes the first day. (¶13) Numerous active market makers make it more difficult to manipulate a stock. (¶12)

- Sedona's stock price remained relatively constant, opening at $9.50 on January 22 and closing at $8.10 on January 28. (¶23)

- VFinance, the U.S. market maker LOM used for most if its U.S. transactions in Sedona stock, accounted for only 19.6% of trading volume on the first day, and only 12.7% or volume over the entire period. (¶20) An economist would expect a firm propping up a stock price to be an active buyer in the market, but VFinance did not buy at all in the market on four days, and on the other three its limited purchases were mainly from its own customers, followed by sales into the market. (¶21) And VFinance accounted for only about 13% of sales into the market. (¶22)

- As a market maker, VFinance posted only 1.2% of the "inside bid" quotations (*i.e.* highest bid price) on January 21, no inside bid quotes on January 22 through 28, and only 2.4% of the inside bid quotes on January 29. (¶14) Overall, only 2.6% of the dollar amount of bid increases was attributable to VFinance. (¶15-16) An economist would expect that a market maker representing someone trying to manipulate a stock price higher would post higher bid prices to accomplish this goal. (¶10-11) [SF ¶171-82]

---

[14] Paragraph references in this bulleted section are to the Expert Report of Jennifer E. Bethel, Oct. 30, 2009. (Ex. 221)

The SEC lacks evidence to show that the LOM Defendants engaged in trading that manipulated the price of Sedona. As discussed above, SEC Regulation FD required Sedona to issue its January 21, 2003 release to broadly disseminate to the market news of the proposed venture that, if consummated, would substantially change its business. About nine hours after the release, the market opened and Sedona shares jumped from pennies to around $9 per share and stayed around that price for most of the seven trading days. Responding to this Sedona announcement and ensuing demand, Brian Lines authorized the sale of 143,000 shares over the seven days. [SF ¶165-66] Such sales at prevailing (and generally stable) market prices through registered U.S. broker-dealers did not constitute a manipulation.

The Second Circuit has made plain that trading alone – even high volume trading that impacts a stock's price – is not enough to support a manipulation claim. In *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007), the Court affirmed Judge Kaplan's dismissal of a complaint charging defendants with a so-called "death spiral" strategy involving massive short sales (to be covered with common stock from exercise of the issuer's convertible preferred shares) that depressed the stock price and ultimately led to an exchange trading suspension. The Second Circuit noted that the term "manipulation," for purposes of Exchange Act §10(b) and Rule 10b-5, "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* at 99-100 (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476-77 (1977)).

In *ATSI*, 493 F.3d at 101, the Second Circuit cited with approval the Third Circuit's decision in *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 207 (3d Cir.

2001), where the court affirmed summary judgment for a defendant charged with depressive short selling around trading days used to set an exchange rate for defendant to obtain additional shares from a counterparty. In so doing, the court stressed that simply selling a security, regardless of impact on stock price, is not manipulative – "increasing the supply of stocks by selling them on the open market in legitimate transactions to real buyers does not artificially affect prices and therefore cannot be manipulative." *Id.* at 209, n.10.

Judge Sand relied on *ATSI* in granting summary judgment dismissing market manipulation charges in *Nanopierce Technologies, Inc. v. Southridge Capital Management*, 2008 U.S. Dist. LEXIS 6225, at *5-*14 (S.D.N.Y. Jan. 29, 2008). In that case, defendants' stock sales represented over 20% of the trading volume in the period leading up to reset dates under a financing agreement. The agreement provided that if the stock price declined, defendants were entitled to more shares. The court held that defendants' were entitled to sell their shares, and plaintiff provided no evidence showing that defendants' behavior was "inherently manipulative." *Id.* at *14.

In the present case, the SEC's Complaint is built around a theory that Anthony Wile conspired with his uncle, Defendant Wayne Wew, to manipulate Sedona. [15] However during discovery, the evidence showed just the opposite: Wew is a day trader, and he believes in buying new issues when they begin trading and "get their initial kick on the upside." [Wew Dep. 95-96] On the morning of January 21, 2003, when trading began in Sedona, Wew looked at market maker quotes on his screen and gave a buy order for 5,000 shares at $8.25, slightly above the prevailing bid quote (so-called "topping the

---

[15] Wayne Wile changed his name to Wayne Wew. During the SEC's multi-year investigation of this matter, the name "Wayne Wile" had been added to lists restricting travel. [Wew Dep. 8-9]

bid") – a non-manipulative act. [Wew Dep. 99-101, 108] He traded through his usual broker (Canaccord, based in his native Canada), and he had no control over where his broker would then direct the order. [Wew Dep. 105-06, 108-09] After his order was filled at $8.25, the next several trades received execution at $9.50, thus indicating that Wew's bid had not "pegged" the market at $8.25. As a day trader, he sold later in the day and took a small profit. [Wew Dep. 97, 103-04]

Wew never talked to Brian or Scott Lines or anyone else at LOM about Sedona. [Wew Dep. 94-95] Wew has a close father-son relationship with his nephew Anthony Wile and often speaks with him by phone several times a day, so phone records of calls between them in January 2003 are not out of character. [Wew Dep. 98-99] [SF ¶185-91] These normal phone calls certainly do not support an inference, standing alone and without a shred of other evidence, that one of those calls was for the purpose of planning a market manipulation scheme, as the Complaint alleges.

### D. Trading Market Aware of Sedona Concentration

As discussed above, the SEC lacks evidence to show that the market for Sedona stock was manipulated. Numerous brokers and market makers participated in an active quoting and trading market, and Sedona's stock price remained relatively stable over the seven days it traded. [SF ¶170-74] Beyond this, the SEC mistakenly claims that Brian and Scott Lines owned 99% of Sedona and that this should have been disclosed to participants in the seven-day Sedona trading market. [16] [Complaint ¶58] [SF ¶156]

---

[16] The evidence shows that Brian and Scott Lines did not own 99% of Sedona. Most of Sedona's stock (3,205,000 shares, or 60% of the 5,376,500 shares outstanding) was then being held for cancellation after completion of the merger with Renaissance, and the balance was principally held by LOM customers (each holding under 5%) who had previously invested with Brian Lines. A total of 245,000 Sedona shares (4.6%) were held in an LOM structuring account over which Brian (not Scott) Lines had trading authority and in which trusts for the benefit of the families of Brian and Scott Lines had indirect beneficial interests. Brian Lines authorized the sale of 143,000 shares (2.7%) from this account into the trading market, and an

However, the identities and percentage ownership of Sedona's shareholders were immaterial to the Sedona trading market because, as discussed below, **(i)** Sedona had already disclosed that its share ownership was 98% concentrated; **(ii)** Sedona had also disclosed that, following the planned transactions that were necessary to give value to its shares, the legacy Sedona shareholders would own only 13% of the resulting venture, which would be dominated by others (so 98% was really 13% of what mattered); and **(iii)** Sedona correctly disclosed that LOM would assist in selling the Renaissance private placement, but did not represent to the trading market that any of the Lines Defendants were involved in "evaluating" the planned merger.

**(i) Concentration Already Disclosed.** Sedona's outstanding public disclosure on SEC Form 10-KSB showed that just eight persons owned about 98% of its shares. Sedona disclosed that these shareholders were its founder John Cooper (owning 3 million shares or 55.8% of the 5,376,500 outstanding shares), his two sons Andrew and Gordon Cooper (1 million shares or 18.6%), and five "pre-incorporation" shareholders (1.25 million shares or 23.2%). [Ex. 29, pp. 8-9, 15, 21; Cooper Dep. 57] Sedona did not update its disclosure to reflect sale of the shell in January 2003, so the January 21 trading market saw disclosure of a 98% ownership concentration in Sedona shares. [Cooper Dep. 58-60] [SF ¶160-62]

Beyond Sedona's disclosure of concentration, the trading market knew that Sedona was simply a shell. Hours before trading began on January 21, Sedona issued its press release stating plainly that it had "no assets and no outstanding liabilities." Because

---

additional 16,000 shares (0.3%) directly to other LOM customers. [Ex. 30] On an interim basis and as an accommodation, the structuring account had advanced the $387,500 purchase price for the Sedona shell, which would be used as the publicly-held vehicle for the planned mining venture. [Complaint ¶42]

it was just a shell, investors expected that it would be closely held, as concentrated ownership of a shell is considered a common and positive attribute. *See* Expert Report of Bernard J. Guarnera [Ex. 270, p. 17]. [SF ¶163-64]

**(ii) Legacy Sedona Owners Highly Diluted.** The trading market knew from Sedona's January 21 release that, following completion of the transactions that would combine Sedona with Renaissance and CAMHL's mining assets, the legacy Sedona shareholders would own only a relatively small part of a resulting company dominated by others.[17] As discussed above, the resulting company would be owned 49% by CAMHL, 26% by legacy Renaissance shareholders, 12% by new Renaissance private placement investors, and only 13% by all of the legacy Sedona shareholders combined (2,135,000 shares out of 16,442,300 shares that would be outstanding). [Ex. 77] [SF ¶183]

Legacy Sedona shareholders would be diluted down to 13% of what mattered – the mining venture that was the only reason Sedona shares had value at all. And for this reason, it was immaterial whether, going into these important transactions, the legacy Sedona shell company was 98% owned by "Cooper" affiliates (as Sedona had publicly disclosed), or allegedly 99% owned by Brian and Scott Lines (as alleged by the SEC, Complaint ¶58). A 98% or 99% ownership of Sedona would be a mere 13% interest in the surviving company, which would be dominated by CAMHL's 49% share ownership. [SF ¶117]

---

[17] The planned merger with Renaissance, the acquisition of the identified mining assets, and the legacy Sedona shareholders' resulting interest in the combined Renaissance-Sedona were the only things that mattered to the Sedona shareholders. Absent successful completion of these transactions, Sedona would continue as simply a shell company with "no assets and no outstanding liabilities," and its stock would again trade for pennies.

The former SEC chief economist Dr. Bethel concluded in her expert report that "a rational investor in Sedona (or the Renaissance private placement) would have anticipated dramatic changes in the future ownership of their firm. Such investors' buy and sell decisions would rationally have been based on the firm's prospective ownership, given most of its shares would be retired and the remainder would constitute a minority position in the newly merged company." [Ex. 221, ¶33] [SF ¶184]

**(iii) No Representation Concerning Evaluation.** The SEC complains that because Renaissance and Sedona did not affirmatively disclose that Brian and Scott Lines had allegedly acquired 99% of Sedona's stock, this "created the misleading impression that an independent investment banking firm" had "evaluated the merits of the Renaissance/Sedona merger" and agreed to sell the Renaissance private placement. [Complaint ¶76, 80] [SF ¶192]

But what Renaissance and Sedona actually stated was that LOM Capital Ltd. had simply agreed to "assist" as a selling agent for the Renaissance private placement on a "best efforts" basis, and "subject to satisfactory completion of due diligence." [Ex. 76, 142] [SF ¶193] Renaissance and Sedona did not tell the Sedona trading market (or "create the impression") that LOM would be "evaluating" the merger – whether for the benefit of the trading market or others. [Ex. 77, 137] [SF ¶194] In short, even if Brian and Scott Lines had owned 99% of Sedona (which they did not) and even if a particular U.S. purchaser of Sedona stock had heard of LOM (unlikely), Renaissance and Sedona were not telling the trading market to rely on LOM for an "evaluation" of the planned merger of Renaissance and Sedona. There is thus no factual basis for the SEC's allegation that LOM's "independence" was misrepresented to the market.

## II. CLAIMS INVOLVING RENAISSANCE PRIVATE PLACEMENT

The SEC likewise lacks evidence to support its First, Third and Fourth Claims to the extent they further contend that the Lines Defendants violated Securities Act §17(a) and Exchange Act §10(b) and Rule 10b-5, and that they aided and abetted Defendant Anthony Wile, by offering private placement shares of Renaissance Mining Corp. While LOM agreed to serve as a non-exclusive selling agent for the placement (to non-U.S. investors), LOM actually never did more than discuss so-called "indications of interest," which were completely non-binding on both sides. Thus, as discussed below, LOM never engaged in an "offer" or a "sale" of Renaissance shares, a required element to prove a violation.

### A. Undisputed Facts Relating to Renaissance Placement[18]

As described above, LOM Capital agreed to assist Renaissance in the private placement up to two million restricted shares at $3 per share to qualified "non-U.S." investors. The plan was for LOM to sell the shares to wealthy foreign individuals who were valued LOM customers and who regularly invested through LOM. LOM could never cheat or otherwise harm such bread-and-butter customers, whose continued patronage and referrals were vital for LOM's continued existence. Moreover, as the placement involved a one-year holding period, the investment had to be fair and credible when offered and also had to have reasonably good prospects for at least the ensuing twelve months. [S. Lines Dep. 206-07] [SF ¶124-27]

---

[18] A more detailed statement of these facts with record citations is contained in Paragraphs 124 through 146 of the Lines Defendants' Statement of Undisputed Facts, filed in support of this motion under Local Rule 56.1.

LOM agreed to act as a selling agent on a best efforts and non-exclusive basis, and subject to completion of due diligence to LOM's satisfaction and other conditions. As set forth in the draft Renaissance Private Offering Memorandum, the shares were to be offered to such qualified sophisticated investors under "the exemption from registration requirements ... provided by Section 4(2) of the [Securities] Act [of 1933] and Regulation D." LOM Capital was to receive a fee of 7% upon successful conclusion of the placement. [SF ¶128-29]

However LOM Capital never actually "offered or sold" Renaissance shares to its customers. LOM Capital simply sought, as an initial step in the process, so-called "indications of interest" in the proposed private placement from certain of LOM's sophisticated and highly valued foreign customers. The indications of interest were strictly non-binding, and customers who had expressed any interest could decline to actually make an investment for any reason or for no reason at all. [SF ¶131-33]

During this indication of interest process, LOM was "show[ing] the deal to ... clients and ... gaug[ing] their interest," which LOM did with "any deal." LOM would say "from our understanding, this is what it is. What's your interest?" Based on customer responses, LOM would "try to figure out what sort of interest level there was in it." [S. Lines Dep. 78-79] LOM did not provide written materials, as it was only "gauging investor interest. It was a long way away from doing a transaction. The documentation to do the deal wasn't even finalized yet." [S. Lines Dep. 79-80] Once LOM actually had the final documentation and completed due diligence, it would then "go back to [its] customers or new customers ... and say, remember the deal we spoke about? Are you still interested? Sometimes they say no, sometimes they say three times as interested because

22

gold's gone up." LOM would only then give the customer the offering memorandum and other documentation and proceed to make the "offer." [S. Lines Dep. 80-81] [SF ¶134-36]

As LOM canvassed its customers during the indication-of-interest process for the Renaissance placement, LOM found that demand for the shares was strong, and it appeared to LOM that the placement – if actually offered – would be fully subscribed. If the private placement had gone forward, LOM would next have obtained and reviewed final versions of the offering memorandum and binding subscription agreement for the placement. LOM would then have made the "offer" to customers who had indicated interest by sending them these documents, and by requesting the customers to execute the binding subscription agreements and return signed copies to LOM. But as described above, the Renaissance-Sedona venture was frustrated by the SEC's trading suspension before LOM could thus proceed to make the offer to the interested customers. [SF ¶137-40]

With the venture cancelled, LOM could obviously not complete due diligence to its satisfaction, and thus had the right to cancel its agreement to assist in selling the private placement. LOM did this in a letter formally notifying Renaissance that it was canceling its agreement. [SF ¶141-42]

LOM's customers thus never received binding subscription agreements to sign, parted with no funds to buy Renaissance stock, and consequently lost nothing when the Renaissance placement did not go forward. [S. Lines Dep. 297-98] As discussed below, the SEC lacks evidence to support its claims relating to the Renaissance private placement because the Lines Defendants neither offered nor sold Renaissance securities.

## B. No "Purchase or Sale" of Securities

Summary judgment should be granted dismissing the claim under Exchange Act §10(b) and Rule 10b-5, because the SEC cannot come forward with evidence showing a "purchase or sale" of a security. Both the statute and the rule proscribe fraudulent conduct "in connection with the purchase or sale of any security" using interstate means. Section 3(a)(13) defines a "purchase" to include a "contract to buy, purchase or otherwise acquire" a security, and Section 3(a)(14) defines a "sale" to include a "contract to sell or otherwise dispose of" a security.

Interpreting Exchange Act §10(b) and Rule 10b-5, the Supreme Court has held unequivocally that the "purchase or sale" element requires that the alleged breach of duty "coincide" with an actual securities transaction. *E.g. SEC v. Zandford*, 535 U.S. 813, 822 (2002); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596-97 (2001); *U.S. v. O'Hagan*, 521 U.S. 642, 655-56 (1997); *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 9-10 (1971).

Here there was no purchase or sale of Renaissance stock. For this reason, the Lines Defendants have not violated Exchange Act §10(b) and Rule 10b-5 with respect to the Renaissance private placement.

## C. No "Offer or Sale" of Securities

Summary judgment should also be granted dismissing the claim under Securities Act §17(a), because the SEC cannot come forward with evidence showing an "offer or sale" of a security. Section 17(a) proscribes fraudulent conduct only "in the offer or sale of any securities" using interstate means.[19]

---

[19] This Court has observed that "'With respect to [Section] 17(a)(1), essentially the same elements must be established in connection with the offer or sale of a security [as for Section 10(b) and Rule 10b-5 liability].'

As discussed above, the Lines Defendants did not engage in the "sale" of Renaissance stock.  Neither did they engage in "offers" of Renaissance stock.  Section 2(a)(3) defines an "offer" to include simply an "attempt or offer to dispose of, or solicitation of an offer to buy," a security.

The term "offer has a plain and long-settled meaning in the law.  "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981).  "By making an offer, the offeror thus confers upon the offeree the power to create a contract. ... Empowerment of the offeree to make the offeror's promise enforceable is thus the essence of an offer."  E.A. Farnsworth, Farnsworth on Contracts, § 3.3, pp. 112-13 (1999).

While the text of Securities Act §17(a) is plain on its face in requiring that there be an "offer" in the traditional sense of that term, the adjacent §17(b) provides confirmation that Congress meant what it said when it used the word "offer" in §17(a). Section 17(b) requires disclosure of compensation for recommending a stock through oral or written statements that are not themselves "offers."  Section 17(b) reaches "any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, *though not purporting to offer a security for sale*, describes such security for a consideration" (emphasis added).  Thus, when Congress in the adjacent §17(b) wanted to reach conduct "not purporting to offer a security for sale," Congress knew how to do so.

---

... 'Scienter, however, need not be established for the SEC to obtain an injunction ... under [Sections] 17(a)(2) or (3).'"  *SEC v. KPMG LLP*, 412 F. Supp. 2d 349, 371 (S.D.N.Y. 2006) (Cote, J.), *quoting SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996).

It did no such thing in §17(a), which by its own plain terms requires an "offer or sale" as a statutory element.

Congress added the term "offer" to Securities Act §17(a) – replacing "sale of any securities" with "offer or sale of any securities" – by an amendment in 1954. The scant legislative history on the various 1954 amendments to the Securities Act explains that the amendments were generally intended to promote, among other things, "greater latitude ... in testing out the market," so that an underwriter or dealer in a registered offering could "get an idea ... of whether [it would] be in a position to sell the securities." *Hearings before the House Comm. on Interstate and Foreign Commerce on S. 2846*, 83rd Cong., 2d Sess., at 12 (1954). Specifically with respect to the addition of "offer" in §17(a), the legislative history explains that this was purely a "technical change" and that "civil and penal liabilities and sanctions imposed by the statute shall remain unchanged, notwithstanding the changes made elsewhere in the statute." *Id.* at 26. Thus, the legislative history is consistent with the view that Congress did not intend to extend liability under §17(a) to circumstances outside an actual offer or sale of securities. Simply put, an "offer" is a required element for a claim under §17(a).

In the present case, the Lines Defendants reached out to their highly valued foreign customer base to assess whether there was interest in the forthcoming Renaissance private placement, which customers would be interested, and the number of shares each would be interested in acquiring. But there was at that point no obligation on either side, as LOM could ultimately decide not to offer the placement to some or all of the customers who had expressed interest, and if LOM actually did make the offer, any of the customers were totally free not to participate. *See MHA Financial Corp. v. Rotstein*,

1987 U.S. Dist. LEXIS 395, at *2-3 (S.D.N.Y. Jan. 27, 1987), in which Circuit Judge

Lumbard, sitting by designation, noted the difference between mere "indications of

interest" and "firm offers" in the context of a public offering transaction.

The Lines Defendants did not make an "offer or sale" of Renaissance stock.  For

this reason, the Lines Defendants have not violated Securities Act §17(a) with respect to

the Renaissance private placement.

## III.  CLAIMS INVOLVING CUSTOMER SALES OF SHEP STOCK

The SEC lacks evidence to support its Eleventh, Twelfth and Thirteenth Claims,

which contend that the Lines Defendants violated Securities Act §17(a) and Exchange

Act §10(b) and Rule 10b-5, and that they aided and abetted William Todd Peever and

Phillip James Curtis, by offering and selling shares of SHEP Technologies Inc.[20]  As

discussed below, the evidence adduced in discovery shows that SHEP's CEO continues

in recent testimony to personally swear to the accuracy of the information disseminated

about SHEP during its years developing an automotive product, and the records of

trading in SHEP stock do not present evidence of a manipulated market.  The SEC lacks

evidence to the contrary.

---

[20] Peever and Curtis are Canadians who settled this matter without admitting or denying liability.  At their depositions, taken in Canada, they asserted their Fifth Amendment privilege as to all substantive questions. When pressed, they each admitted that they would assert their privilege as to questions asked by the SEC or the litigating defendants, and regardless of whether questions were "loaded" to suggest that silence favored one side or the other in the litigation.  [Peever Dep. 28-29; Curtis Dep. 22]  [SF ¶203-05]

## A. Undisputed Facts Relating to SHEP Technologies[21]

SHEP was a company developing an energy recovery system for cars, trucks and mass transit vehicles that would capture energy during deceleration and use it during acceleration. In a May 2001 letter, Ford Motor Company endorsed SHEP's work:

> Ford Motor Company has been evaluating Shep supplied hydraulic components in a system designed to recover and reuse deceleration energy. To date these components have proven very successful and are providing significant fuel economy increases. We would encourage Shep to continue its efforts to grow the capabilities of their system. Shep will benefit all of us with improved fuel economy and affordable performance. [Ex. 40, at SEC060719]

Another letter from Ford in July confirmed that, using SHEP's technology, "work to date has indicated that fuel economy can be increased by 25% on the EPA city cycle and 35% on a more representative truck city cycle." [Ex. 40, at SEC060720] SHEP's CEO Malcolm Burke confirmed at his deposition that Ford was very enthusiastic about SHEP and that these letters accurately reflected Ford's views of SHEP's system. [Burke Dep. 24, 36-42] (After a multi-year investigation, the SEC has not suggested, in its 258-paragraph Complaint or elsewhere, that Burke engaged in any impropriety.)

SHEP successfully tested its components – involving a hydraulic pump mechanism and a light weight accumulator system – on several Ford vehicles, including Lincoln Navigator SUVs and Ford F-Series pickup trucks. [Burke Dep. 21-29, 35-39, 149-50] SHEP also contracted with Pi Technology, a UK-based Formula-1 racing technology company, for an electronic control component to be installed on two Jaguar prototype vehicles SHEP was developing in 2002. [Burke Dep. 29-34]

---

[21] A more detailed statement of these facts with record citations is contained in Paragraphs 206 through 260 of the Lines Defendants' Statement of Undisputed Facts, filed in support of this motion under Local Rule 56.1.

Interest in SHEP was not limited to Ford. During 2002 and 2003, SHEP also met multiple times with officials at the Volvo truck manufacturing facility in Sweden. [Burke Dep. 55-56] SHEP also drew interest from, among others, a U.K. agency interested in exploring the technology for London taxis and subways. [Burke Dep. 56-58] SHEP also sought and obtained appropriate international patent protection for its innovations. [Burke Dep. 87-89]

Like other small companies, SHEP determined to go public through a reverse merger, which as noted above is permitted by the SEC and less expensive and faster than a formal IPO. [Ex. 270, Expert Report of Bernard Guarnera, p. 15; SEC Release Nos. 33-8587 & 34-52038 (July 15, 2005)] To accomplish this goal, SHEP in September 2002 combined with a public shell company called Inside Holdings Inc. [SF ¶37, 216] Inside's public filings disclosed that, before its merger with SHEP, 72.3% of Inside's stock was concentrated in the hands of three entities, which Inside disclosed were controlled by its three directors – Kevin Winter (controlling Gateway Research Management Group Ltd.), Eric Collins (controlling Consensus Investments Ltd.), and Richard King (controlling Nottinghill Resources Ltd.). In the reverse merger, legacy SHEP shareholders got slightly over 50% of the surviving entity, and legacy Inside shareholders got under 50%. [Ex. 43; Burke Dep. 70-80] Thus, following the merger, the holdings of Gateway, Consensus and Nottinghill were only about 35% of SHEP [Burke Dep. 83] And by the end of 2002, the Gateway, Consensus and Nottinghill holdings were only 27.6% of SHEP. [Ex. 48; Burke Dep. 127-30]

SHEP arranged the reverse merger with Inside through Peever and Curtis, who acknowledged owning shares of Inside. [Burke Dep. 62-67, 175-76] The legacy

shareholders of the Inside shell company had accounts at LOM. [Burke Dep. 161-62]
But LOM did not play a role in introducing Inside to SHEP or in the reverse merger of
Inside and SHEP. [Ex. 52; Burke Dep. 219-22] In December 2002, three months after
the merger, Peever brought SHEP's CEO Malcolm Burke to Bermuda and introduced
him to LOM, where he met Brian Lines and made a presentation on SHEP to LOM's
staff. Peever told Burke that LOM could help SHEP raise capital, but LOM never made
any contractual commitment to help SHEP.[22] [Burke Dep. 95-98] Peever promised to
introduce SHEP to other funding sources, but likewise failed to deliver on such promises.
[Burke Dep. 173-75, 242-43]

Peever and Curtis urged SHEP to publicize the company and introduced it to two
publications, OTC Journal and Intrepid Investor. [Burke Dep. 109-10, 115, 122-23, 176-
78] The OTC Journal writer, Larry Isen, insisted on actually visiting Ford to drive a test
vehicle equipped with the SHEP system, reviewed detailed business and engineering
information on SHEP furnished by its CEO Burke, and may have published his article
without giving Burke an advance look at the draft. Burke was the person who selected
OTC Journal to cover SHEP based on Isen's serious approach and focus. At his
deposition, Burke confirmed the accuracy of the OTC Journal publication *under oath*.
[Burke Dep. 109-20]

Burke also made the decision to have SHEP covered by Intrepid Investor. Burke
again supplied detailed business and engineering information, determined that the writer
seemed knowledgeable, and reviewed drafts of this publication and made comments on

---

[22] However Brian Lines personally invested $200,000 in SHEP through a private placement in 2002, and
continued as a SHEP shareholder at least into 2004. Brian Lines used the Largo Flight account at LOM for
the investment and was simply a shareholder in SHEP. [Ex. 52] [SF ¶227]

the text to make sure it was accurate. He did not see the headline ("Greatest Automobile Discovery Since Antilock Brakes") until after publication and viewed it as highly promotional and irresponsible. But at his deposition, Burke confirmed the accuracy of the text of the Intrepid Investor publication *under oath*. [Burke Dep. 122-26, 225-30]

Burke hoped that if SHEP's stock price rose, SHEP would be able to raise capital "on a less diluted basis" to fund its ongoing research and development activities. [Burke Dep. 183-84] After both publications Burke saw volume increase, but after the OTC Journal publication he saw the price actually go down. Burke was puzzled as to who was selling the stock and contacted Peever, who said that short sellers were active but that the stock would regain its price when the short sellers had to buy in stock to cover their short positions. [Burke Dep. 187-88]

Peever's comment about short sellers reflected what Peever heard from LOM. Around this time, Peever tried to reach Brian Lines but in his absence spoke with Scott Lines, who confirmed to Peever that activity on the trading screen suggested short selling of SHEP. Scott Lines was apparently aware that the stock had received some coverage and gave his opinion that the short sellers "maybe keyed off" the coverage. Scott Lines told Peever that "[m]aybe it's a new world where you don't promote a stock." Scott Lines also commented that the short sellers would want to cover their positions by the end of the month. [Complaint ¶175-76]

While Peever was then himself attempting to sell shares through LOM, he apparently did not advise SHEP's CEO Burke of this. However, in April or May 2003, Brian Lines phoned Burke and advised him of the sales of SHEP stock. Brian Lines seemed "angry" that SHEP had failed to make SEC filings to disclose these sales, but

Burke responded that this was not SHEP's responsibility. Burke (a Canadian) told Brian Lines (a Bermudian) that under American law, such filings needed to be made by the shareholders themselves rather than by the company. Burke then asked SHEP's U.S. securities lawyer to get involved, and forms were then filed with the SEC disclosing certain SHEP sales. [Burke Dep. 103-07, 198-201, 247-56]

The call from Brian Lines was what first informed Burke of sales of SHEP stock by insiders. [Burke Dep. 105, 198-201, 247-56] Burke then confronted Peever and Curtis as to whether they were selling SHEP stock. Peever delayed but then "apologized" for "selling a bunch of stock." [Burke 201-02, 215-17]

SHEP was ultimately able on its own to raise capital from other sources. An Australian investment banker raised funds in Australia for SHEP. Other sources, including a company called Gibraltar Holdings, raised approximately $2.5 million from clients for SHEP. And SHEP began the process to obtain a so-called "AIM" listing on the London Stock Exchange. [Burke Dep. 47-49, 59-62, 107-09] A group in New Hampshire also agreed to raise $6 million for SHEP, but backed away after reading press about the SEC investigation that preceded the filing of this case. [Burke Dep. 197-99, 209-11, 243-45]

### B. No Misrepresentations and No Manipulation

The SEC lacks evidence to show that the Lines Defendants engaged in fraudulent conduct with respect to SHEP. The SEC lacks evidence that the Lines Defendants made material misrepresentations or omissions concerning SHEP, or that the Lines Defendants made any public statement at all about SHEP.

The SEC lacks evidence to support a claim that the Lines Defendants engaged in wash sales, matched orders, marking the close or other types of manipulative trading conduct, or even that others engaged in that kind of trading activity. Beyond this, the Complaint simply alleges that LOM, acting as a broker, executed customer sell orders and wire transfer instructions. [Complaint ¶192-97]

The SEC complains about sales of SHEP stock out of accounts held at LOM during the period from late February through June 2003. [Complaint ¶178] But the actual trading data do not reflect a manipulation scheme. The volume-weighted average sales price for these accounts was only $1.07, approximately the same price that SHEP had traded at in September 2002, around the time of SHEP's merger with Inside Holdings. And the accounts' sales of 550,000 shares on June 9 and 10 at $0.74 and $0.78 immediately preceded a run-up in the price over the next three days (to $1.31, $1.70 and $1.45), when the accounts sold only 151,000 shares. And weeks later, when SHEP reached $2.85, the accounts sold only 17,500 shares at prices above $2.00. [Ex. 221, Bethel Expert Report, ¶43-45] [SF ¶251-55]

And as discussed above, trading alone – even high volume trading that impacts a stock's price – is not enough to support a manipulation claim. *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007); *Nanopierce Technologies, Inc. v. Southridge Capital Management*, 2008 U.S. Dist. LEXIS 6225, at *5-14 (S.D.N.Y. Jan. 29, 2008). *See also GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 209, n.10 (3d Cir. 2001) ("increasing the supply of stocks by selling them on the open market in legitimate transactions to real buyers does not artificially affect prices and therefore

cannot be manipulative"), cited with approval by the Second Circuit in *ATSI*, 493 F.3d at 101.

## CONCLUSION

For the reasons set forth above, summary judgment should be granted dismissing the SEC's First, Third, Fourth, Eleventh, Twelfth and Thirteenth Claims as to the Lines Defendants.

Dated: January 25, 2010

    /s/ Philip M. Smith
Philip M. Smith (PS-8132)
Kate S. Woodall (KW-8514)
**PATTON BOGGS LLP**
1185 Avenue of the Americas, 30th floor
New York, NY 10036
646.557.5100

*Attorneys for Defendant Brian N. Lines*


    /s/ Stephen J. Crimmins
Stephen J. Crimmins (SC-2714)
Lisa M. Richman (LR-4927)
**K&L GATES LLP**
1601 K Street NW
Washington, DC 20006-1600
202.778.9000

*Attorneys for Defendant Scott G.S. Lines*