UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────────────────

SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

            v.                                    07-CV-11387 (Judge Cote)

BRIAN N. LINES, *et al.*,

                            Defendants.
───────────────────────────────────────────


**BRIAN AND SCOTT LINES' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Brian N. Lines and Scott G.S. Lines respectfully submit this statement

pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1(a) of the Rules

of the United States District Court for the Southern District of New York in support of their

motion for summary judgment against Plaintiff Securities and Exchange Commission ("SEC" or

"the Commission").  Brian and Scott Lines are entitled to summary judgment based on the

following undisputed facts:[1]

I.      **Undisputed Background Facts**

        1.      Defendant Brian N. Lines is a citizen of Bermuda and of Canada.  During the

relevant time period, he was LOM's President.  Deposition of Brian Lines on November 9 and

10, 2009 ("B. Lines Dep.") at 7; Compl ¶ 18.

        2.      Defendant Scott G. S. Lines is a citizen of Bermuda and the United Kingdom.

During the relevant time period, he was LOM's Managing Director.  Deposition of Scott Lines

on November 11 and 12, 2009 ("S. Lines Dep.") at 212; Compl. ¶ 19.

---

[1] Defendants Brian Lines, Scott Lines, LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., and LOM Securities (Bahamas) Ltd. are collectively referred to as the "Lines Defendants."

3.      Defendant LOM (Holdings) Ltd. is the Bermuda-based parent of a group of financial services companies founded 17 years ago by defendants Brian and Scott Lines.  S. Lines Dep. at 13, 18-19; Compl. ¶ 20.

4.      LOM (Holdings) Ltd. provides a complete range of investment services and products to its primarily high net-worth individual and institutional customers in over 75 countries around the world.  See LOM's website at http://www.lom.com.

5.      It provides brokerage, asset management and corporate finance services through its regulated subsidiaries in Bermuda, Grand Cayman and Bahamas, and an office in London.  See LOM's website at http://www.lom.com.

6.      LOM (Holdings) Ltd.'s stock is publicly traded on the Bermuda Stock Exchange. Compl. ¶ 20; LOM's website at http://www.lom.com.

7.      Its primary regulator is the Bermuda Monetary Authority.  See LOM's website at http://www.lom.com.

8.      LOM Holdings is Bermuda's largest non-bank broker-dealer and is Bermuda's ninth largest domestic public company.  Answer of Defendant Scott Lines at ¶ 20.

9.      Its board members have included Bermuda's current Premier, Dr. Ewart Brown. Exhibit P (LOM Financial Statement dated July 19, 2001) at SEC190563.

10.     Its chairman is Donald Lines, has been honored by Queen Elizabeth II with the Order of the British Empire.  See LOM's website at http://www.lom.com.

11.     The following defendants are wholly-owned subsidiaries of LOM (Holdings) Ltd.: Lines Overseas Management Ltd., LOM's custody and clearing operation; LOM Capital Ltd., LOM's investment banking arm; LOM Securities (Bermuda) Ltd., LOM's Bermuda-based broker-dealer; LOM Securities (Cayman) Ltd., LOM's Cayman Islands-based broker-dealer; and LOM Securities (Bahamas) Ltd., LOM's Bahamas-based broker-dealer.2  S. Lines Dep. at 18-19; Compl. ¶ 21.

---

2       Unless otherwise noted, LOM (Holdings) Ltd. and its subsidiaries will be referred to herein as "LOM."

12.     LOM primarily serves wealthy non-U.S. clients, and does not solicit U.S. clients or business.  S. Lines Dep. at 220-22; LOM's website at http://www.lom.com.

13.     Only about 3% of LOM's customers are U.S. persons or residents.  S. Lines Dep. at 215-16, 263-64.

14.     Since January 2001, LOM has not accepted new U.S. customers.  S. Lines Dep. 220-22; LOM's website at http://www.lom.com.

15.     Specifically, LOM does not accept corporate accounts for U.S. corporations, individual or joint accounts for U.S. residents, or trust accounts where a U.S. resident or citizen is a beneficiary or grantor.  S. Lines Dep. at 220-22; 263-64; LOM's website at http://www.lom.com.

16.     Because LOM had very few American customers at the time, they decided it would be easier simply not to accept additional American customers.  S. Lines. Dep. at 221.

17.     LOM had a few American customers who were "grandfathered clients," but they restricted their trading – and asked that they not trade U.S. securities through LOM.  S. Lines Dep. at 221-22; 263-64.

18.     After 2000, LOM had approximately 10-20 "grandfathered" U.S. customers.  S. Lines Dep. at 263-64.

19.     For its few remaining U.S. customers, LOM does not solicit securities transactions from them and does not permit them to trade in U.S. securities.  S. Lines Dep. at 220-22.

20.     When an LOM customer wants to buy or sell U.S. securities, LOM "give[s] it to a U.S. broker-dealer."  S. Lines Dep. at 221-22.

21.     Defendant Anthony W. Wile is a Canadian citizen who resides in Vancouver, British Columbia.  Deposition of Anthony Wile on December 8, 2009 ("Wile Dep.") at 8; Compl. ¶ 22.

22.     In late 2002 and 2003, Wile was 36 years old.  Wile Dep. at 8.

23.     He earned a business degree from St. Mary's University in Halifax, Nova Scotia in 1991.  From 1994 through 1996, Wile worked as a securities broker and investment advisor with Scotia Mcleod (Bank of Nova Scotia) and Nesbitt Burns (Bank of Montreal) in Canada.  Wile

was a Certified Investment Manager and was made a Fellow of the Canadian Securities Institute in 1995. From 1996 through 1997, he managed the Atlantic Aggressive Growth Fund and thereafter engaged in private investing and business consulting. Wile Dep. at 8-11, 16.

24.     Defendant Wayne Wile aka Wayne Wew is a Canadian citizen, who lives in Switzerland. Compl. ¶ 23; Deposition of Wayne Wew on January 19, 2010 ("Wew Dep.") at 16-17.

25.     Wayne Wile changed his name to Wayne Wew. During the SEC's multi-year investigation of this matter, the name "Wayne Wile" had been added to lists restricting travel. Wew Dep. 8-9

26.     Defendant William Todd Peever is a Canadian citizen who resides in Vancouver, British Columbia. Compl. ¶ 25.

27.     Defendant Phillip James Curtis is a Canadian citizen who resides in Vancouver, British Columbia. Compl. ¶ 26.

## II.     Undisputed Facts Regarding the Corporate Form of Sedona/Renaissance and IHI/SHEP, the Companies Underlying the Securities in Dispute

### A.     Sedona

28.     Sedona Software Solutions, Inc. ("Sedona") was, at all relevant times, a Nevada shell corporation based in Vancouver, British Columbia. Exhibit 29 (September 30, 2002 Sedona 10-KSB), at page 1-2, 16 of 24; Compl. ¶ 28.

29.     During the relevant period, Sedona was registered with the SEC and was traded and quoted on the OTCBB under the ticker symbol "SSSI." Exhibit 29 (September 30, 2002 Sedona 10-KSB), at page 3 of 24; Compl. ¶ 28.

30.     Sedona was a so-called "clean shell," meaning that it was current in filing periodic reports with the SEC. Deposition of John Cooper on August 19, 2009 ("Cooper Dep.") at 55.

31.     It had filed its most recent annual report on Form 10-K on the SEC's EDGAR system on September 30, 2002. Exhibit 29 (September 30, 2002 Sedona 10-KSB); Cooper Dep. at 56.

32.     On January 29, 2003, the SEC suspended trading in Sedona for ten days.  Compl. ¶ 28.

33.     On June 30, 2006, Sedona filed a Form 15 with the SEC to terminate its registration. Compl. ¶ 28.

B.      Renaissance

34.     In 2002 and 2003, Renaissance Mining Corporation, Inc. ("Renaissance") was a privately-held Delaware corporation with its headquarters in Boulder, Colorado.  Wile Dep. at 90-92; Deposition of Ian Park on November 16, 2009 ("Park Dep.") at 231-33; Compl. ¶ 29.

C.      SHEP

35.     SHEP Technologies, Inc. ("SHEP") is a public company with its headquarters in Vancouver, British Columbia.  Exhibit 48 (United States Securities and Exchange Commission Form 20-F for the period ending December 31, 2002, Annual Report filed by SHEP Technologies Inc.), at page 1 of 87; Compl. ¶ 30.

36.     In 2002 and 2003, SHEP owned intellectual property for vehicle braking technology.  Exhibit 48 (United States Securities and Exchange Commission Form 20-F for the period ending December 31, 2002, Annual Report filed by SHEP Technologies Inc.), at page 4, 13-14 of 87; Compl. ¶ 30.

37.     SHEP was formed in September 2002 through the reverse merger of the privately-held SHEP Ltd. and Inside Holdings, Inc. ("IHI"), a public shell company.  Exhibit 43 (September 17, 2002 United States Securities and Exchange Commission Form 6-K, Report of Foreign Private Issuer filed by Inside Holdings Inc.); Compl. ¶ 30.

38.     In 2002 and 2003, SHEP's stock was quoted on the OTCBB under the trading symbol "STLOF." Exhibit 48 (United States Securities and Exchange Commission Form 20-F for the period ending December 31, 2002, Annual Report filed by SHEP Technologies Inc.), at page 18 of 87; Compl. ¶ 30.

III.    **Undisputed Facts Regarding the Sedona/Renaissance Transactions**

    A.    Agreement Between Renaissance an CAMHL/RNC Resources Regarding the Greenstone Mining Assets

    39.    Greenstone Resources Ltd. ("Greenstone") was a publicly-traded mining company. Park Dep. at 17-18.

    40.    It was listed on the stock exchange in Canada. Park Dep. at 18.

    41.    Greenstone operated the Bonanza and La Libertad gold mines in Central America during the 1990s and achieved a $1 billion market capitalization, while carrying $100 million in debt. Lough Dep. at 7-8; Park Dep. at 26, 304.

    42.    In 1999, gold crashed to around $250 per ounce. Exhibit 1 (Goldprice.org Chart reflecting gold prices from July 1995 through July 2009); Exhibit 9 (Yahoo Finance Chart reflecting value of the American Stock Exchange Gold BUGS (Basket of Unhedged Gold Stocks) Index from 1998 through 2009); Exhibit 10 (Yahoo Finance Chart reflecting value of the American Stock Exchange Gold BUGS (Basket of Unhedged Gold Stocks) Index from October 1, 2002 through March 31, 2003).

    43.    By early 2003, gold was back up to over $350 and predicted to go higher. Lough Dep. at 82-90; Exhibit 1 (Goldprice.org Chart reflecting gold prices from July 1995 through July 2009); Deposition of David Skarica on October 11, 2009 ("Skarica Dep.") at 112-13.

    44.    Around the end of 2005, gold crossed the $500/ounce barrier, and it presently trades above $1,100 per ounce. Lough Dep. at 90; Skarica Dep. at 112-13; Exhibit 1 (Goldprice.org Chart reflecting gold prices from July 1995 through July 2009); see also http://www.goldprice.org/spot-gold.html.

    45.    When gold cratered to around $250 an ounce, Greenstone went bankrupt and the mines reverted to local owners in Nicaragua. Lough Dep. at 15-18; Park Dep. 193-94.

    46.    Some of Greenstone's former management (its COO Randall Martin and VP-Finance Thomas Lough) formed RNC Resources and its subsidiary, Central American Mine

Holding Ltd. ("CAMHL"), which operated the Greenstone mines for the local owners, and ultimately acquired a 50% interest in the mines.  Lough Dep. at 17-25, 31, 124.

47.     Others in Greenstone's former management (Greenstone's founder Ian Park and Colin Bowdidge, both geologists) formed Renaissance Mining Corp. to explore in a proven gold belt in Ontario, but also continued to believe that the Greenstone operation could be fully brought back and expanded once the price of gold recovered.  Lough Dep. at 13-14, 33-39, 167-70; Wile Dep. at 29-37; Park Dep. at 30- 31, 201-03.

48.     By late 2002, RNC Resources through its wholly-owned subsidiary, CAMHL, was running the two principal former Greenstone mines – Bonanza, in production since 1939, and La Libertad, then undergoing refurbishment with $3.5 million in new bank financing.  Lough Dep. at 9-10, 17-25, 28, 31, 58-59, 86-87.

49.     Gold prices began to soar at the end of 2002, and both Bonanza and La Libertad held proven gold resources, that had been confirmed in technical studies by qualified independent experts that were used, among other things, to obtain the bank loan. Exhibit 270 (October 2009 Guarnera Expert Report, amended as of December 2009 ("Guarnera Expert Report")), at pages 6, 9-13; Exhibit 1 (Goldprice.org Chart reflecting gold prices from July 1995 through July 2009); Exhibit 5 (May 28, 2003 Report entitled "Mineral Reserve Audit, Cerro Mojón [aka La Libertad] Project, Republic of Nicaragua, prepared for RNC Gold Inc." prepared by Chlumsky, Armbrust and Meyer, LLC) (also offered as Exhibit 275); Exhibit 6 (June 20, 2003 Report entitled "Technical Report on the Hemco Concession Northeast [aka Bonanza], Nicaragua, for RNC Gold Inc." prepared by Joseph Arengi, Dennis Francoeur and Richard Bybee) (also offered as Exhibit 277); Exhibit 17 (December 27, 2002 Report entitled "Resource & Reserve Estimate – Cerro Mojon [aka La Libertad] Project" prepared by Bikerman Engineering & Technology Associates, Inc.); Exhibit 147 (November 21, 2002 Report entitled "Technical Audit of Cerro Mojon Project Nicaragua [aka La Libertad], Prepared for Standard Bank of London Limited" prepared by Chlumsky, Armbrust and Meyer, LLC); Lough Dep. at 57-61.

50.     CAMHL planned to increase its 50% ownership of these former Greenstone properties by acquiring an additional interest held by Auric Resources (controlled by an individual named Donald MacGregor) – thereby boosting CAMHL's ownership to 90% of the La Libertad mine and 80% of the Bonanza mine.  Lough Dep. at 26-37, 50; Park Dep. at 204-06, 209.

51.     The acquisition of the Greenstone properties was, during late 2002, being aggressively pursued by other groups as well.  Wile Dep. at 31-32.

52.     CAMHL also wanted to go public to raise additional capital.  Lough Dep. at 32-37; Park Dep. at 204.

53.     Auric Resources agreed to sell their interest to CAMHL for $5.5 million, with half payable on February 28, 2003 and half a year later.  Lough Dep. at 29-33; Exhibit 2 (Letter of intent dated December 18, 2002 between Central America Mines Holding Ltd. and Auric Resources Corporation).

54.     Ian Park, the former Greenstone geologist and founder then with Renaissance, and his partner Anthony Wile approached Park's former Greenstone colleagues at CAMHL and proposed that Renaissance and CAMHL join forces to raise the capital to finance the first payment to Auric Resources and to take their combined venture public through the SEC-approved technique of a "reverse" merger with a public shell company.  Lough Dep. at 33-42, 176-77; Exhibit 3 (Letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation); Exhibit 4 (Unexecuted letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation).

55.     Wile had considerable experience in finance in the public markets in Canada with an emphasis on venture capital oriented towards early phase development of mining companies.  Wile Dep. at 22 -23.

56.     Other than Wile and Park, the management team at Renaissance included William Daly, with almost 20 years of mining experience; Robert "Dutch" Van Tassell, with over 40

years of mining experience who was well known in the industry; Colin Bowdidge, who had over 30 years of mining experience and held a Ph.D. in Geology; and Barry Price, who also had approximately 30 years' mining experience. Wile Dep. at 27-33; Exhibit 76 (Amended and Restated Confidential Private Placement Memorandum dated January 24, 2003), at 13-16.

57.    Renaissance acquired mineral exploration rights to eight properties in Northwest Western Ontario.  These properties were located in the "Red Lake" region in which Goldcorp, one of the largest gold producers in North America, operated gold mines.  Wile Dep. at 35-37; Exhibit 76 (Renaissance Amended and Restated Confidential Private Placement Memorandum dated January 24, 2003), at 10-14.

58.    Reverse mergers are a common way that mining companies go public.  Lough Dep. at 41-42.

59.    The Renaissance proposal offered exactly what CAMHL wanted, so the former Greenstone management got back together to revive the Greenstone mines in Central America (and also develop Renaissance's exploration properties in the Ontorio gold belt) the new environment of soaring gold prices.  Lough Dep. at 39-40, 82-83.

60.    The plan was essentially for Renaissance to raise $5-6 million, which CAMHL would use to pay the first $2.75 million to Auric Resources for the other half of the mines that CAMHL did not already own, with the balance to be used for working capital.  Park Dep. at 101-03; Lough Dep. at 34-39; Wile Dep. at 70-75; Exhibit 3 (Letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation); Exhibit 4 (Unexecuted letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation).

61.    Renaissance determined to raise the $5-6 million (approximately 2 million shares at $3) in a private placement.  Wile Dep. 71-84, 159-60; Park Dep. at 49-52; Exhibit 20 (Facsimile dated December 21, 2002 from Ian Park to Randy Martin).

62.    Renaissance would go public through a reverse merger with a public shell company, and CAMHL would transfer the mines to Renaissance in exchange for 49% ownership of Renaissance.  Lough Dep. at 34-38, 42-52.

63.    Thomas Lough, CAMHL's part owner and CFO, testified that CAMHL wanted to purchase the remainder of the mining properties and that Park's proposal to them to accomplish that by means of an RTO that would result in CAMHL owning "approximately 50 percent of the new entity" met their needs.  Lough Dep. at 21, 34-42, 124.

64.    Renaissance stock would then be owned 49% by CAMHL, 26% by legacy Renaissance shareholders, 12% by Renaissance private placement investors, and 13% by legacy shell company shareholders.  Exhibit 77 (January 21, 2003 Sedona Press Release); Lough Dep. at 41-42, 50-54.

B.    Renaissance Asks LOM to Provide Financing

65.    Wile and Park knew that LOM Capital Limited was familiar with public mining deals and could finance them.  Wile Dep. at 77-79.

66.    Park and Wile approached Brian Lines at LOM and asked that LOM assist by selling the Renaissance private placement to non-U.S. customers of LOM.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); Wile Dep. at 77-84; B. Lines Dep. at 137-143; 148-151.

67.    As explained above, LOM's customers were overwhelmingly foreigners and not U.S. residents.  S. Lines Dep. at 220-22; 263-64.

68.    After initially discussing the proposed financing and RTO structure with Brian Lines, Wile and Park presented the opportunity to LOM's brokers on or about January 16, 2003.  S. Lines Dep. at 60-70.

69.    During the January 16, 2003 meeting, Wile and Park provided a presentation to LOM's brokers outlining the opportunity for Renaissance, the financing that LOM was going to

potentially do for them, and the different properties Renaissance had or would be acquiring.  S. Lines Dep. at 72-76.

70.    LOM had done numerous successful mining deals.  B. Lines Dep. at 424-26; S. Lines Dep. at 14-15, 69-71.

71.    It had a stable of wealthy non-U.S. individual customers who regularly invested in gold or exploration stocks, including mining deals.  S. Lines Dep. at 205-06, 108; B. Lines Dep. at 346-47, 388, 393-96, 403-04.

72.    Significantly, these were "very good" and long-time customers whom LOM could never afford to cheat or disadvantage in any way.  S. Lines Dep. at 206-07.

73.    Moreover, private placement investors would have to hold their stock for a year, so the venture had to be good at the offering and good for at least 12 months thereafter.  Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation), at pages 7, 19; S. Lines Dep. at 206-07, 297-98.

74.    LOM agreed to assist in the private placement, and by mid-January 2003, LOM was seeking non-binding "indications of interest" from its wealthy foreign customers to see if there was sufficient interest before actually offering the private placement.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); S. Lines Dep. at 78-82, 287-88.

75.    Had LOM actually offered the private placement, its next step would have been to send a private placement memorandum with detailed information to the customers, as well as a subscription agreement.  S. Lines Dep. at 79-82; Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation), at page 4.

76.    The customers would only be obligated if, after receiving these materials, they signed and returned the subscription agreements with their payment, and their subscription was accepted in writing by an authorized officer of Renaissance. Their payment, in turn, would be held in escrow until the placement closed.  S. Lines Dep. at 80-81, 297-98; B. Lines Dep. at 433-34.  Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation), at pages 4-6.

C.    The Sedona Shell Company

77.    Brian Lines also arranged for the needed public shell company.  B. Lines Dep. at 150-51; Wile Dep. at 78-80.

78.    He had recently organized a group of Bermuda friends who regularly invested with him to acquire Sedona.  B. Lines Dep. at 58-61, 71-72.

79.    Sedona had been a software development company but was no longer active, and its shareholders had "instruct[ed]" its president John Cooper to sell the company as a shell.  Cooper Dep. at 11-12, 88-90.

80.    Cooper had an agreement to sell Sedona for $380,000 for use in a reverse merger being organized by a senior corporate partner at the Proskauer Rose LLP law firm in New York, but that deal collapsed in late 2002, and Cooper then negotiated with Brian Lines to sell the Sedona shell for the same $380,000 that the Proskauer group was to have paid.  Cooper Dep. at 14-28, 38-39, 81, 86-87; Exhibit 25 (December 23, 2002 Facsimile from R.J. MacRae to David Sloan and John Heskett attaching December 20, 2002 Settlement Agreement between Cooper group and Proskauer group).

81.    On an interim basis and as an accommodation, the ICH structuring account advanced the $387,500 purchase price for the Sedona shell, which was to be used as the publicly-held vehicle for the planned mining venture.  Compl. ¶ 42; B. Lines Dep. at 55, 130.

D.    Press Releases Regarding Renaissance

82.    Renaissance posted a couple of releases describing the new mining venture on its website in early and mid-January 2003.  Exhibit 8 (January 8, 2003 Renaissance Press Release); Exhibit 137 (January 17, 2003 Renaissance Press Release); Exhibit 133 (Renaissance Website).

83.    Renaissance posted a January 8, 2003 release on its website with a headline that Renaissance "acquires" the CAMHL gold producing assets.  Compl. ¶ 63; Exhibit 8 (January 8, 2003 Renaissance Press Release); Exhibit 133 (Renaissance Website).

84.     But the very first sentence under that headline made clear that Renaissance had "signed a letter of intent ... to acquire" the assets.  Exhibit 8 (January 8, 2003 Renaissance Press Release).

85.     To the extent the headline caused any confusion, the release corrected itself.  Lough Dep. at 228-29; Exhibit 8 (January 8, 2003 Renaissance Press Release).

86.     In other respects, the Renaissance release was accurate.  Lough Dep. 73-78, 80-86, 90.

87.     Renaissance then posted a January 17, 2003 release on its website that repeated it had a "letter of intent to acquire" the assets.  Exhibit 137 (January 17, 2003 Renaissance Press Release); Exhibit 133 (Renaissance Website).

88.     The January 17, 2003 Renaissance press release was reviewed by Renaissance lawyers.  Wile Dep. at 197-99, 203.

89.     The SEC complains that Anthony Wile (chairman of Renaissance and Sedona) sent a January 20, 2003 email to an unspecified number of people that attached a third party newsletter saying, among other things, that Renaissance "acquired" the mining assets.  Compl. ¶ 88-90.

90.     But the newsletter likewise self-corrected by referring to attached releases saying Renaissance "will acquire" the assets under a "letter of intent."  Exhibit 202 (Email from Tony Wile to Jeff Barber attaching Robert Chapman news bulletin), at SEC021489.

91.     The SEC complains that newsletter attached to Wile's January 20, 2003 email also said that Sedona was trading at $10 and "could eventually reach" $62.  Compl. ¶ 88-90.

92.     But the next trading day, Sedona was quoted at $10 and traded at $9.50.  Exhibit 78 (NASD Quote Movement Report), at page 1; Exhibit 222 (NASD Trade Movement Report), at page 1.

93.     And the newsletter disclosed the methodology for its $62 prediction – simply dividing Greenstone's $1 billion market cap by the number of shares planned for the new

Sedona-Renaissance venture.  Exhibit 202 (Email from Tony Wile to Jeff Barber attaching Robert Chapman news report), at SEC021489.

94.     Brian Lines received this newsletter, but none of the Lines Defendants caused its publication.  Compl. ¶ 91; Exhibit 90 (January 21, 2003 Email from Tony Wile to Brian Lines attaching news reports by Roulston, Chapman, Skarica and Morgan); B. Lines Dep. at 191-94.

95.     Although they were offered the opportunity to purchase founder's shares in Renaissance, the newsletter writers were paid no monetary compensation to write the reports on Renaissance/Sedona. Wile Dep. at 220; see also Roulston Dep. at 31-32; Skarica Dep. at 26-30, 46.

96.     Wile also testified under oath that he did not ask any of the newsletter writers to write a report.  Wile Dep. at 220.

97.     Other than meeting Brian Lines in passing at investment conferences, none of the newsletter writers had contact with any of the Lines Defendants.  See Roulston Dep. at 25-26; Skarica Dep. at 193-94, 277-78.

98.     The newsletter writers knew of the Greenstone properties and were optimistic about the prospects for Renaissance/Sedona.  Skarica Dep. at 24-25, 42-44; Roulston Dep. at 122-26.

E.     Press Release Regarding Sedona

99.     The big announcement came when the public company Sedona itself issued a release in the early hours of January 21, 2003.  Exhibit 77 (January 21, 2003 Sedona Press Release).

100.     Sedona used Business Wire, Dow Jones and Bloomberg to widely disseminate the release which described the series of transactions underway to form a promising mining venture combining Sedona, Renaissance and CAMHL.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias); Exhibit 224 (Bloomberg Copy of Sedona 1/21/2003 Press Release on Bloomberg); Compl. ¶80.

101.    The Sedona release was "substantially identical" to a January 17, 2003 release that Renaissance, the private company, had posted on its website and emailed to a limited audience. Compl. ¶80; Exhibit 137 (January 17, 2003 Renaissance Press Release); Wile Dep. at 146-47.

102.    Renaissance had also made selective disclosure to newsletter writers, LOM personnel and others. Wile Dep. at 101-02, 111-15.

103.    The Sedona release informed the market that Sedona, the publicly-traded company issuing the release, itself had "no assets and no outstanding liabilities."  It was simply a shell company.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

104.    The release also informed the market Sedona had signed a "letter of intent" to merge with the privately-held Renaissance Mining Corp.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias); Exhibit 28 (January 14, 2003 Letter of Intent between Renaissance and Sedona)..

105.    It further stated that the public shell Sedona would be the surviving company – making the transaction a reverse merger, essentially a way for Renaissance to go public without the time and expense of an IPO.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

106.    Moreover, it noted that the merger was "subject to negotiation of a definitive purchase documentation, and satisfaction of other contingencies as set forth in the LOI."  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

107.    The Sedona release also stated that LOM Capital Ltd. had agreed to assist Renaissance with a private placement of "up to" 2 million shares at $3 per share.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias); Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM). .

108.    LOM Capital's agreement to assist was "subject to satisfactory completion of due diligence" by LOM.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

109.    As described in paras. 48 through 63 above, Renaissance had signed a separate "letter of intent" to acquire from CAMHL certain Central American gold producing properties,

which "upon consummation of the transaction" would leave Renaissance "poised to become" a significant intermediate gold producer.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias); Exhibit 3 (Letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation); Exhibit 4 (Unexecuted letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation).

110.    "Following the completion of the merger, the private equity placement, and the CAMHL mining property acquisition," the "new post merger company" would have 16,442,300 common shares.  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

111.    CAMHL would hold 8,000,000 of these shares (49%); legacy Renaissance owners would hold 4,307,300 shares (26%); investors in the Renaissance private placement would hold up to 2,000,000 shares (12%); and legacy shareholders of the Sedona shell company would hold 2,135,000 shares (13%).  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

112.    Wile recalled that Renaissance's counsel generally reviewed and edited the press releases issued in the January 2003 time frame, including the press release issued on January 17, 2003.  Wile Dep. at 125-26, 197-99, 203; Exhibit 211 (January 17, 2003 Email from Jeff Klein attaching revised draft of January 17, 2003 press release with attorney revisions).

113.    The content of Sedona's January 21, 2003 release, which was "substantially identical" to the January 17, 2003 release (Compl. ¶ 80), therefore also was vetted by U.S. securities counsel.  Wile Dep. at 125-26, 197-99, 203; compare Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias) with Exhibit 137 (January 17, 2003 Renaissance Press Release).

114.    In any event, it contained appropriate cautionary language, including that the transaction was "subject to negotiation of a definitive purchase documentation," and that LOM's assistance to the private placement was "subject to satisfactory completion of due diligence." Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

F.    The Sedona Press Release Was Accurate

115.    The January 21, 2003 release was the only statement by the public company, Sedona. Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias); Deposition by Expert Jennifer Bethel on December 11, 2009 ("Bethel Expert Dep.") at 131-136.

116.    It got the facts concerning the status of the transactions right and contained no price predictions.  Exhibit 77 (January 21, 2003 Sedona Press Release); Bethel Expert Dep at 131-138.

117.    Sedona disclosed that, following the planned transactions that were necessary to give value to its shares, the legacy Sedona shareholders would own only 13% of the resulting venture, which would be dominated by others.  Exhibit 77 (January 21, 2003 Sedona Press Release).

118.    Sedona correctly disclosed that LOM would assist in selling the Renaissance private placement, but did not represent to the trading market that any of the Lines Defendants were involved in "evaluating" the planned merger.  Exhibit 77 (January 21, 2003 Sedona Press Release).

119.    Alternatively, the January 21, 2003 Sedona release served as "corrective" disclosure to allay any hypothetical confusion over any earlier statement by Renaissance.  Bethel Expert Dep. at 130-39; Exhibit 221 (October 30, 2009 Expert Report of Jennifer Bethel ("Bethel Expert Report")), at ¶ 34-38.

120.    The letters of intent referenced in the Sedona release (including the LOIs between Renaissance and Sedona and between Sedona and CAMHL) actually did provide for the transactions described, and the Central American mining assets were real and substantial.  See, e.g., Exhibit 270 (Guarnera Expert Report), at pages 2, 7, 10-13, 22; Lough Dep. at 157-58, 166-70; Exhibit 2 (Letter of intent dated December 18, 2002 between Central America Mines Holding Ltd. and Auric Resources Corporation); Exhibit 3 (Letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation); Exhibit 4 (Unexecuted letter of intent dated December 27, 2002 between Central American Mine Holdings Inc. and Renaissance Mining Corporation); Exhibit 28 (January 14, 2003 Letter of

17

Intent between Renaissance and Sedona); Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM).

121.     Renaissance management and CAMHL management had worked together at Greenstone for years, and they had extensive experience with the Greenstone assets intended to be revived in the new venture.  Lough Dep. at 13-14, 32-34, 84-87.

122.     As contemplated in the letter of intent between Renaissance and Sedona, the shell company Sedona's officers and directors did tender signed resignations.  Cooper Dep. at 43-44, 52-54; Exhibit 27 (Letters tendering resignation of employment to Sedona Software Solutions by Kathleen Smith, Andrew Cooper, Gordon Cooper and John Cooper); Exhibit 28 (January 14, 2003 Letter of Intent between Renaissance and Sedona).

123.     Sedona's founder John Cooper testified that as of the closing on January 3, 2003, Sedona's officers and directors had resigned, Cooper had turned over all share certificates, corporate books and records and control to Renaissance, and that in his mind there was no question that there would be a merger between Sedona and Renaissance.  Cooper Dep. at 43-44, 52-54, 114-15.

**IV.     Undisputed Facts Regarding the Renaissance Private Placement**

124.     As described above, LOM Capital agreed to assist Renaissance in the private placement of up to two million restricted shares at $3 per share to qualified "non-U.S." investors.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM).

125.     The plan was for LOM to sell the shares to wealthy foreign individuals who were valued LOM customers who regularly invested through LOM.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); B. Lines Dep. at 152-54, 174; S. Lines Dep. at 78-82, 103-10, 205-07.

126.     LOM could never cheat or otherwise harm such bread-and-butter customers, whose continued patronage and referrals were vital for LOM's continued existence.  S. Lines Dep. at 206-08.

127.    Moreover, as the placement involved a one-year holding period, the investment had to be fair and credible when offered and also had to have reasonably good prospects for at least the ensuing twelve months.  Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation), at pages 7, 19; S. Lines Dep. at 206-08

128.    LOM agreed to act as a selling agent on a best efforts and non-exclusive basis, and subject to completion of due diligence to LOM's satisfaction and other conditions.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); S. Lines Dep. at 76; 208-09; 227, 231; B. Lines Dep. at 433.

129.    As set forth in the draft Renaissance Private Offering Memorandum, the shares were to be offered to such qualified sophisticated investors under "the exemption from registration requirements ... provided by Section 4(2) of the [Securities] Act [of 1933] and Regulation D." Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation), at page 2.

130.    LOM Capital was to receive a fee of 7% upon successful conclusion of the placement.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM).

131.    However, LOM Capital never actually "offered or sold" Renaissance shares to its customers.  S. Lines Dep. at 78-80, 288-89; B. Lines Dep. at 174-77.

A.    LOM Did Not Offer or Sell Renaissance

132.    LOM Capital simply sought, as an initial step in the process, so-called "indications of interest" in the proposed private placement from certain of LOM's sophisticated and highly valued foreign customers.  S. Lines Dep. at 78-82, 138-39, 205-07, 288-89; B. Lines Dep. at 174-77.

133.    The indications of interest were strictly non-binding, and customers who had expressed any interest could decline to actually make an investment for any reason or for no reason at all. S. Lines Dep. at 78-82.

134.    During this indication of interest process, LOM was "show[ing] the deal to ... clients and . . . gaug[ing] their interest," which LOM did with "any deal."  LOM would say "[f]rom our understanding, this is what it is.  What's your interest?"  Based on customer responses, LOM would "try to figure out what sort of interest level there was in it."  S. Lines Dep. at 78-79.

135.    LOM did not provide written materials, as it was only "gauging investor interest.  It was a long way away from doing a transaction.  The documentation to do the deal wasn't even finalized yet."  S. Lines Dep. at 79-80.

136.    Once LOM actually had the final documentation and completed due diligence, it would then "go back to [its] customers or new customers ... and say, remember the deal we spoke about?  Are you still interested?  Sometimes they say no, sometimes they say three times as interested because gold's gone up."  LOM would only then give the customer the offering memorandum and other documentation – and proceed to make the "offer."  S. Lines Dep. at 80-81.

137.    As LOM canvassed its customers during the indication-of-interest process for the Renaissance placement, LOM found that demand for the shares was strong, and it appeared to LOM that the placement – if actually offered – would be fully subscribed.  B. Lines Dep. at 152-54; S. Lines Dep. at 199-200..

138.    If the private placement had gone forward, LOM would next have obtained and reviewed final versions of the offering memorandum and binding subscription agreement for the placement.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); S. Lines Dep. at 79-82, 297-98; Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation) at 6; Exhibit 158 (January 20, 2003 Draft Confidential Private Placement Memorandum for Renaissance Mining Corporation), at BL00455-59.

139.    LOM would then have made the "offer" to customers who had indicated interest by sending them these documents, and by requesting the customers to execute the binding subscription agreements and return signed copies to LOM.  Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM); S. Lines Dep. at 78-82; Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation) at 6; Exhibit 158 (January 20, 2003 Draft Confidential Private Placement Memorandum for Renaissance Mining Corporation), at BL00455 – BL00459.

140.    But as described below, the Renaissance-Sedona venture was frustrated by the SEC's trading suspension before LOM could thus proceed to make the offer to the interested customers. Lough Dep. at 95-97; S. Lines Dep. at 255-60; B. Lines. Dep. at 431-33.

141.    With the venture cancelled, LOM could obviously not complete due diligence to its satisfaction, and thus had the right to cancel its agreement to assist in selling the private placement.  Exhibit 116 (February 5, 2003 Facsimile from Scott Lines to Tony Wile regarding LOM withdrawing its offer to assist Renaissance with financing); S. Lines Dep. at 258-60.

142.    LOM did this in a letter formally notifying Renaissance that it was canceling its agreement.  Exhibit 116 (February 5, 2003 Facsimile from Scott Lines to Tony Wile regarding LOM withdrawing its offer to assist Renaissance with financing); S. Lines Dep. at 255-60.

B.    None of the Customers from Whom LOM Sought Indications of Interest were U.S. Persons

143.    The only situation in which the SEC contends that LOM approached a U.S. person about investing in the Renaissance private placement involved a U.S. citizen named Robert Deutsch.  Compl. ¶ 104.

144.    However, discovery has revealed that Deutsch was not an LOM customer – instead the customer in question was a British Virgin Islands entity that was beneficially co-owned by Deutsch and his spouse, who was Danish.  Exhibit 153 (August 21, 1996 LOM Investment Account Agreement for Chalkcliffe Limited), at page 1; Deutsch Dep. at 59-64; S. Lines Dep. at 107, 222-223; B. Lines Dep. at 478-79.

145.    Renaissance on its own – and without involvement by LOM – had apparently obtained funds from U.S. investors for its private placement.  Wile Dep. at 161-62; B. Lines Dep. at 212-15, 433-34; Exhibit 141 (January 21, 2003 Letter from J&P Turner and Company to Ian Park regarding selling agreement for private placement of Renaissance); Exhibit 142 (January 24, 2003 Letter from J&P Turner and Company to Ian Park regarding selling agreement for private placement of Renaissance); S. Lines Dep. at 134-35.

146.    Renaissance promptly refunded the proceeds of its sales to the purchasers upon cancellation of the venture with Sedona,.  Wile Dep. at 219; Park Dep. at 287-88; B. Lines Dep. at 433-34.

C.    CAMHL Decides to Proceed with Another Publicly Traded Shell

147.    Within months, CAMHL decided to proceed with the deal using a Toronto-listed shell called Tango Mineral Resources and a deal structure highly similar to that planned for Sedona-Renaissance.  Lough Dep. at 111-16; Park Dep. at 294-98; Wile Dep. at 200-02; Exhibit 270 (Guarnera Expert Report), at pages 4, 16; Exhibit 13 (2003 Annual Report of RNC Gold Inc.), at pages TWL00010-11.

148.    Jennings Capital of Toronto assisted in selling the private placement, the role intended for LOM had the Sedona-Renaissance transaction been allowed to proceed.  Lough Dep. at 112-16; Park Dep. at 294-95.

149.    Canadian regulators did not interfere, and the resulting company, RNC Gold Inc., proved to be a successful gold producer.  Lough Dep. at 112-28; Park Dep. at 294-98; Wile Dep. at 200-02; Exhibit 270 (Guarnera Expert Report), at 16; Exhibit 13 (2003 Annual Report of RNC Gold Inc.), at pages TWL00010-11.

150.    After two-and-a-half years, RNC Gold was taken over by a much larger gold producer, Yamana Gold, which is listed on the Toronto, New York and London Stock Exchanges.  Lough Dep. at 122-28; Park Dep. at 294-98; Wile Dep. at 200-02; Exhibit 270 (Guarnera Expert Report), at 16; See also Yamana Gold's website at http://www.yamana.com/.

151.    Park negotiated compensation for Renaissance in exchange for a release of its rights under the letter of intent with CAMHL. Wile Dep. at 219 -20; Lough Dep. at 104-07.

## V.    Undisputed Facts Regarding Trading in Sedona Stock

### A.    Sedona's Price Does Not Suggest a Manipulation by the Lines Defendants

152.    Gold and gold stocks were soaring at the beginning of 2003.  Lough Dep. at 82-83, 91-93; S. Lines Dep. at 92-93; Exhibit 1 (Goldprice.org Chart reflecting Gold prices from July 1995 through July 2009); Exhibit 9 (Yahoo Finance Chart reflecting value of the American Stock Exchange Gold BUGS (Basket of Unhedged Gold Stocks) Index from 1998 through 2009); Exhibit 10 (Yahoo Finance Chart reflecting value of the American Stock Exchange Gold BUGS (Basket of Unhedged Gold Stocks) Index from October 1, 2002 through March 31, 2003).

153.    When the markets opened nine hours after Sedona's January 21, 2003 release, market makers were already posting $8 to $10 quotes for Sedona in anticipation of the completion of the transactions described in the release.  Exhibit 221 (Bethel Expert Report), at ¶ 15; Exhibit 78 (NASD Quote Movement Report), at pages 1-4; Exhibit 222 (NASD Trade Inquiry Report), at page 1;  Exhibit Q (January 16, 2003 – January 31, 2003 OTCBB Market Maker Price Movement Report for Sedona Software Solutions, Inc.) (publicly available) and Exhibit  R (January 16, 2003 – January 31, 2003 OTCBB Time and Sales Report for Sedona Software Solutions, Inc.) (publicly available).

154.    Sedona traded as high as $9.50 that day, both shortly after the opening and again around the close.  Exhibit 222 (NASD Trade Inquiry Report), at pages 1-5.

155.    This was considerably above the $3 price for the Renaissance private placement, but shares purchase in the private placement would be subject to a one-year holding period.  Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation) at pages 7, 19.

B.      The SEC's Allegations Concerning Concentrated Ownership of Sedona

156.    The SEC claims that Brian and Scott Lines owned 99% of Sedona and that this should have been disclosed to participants in the seven-day Sedona trading market.  Compl. ¶ 58.

157.    The evidence shows that Brian and Scott Lines did not own 99% of Sedona.  Most of Sedona's stock (3,205,000 shares, or 60% of the 5,376,500 shares outstanding) was then being held for cancellation after completion of the merger with Renaissance. Cooper Dep. at 63-68; Exhibit 30 (Document titled "Closing Share Positions").

158.    The balance was principally held by LOM customers (each holding under 5%) who had previously invested with Brian Lines.  Exhibit 90 (Document titled "Closing Share Positions").

159.    A total of 245,000 Sedona shares (4.6%) were held in an LOM structuring account, the ICH account, over which Brian (not Scott) Lines had trading authority and in which trusts for the benefit of the families of Brian and Scott Lines had indirect beneficial interests.  B. Lines Dep. at 52-55, 79; S. Lines Dep. at 51-52; Exhibit 94 (February 4, 2003 Email from David McNay to Brian Lines and Scott Lines regarding current positions and crosses for SSSI), at SEC001543.

160.    Sedona's outstanding public disclosure on SEC Form 10-KSB showed that just eight persons owned about 98% of its shares.  Exhibit 29 (September 30, 2002 Sedona 10-KSB), at pages 8 and 21.

161.    Sedona disclosed that these shareholders were its founder John Cooper (owning 3 million shares or 55.8% of the 5,376,500 outstanding shares), his two sons Andrew and Gordon Cooper (1 million shares or 18.6%), and five "pre-incorporation" shareholders (1.25 million shares or 23.2%).  Exhibit 29 (September 30, 2002 Sedona 10-KSB), at pages 8-9, 15, 21; Cooper Dep. at 57.

C.      The Sedona Press Release Provided Important Information to the Trading Market

162.    Sedona did not update its disclosure to reflect sale of the shell in January 2003, so the January 21 trading market saw disclosure of a 98% ownership concentration in Sedona shares. Cooper Dep. at 58-60.

163.    Beyond Sedona's disclosure of concentration, the trading market knew that Sedona was simply a shell.  Hours before trading began on January 21, Sedona issued its press release stating plainly that it had "no assets and no outstanding liabilities."  Exhibit 77 (January 21, 2003 Sedona Press Release on Knobias).

164.    Because it was just a shell, investors expected that it would be closely held, as concentrated ownership of a shell is considered a common and positive attribute.  Exhibit 270 (Guarnera Expert Report), at page 17.

165.    About nine hours after Sedona's January 21, 2003 release, the market opened and Sedona shares jumped from pennies to around $9 per share and stayed around that price for most of the seven trading days.  Compl. ¶ 122; Exhibit 221 (Bethel Expert Report), at ¶ 38-39; Exhibit 222 (NASD Trade Inquiry Report).

D.      Sales of Sedona Shares Into the Trading Market

166.    Responding to this Sedona announcement and ensuing demand, Brian Lines authorized the sale of 143,000 shares from the ICH account into the trading market over the seven days, mostly on January 21 and 22, 2003, with much smaller sales on January 24 and 27, 2003.  Exhibit 97 (SSSI Trade Blotter); Compl. ¶ 121; Exhibit 221 (Bethel Expert Report), at ¶ 29, 33; Exhibit 30 (Document titled "Closing Share Positions"); Exhibit 94 (February 4, 2003 Email from David McNay to Brian Lines and Scott Lines regarding current positions and crosses for SSSI).

167.    The 143,000 shares represented a relatively small portion of the Sedona stock held in accounts at LOM.  Exhibit 221 (Bethel Expert Report), at ¶ 29, 31, 33.

168.    Brian Lines also authorized the sale of an additional 16,300 shares (0.3%) from the ICH account directly to other LOM customers.  Exhibit 30 (Document titled "Closing Share Positions"); Exhibit 94 (February 4, 2003 Email from David McNay to Brian Lines and Scott Lines regarding current positions and crosses for SSSI).

169.    Wile did not have any financial interest in any sales of shares in Sedona allegedly made by any of the Lines Defendants, nor any agreement to share profits or proceeds with any of them. Wile Dep. at 197, 220; B. Lines Dep. at 416.

170.    Sedona's stock price remained relatively stable over most of the seven days that Sedona traded.  Exhibit 221 (Bethel Expert Report), at ¶ 38; Exhibit 222 (NASD Trade Inquiry Report).

171.    It opened at $9.50 on January 22 and closed at $8.10 on January 28. Exhibit 221 (Bethel Expert Report), at ¶ 23.

E.    Market Maker Quoting in Sedona Stock

172.    Over 90 brokers traded Sedona during the seven days. Exhibit 221 (Bethel Expert Report), at ¶ 20.

173.    Over 20 market makers posted quotes for Sedona, with 10 posting quotes the first day. Exhibit 221 (Bethel Expert Report), at ¶ 13.

174.    Numerous active market makers make it more difficult to manipulate a stock. Exhibit 221 (Bethel Expert Report), at ¶ 12.

175.    With the stock trading around $9, LOM separately sold 100,000 shares internally to valued LOM customers and a few managers at $4 as a goodwill gesture.  Exhibit 222 (SSSI NASD Trade Inquiry Report); S. Lines Dep. at 119-22; Compl. ¶ 127.

176.    Only 16,300 of the 100,000 shares sold internally were ever resold into the trading market.  Exhibit 94 (February 4, 2003 Email from David McNay to Brian Lines and Scott Lines regarding current positions and crosses for SSSI); Compl. ¶ 128.

177.    VFinance, the U.S. market maker LOM used for most if its U.S. transactions in Sedona stock, accounted for only 19.6% of trading volume on the first day, and only 12.7% or volume over the entire period. Exhibit 221 (Bethel Expert Report), at ¶ 20.

178.    An economist would expect a firm propping up a stock price to be an active buyer in the market, but VFinance did not buy at all in the market on four days, and on the other three its limited purchases were mainly from its own customers, followed by sales into the market. Exhibit 221 (Bethel Expert Report), at ¶ 21.

179.    And VFinance accounted for only about 13% of sales into the market. Exhibit 221 (Bethel Expert Report), at ¶ 22.

180.    As a market maker, VFinance posted only 1.2% of the "inside bid" quotations (i.e. highest bid price) on January 21, no inside bid quotes on January 22 through 28, and only 2.4% of the inside bid quotes on January 29. Exhibit 221 (Bethel Expert Report), at ¶ 14.

181.    Overall, only 2.6% of the dollar amount of bid increases was attributable to VFinance. Exhibit 221 (Bethel Expert Report), at ¶ 15-16.

182.    An economist would expect that a market maker representing someone trying to manipulate a stock price higher would post higher bid prices to accomplish this goal. Exhibit 221 (Bethel Expert Report),  at ¶ 10-11.

183.    As discussed above, the resulting company would be owned 49% by CAMHL, 26% by legacy Renaissance shareholders, 12% by new Renaissance private placement investors, and only 13% by all of the legacy Sedona shareholders combined (2,135,000 shares out of 16,442,300 shares that would be outstanding).  Exhibit 77 (January 21, 2003 Sedona Press Release).

184.    The former SEC chief economist Dr. Bethel concluded in her expert report that "a rational investor in Sedona (or the Renaissance private placement) would have anticipated dramatic changes in the future ownership of their firm.  Such investors' buy and sell decisions would not rationally have been based on the firm's prospective ownership, given most of its

shares would be retired and the remainder would constitute a minority position in the newly merged company." Exhibit 221 (Bethel Expert Report), at ¶ 33.

F.    Wew's Purchases of Sedona Do Not Support the Theory that the Stock was "Manipulated"

185.    The SEC's Complaint is built around a theory that Anthony Wile conspired with his uncle, Defendant Wayne Wew, to manipulate Sedona. Compl. ¶ 106-16.

186.    During discovery, the evidence showed that Wew is a day trader, and he believes in buying new issues when they begin trading and "get their initial kick on the upside." Wew Dep. at 95-96.

187.    On the morning of January 21, 2003, when trading began in Sedona, Wew looked at market maker quotes on his screen and gave a buy order for 5,000 shares at $8.25, slightly above the prevailing bid quote (so-called "topping the bid") – a non-manipulative act. Wew Dep. at 99-101, 108.

188.    He traded through his usual broker (Canaccord, based in his native Canada), and he had no control over where his broker would then direct the order. Wew Dep. at 105-06, 108-09.

189.    After his order was filled at $8.25, the next several trades received execution at $9.50, thus indicating that Wew's bid had not "pegged" the market at $8.25. As a day trader, he sold later in the day and took a small profit. Wew Dep. at 97, 103-04.

190.    Wew never talked to Brian or Scott Lines or anyone else at LOM about Sedona. Wew Dep. at 94-95.

191.    Wew has a close father-son relationship with his nephew Anthony Wile and often speaks with him by phone several times a day, so phone records of calls between them in January 2003 are not out of character. Wew Dep. at 98-99.

G.    LOM Did Not Try to Deceive the Trading Market

192.    The SEC complains that because Renaissance and Sedona did not affirmatively disclose that Brian and Scott Lines had allegedly acquired 99% of Sedona's stock, this "created

the misleading impression that an independent investment banking firm" had "evaluated the merits of the Renaissance/Sedona merger" and agreed to sell the Renaissance private placement. Compl. ¶ 76.

193.     But what Renaissance and Sedona actually stated was that LOM Capital Ltd. had simply agreed to "assist" as a selling agent for the Renaissance private placement on a "best efforts" basis, and "subject to . . . completion of satisfactory due diligence."  Exhibit 76 (January 24, 2003 Confidential Private Placement Memorandum for Renaissance Mining Corporation); Exhibit 136 (January 15, 2002 [sic] Letter Agreement between Renaissance and LOM).

194.     And Renaissance and Sedona did not tell the Sedona trading market (or "create [ ] the misleading impression") that LOM would be "evaluating" the merger – whether for the benefit of the trading market or others.  Exhibit 77 (January 21, 2003 Sedona Press Release); Exhibit 137 (January 17, 2003 Renaissance Press Release).

H.     The SEC Investigates LOM and the Renaissance/Sedona Transaction

195.     The SEC began investigating the activity in Sedona almost immediately.  B. Lines Dep. at 446-48, 453-59; S. Lines Dep. at 140-42 .

196.     It conducted phone interviews with Anthony Wile, Ian Park, Brian Lines and others. S. Lines Dep. at 140-141; B. Lines Dep. at 446-48, 453-59; Skarica Dep. at 246-47.

197.     It also began calling investors, and as one investor put it, they "scared [him] right out of" the stock and caused him to sell out his entire Sedona position immediately.  Deposition of Frank Miller on December 4, 2009 at 53-56.

198.     After only seven trading days, the SEC suspended trading, issued a press release questioning the mining assets and business, and commenced a subpoena-empowered investigation that stretched from January 2003 to the filing of this action in December 2007. Compl. ¶ 129; *Trading Suspension: Sedona Software Solutions, Inc.*, Release No. 47283 (Jan. 29, 2003) (available at www.sec.gov).

199.    With Sedona suspended and a major investigation underway, the Sedona-Renaissance venture was dead.  Lough Dep. at 95-97.

200.    At this point, LOM bought back the Sedona stock it had sold internally to favored customers and managers at $4.  S. Lines Dep. at 152-53.

201.    Additionally, LOM escrowed the proceeds from its sales of 143,000 Sedona shares into the trading market during the seven days Sedona had traded, and those funds remain in escrow today.  See, e.g., Exhibit S (Account Statement for LOM (Holdings) Ltd. Escrow Account, Bates labeled LOM-SDNY-001977-80).

202.    Thomas Lough, CAMHL's part owner and CFO, testified that up until the very day of the SEC's trading suspension, CAMHL had every intention of proceeding with the Sedona-Renaissance venture.  Lough Dep. at 97.

## VI.    **Undisputed Facts Relating to SHEP Technologies**

203.    Peever and Curtis are Canadians who settled this matter without admitting or denying liability.  Compl. ¶ 25-26; Deposition of John Peever on August 21, 2009 ("Peever Dep.") at 27; Deposition of James Curtis on August 21, 2009 ("Curtis Dep.") at 20; *Court Enters Permanent Injunctions and Penny Stock Bars Against William Todd Peever and Phillip James Curtis in Market Manipulation Case,* Lit. Release No. 20733 (Sept. 22, 2008) (available at www.sec.gov).

204.    At their depositions, taken in Canada, they asserted their Fifth Amendment privilege as to all substantive questions.  See generally Peever Dep.; Curtis Dep.

205.    When pressed, they each admitted that they would assert their privilege as to questions asked by the SEC or the litigating defendants, and regardless of whether questions were "loaded" to suggest that silence favored one side or the other in the litigation.  Peever Dep. at 28-29; Curtis Dep. at 22.

A.    Background Facts Regarding SHEP

206.    SHEP was a company developing an energy recovery system for cars, trucks and mass transit vehicles that would capture energy during deceleration and use it during acceleration.  Exhibit 40 (January 2003 Business Plan for Shep Technologies Inc. entitled "Energy-Efficiency for Global Transportation Applications Today") at SEC060684.

207.    In a May 2001 letter, Ford Motor Company endorsed SHEP's work: "Ford Motor Company has been evaluating Shep supplied hydraulic components in a system designed to recover and reuse deceleration energy.  To date these components have proven very successful and are providing significant fuel economy increases.  We would encourage Shep to continue its efforts to grow the capabilities of their system.  Shep will benefit all of us with improved fuel economy and affordable performance."  Exhibit 40 (January 2003 Business Plan for Shep Technologies Inc. entitled "Energy-Efficiency for Global Transportation Applications Today"), at SEC060719.

208.    Another letter from Ford in July 2001 confirmed that, using SHEP's technology, "work to date has indicated that fuel economy can be increased by 25% on the EPA city cycle and 35% on a more representative truck city cycle".  Exhibit 40 (January 2003 Business Plan for Shep Technologies Inc. entitled "Energy-Efficiency for Global Transportation Applications Today"), at SEC060720.

209.    SHEP's CEO Malcolm Burke confirmed at his deposition that Ford was very enthusiastic about SHEP and that these letters accurately reflected Ford's views of SHEP's system.  Deposition of Malcolm Burke on August 20, 2009 ("Burke Dep.") at  23-24, 35-42.

210.    SHEP successfully tested its components – involving a hydraulic pump mechanism and a light weight accumulator system – on several Ford vehicles, including Lincoln Navigator SUVs and Ford F-Series pickup trucks.  Burke Dep. at 21-29, 35-39, 149-50.

211.    SHEP also contracted with Pi Technology, a UK-based Formula-1 racing technology company, for an electronic control system to be installed on two Jaguar prototype vehicles SHEP was developing in 2002.  Burke Dep. at  29-34.

212.    Interest in SHEP was not limited to Ford.  During 2002 and 2003, SHEP also met multiple times with officials at the Volvo truck manufacturing facility in Sweden.  Burke Dep. at 55-56

213.    SHEP also drew interest from, among others, a U.K. agency interested in exploring the technology for London taxis and subways.  Burke Dep. at 56-58.

214.    SHEP also sought and obtained appropriate international patent protection for its innovations.  Burke Dep. at  87-89.

B.    SHEP Decides to Go Public Through a Reverse Merger with IHI

215.    Like other small companies, SHEP determined to go public through a reverse merger, which is far faster and less expensive than a formal IPO.  Burke Dep. at 62-67, 77-80, 83-84;  Exhibit 270 (Guarnera Expert Report) at page 14-15.

216.    To accomplish this goal, SHEP in September 2002 combined with a public shell company called Inside Holdings Inc.  Exhibit 43 (September 17, 2002 United States Securities and Exchange Commission Form 6-K, Report of Foreign Private Issuer filed by Inside Holdings Inc.); Burke Dep. at 62-67, 160.

217.    Inside's public filings disclosed that, before its merger with SHEP, 72.3% of Inside's stock was concentrated in the hands of three entities, which Inside disclosed were controlled by its three directors – Kevin Winter (controlling Gateway Research Management Group Ltd.), Eric Collins (controlling Consensus Investments Ltd.), and Richard King (controlling Nottinghill Resources Ltd.). Exhibit 42 (United States Securities and Exchange Commission Form 20-F for the period ending April 30, 2002, Annual Report filed by Inside Holdings Inc.), at 17 of 39; Burke Tr. 70-80.

218.    In the reverse merger, legacy SHEP shareholders got slightly over 50% of the surviving entity, and legacy Inside shareholders got under 50%.  Exhibit 43 (United States Securities and Exchange Commission Form 6-F filed by Inside Holdings Inc.); Burke Tr. 70-83.

219.    Thus, following the merger, the holdings of Gateway, Consensus and Nottinghill were only about 35% of SHEP. Burke Dep. at 83.

220.    And by the end of 2002, the Gateway, Consensus and Nottinghill holdings were only 27.6% of SHEP.   Exhibit 48 (United States Securities and Exchange Commission Form 20-F for the period ending December 31, 2002, Annual Report filed by SHEP Technologies Inc.), at page 33 of 87; Burke Tr. 127-30.

221.    SHEP arranged the reverse merger with Inside through Peever and Curtis, who acknowledged owning shares of Inside.  Burke Dep. at  62-67, 175-76.

222.    The legacy shareholders of the Inside shell company had accounts at LOM.  Burke Dep. at 161-62.

C.    LOM's Role in the Reverse Merger

223.    But LOM did not play a role in introducing Inside to SHEP or in the reverse merger of Inside and SHEP.  Exhibit 52 (January 24-26, 2004 communications between Tracy Moore, Brian Lines, Kevin Winter, Richard King and Eric Collins regarding financing of SHEP's operations); Burke Dep. 219-22.

224.    In December 2002, three months after the merger, Peever brought SHEP's CEO Malcolm Burke to Bermuda and introduced him to LOM, where he met Brian Lines and made a presentation on SHEP to LOM's staff.  Burke Dep. at 92-96.

225.    Peever told Burke that LOM could help SHEP raise capital, but LOM never made any contractual commitment to help SHEP. Burke Dep. at 95-98.

226.    Peever promised to introduce SHEP to other funding sources, but likewise failed to deliver on such promises.  Burke Dep. at 173-75, 242-43.

227.    However Brian Lines personally invested $200,000 in SHEP through a private placement in 2002, and continued as a SHEP shareholder at least into 2004.  Brian Lines used the Largo Flight account at LOM for the investment and was simply a shareholder in SHEP. Exhibit 52 (January 24-26, 2004 communications between Tracy Moore, Brian Lines, Kevin Winter, Richard King and Eric Collins regarding financing of SHEP's operations).

D.    Publicity Regarding SHEP

228.    Peever and Curtis urged SHEP to publicize the company and introduced it to two publications, OTC Journal and Intrepid Investor.  Burke Dep. at 109-10, 115, 122-23, 176-78.

229.    The OTC Journal writer, Larry Isen, insisted on actually visiting Ford to drive in a test vehicle equipped with the SHEP system, reviewed detailed business and engineering information on SHEP furnished by its CEO Burke, and may have published his article without giving  Burke an advance look at the draft.  Burke Dep. at 109-20.

230.    Burke was the person who selected OTC Journal to cover SHEP based on Isen's serious approach and focus.  Burke Dep. at 118.

231.    At his deposition, Burke confirmed the accuracy of the OTC Journal publication under oath.  Burke Dep. at 120-21.

232.    Burke also made the decision to have SHEP covered by Intrepid Investor.  Burke Dep. at 122-25.

233.    Burke again supplied detailed business and engineering information, determined that the writer seemed knowledgeable, and reviewed drafts of this publication and made comments on the text to make sure it was accurate. Burke Dep. at 124-26, 225-30.

234.    He did not see the headline ("The Greatest Automobile Discovery Since Antilock Brakes") until after publication and viewed it as highly promotional and irresponsible.  Burke Dep. at 124-26, 225-30.

235.    But at his deposition, Burke confirmed the accuracy of the text of the Intrepid Investor publication under oath.  Burke Dep. at 126, 225-30.

236.    Burke hoped that if SHEP's stock price rose, SHEP would be able to raise capital "on a less diluted basis" to fund its ongoing research and development activities.  Burke Dep. at 183-84.

E.    Trading in SHEP

237.    After the OTC Journal and Intrepid Investor publications, Burke saw volume increase, but after the OTC Journal piece, he saw the price of SHEP stock actually go down. Burke Dep. at 186-88, 240-41.

238.    Burke was puzzled as to who was selling the stock and contacted Peever, who said that short sellers were active but that the stock would regain its price when the short sellers had to buy in stock to cover their short positions.  Burke Dep. at 187-88.

239.    Peever's comment about the short sellers reflected what Peever heard from LOM. S. Lines Dep. at 247-49; Compl. ¶ 175-76.

240.    Around this time, Peever tried to reach Brian Lines but in his absence spoke with Scott Lines, who confirmed to Peever that activity on the trading screen suggested short selling of SHEP.  S. Lines Dep. at 248-49.

241.    Scott Lines was apparently aware that the stock had received some coverage and gave his opinion that the short sellers "maybe . . . keyed off" the coverage.  Compl. ¶ 175.

242.    Scott Lines told Peever that "[m]aybe it's a new world where you don't promote a stock."  Compl. ¶ 175.

243.    Scott Lines commented that the short sellers would want to cover their positions by the end of the month.  Compl. ¶ 176.

244.    While Peever was then himself attempting to sell shares through LOM, he apparently did not advise SHEP's CEO Burke of this.  Burke Dep. at 191-92.

245.    However, in March, April or May 2003, Brian Lines phoned Burke and advised him of the sales of SHEP stock.  Burke Dep. at 103-07, 198-201, 247-56.

246.    Brian Lines seemed "angry" that SHEP had failed to make SEC filings to disclose these sales, but Burke responded that this was not SHEP's responsibility.  Burke Dep. at 103-07, 198-201, 247-56.

247.     Burke (a Canadian) told Brian Lines (a Bermudian) that under American law, such filings needed to be made by the shareholders themselves rather than by the company. Burke Dep. at 103-07, 198-201.

248.     Burke then asked SHEP's U.S. securities lawyer to get involved, and forms were then filed with the SEC disclosing certain SHEP sales. Burke Dep. at 103-07, 198-201, 247-56.

249.     The call from Brian Lines was what first informed Burke of sales of SHEP stock by insiders. Burke Dep. at 105, 198-201, 254.

250.     Burke then confronted Peever and Curtis as to whether they were selling SHEP stock. Peever delayed but then "apologize[d]" for "selling a bunch of stock." Burke Dep. at 201-02, 215-16.

251.     The SEC complains about sales of SHEP stock out of accounts held at LOM during the period from late February through June 2003. Compl. ¶ 178.

252.     But the actual trading data do not reflect a manipulation scheme. Exhibit 221 (Bethel Expert Report), at ¶ 43-45.

253.     The volume-weighted average sales price for these accounts was only $1.07, approximately the same price that SHEP had traded at in September 2002, around the time of the SHEP-IHI merger. Exhibit 221 (Bethel Expert Report), at ¶ 43.

254.     And the accounts' sales of 550,000 shares on June 9 and 10 at $0.74 and $0.78 immediately preceded a run-up in the price over the next three days (to $1.31, $1.70 and $1.45), when the accounts sold only 151,000 shares. Exhibit 221 (Bethel Expert Report), at ¶ 44.

255.     And weeks later, when SHEP reached $2.85, the accounts sold only 17,500 shares at prices above $2.00. Exhibit 221 (Bethel Expert Report), at ¶ 44.

F.     SHEP Raised Financing from Other Sources

256.     SHEP was ultimately able on its own to raise capital from other sources. Burke Dep. at 47-49, 107-09

257.    An Australian investment banker raised funds in Australia for SHEP.  Burke Dep. at 108.

258.    Other sources, including a company called Gibraltar Holdings, raised approximately $2.5 million from clients for SHEP.  Burke Dep. at 47-49, 107-09.

259.    And SHEP began the process to obtain a so-called "AIM" listing  on the London Stock Exchange.  Burke Dep. at 59-62.

260.    A group in New Hampshire also agreed to raise $6 million for SHEP, but backed away after reading press about the SEC investigation that preceded the filing of this case.  Burke Dep. at 197-99, 209-11, 243-45.


Dated: January 25, 2010



  /s/ Philip M. Smith
Philip M. Smith (PS-8132)
Kate S. Woodall (KW-8514)
**PATTON BOGGS LLP**
1185 Avenue of the Americas, 30th floor
New York, NY 10036
646.557.5100

*Attorneys for Defendant Brian N. Lines*


  /s/ Stephen J. Crimmins
Stephen J. Crimmins (SC-2714)
Lisa M. Richman (LR-4927)
**K&L GATES LLP**
1601 K Street NW
Washington, DC 20006-1600
202.778.9000

*Attorneys for Defendant Scott G.S. Lines*