UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.                                                    07-CV-11387 (Judge Cote)

BRIAN N. LINES, *et at,*

Defendants.

## MEMORANDUM IN SUPPORT OF DEFENDANT
## ANTHONY WILE'S MOTION FOR SUMMARY JUDGMENT

### (CORRECTED)

{NY092043;1}

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ............................................................................................................... ii

SUMMARY ..................................................................................................................................... 2

LEGAL STANDARD FOR SUMMARY JUDGMENT............................................................... 2

BACKGROUND ............................................................................................................................. 3

DISCUSSION ............................................................................................................................... 13

SECTION 5 CLAIM ..................................................................................................................... 16

THERE IS NO BASIS FOR AN INJUNCTION AGAINST WILE ............................................ 17

NO BASIS FOR DISGORGEMENT ........................................................................................... 19

CONCLUSION.............................................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC,*
  446 U.S. 680 (1980) ................................................................................................... 13, 17

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................................................ 2

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ...................................................................................................... 14

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................................ 2

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,*
  480 F.2d 341 (2d Cir. 1973), cert. denied, 414 U.S. 910 (1973) ............................... 17

*Church of Sudan v. Talisman Energy, Inc.,*
  582 F.3d 244 (2d Cir. 2009) ........................................................................................... 3

*Fujitsu Ltd. v. Federal Express Corp.,*
  247 F.3d 423 (2d Cir. 2001) ......................................................................................... 13

*Ganino v. Citizens Utilities Co.,*
  228 F.3d 154 (2d Cir. 2000) ......................................................................................... 15

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983) ...................................................................................................... 13

*Higazy v. Templeton,*
  505 F.3d 161 (2d Cir. 2007) ......................................................................................... 13

*In re Browning – Ferris Indus. Inc. Sec. Lit.,*
  876 F. Supp. 870 (S.D. Tex. 1995) .............................................................................. 15

*In re Burlington Coat Factory Sec. Lit.,*
  114 F.3d 1410 (3rd Cir. 1997) ...................................................................................... 14

*In re Duane Reade, Inc. Sec., Lit.,*
  No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. Lexis 21319 (S.D.N.Y. 2003) ................... 15

*In re John Alden Fin. Corp.,*
  249 F. Supp 2d 1273 (S.D.Fla. 2003) .......................................................................... 14

*In re NUI Securities Litigation,*
  314 F. Supp. 2d 388 (D.N.J., 2004) ............................................................................. 15

*Jaramillo v. Weyerhaeuser Co.,*
  536 F.3d 140 (2d Cir. 2008) ..................................................................................... 3, 13

*Jeffreys v. City of New York,*
  426 F.3d 549 (2d Cir. 2005) ......................................................................................... 13

*Matsushita Elec. Indus. v. Zenith Radio Corp.*
  475 U.S. 574 (1986) ...................................................................................................... 13

*Mercury Air Group, Inc. v. Mansour,*
    237 F. 3d 542 (5th Cir. 2001).................................................................................... 16

*Milano v. Perot Systems Corp.*
    Civil Action No. 3:02-CV-1269-D, *et al.*, 2006 WL 929325 (N. D. Tex., Mar.
    31, 2006) ..................................................................................................................... 15

*Nathenson v. Zonagen Inc.,*
    267 F. 3d 400 (5th Cir. 2001)..................................................................................... 15

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,*
    940 F. Supp. 1101 W.D. Mich., 1996)...................................................................... 15

*Plotkin v. IP Axess Inc.,*
    407 F.3d 690 (5th Cir. 2005)........................................................................................ 8

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*
    453 F. Supp. 2d 633 (S.D.N.Y. 2006).......................................................................... 3

*SEC v. Opulentica, LLC,*
    *479 F.Supp.2d 319, 331 (S.D.N.Y.2007))* ............................................................... 18

*SEC v. Absolutefuture.com,*
    393 F.3d 94 (2d Cir.2004)......................................................................................... 19

*SEC v. Bausch & Lomb, Inc.,*
    565 F.2d 8 (2d Cir. 1977)........................................................................................... 17

*SEC v. Blatt,*
    583 F.2d 1325 (5th Cir. 1978)................................................................................... 17

*SEC v. Cohen,*
    No. 4:05 CV 371-DJS 2007 WL 1192438 *21 (E.D. Mo., April 19, 2007)........... 19

*SEC v. Coleman,*
    Civ. A. No. 91-2526 (RCL) 1993 WL 414699 (D.D.C., April 21, 1993)................ 18

*SEC v. Commonwealth Chem. Sec., Inc., et al.,*
    574 F.2d 90 (2d Cir. 1978)......................................................................................... 17

*SEC v. DiBella,*
    *No. 3:04cv 1342 (EBB)* 2008 WL 6965807 (D.Conn., Mar. 13, 2008) ................. 19

*SEC v. Fischbach Corp.,*
    133 F.3d 170 (2d Cir. 1997)....................................................................................... 19

*SEC v. Jones,*
    476 F.Supp.2d 374 (S.D.N.Y. 2007).......................................................................... 19

*SEC v. Monarch Funding Corp.,*
    192 F.3d 295 (2nd Cir. 1999) ..................................................................................... 13

*SEC v. One Wall Street,* No. 06-CIV-4217 (NGG) 2008 WL 5082294 *5
    (E.D.N.Y., Nov. 26, 2008) .......................................................................................... 19

*SEC v. Pardue,*
    367 F. Supp. 2d 773 (E.D. Pa. 2005) ........................................................................ 17

*SEC v. Steadman*,
   967 F.2d 1636 (D.C. Cir. 1992) ............................................................................... 17

*SEC v. Tecumseh Holdings, Corp.*,
   No. 03 Civ. 5490 (SAS) 2009 WL 4975263 *6  (S.D.N.Y., Dec. 22, 2009)........................... 18

*SEC v. Todd*,
   No. 03CV2730 BEN 2007 WL 1574756 * 18 (S.D. Cal., May 30, 2007) ............................... 19

*Virginia Bankshares, Inc. v. Sandberg*,
   501 U.S. 1083, 1097) ............................................................................................. 15

**Rules**

Fed. R. Civ. P. 56(b) ................................................................................................. 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                  Plaintiff,

        v.                            07-CV-11387 (Judge Cote)

BRIAN N. LINES, *et at*,

                  Defendants.

---

## MEMORANDUM IN SUPPORT OF DEFENDANT
## ANTHONY WILE'S MOTION FOR SUMMARY JUDGMENT

Defendant Anthony Wile ("Wile") moves under Fed. R. Civ. P. 56(b) for summary judgment dismissing the First, Third, and Sixth Claims[1] in the Securities and Exchange Commission's ("SEC") Complaint.[2]

This Motion will demonstrate that the uncontroverted evidence in this case conclusively shows that Wile was not a participant in an illegal "pump and dump," but rather was a participant with many others in a lawful business transaction. The SEC's version of the events as reflected in its Complaint are simply not borne out by the evidence which has been developed through discovery in this case.

---

[1] Wile is joined as a defendant with the "Lines Defendants" in these claims. Accordingly, in the interest of judicial convenience and economy, Wile adopts the arguments, as set forth in the Memorandum Supporting Lines' Motion for Summary Judgment and the Lines Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of Their Motion for Summary Judgment (the "Statement") and relies and adopts the Statement in support of his Motion as well as the deposition excerpts (cited as "Dep.") and deposition exhibits (cited as "Ex.") filed by the Lines Defendants in support of their Motion as it pertains to Wile, Renaissance and Sedona. Wile is not a party to the "Shep Allegations". The Declaration of Wayne E. Wew filed in support of his Motion for Summary Judgment is also relied upon.

[2] Wile is not named in any other of the 13 claims for relief that the SEC has pled and not at all involved in the "SHEP" allegations contained in paragraphs 144 through 197 of the Complaint. Inexplicably, the SEC repeats all of the paragraphs in the Complaint (1 through 197) for every claim for relief whether or not Wile is allegedly involved in those claims.

## SUMMARY

The SEC's Complaint, at its core, alleges that Wile, as part of a fraudulent "pump and dump" scheme with others, promoted Renaissance Mining Corp. ("Renaissance") in a materially misleading way in order to enrich himself and defraud the public when Renaissance was to be merged into a publicly traded shell corporation known as Sedona Software Systems, Inc. ("Sedona"). The facts that have emerged in the course of discovery indicate that Wile never misled or intended to mislead the public when promoting Renaissance; the mining properties to be acquired by Renaissance were real, not a fiction and were not misrepresented; Wile never sold a single share of Renaissance or Sedona stock, took no compensation, and did not profit at all from the trading in Sedona stock; and further, Wile caused Renaissance to return every single dime that was raised in a private placement after the SEC's trading suspension caused the deal to crater. Finally, as established by the Lines Defendants in their Motion for Summary Judgment, there was no manipulation of Sedona stock.

As the SEC is unable to demonstrate that Wile violated the securities laws seven years ago, summary judgment denying injunctive and other relief sought by the SEC is appropriate.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

A party may move for summary judgment showing that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The non-moving party must then come forward with "specific facts" showing a genuine factual issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Summary judgment will be granted where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). *Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir.

2009) aff'g *Presbyterian Church of Sudan v. Talisman Energy, Inc.* 453 F. Supp. 2d 633, 662 (S.D.N.Y. 2006) (Cote, J).

Accordingly, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim, *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

## **BACKGROUND**

At the time of the actions complained of Wile was 36 years old and a Canadian citizen. He earned a business degree from Saint Mary's University in Halifax, Nova Scotia in 1991. From 1994 through 1996, Wile worked as a securities broker and investment advisor with Scotia Mcleod (Bank of Nova Scotia) and Nesbitt Burns (Bank of Montreal) in Canada. Wile was a Certified Investment Manager and was made a Fellow of the Canadian Securities Institute in 1995. From 1996 through 1997, he managed the Atlantic Aggressive Growth Fund and thereafter engaged in private investing and business consulting. (Deposition of Anthony Wile December 8, 2009 (hereinafter "A. Wile Dep.") at. 8-11, 16).

Wile had considerable experience in finance and the public markets in Canada, with an emphasis on venture capital oriented towards early phase development of mining companies. (A. Wile Dep. at 22-23). Wile has never been the subject of any regulatory action or criminal proceeding, and his vocational history does not reflect that he ever held a position as an officer or director of a public company.

Renaissance

In September 2002, Wile and Ian Park ("Park") formed Renaissance because of their belief that the then recent changes in the world economic picture signaled a renewed interest in

minerals and mineral exploration, particularly gold. It was their belief that the price of gold, which had already risen from the lows it reached in the late 1990s, would continue to increase. They assembled a strong management team consisting of a number of people who had been involved in mining operations for many years.[3]

Initially, Renaissance acquired mineral exploration rights to eight properties in North Western Ontario. These properties were located in the "Red Lake" region in which Goldcorp, one of the largest gold producers in North America, operated gold mines. (A. Wile Dep. at 35, 36; Renaissance Amended and Restated Confidential Private Placement Memorandum dated January 24, 2003, Ex. 76).

Shortly after this acquisition, Wile and Park began pursuing certain properties located in Latin America. These properties had, at one time, been owned by Greenstone Resources, Ltd. ("Greenstone"), a gold producer in the 1990s, and were well known to those involved in the mining industry. Greenstone had, at one point, a market capitalization of over $1 billion dollars and traded on the New York Stock Exchange. In fact, the acquisition of the Greenstone properties was, at the same time, being aggressively pursued by other groups. (A. Wile Dep. at 31-32).

Due in part to Park's previous association, through Greenstone, with Randall Martin and Thomas Lough (both highly experienced in the mining industry), the principals of Central American Mines Holdings, Ltd. ("CAMHL") and its affiliates, Renaissance was able to negotiate and execute a letter of intent dated December 27, 2002 to acquire these properties, subject to certain monetary and other conditions, one of which was that Renaissance would merge into a

---

[3] This management team consisted of William Daly, with almost 20 years of mining experience; Robert "Dutch" Van Tassell, with over 40 years of mining experience and well known in the industry; Colin Bowdidge, who had over 30 years of mining experience and held a Ph.D. in Geology and Barry Price, who also had approximately 30 years' mining experience. (A. Wile Dep. at 27-33).

public company which would ultimately be controlled by the principals of CAMHL (Ex. 3 and 4). In order for this transaction to close, additional funds needed to be raised to make certain payments required by CAMHL, and for initial working capital. Renaissance issued a press release on January 8, 2003 disclosing this letter of intent and posted it on its website.

LOM and Sedona

After Wile and Park reached agreement with the CAMHL principals, they quickly moved to enlist assistance in raising the required funds for the transaction and to identify a merger candidate. Wile and Park knew that LOM Capital Limited, a Bermuda based investment bank ("LOM"), was familiar with this type of mining deal and had the ability to finance it. (A. Wile Dep. at 78-79). LOM was presented with the facts concerning the underlying mining properties, the terms of the CAMHL transaction and the need for a public shell. LOM identified a public shell company (Sedona) and an agreement was reached between Sedona and Renaissance memorialized in a letter of intent dated January 14, 2003 (Ex. 28). This letter of intent provided for a merger of Renaissance into a to be formed subsidiary of Sedona, with Renaissance shareholders to receive Sedona stock. The transaction was subject to the execution of a definitive agreement by February 15, 2003, with a closing effective upon delivery of an Information Statement to Sedona shareholders in conformity with Rule 14C of the Securities and Exchange Act of 1934, as amended ("Exchange Act").

In addition, LOM agreed to assist Renaissance in raising a minimum of $3 million to a maximum of $6 million in a private placement to non-U.S persons who were accredited investors. Renaissance engaged LOM to assist in the private financing on a "best efforts basis" which was memorialized in a letter dated January 15, 2002 (Ex. 136). Renaissance also prepared a Private Placement Memorandum for a Regulation D, Rule 506, offering to accredited investors in order to raise a portion of the required capital.

By January 17, 2003, all the pieces were in place for a successful transaction which would result in a public company owning, what Wile and many others considered to be, substantial gold producing assets and exploratory projects in Latin America, with necessary short term working capital, an experienced management team and an opportunity to develop into a leading intermediate gold producer.    A press release announcing the Renaissance/ CAMHL/Sedona transaction was issued on January 17, 2003 by Renaissance and on January 21, 2003 by Sedona (both releases were reviewed by Renaissance lawyers).  (A. Wile Dep. at 197-199, and 203).  These releases accurately reflected the following facts:

1.      That Sedona (with no assets and no liabilities) was to acquire Renaissance, subject to the negotiation of definitive purchase documentation and the satisfaction of other contingencies;

2.      That LOM had agreed to serve as an investment banker in connection with a private equity financing of $6,000,000 (2,000,000 shares at $3.00 per share), subject to due diligence;

3.      That Renaissance had signed a letter of intent to acquire gold producing properties in Central America; and

4.      That upon the closing of the Sedona transaction and acquisition of the properties, CAMHL shareholders would hold 8,000,000 shares of Sedona; Renaissance shareholders would hold 4,307,000 shares of Sedona; Sedona shareholders would retain 2,135,000 shares (after 3,206,000 shares were redeemed); and new investors in the private placement would hold 2,000,000 shares.

The shares of Sedona began trading on January 21, 2003 at prices of around $9.00.  The SEC staff commenced an inquiry/investigation.  On January 29, 2003 a trading suspension was ordered.

The trading suspension and SEC investigation doomed the proposed merger and CAMHL transactions. The letter of intent with Sedona was cancelled in the beginning of February 2003. Renaissance refunded approximately $1.4 million that had been in escrow to approximately 40 investors who had subscribed for shares of Renaissance in a private placement. CAMHL and its affiliates began negotiations with a group in Canada to accomplish essentially the same transaction north of the border. Park was able to negotiate compensation for Renaissance in exchange for a release of its rights under the letter of intent with CAMHL. CAMHL's negotiations in Canada were consummated, and in 2003, CAMHL effected a reverse take over of a public company in Canada. That company, known as RNC Gold, Inc., raised approximately $30 million, traded on the Toronto Stock Exchange and was subsequently acquired by Yamana Gold, Inc., another public mining company traded on the New York Stock Exchange.

Wile did not receive any compensation from Renaissance or Sedona; he did not receive any commissions or fees with respect to the sale of any stock of either Renaissance or Sedona; and he did not sell a single share of stock of either Renaissance or Sedona, in fact, he never owned any shares of Sedona. Finally, he did not have any financial interest in any sales made by any of the LOM Defendants, nor any agreement to share profits or proceeds with any of the LOM Defendants. (A. Wile Dep. at 197 and 220).

### THERE IS NO EVIDENCE SUPPORTING THE MATERIAL ALLEGATIONS AGAINST WILE ALLEGED IN THE COMPLAINT

After extensive discovery, no facts have been revealed to support any of the material allegations in the Complaint made against Wile proving that he was a participant in a "pump and dump" scheme.

The undisputed facts developed in discovery show that the SEC lacks evidence to support the essential elements of its claims. A comparison of the SEC's allegations in the Complaint

with the facts developed demonstrate this. (The paragraph references are to the paragraphs in the Complaint).

     1.     Paragraph 2 alleges the use of "paid touters to promote Sedona... stock". Wile, in his testimony, denied making any payments to mining analysts/newsletter writers nor asking analysts to write reports, nor did he review them prior to dissemination. Roulston and Skarica both testified that they received no compensation for the newsletters they wrote about Renaissance/Sedona, and there is no evidence otherwise.

     2.     Paragraphs 3, 63, 64, and 65 allege that the January 8, 2003 press release was false and misleading because it created the false impression that Renaissance had acquired a major portfolio of gold producing assets in Latin America (Par. 63); omitted to disclose that at the time Renaissance lacked the financial resources to acquire the gold mines and had to raise funds for that purpose (Par. 63); omitted to disclose the public company contingency and that the Renaissance board of directors would change (Par. 64); and omitted to disclose the unverified nature of certain projections (Par. 65).

     The January 8, 2003 press release (Ex. 155) itself is the best refutation of the SEC's allegations. The SEC myopically focuses on the headline and ignores the text. The very first sentence of the text in the release states: "Renaissance Mining Corp. announces that the Company has signed a letter of intent with Central American Holdings Limited ("CAMHL") to acquire a marquee package of producing gold mines and economic gold deposits in Nicaragua and Panama", (emphasis supplied). The release goes on to state that "on closing, Renaissance will pay $2.95 million and issue 8 million shares to CAMHL...". (emphasis supplied). Courts have recognized that headings must be read in conjunction with the text in assessing whether a press release is misleading. *Plotkin v. IP Axess Inc.,* 407 F.3d 690 (5th Cir. 2005); therefore, this release cannot be considered misleading.

None of the information that the SEC claims should have been disclosed (i.e. need for additional financing, change of board members, etc.) was required to be disclosed in that there was nothing in the release that was misleading without such disclosure.[4]  Further, this was a release disseminated at that time primarily to the shareholders of a <u>private</u> company.  A private company has no <u>required</u> disclosures under applicable federal securities laws, particularly at a time when the private company is neither offering nor selling securities.[5]  Finally, there is no evidence to show any connection whatsoever between this press release and the trading of Sedona stock that commenced 13 days later.[6]

3.      Paragraphs 66 and 67 allege that Renaissance's web site created the impression that Renaissance had acquired the Latin American properties and also contained false statements by Park that the company had successfully made the "leap" from exploration to production.

Initially, it must be emphasized that it was Renaissance's web site, and not Sedona's, that carried the allegedly misleading information; the Renaissance web site made no mention of Sedona.  Further, for the reason stated above, the January 8, 2003 press release, which was posted on the web site, was not misleading and did not omit any facts that were required to be disclosed in order to make what was disclosed not misleading.  Additionally, the Renaissance

---

[4]  The SEC throughout its Complaint constantly refers to the failure to disclose certain facts.  However, these allegedly omitted facts do not render what was stated materially false or misleading.  The SEC's construct is specious and does violence to the plain text of Section 17(a) of the Securities Act of 1933, as amended ("Securities Act"), Section 10(b) of the Exchange Act and Rule 10b-5, which requires an omission to state facts <u>that are necessary to make the facts that were stated not false and misleading</u>.  Omissions must relate to facts that are stated for a violation to occur.

[5]  It is horn book law that in order for actionable conduct to arise under Section 17(a) of the Securities Act, there has to be an offer and sale of a security.  Likewise for there to be actionable conduct under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, there has to be fraud in connection with the purchase and sale of a security.  At the time of the January 8, 2003 press release Renaissance was not engaged in either the offer, purchase or sale of any security.

[6]  Indeed, when Renaissance and Sedona issued the January 17 and January 21, 2003 press releases and trading in Sedona commenced, there <u>was</u> further disclosure of the CAMHL transaction and the fact that such transaction had <u>not yet</u> been consummated, thus curing any deficiencies, even if they did exist.

press release dated January 17, 2003 and the Sedona press release dated January 21, 2003 made it crystal clear that Renaissance had not yet consummated the CAMHL transaction. Finally, there is absolutely no evidence that what the SEC maintains was misleading on the Renaissance web site influenced the trading of Sedona stock.

4.      Paragraph 70 alleges that Wile "misleadingly spoke about the mining properties as if they already had been acquired by Renaissance," in a Wall Street Reporter interview conducted on January 14, 2003 which lasted 14 minutes. In this interview, Wile made three brief comments about the acquisition of the CAMHL properties by Renaissance. He stated that Renaissance recently "announced the acquisition" of mines; he referred to "mines we bought" and finally to "projects recently acquired." Most of the interview involved general matters and the management team, with a fair amount of time devoted to a description of the Canadian mineral exploration rights Renaissance already owned (a recording of interview was referred to as "Exhibit 1990" at 225, A. Wile Dep.).

These statements expressed Wile's enthusiastic belief that the acquisition would close, because at the time he had successfully engaged LOM, and the letter of intent with Sedona was near completion. Further, these statements were not made in connection with the purchase and sale of any security; Wile did not mention Sedona at all, and, at that time, there was no trading in Sedona stock.

5.      Paragraphs 75 and 76 allege that Renaissance's January 17, 2003 press release, falsely claimed that all of Sedona's officers and directors had already resigned and been replaced by Wile..." (Par. 75), and omitted to disclose "the Line's brothers controlling interest in Sedona," and a misleading impression was created that LOM had "evaluated the merits of the Renaissance/Sedona merger." First, Wile believed he and Park were officers and directors of Sedona. The express language contained in paragraph 3 of the January 14, 2003 letter of intent,

provided that the then current officers and directors of Sedona would tender their resignations and be replaced by Renaissance designees, on <u>execution</u> of the letter. In fact, even Wile's attorneys believed that someone had taken care of the required paperwork, because both of them allowed the release to be issued with the disclosure. It was only later, and after the trading suspension order was entered, that Wile first learned that he had <u>not</u> been appointed to such position. Clearly, there was no intentional misstatement. Second, there is no evidence that Wile knew the identity of all the owners of the publicly traded Sedona shares or the exact breakdown of ownership. Third, the press release did not reference at all the identity of the shareholders-it just stated that Sedona shares held by officers and directors would be redeemed at the closing of the merger and the number of shares to be owned by the legacy Sedona shareholders post-merger. The alleged omitted statement has no affect on what was disclosed; what was disclosed about shareholders and share ownership was accurate. Fourth, the release merely stated that LOM was going to assist in the private equity financing as its investment banker; there was no mention of LOM serving as an advisor in the Sedona merger.

6.      The Complaint alleges that Wile, along with defendants Wayne Wew, Brian and Scott Lines, "orchestrated a manipulative trade in Sedona stock," through a prearranged trade designed to artificially inflate the price of Sedona stock. (Par. 106 – 116). The SEC's evidence is the mere existence of certain telephone calls between Wile and his uncle Wayne Wew in the morning of January 21, 2003 (Par. 108-110).

Discovery has adduced absolutely no facts to support these allegations. In fact, the SEC failed to ask Wile a single question concerning these telephone calls at his deposition. Accordingly, the only evidence as to the content of these discussions and the particulars of Wayne Wew's trade is found in his deposition taken on January 19, 2010.

In his deposition, Mr. Wew testified that he spoke frequently with his nephew about business and personal matters on a regular basis. He further testified that he generally recollects that he spoke to his nephew at or about the time that trading commenced on that day, and his nephew was very "exuberant" over the pending Renaissance/CAMHL/Sedona deal. He denied ever receiving any instructions or request from his nephew to purchase Sedona stock and denied telling him that he was going to purchase Sedona stock on that day. Mr. Wew testified that he is a day trader who frequently purchases shares in companies when they initially commence trading. He testified that he has access to a "Stockwatch" trading screen which reflects all bids and asks of market makers in a stock and further testified that he merely "topped the bid", which was then at $8.00, in order to become the first buyer at $8.25. He further testified that he did not know from whom he purchased the shares; that he never spoke to the Lines Defendants about his trades; that he sold all 5,000 shares later that day and made approximately $5,000; and although he knew about the Greenstone assets and knew that Sedona was poised to acquire the Greenstone assets, these particular facts did not bear on his day trading decision. In short, Mr. Wew's testimony is "unrebutted" and refutes the allegations in the Complaint that the trade was prearranged by the Defendants in an effort to manipulate the price of Sedona stock. (Declaration of Wayne E. Wew filed in Support of his Motion for Summary Judgment.)

7.    Finally, in Paragraph 97, the SEC alleges certain misrepresentations and omissions contained in "Renaissance's Offering Memorandum." These relate to "a last recorded trade price", appointments of Wile and Park to Sedona board and as officers, the assumption of debt, the "terms" of CAMHL's control over Renaissance's board and the Lines Defendants ownership of Sedona. However, it is indisputable that the Amended and Restated Confidential Private Placement Memorandum dated January 24, 2003 (Ex. 28) makes no mention of a $5.00 price and Wile reasonably believed that management of Sedona had been changed. The

remaining alleged "deficiencies" are nothing more than a variation of the same theme with respect to the purported deficiencies in the press releases which have already been addressed. Finally, this offering was aborted and all funds were returned to subscribers.

## DISCUSSION

A violation of the anti-fraud provisions of the securities laws requires (1) a misrepresentation or omission, (2) that was material, (3) made in the offer and sale of a security (Section 17(a)(1) of the Securities Act), or in the purchase and sale of security (Section 10(b) and Rule 10b-5 under the Exchange Act), (4) with *scienter* and (5) the involvement of interstate commerce. *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2nd Cir. 1999). Negligence, instead of *scienter,* is sufficient to prove violations of Sections 17(a)(2) and (3) of the Securities Act. *Aaron v. SEC,* 446 U.S. 680, 701-02 (1980). The burden of proving these elements by a preponderance of the evidence falls on the SEC. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983).

As noted above, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. *Jaramillo v. Weyerhaeuser Co.,* 536 F.3d 140, 145 (2d Cir. 2008). The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts…," *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.* 475 U.S. 574, 586 (1986), and it "[m]ay not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir. 2001)).

We have demonstrated that there is a complete lack of evidence which would require Wile to go before a trier of fact on the essential elements of the SEC's Complaint. The undisputed facts clearly reveal that Wile was engaged in a lawful business activity without any intent to defraud anyone, and not in an illegal "pump and dump" scheme, which is at the heart of the SEC's Complaint.

Further, in this particular case, which involves primarily statements of belief and/or optimism regarding the Renaissance/CAMHL/Sedona transaction, the SEC has adduced no facts to demonstrate that Wile did not genuinely believe that there was no reasonable basis for such statements or beliefs. *In re John Alden Fin. Corp.,* 249 F. Supp 2d 1273 (S.D.Fla. 2003) and *In re Burlington Coat Factory Sec. Lit.,* 114 F.3d 1410 (3rd Cir. 1997).

There is absolutely no evidence that either Wile did not believe in the projected gold production from the two Latin American mines, or that there was no reasonable basis for such belief, due to the voluminous information provided to Renaissance by CAMHL representatives from which the projections came and the history of the mines which was intimately known by Park.

In addition, the press releases and newsletters which the SEC fastens upon were not false and misleading. Under the rule established by the Supreme Court's decision in *Basic Inc. v. Levinson,* 485 U.S. 224 (1988), a misrepresentation or omission is considered material when there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision. In addition, courts look to the "total mix" of information available in the marketplace to determine whether a reasonable investor would consider the information important. It is submitted that the misrepresentations and omissions that the Complaint alleges are either (i) not material in view of the releases issued on January 17

and January 21, prior to the commencement of Sedona trading, which accurately disclosed the in futuro status of the Sedona merger and CAMHL acquisition, (ii) are not material misrepresentations or omissions at all, or (iii) constitute "puffing", which has been held by numerous courts not to be actionable. See *Milano v. Perot Systems Corp.*, Civil Action No. 3:02-CV-1269-D, *et al.*, 2006 WL 929325 (N. D. Tex., Mar. 31, 2006); *In re NUI Securities Litigation*, 314 F. Supp. 2d 388 (D.N.J., 2004); *Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101 W.D. Mich., 1996); *In re Browning – Ferris Indus. Inc. Sec. Lit.*, 876 F. Supp. 870 (S.D. Tex. 1995); *In re Duane Reade, Inc. Sec., Lit.*, No. 02 Civ. 6478 (NRB), 2003 U.S. Dist. Lexis 21319 (S.D.N.Y. 2003): (*See also, Nathenson v. Zonagen Inc.*, 267 F. 3d 400 (5th Cir. 2001), to the effect that generalized, positive statements about a company's prospects are not actionable under the federal securities laws). Accordingly, there is no securities law violation.[7]

Wile acknowledges mistakes with respect to certain statements made to the effect that the CAMHL and Sedona transactions had closed. (A. Wile Dep. at 218-220). However, he was also responsible for the January 17 and 21, 2003 releases, which superseded these prior statements and "neutralized" them, by clearly disclosing that neither transaction had as yet been consummated. Under such circumstances, the prior misrepresentations (and omissions) are not actionable. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) (*See also, Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097). "While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of deception drops to nil.")

---

[7] The price predictions and optimistic statements which were disseminated by Lawrence Roulston and David Skarica related to the future prospects of Renaissance and were believed by them; in any event they were expressions of opinions and not facts. Chapman's prediction of a future stock price was also an opinion.

It is submitted that the facts and circumstances as recited herein and in the Lines Defendants Memorandum conclusively demonstrate Wile's lack of scienter. Wile was, along with others, attempting to acquire valuable mining assets and create a public company that could finance mining operations and succeed, not engaging in an illegal pump and dump scheme. Inasmuch as there is a complete lack of evidence of scienter, an essential element of the SEC's case is missing. [8] Accordingly, summary judgment is appropriate.

## SECTION 5 CLAIM

With respect to the Sixth Claim for relief, the SEC alleges that Wile, along with the Lines Defendants, violated the registration provisions contained in Section 5 of the Securities Act in connection with the offer and sale of Renaissance common stock.

It is difficult to discern exactly what the SEC is talking about in light of the fact that it alleges that paragraphs 1-197 of the Complaint (which includes allegations concerning SHEP, none of which are applicable to Wile) constitute part of this charge. The facts that have been developed through discovery indicate that the private placement was conducted by Renaissance pursuant to an amended and restated Confidential Private Placement Memorandum dated January 24, 2003; that Renaissance raised approximately $1.4 million; that these funds were maintained in an escrow account; and that, upon the cratering of the Sedona/CAHML transaction, Renaissance returned all of the funds to subscribers. Accordingly, any technical violation of Section 5 in connection with the offer of Renaissance securities, even if proven by the SEC, (because "sales" were not made) was vitiated by the return of all funds. Under these circumstance injunctive relief against Wile is neither necessary nor appropriate.

---

[8] It is submitted that given the public disclosures made in the January 21, 2003 press release, it cannot be proven that Wile's conduct was even severely reckless. *Mercury Air Group, Inc. v. Mansour*, 237 F. 3d 542 (5th Cir. 2001).

## THERE IS NO BASIS FOR AN
## INJUNCTION AGAINST WILE

In the absence of an ongoing violation, the SEC may be granted injunctive relief by a Court only if there is a demonstration of the reasonable likelihood of reoccurrence. *SEC v. Commonwealth Chem. Sec., Inc., et al.,* 574 F.2d 90, 99 (2d Cir. 1978). In imposing a permanent injunction, the Court must consider a number of factors, including the (1) egregiousness of the defendant's conduct, (2) isolated or recurrent nature of the violation, (3) degree of *scienter*, (4) sincerity of defendant's recognition of his transgression, and (5) likelihood of the defendant's job providing opportunities for future violations. *SEC v. Blatt,* 583 F.2d 1325, 1334 n.29 (5th Cir. 1978). Courts have gone as far to say that "(T)he Commission cannot obtain relief without positive proof of a reasonable likelihood that past wrong-doing will recur." *SEC v. Bausch & Lomb, Inc.,* 565 F.2d 8, 18 (2d Cir. 1977); *SEC v. Pardue,* 367 F. Supp. 2d 773, 776 (E.D. Pa. 2005)

The existence of a past violation in and of itself does not constitute a basis to enter an injunction. The SEC is required to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 394 (2d Cir. 1973), cert. denied, 414 U.S. 910 (1973) . Indeed, former Chief Justice Burger noted that "[an] injunction is a drastic remedy, not a mild prophylactic, and should not be obtained against one acting in good faith." *Aaron v. SEC,* 446 U.S. 680, 703 (1980). Thus, courts have not issued injunction where the *scienter* element is missing.[9] An injunction, when applying the foregoing principles, is not warranted for the following reasons:

---

[9] *See e.g., SEC v. Steadman,* 967 F.2d 1636 (D.C. Cir. 1992) (denying Commission's request for injunctive relief, the court stated "injunctive relief is reserved for willful lawbreakers or those whose operations are so persistently sloppy as to pose a continuing danger to the investing public.")

1.    The activities complained of by the SEC took place December 2002 and through January 29, 2003.  Had the SEC truly believed that there was a reasonable likelihood of reoccurrence on the part of Wile it is hard to conceive that there would be such a delay where an injunction is said to be needed to prevent further violations of the securities laws.

2.    There are no facts to establish that Wile is in a position to commit the same alleged violations of law.

3.    When the Sedona transaction was no longer viable because of the action taken by the SEC to suspend trading in its stock, Wile caused Renaissance to refund all monies raised in the private placement which were then in escrow.

4.    Wile recognized that he may have made certain mistakes through over-exuberance and imprecise language and candidly admitted so during his deposition.  Acceptance of responsibility further militates against the imposition of an injunction or any other relief as requested by the SEC.

5.    The conduct of Wile, by any reasonable estimate, clearly cannot be viewed as "egregious".  This case boils down to a press release that had an exaggerated headline which was then repeated in various contexts.  All of the promotional activities of Wile were done in good faith to try to produce a business transaction involving substantive mining properties, which also negates the existence of scienter.  It is clear that Wile's activity during a short period of time was isolated and not recurrent.

Under these circumstances, an injunction is not warranted.  *See, SEC* v. *Coleman*, Civ. A. No. 91-2526 (RCL) 1993 WL 414699 (D.D.C., April 21, 1993) [10]

---

[10] Inasmuch as the factors that the Court examines to determine whether civil penalties are appropriate are similar to the ones used to determine whether to impose an injunction, civil penalties should not be awarded in this case.  *SEC v. Tecumseh Holdings, Corp.,* No. 03 Civ. 5490 (SAS) 2009 WL 4975263 *6  (S.D.N.Y., Dec. 22, 2009) (citing *SEC v. Opulentica, LLC,* 479 F.Supp.2d 319, 331 (S.D.N.Y. 2007)).

## NO BASIS FOR DISGORGEMENT

The Complaint also fails to provide allegations to justify imposing disgorgement upon Wile. "The amount of disgorgement ... is determined by the amount of profit realized by the defendant," *SEC v. One Wall Street,* No. 06-CIV-4217 (NGG) 2008 WL 5082294 *5 (E.D.N.Y., Nov. 26, 2008) (quoting *SEC v. Absolutefuture.com,* 393 F.3d 94, 96 (2d Cir.2004)). "The primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *SEC v. Fischbach Corp.,* 133 F.3d 170, 175 (2d Cir. 1997). Disgorgement is a remedial action and "the court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *SEC v. DiBella, No. 3:04cv 1342 (EBB)* 2008 WL 6965807 (D.Conn., Mar. 13, 2008). Further, a plaintiff bears the burden to show that the disgorgement figure "approximates the amount of unjust enrichment ...." *Id.* Here, the SEC cannot meet that burden as it cannot submit any documentary evidence that supports its theory that Wile made any profits or was unjustly enriched in any way and it cannot as Wile made no profit from the sale of Sedona shares (he sold none) and there is no evidence that he shared in or participated in gains or profits that any other Defendants may have made. *See SEC v. Jones,* 476 F.Supp.2d 374, 376 (S.D.N.Y. 2007) (no disgorgement where the SEC was "unable to set forth any evidence of specific profits subject to disgorgement"); *SEC v. Todd,* No. 03CV2730 BEN 2007 WL 1574756 * 18 (S.D. Cal., May 30, 2007) (denying disgorgement where the SEC failed to show that the amount it sought represented the defendant's unjust enrichment and was a reasonable approximation of the defendant's ill-gotten gains); *SEC v. Cohen,* No. 4:05 CV 371-DJS 2007 WL 1192438 *21 (E.D. Mo., April 19, 2007) (denying disgorgement where the SEC had "not shown that defendant obtained any ill-gotten gains or unjust enrichment from his actions.") Thus, disgorgement is not warranted.

## CONCLUSION

For the foregoing reasons, Defendant Wile's Motion for Summary Judgment should be granted.

Dated: New York, New York
      January 25, 2010               Respectfully Submitted,

**AKERMAN SENTERFITT LLP**

By: _____
Leonard H. Bloom (LB-9306 )
One S.E. Third Avenue, 25th Floor
Miami, Florida 33131
Tel: 305-374-5600
Fax: 305-374-5095

William Nortman (WN-9511)
Las Olas Centre II
350 E. Las Olas Boulevard, Suite 1600
Fort Lauderdale, Florida 33301
Tel: 954-463-2700
Fax: 954-462-2224

-and-

Scott M. Kessler (SK-5510)
335 Madison Avenue, 26th Floor
New York, New York 10017
Tel: 212-880-3800
Fax: 212-880-8965

*Attorneys for Defendant Anthony Wile*

TO:

A. David Williams, Esq.
Vinyard V. Cooke, Esq.
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington DC 20549

Philip M. Smith, Esq.
Kate S. Woodall, Esq.
PATTON BOGGS LLP
1185 Avenue of the Americas, 30th Floor
New York, New York 10036
*Attorneys for Defendant Brian N. Lines*

Stephen J. Crimmins, Esq.
K&L GATES LLP
1601 K Street NW
Washington DC 20006
*Attorneys for Defendant Scott G.S. Lines*

Reid M. Figel, Esq.
Derek T. Ho, Esq.
KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, PLLC
1615 M Street NW
Washington DC 20036
*Attorneys for LOM (Holdings) Ltd., Lines Overseas
Management Ltd., LOM Capital Ltd., LOM Securities
(Bermuda) Ltd., LOM Securities (Cayman) Ltd., and
LOM Securities (Bahamas) Ltd.*

Mario Aieta, Esq.
SATTERLEE, STEPHENS, BURKE & BURKE, LLP
230 Park Avenue
New York, New York 10169
*Attorneys for Defendant Wayne W. Wew*