David Williams
Justin Chretien
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4030
(202) 551-4548 (Williams)
(202) 772-9233 (facsimile)
williamsdav@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Case No: 07-CV-11387 (DLC) |
| | : |
| BRIAN N. LINES, <u>et al</u>., | : |
| | : |
| Defendants. | : |
| | : |

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
<u>STATEMENT PURSUANT TO LOCAL RULE 56.1</u>

Pursuant to Local Rule 56.1, Plaintiff Securities and Exchange Commission (the "SEC"

or "Commission") states that there is no genuine issue to be tried as to the material facts set forth

below.  The Commission respectfully submits this statement, together with the accompanying

Memorandum of Law, in support of its motion for partial summary judgment against Defendants

Brian N. Lines ("Brian Lines"), Scott G.S. Lines ("Scott Lines"), Anthony Wile ("Wile"), LOM

(Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd., and LOM Securities (Bahamas) Ltd. (collectively, "LOM").

Summary

1.      This matter concerns two separate, but similar, fraudulent schemes to manipulate the stock prices of publicly-traded shell companies quoted on the OTC Bulletin Board: Sedona Software Solutions, Inc. ("Sedona") and SHEP Technologies, Inc. ("SHEP").  Both schemes took place from 2002 through mid-2003.  Both the Sedona and SHEP fraudulent schemes involved the undisclosed acquisition of publicly-traded shell companies, the use of LOM-controlled nominees to conceal beneficial ownership and control over Sedona and SHEP, the use of paid touters to promote Sedona and SHEP stock, and significant trading through the U.S. market in those stocks by defendants Brian Lines and Scott Lines and others.  In the Sedona scheme, the Lines brothers' trading yielded approximately $1.5 million in illegal proceeds.  In the SHEP scheme, trading by the Lines brothers and two of their customers, Defendants W. Todd Peever and P. James Curtis, yielded approximately $4.3 million in illegal proceeds.

**THE DEFENDANTS**

2.      Defendant **Brian N. Lines**, age 45, is a citizen and resident of the overseas territory of Bermuda of the United Kingdom.  Brian Lines was the president and a director of LOM Holdings and its defendant subsidiaries until his resignation on July 1, 2005.  Exhibit A, Answer of Brian N. Lines, ¶ 18.

3.      Defendant **Scott G. S. Lines,** age 43, is a citizen and resident of the overseas territory of Bermuda of the United Kingdom.  Scott Lines is currently the president and chief executive officer of LOM Holdings and its defendant subsidiaries.  During the relevant period, he held the title of Managing Director of LOM Holdings and its defendant subsidiaries.  Exhibit B, Answer of Scott Lines, ¶ 19.

4.    Defendant **LOM Holdings** is the Bermuda-based parent of a group of financial services companies founded by defendants Brian and Scott Lines and their father, Donald Lines. The stock of LOM Holdings is publicly traded on the Bermuda Stock Exchange.  LOM Holdings and its subsidiaries are collectively referred to herein as "LOM" or the "LOM Entities."   Exhibit C, Answer of LOM Entities, ¶ 20.

5.    The following defendants are wholly-owned subsidiaries of LOM Holdings:  **LOM Capital**, LOM's investment banking arm; **LOM Bermuda**, LOM's Bermuda-based broker-dealer; **LOM Bahamas**, LOM's Bahamas-based broker-dealer; **LOM Cayman**, LOM's Cayman Islands-based broker-dealer; and **LOM Ltd.**, LOM's administrative, financial, and clearing operations.   Exhibit C, Answer of LOM Entities, ¶ 21.

6.    Defendant **Anthony W. Wile**, age 39, is a Canadian citizen who resides in British Columbia, Canada.  Wile was Renaissance's founder, chairman, and largest shareholder.  Exhibit D, Answer of Anthony Wile, ¶ 22.

## OTHER RELEVANT ENTITIES

7.    **Sedona Software Solutions, Inc.** was, at all relevant times, a Nevada corporation based in Vancouver, British Columbia, Canada.  During the relevant period, Sedona's stock was registered with the Commission and was traded and quoted on the OTCBB under the ticker symbol "SSSI."  On January 29, 2003, the Commission suspended trading in Sedona securities for ten days.  On June 30, 2006, Sedona filed a Form 15 with the Commission to terminate its registration.  Exhibit E, Sedona Form 10KSB 6/03; Exhibit F, Sedona Form 15.

8.    **Renaissance Mining Corporation, Inc.** was a privately-held Delaware corporation with its headquarters in Boulder, Colorado during the relevant period.   Exhibit D, Answer of Anthony Wile, ¶ 29.

9.      **SHEP Technologies Inc.** is a public company with its headquarters in Vancouver, British Columbia, that owned intellectual property for a vehicle braking technology.  SHEP was formed in September 2002 through the reverse merger of the privately-held SHEP Ltd. and Inside Holdings, Inc., a public shell company.  SHEP's stock is registered with the Commission and is quoted in the Pink Sheets under the symbol "STLOF."  SHEP's stock was quoted on the OTCBB during the relevant period.  Exhibit G, SHEP 20-F, 2002 Annual Report.

## FACTUAL ALLEGATIONS

### I.      THE SEDONA FRAUDULENT SCHEME

#### A.      Tony Wile Formed Renaissance and Executed a Non-Binding Letter of Intent to Acquire Gold Mines in Central America

10.     In late September 2002, defendant Tony Wile and Ian Park ("Park") formed Renaissance with the purported objective of engaging in gold mining and exploration.  Exhibit D, Answer of Anthony Wile, ¶ 34.

11.     During the relevant period, Renaissance had no revenues, nominal non-cash assets, and no business activities. Exhibit H, Renaissance balance sheet; Exhibit I, Deposition of Anthony Wile, p. 46:21-47:2.

12.     Tony Wile owned at least 1,750,000 restricted shares of Renaissance stock, at least 750,000 of which, upon information and belief, he held secretly through an offshore nominee. Exhibit I, Deposition of Anthony Wile, p. 51:10-51:14; 59:24-61:24.

13.     RNC Resources was a privately-held company that owned and operated several South American gold mines.  Exhibit J, Deposition of Thomas Lough, p:21:5 – 21:10.

14.     These mines had previously been operated by a publicly traded U.S. firm called Greenstone Resources, which had gone bankrupt several years before.  Exhibit J, Deposition of Thomas Lough, p:15:2 – 15:13.

15.    RNC was not a profitable company, and in fact was never profitable throughout the relevant period.  Exhibit J, Deposition of Thomas Lough, p:204:14 –204:16.

16.    In late 2002, Renaissance began negotiating with RNC relating to RNC's need to raise capital.   Exhibit J, Deposition of Thomas Lough, p:34:2 – 35:6.

17.    RNC had been seeking to go public in order to raise funds to pay its debts and supply operating capital, and Wile and Park said that they could help RNC do so through two nearly-simultaneous transactions:  the merger of Renaissance and RNC, closely followed by the combined entity's reverse takeover of a publicly-traded shell company.  As part of its negotiations with RNC, Renaissance needed to raise $5 to $6 million to acquire an ownership interest in RNC's mines.   Exhibit J, Deposition of Thomas Lough, p:34:22 – 35:21.

18.    To facilitate the transaction, RNC placed several of its mining assets into a private Belize holding company called Central American Mine Holdings Limited ("CAMHL"), which would be merged into Renaissance.   Exhibit J, Deposition of Thomas Lough, p:43:1 – 43:20.

19.    The mines held by CAMHL were the "La Libertad" (or "Desminic") mine in Nicaragua, the "Bonanza" (or "Hemco") mine and "Cerro Quema" mines in Panama.   Exhibit K, Letter of Intent.

20.    In a December 21, 2002 letter following a meeting between Anthony Wile and Ian Park from Renaissance, and Randy Martin and Thomas Lough of CAMHL, the role of Renaissance was explained – "While it may appear straightforward to take a company public from the standpoint of advancing the mining and production assets, the work required to conduct the fund raising and create stock promotion is an extremely large and specialized task."  Exhibit L, December 21, 2002 Letter at 2.

21.     The letter promised that a "key part of Renaissance's success is the early structuring of 9 of the world's top independent mining analysts as shareholders of the Company. These very influential people reach approximately 35 million investors each month with their research reports.  They are carried by all forms of media distribution and are regularly featured speakers on approximately 20 different radio programs and television broadcasts.  Their comments are republished by major U.S. periodicals such as Barrons's and the Wall Street Journal.  This network was put together by Tony [Wile] who has very good relationships in the financial community and has access to significant funds for quality mining projects.  Public liquidity as been built into the structure of Renaissance.  Our team of analysts will continue to provide the ongoing support we need to keep our name in the marketplace to encourage new buying on a constant basis."  *Id*. at 3-4.

22.     The letter proposed a two-step process subsequent to the signing of a letter of intent between Renaissance and CAMHL, the first step being a reverse-merger with a shell company, and the second step the issuance of shares of Renaissance at $3 per share as a part of a private offering.  *Id*. at 4.

23.     The letter was drafted by both Wile and Park.  Exhibit M, Deposition of Ian Park, p. 64:2-64:3.

24.     On or about December 20, 2002, Wile and Park met with Brian Lines, then president of LOM Holdings and its various subsidiaries, to discuss the involvement of LOM in Renaissance's proposed transaction with CAMHL taking the combined Renaissance/CAMHL entity public.  Exhibit N, Deposition of Brian Lines, at pp. 137:17-141:20.

25.     The day before the meeting, Wile called Brian Lines and told him "Brian, I have got something that is just about as good a deal as you have ever seen in your life for the money business."  Wile asked if Lines was familiar with Greenstone Resources – the bankrupt formerly

publicly-traded company that had previously owned the mining assets being held by CAMHL –
and told Lines that "[w]ell that company is coming back to life, and a company called
Renaissance Mining -- www.renaissancemining.com, you will see all about it -- I have got a
stacked board, we are loaded with cash, I have got lots of brokers and brokerage houses in the
U.S. working with me on the deal, I don't need that.  What I need is the non-affiliate paper to be
properly handled."  Lines agreed and agreed to meet with Wile and Park that evening.  Exhibit
O, BL_20021219a.wav.

26.    Following the meeting, LOM's investment banking subsidiary, LOM Capital,
subsequently agreed to serve as Renaissance's investment banker to raise $5 million through a
private offering of Renaissance shares (the "Offering"), which would presumably enable
Renaissance to acquire the interest in CAMHL's mines.   Exhibit A, Answer of Brian Lines, ¶
38.  Exhibit D, Answer of Anthony Wile, ¶ 38.   The agreement was expressly conditioned on
Renaissance conducting its reverse merger through a publicly-traded shell entity supplied by
LOM.  Exhibit P, LOM-Renaissance Letter of Intent, p. 2.

27.    In the absence of raising funds from investors, Renaissance had nowhere near the
$5 million necessary to acquire the assets.   In about late December 2002, Renaissance had less
than $500,000 in cash assets and a nominal amount of non-cash assets.  Exhibit H, Renaissance
balance sheet; Exhibit Q, Renaissance Bank Statement.

28.    Lines agreed to purchase the publicly traded shell company that would be used to
vend the Renaissance assets into.  See Statement paragraphs 33 to 58.  On January 8, 2003, Lines
explained to his brother Scott that "Well, I bought the shell for the thing and I'm putting the
Greenstone dig in there, basically.  We get our money back right off the bat.  It's – Todd
[Peever]'s in for 1/3, I'm in for 1/3 and Largo's in for 1/3, basically. . . It's called Sedona Systems
is the shell.  And then, and then we announce the RTO, the intent to purchase Renaissance,

Renaissance Gold, basically.  So probably we'll make some good money out of this one, I think."

Scott Lines replied, "Good."  Exhibit R, 20030108A.wav.

29.    With respect to the entity "Largo," or Largo Flight Limited, the families of Brian

Lines and Scott Lines are the beneficial owners.  Exhibit N, Deposition of Brian Lines, at pp.

46:14-46:18.  The other entity that furished payment were Monashee

30.    Lines would later explain to Todd Peever how they would make money from the

deal:

"PEEVER: So what are we doing?

BRIAN LINES:  Selling paper.

PEEVER:  Are we?

BRIAN LINES:  Yeah, we are selling paper to get our money back, and then we get 10

percent of everything, split three ways, right?

PEEVER:  That is f**king -- What can I say?

BRIAN LINES:  Yeah, so we are going to make some good coin on this one.

PEEVER:  F**king thank you.

BRIAN LINES:  All right?

PEEVER:  That is awesome.

MR. LINES:  Yeah."

Exhibit S, BL_200301211.wav.

31.    On December 27, 2002, Renaissance signed a non-binding letter of intent to

acquire CAMHL's mines in exchange for $5 million in cash to be paid at closing, the issuance to

CAMHL's principals of a $4 million convertible debenture (with interest at twenty-five percent

per year), and Renaissance's assumption of at least $9 million in debt.  Exhibit K, Letter of

Intent; Exhibit J, Deposition of Thomas Lough, p185:2 – 185:17.

32.    To effectuate CAMHL's objective of going public, the letter of intent required Renaissance to have become a publicly-traded company by the time of the closing, and provided that CAMHL's principals would acquire control of Renaissance's board within six months of the closing and would own approximately fifty percent of the public shell's outstanding shares. Exhibit K, Letter of Intent.

### B.    Brian and Scott Lines Acquire the Sedona Shell

33.    Around the time of the meeting with Wile and Park in mid-December 2002, Brian Lines identified Sedona as a suitable merger partner for Renaissance and negotiated an agreement with Sedona's chairman and chief executive officer (the "Sedona CEO") to acquire 5.34 million shares of Sedona stock, representing over ninety-nine percent of Sedona's total shares, for a total purchase price of approximately $387,500.  See Exhibit R, Closing Positions Document; Exhibit S, Cooper e-mail re: Closing.

34.     Prior to negotiating the sale with Brian Lines, Cooper had previously obtained the power from other shareholders to dispose of the shares of all of the "affiliate" and "non-affiliate" shares of Sedona involved in the transaction and Cooper alone determined to sell the securities to Lines.  *See* Exhibit T, Deposition of John Cooper at 98:12- 98:20.  Of the approximately 5.34 million shares of Sedona that Brian and Scott Lines acquired, four million shares were owned by the Sedona CEO and his sons, and the remaining 1.34 million shares were held by seven friends, relatives, or associates of Cooper (the "Seven Shareholders").  See Exhibit R, Closing Positions Document; Exhibit S, Cooper e-mail re: Closing.

35.    Although Brian and Scott Lines treated the 1.34 million shares from the Seven Shareholders as unrestricted or tradable shares, those shares were in fact restricted, because, among other reasons, Brian and Scott Lines acquired the Sedona shell as part of a single unregistered transaction.  Exhibit N, Deposition of Brian Lines, 105:21-105:25.

36.     The agreement provided that 3,205,000 shares previously held by Sedona affiliates would be cancelled.  *See* Exhibit R, Closing Positions Document.  An additional 796,000 affiliate shares would be transferred to the Lines Group.  *Id*. On or about the date of the closing of the transaction, January 3, 2003, Cooper and other Sedona affiliates signed and executed blank share purchase agreements dated April 14, 2003.  Exhibit T, Deposition of John Cooper at 109-110; Exhibit S, Cooper e-mail re: Closing.  The purpose of forward-dating the purchase agreements transferring the stock to unnamed purchasers to mid-April was to avail the transactions of an exemption to the U.S. registration requirements permitting the transfer of stock after the stock had purportedly become "free trading" 90 days after Cooper and other Sedona affiliates ceased to be affiliated with the company.   Exhibit T, Deposition of John Cooper at 109-110.  Notwithstanding the date of the agreements, Cooper had agreed to transfer the "affiliate" shares on or about the date of closing.   *Id*.   Cooper also agreed to sell to Lines 1.3 million "non-affiliate," purportedly "free trading" shares of Sedona stock.  Exhibit R, Closing Positions Document.

37.     With respect to the sales of both "affiliate" and "non-affiliate" shares, Cooper insisted that all sale negotiations and confirmations be conducted through him.  Cooper told Lines that the attorney handling the transaction would not be permitted to contact anyone other than Cooper in connection with the sales of the Sedona shares: "here is what he wants to do, and I can tell you it ain't going to happen. . . . He wants to go to each one of my clients, and notwithstanding that he has a share transfer agreement which is signed by them and agreed to, he wants to go to each one of these fucking clients and get their permission that they be paid this amount of money for that amount of stock.  Well that ain't going to happen.  These are my clients, my friends, and my associates, and I'm not going to have an outside lawyer in there stirring the f**king soup."  Cooper noted to Lines that "these deals, as you know, the SEC

doesn't like them, the NASD doesn't like them, and they take a certain amount of finesse. . . .

You get someone in there who is ham-fisted and wants to create huge stupid paper trails . .. ."

Lines agreed to talk to the lawyer and get him to "calm down."  Exhibit U, BL_20030114c.wav-

BL_20030114d.wav.

38.    Later, after being contacted by the SEC, Cooper called Lines and told Lines it was

important to bring the attorneys "into toe" because "they wrote me a letter . . . which would – if

the SEC got a hold of this letter, you would have no free trading shares.  Like, I mean, these guys

just don't fucking get it, you know?"  Lines asked Cooper to fax him the letter.  Exhibit V,

BL_2003127j.wav.

39.    That same day, Lines called the attorneys who had drafted the letter.  The attorneys

indicated that they had drafted the letter to confirm that Cooper had authorized them to send the

shares to LOM.  Lines told them "Yeah.  So maybe if we can destroy that letter, that would be

appreciated, basically.  Okay?  I think we've got receipt of everything.  And all the – see

basically, we should have receipt basically, from all the shareholders, basically, more than

anything.  Okay?  Because I guess the main thing is, then, you don't want him [Cooper]

directing, basically – directing the whole show, basically. . . . I know what the purpose was.

That's fine, basically.  I'm not doubting the purpose.  I'm just saying, from a . . . [f]rom an SEC

perspective, that's not a good letter."  Exhibit W, BL_20030127h.wav.

40.    Cooper indicated that he likely destroyed his copy of the letter.  Exhibit T,

Deposition of John Cooper at 170.

41.    Lines arranged for the transfer of the purportedly freely tradeable "non-affiliate"

Sedona shares through the execution of purchase agreements in the name of five LOM-

controlled nominee companies (the "LOM Nominees"), Gateway Research Management Group

Ltd. ("Gateway"), Clyde Resources Ltd. ("Clyde"), Warwick Ventures Ltd. ("Warwick"), Iguana

Investments Ltd. ("Iguana"), and ICH Investments Ltd ("ICH").  Exhibit X, January 2, 2002

email from Brian Lines to Holder.

42.    The companies executed share purchase agreements for 1.095 million Sedona

shares from six of the Seven Shareholders in individual blocks of stock, each of which

constituted less than five percent of Sedona's outstanding shares.  Each of the LOM Nominees

executed a separate purchase agreement to acquire these blocks of Sedona stock.  Exhibit Y,

Sedona Share Transfer Agreements.

43.    The 245,000 remaining shares were purportedly sold to LOM broker Glenn Fisher,

though the shares were sent directly to Brian Lines from Cooper.  Exhibit Z, Fluery Share

Documents.

44.    Beginning in 2001 or earlier, Brian and Scott Lines had enlisted several friends and

associates to execute share purchase agreements and other documents as "signature directors" of

various nominee companies, including the LOM Nominees used in the Sedona purchase, in

exchange for annual compensation of approximately USD $2,000.  Exhibit AA, Investigative

testimony of Stuart Smith at 39:6- 43:6; Exhibit BB, Deposition of Malcolm Moseley, pp. 63:6-

65:21; 75:21-76:5.  Pursuant to their arrangements with Brian and Scott Lines, these signature

directors were responsible for signing documents when requested to do so by LOM or the Lines

brothers.  *Id.*

45.    Stuart Smith, the sole director of Warwick, "never made the decision to buy Sedona

stock."  Exhibit AA, Investigative testimony of Stuart Smith at 35:12- 35:18.  Smith was asked

to be the director of Warwick by Brian Lines.  His duties were to sign paperwork in return for a

payment of $2000 per year.  Exhibit AA, Investigative testimony of Stuart Smith at 35:25- 38:2.

46.    Graham Redford, the sole director of Clyde, was phoned by Brian Lines in April of

2003 after the SEC investigation to ask Redford if Redford had been contacted by the SEC.

Redford told Lines that when asked about Clyde, he said "I know nothing about Clyde, any inquiries, direct them to LOM." Brian Lines responded, "Good." When asked about the address of Clyde in Nassau, Bahamas, Redford indicated to Lines that he told the SEC "I don't know." Lines said, "Yeah, probably the best thing to say." Redford indicated that he told the SEC that Sedona was "as far as I know, it was a share a split-off from a company that I bought a couple of years ago, but I couldn't remember." Lines told Redford "It wasn't a split-off, basically, it was a subscription, basically." Exhibit CC, BL_20030421b.wav.

47.    During this period, LOM routinely used nominee accounts to purchase stock in private offerings. Exhibit BB, Deposition of Malcolm Moseley, pp. 63:6-65:21; 75:21-76:5. LOM maintained a list of Nominee companies that it used to purchase securities. Exhibit DD, Deposition of Cueva Holder at pp. 26:4-32:4. The names of the entities that were purported "purchasers" of the "non-affiliate" Sedona appear on that list. See Exhibit EE, LOM Nominee Corporation Fees.

       1.     *Brian and Scott Lines Funded the Acquisition and Used Nominees to Conceal Their Identities*

48.    On Brian Lines's instructions, LOM employees transferred approximately $128,533 from each of three LOM accounts (located at LOM Cayman and LOM Bermuda) into a single LOM Bermuda account in the name of ICH Investments Ltd. ("ICH"). Exhibit FF, January 7, 2002 email from Brian Lines to Johal. The funds came from an account in the name "Monashee," which was beneficially owned by Brian Lines family, "Golden Accumulator," an account beneficially owned by Todd Peever, and the "Largo Flight" account jointly owned by Brian and Scott Lines. Exhibit N, Deposition of Brian Lines, p. 42:13 – 44:8; 46:16 – 46:18; 91:19 – 94:8; 147:1 – 147:12.

49.    The ICH account was also jointly controlled by Brian and Scott Lines, and Brian and Scott Lines were also the brokers for the ICH account.  Brian and Scott Lines used the ICH account to pool the $387,500 in funds needed for the Sedona purchase and accompanying payments.  Exhibit A, Answer of Brian Lines, ¶ 42.

### 2.    *The Sedona Closing and Subsequent Events*

50.    On or about January 3, 2003, Brian and Scott Lines closed their transaction to acquire the approximately 5.34 million Sedona shares for approximately $0.07 per share.  *See* Exhibit T, Deposition of John Cooper at 53:12-53:22.

51.    As part of the closing, on or about January 3, 2003 Cooper personally hand-delivered the share certificates representing the 1.095 million Sedona shares from six of the Seven Shareholders to the Lines brothers' attorneys in Vancouver, British Columbia, to be held by the law firm in escrow until full payment had been received from the Lines brothers.  Exhibit T, Deposition of John Cooper at 125:17-126:13.

52.    The Cooper retained one share certificate for 245,000 shares ("Certificate A"), in the name of Alfred Fluery, rather than giving it to the law firm to be held in escrow.  On or about January 6, 2003, LOM Ltd. received Certificate A, representing 245,000 Sedona shares, which Cooper had sent directly to Brian Lines by overnight courier.  Exhibit Z, Fluery Share Documents.

53.    On the other side of the transaction, on or about January 8, 2003 Brian and Scott Lines caused their ICH account at LOM Bermuda to make several payments toward the $387,500 Sedona shell purchase price, including payments to LOM accounts for the benefit of the Sedona CEO, a $15,000 check to a U.S.-based OTCBB market maker, and a $40,000 wire transfer to a New York attorney's bank account maintained at a retail branch of Citigroup Inc.

located at 111 Wall St., New York, New York 10005.  By mid-January, 2003, Brian and Scott

Lines had fully paid for the Sedona shell.  Exhibit FF, BL_20030114d.gov.

54.    On or about January 10, the Cooper arranged for the four million shares held by

himself and his sons to be delivered by mail to the attention of Brian Lines at LOM.   On or

about January 11, 2003, LOM Ltd. received these four million shares.  These share certificates,

which bore restricted legends, were never deposited into LOM's vault or any LOM account.

Exhibit A, Answer of Brian Lines, ¶ 51.

55.    On or about January 14, 2003, after Tony Wile had begun to prime the market by

disseminating deceptive information regarding Renaissance and its planned merger with Sedona

(paragraphs 59-72, below), Brian Lines directed LOM employees to credit the 245,000 Sedona

shares represented by Certificate A to the ICH account, and to rush Certificate A to the

Depository Trust and Clearing Corporation ("DTC"), so that the Sedona shares could be traded

in the U.S. market.  Exhibit Z, Fluery Share Documents; Exhibit GG, January 14 2003 email re:

sedona.

56.    As discussed in paragraphs 99 through 109, below, the Lines brothers subsequently

sold some of these Sedona shares over the OTCBB on January 21, 2003, as part of the scheme.

57.    On or about January 23, 2003, LOM Ltd. received the remaining 1.095 million of

the total 5.34 million Sedona shares that Brian and Scott Lines had acquired.  These shares were

credited to an LOM Bahamas account in the name of Largo Flight Ltd. ("Largo-Bahamas"),

which was also controlled by Brian and Scott Lines.  Exhibit C, Answer of LOM Entities, ¶ 54;

Exhibit A, Answer of Brian Lines, ¶ 54; Exhibit B, Answer of Scott Lines, ¶ 54.

58.    Also on or about January 23, 2003, Brian Lines directed that 327,500 Sedona

shares, a portion of the shares purchased from certain of the Seven Shareholders, be sent to DTC

in the United States.  *See* Exhibit HH, January 23, 2003 email string re: Sedona Share Certs.

That same day, on Brian Lines' instructions, LOM Ltd.'s Physical Securities Department couriered Sedona share certificates totaling 327,000 shares to Mellon's Manhattan offices, and sent a fax to Mellon's Manhattan offices with instructions to, "Please send to the transfer agent and deposit into DTC." Mellon complied with these instructions and, on or about January 28, 2003, these shares were credited into DTC. Answer of LOM Entities, ¶ 55; Answer of Brian Lines, ¶ 55; Answer of Scott Lines, ¶ 55.

### C. Tony Wile and Renaissance Unlawfully Primed the Market for Sedona Stock

59.    In early January 2003, Wile informed Brian Lines that Wile was coordinating a substantial effort to prime the market at that time in advance of the Renaissance/Sedona merger announcement. On January 2, 2003, Wile sent Brian Lines an e-mail attaching a draft of the January 8 Press Release and stating,

> This is the start of a massive promotion. Visit a website www.internationalmininggroup.com to see my team. I own this company and have 15 guys working the phones in South Florida. . . . Bob Chapman's son runs the hedge fund which is being stoked with cash now. Bob [Chapman] and I are also closing a transaction to acquire a brokerage firm . . . that will focus on Resource stocks. . . . The circle is almost complete. Too bad you can't be in Boca [Raton] for the night of [January] 10th. We have over 100 people coming for an unbelievable private Renaissance party.

Exhibit II, E-mail re: Renaissance Press Release.

60.    The January 8, 2003 press release was headlined "Renaissance Acquires Major Portfolio of Gold Producing Assets in Latin America" ("January 8 Press Release"). The release also quoted Wile's partner, Ian Park, as stating that "Renaissance *has successfully made* the leap from exploration to production in the space of a few short months" (emphasis added). Exhibit JJ, January 8, 2003 Press Release.

61.    The release was drafted by Wile and Park. Exhibit M, Deposition of Ian Park, p. 119:18 to 120:18.

62.     At the time of this release, Renaissance had not acquired any assets, but had merely signed a non-binding letter of intent to acquire the three mining properties from CAMHL. Exhibit M, Deposition of Ian Park, p. 235:15 to 235:20.

63.     The release failed to disclose that, at the time, Renaissance did not possess the financial resources to acquire the gold mines and had to raise funds for that purpose.  Exhibit JJ, January 8, 2003 Press Release.

64.     The release also failed to disclose several material facts and contingencies about these purported mining acquisitions, including that: (i) the acquisitions were contingent on Renaissance first becoming a publicly-traded company through the acquisition of a public shell company; (ii) Renaissance would be required to make significant additional payments to, and assume significant debts from, CAMHL; and (iii) Renaissance would be ceding control of its board of directors and outstanding shares to CAMHL's principals within six months of closing. Exhibit JJ, January 8, 2003 Press Release; Exhibit K, Letter of Intent; Exhibit J, Deposition of Thomas Lough, p185:2 – 185:17.

65.     The January 8 Press Release also presented a misleading picture of the "gold producing" assets that Renaissance had purportedly acquired.  For example, the release said that one mine "[wa]s to resume production in February [2003] and produce 75,000 ounces of gold in 2003 and 85,000 ounces of gold in 2004 and 2005 at an average cash operating cost of $193 per ounce."  It further represented that "the Bonzana Gold Mine currently produces 25,000 to 30,000 ounces of gold per year . . .  at an operating cost of approximately $196 per ounce."  The release states that the resource estimates were based on the assumption of a public gold price of $300 per ounce.  The difference between the cash operating costs per ounce of gold and the current gold price, along with the number of ounces produced per year, would enable an investor to determine

how much profit a gold mine can generate in a particular year.  *See* Exhibit J, Deposition of

Thomas Lough, p.190:12 – 191:25.

66.    Shortly after the failed merger with Renaissance, the CAMHL assets were acquired

by a publicly traded company on the Toronto Stock Exchange through a reverse merger

transaction.  Exhibit J, Deposition of Thomas Lough, p.108:13 – 109:2.  The resulting company

was called "RNC Gold." *Id*.  Prior to the stock being offered to the public, technical reports and

independent reviews were conducted on all of the assets.   *Id*. at p.196:6 – 196:20.  No such

reviews or technical reports were conducted in connection with Renaissance.  *Id*.  Instead,

Renaissance had, at most, only earlier reports which related to prior transactions.  *Id*. at p. 179:7-

182:4.  According to the 2003 Annual Report of RNC Gold, which followed the additional pre-

offering due diligence of RNC Gold, in 2002 RNC's interest in the "La Libertad" mine produced

in 2002 – prior to the January 8 press release – 13,452 ounces of gold at an average cash cost of

$350 per ounce, and in 2003 – subsequent to the January 8 press release – 19,806 ounces of gold

at an average cash cost of $427 per ounce.  Exhibit OOO, 2003 Annual Report of RNC Gold, p.

13.  According to that same annual report, RNC's interest in the "Bonanza" mine produced 9,651

ounces of gold in 2002 at an average cash cost of $249 per ounce, and 19,539 ounces of gold in

2003 at an average cash cost of $326 per ounce.  *Id*.

67.    The January 8 Press Release also referred readers to Renaissance's website.  The

website's home page contained several photographs depicting active mining operations and a

large banner stating "Renaissance Mining/Leading Gold Producer in Latin America."  Exhibit

KK, Renaissance Website.   In fact, at that time, Renaissance did not own any gold mines and

was not engaged in mining operations.

68.    Renaissance's website also included a long "mission statement" from Wile's

partner, Renaissance's president, in which he explained, "We have successfully built a portfolio

of producing gold mines and economic deposit [sic] in Central America . . . .  Renaissance has

successfully made the leap from exploration to production in the space of a few short months, in

what normally is a cycle of several years."  In a separate part of the website, under the heading

"Production and Reserves, Central and South America," Renaissance further claimed that it had

"acquired an extensive portfolio of producing gold mines and economic gold deposits in

Nicaragua and Panama," and described each of those mines (as well as specific figures for gold

production and reserves) as if Renaissance had already owned the mines.   Exhibit KK,

Renaissance Website.   These statements were thus inaccurate.  Exhibit J, Deposition of Thomas

Lough, p.221:24 – 223:25.  Wile was substantially responsible for the content of the website.

Exhibit I, Deposition of Anthony Wile, p. 96:25 – 97:10; 224:14 – 225:7.  The website generated

substantial traffic from investors interested in Renaissance.  *Id*. at p. 113:21 – 114:11.

69.    On January 14, Wile gave a radio interview with the *Wall Street Reporter*, an

investment magazine based in Manhattan, New York, that was made available to the public via

webcast on the *Wall Street Reporter's* website.  In that interview, Wile touted Renaissance's

"meteoric rise" and "rapid growth," most recently demonstrated by its "acquisition" of several

"world class" mines in Central America.  Wile misleadingly spoke about the mining properties

as if they already had been acquired by Renaissance.  Exhibit I, Deposition of Anthony Wile, p.

224:14-227:2.

70.    Following the interview on January 14, Wile spoke to Brian Lines and told him that

Wile was sending the interview out to 11,000 people.  Wile also told Brian Lines that "I can't

wait to put the computer on the table and click the emails and just say take a look at these and

read what these poor lambs are saying. . .  I'm going to get a painting done at the top of the La

Libertad mine, and I told my wife what I want to do is I want to get the artist to paint a pig's tail

on my ass, and I want to stand at the top of the La Libertad an get him to paint the mine in the

background and put about 10,000 sheep out there all over the mine.  Just like Orwell."
BL_20030114e.wav.  Wile's reference to "lambs" was a reference to potential investors in
Renaissance.  Exhibit I, Deposition of Anthony Wile, p. 131:23-132:13.

71.    Wile also told Brian Lines that he was in the process of signing a letter of intent for
Renaissance to acquire Sedona, and that Wile and Park would assume the roles as officers of the
Sedona so that Sedona's prior officers "can all resign and get the 90 day clock ticking on their
stock . . . so that 90 days from now we get something else to sell.  We are going to need some
paper because this thing is going to rip. . . . we can't go public with a quarter of a million shares.
It will be a f**king joke."  BL_20030114e.wav  The reference to a quarter of a million shares
was a reference to the shares that Cooper had previously delivered to Brian Lines.  Exhibit I,
Deposition of Anthony Wile, p. 135:3-135:6.

72.    Wile viewed Lines' sales of Sedona stock to be essentially a public offering of
Renaissance.  *Id*. at 137:25 – 139:14.  As a part of the offering, Lines was to receive 10 percent
of the public company.  *Id*. at 114:17 – 115:1.

### D.    Deceptive Press Release Announcing Renaissance's Reverse Merger with Sedona

73.    On January 17, 2003, Wile and Renaissance issued a press release announcing that
it had signed a letter of intent with Sedona (the "January 17 Press Release"), pursuant to which
Sedona was to acquire all of Renaissance's issued and outstanding shares and change its name to
Renaissance Mining Holding Corporation.   Exhibit KK, Renaissance Website, p 2-3.

74.    The January 17 Press Release claimed that all of Sedona's officers and directors
had already resigned and been replaced by Wile (as chairman) and Park (as president and chief
executive officer).  *Id*.

75.     The January 17 Press Release also identified defendant LOM Capital as Renaissance's investment banker and highlighted its role as underwriter of the $6 million stock Offering.  The release failed to disclose that  LOM Capital's principals, defendants Brian and Scott Lines, had recently acquired and controlled more than ninety-nine percent of Sedona's outstanding shares.  *Id*.

76.     Wile drafted the January 17 Press Release.  Exhibit I, Deposition of Anthony Wile, p. 147:10-147:13.  Both Brian Lines and Scott Lines reviewed the January 17 Press Release prior to its issuance.   Exhibit N, Deposition of Brian Lines, p. 162:16 to 166:5.

77.     On January 21, just after midnight, Sedona issued a press release through Business Wire, a corporate news release dissemination service, announcing its letter of intent with Renaissance.  This press release was substantially identical to Renaissance's January 17 Press Release and Tony Wile issued it through Sedona's Business Wire account.  Exhibit LL, Sedona Press Release.

**E.     Robert Chapman and Other Newsletter Writers Published Deceptive Information to Artificially Inflate the Price of Sedona Shares**

78.     In the days preceding the planned announcement of the Renaissance/Sedona merger, defendant Robert Chapman and three other newsletter writers who had been recruited by Tony Wile issued purportedly "independent" research reports that conveyed materially false and misleading information to investors.   On January 14, 2002, prior to a meeting in Bermuda with Brian Lines and Scott Lines, Wile told Brian Lines that at the meeting he would show "the eight analysts that are the true guys working on this deal" and that "[t]hose guys are getting their reports ready for Friday afternoon.  We are signing the letter of intent today with the Sedona people so we can be ready – we are ready to announce it Friday, we are going to get all the news services, DJ, and all that set up, and then this thing is going to come out Monday like a f**king

blizzard, but we got to talk to you about the strategy there because we got five knock out

punches we can deliver for press, which means five great short squeezes that we can pull off here

whenever we want to do it."  Exhibit MM, BL 20030114a.wav.

79.    On January 17, Wile spoke to Brian Lines and told him that Wile was with

Chapman who was working on his report and wanted to know if he could talk about Lines'

involvement with another issuer, and Brian Lines said "I'd rather him not talk about any of that .

. . I'm just invested in all this stuff, man. . .  The last financing I did was eight years ago. ..

People know who I am." Exhibit NN, BL 20030117e.wav.

80.    On Sunday, January 19, Chapman distributed his report (the "Chapman Report") to

his e-mail subscribers, and arranged to have it published on at least one public website.  Exhibit

OO,  BL_20030120c.wav.  The Chapman Report contained the heading, "Renaissance Mining

Corp.  Symbol: SSSI – OTCBB Current Price US $10.00."  Exhibit PP, Chapman Report.  This

headline was false because, at that time, Renaissance was not publicly traded on the OTCBB

under the symbol "SSSI," the merger with Sedona had not been completed, and Sedona's last

quoted share price had been $0.03, not $10.00.   *See* Exhibit QQ, Sedona Stock Price History.

The report also claimed that Renaissance had no debt, and claimed that the value of its assets

yielded at $62 stock price.  Exhibit PP, Chapman Report.  The report did not disclose Chapman's

ownership on at least 310,000 Sedona shares through a nominee entity.  Exhibit XXX, Marathon

Subscription Agreement; Exhibit I, Deposition of Anthony Wile, p. 64-65.

81.    On Monday, January 20, while the U.S. stock markets were closed for the federal

holiday, Wile sent a broadcast e-mail to hundreds of recipients – including, upon information and

belief, potential investors – that falsely stated that "Renaissance [wa]s no longer a private

company," was available for purchase on the OTCBB under the ticker symbol SSSI, and that

"[a]ny publicly traded shares purchased in SSSI will simply become shares in Renaissance

Holding Corp once the name change and symbol change have taken effect." Wile attached a copy of Chapman's January 19 report to his January 20 email and stated, "Attached is a copy of a Special News Bulletin that was issued by one of the world's leading independent mining analysts - Bob Chapman. We encourage you to read the report and expect many analysts to start to cover Renaissance." See Exhibit RR, Wile January 20 email re: Renaissance Mining Update.

82.    Wile called Brian Lines to let Lines know he was sending out the e-mail. Wile told Lines that "Bob Chapman put out a report, which he shows a lot of numerical calculations in there and shows why it's a 62-dollar stock today in terms of value. David Morgan put out a report. And he talks about 50-dollars-plus a share easily within the next six months based on existing value which people start to realize what's here. So this thing, based on the amount of e-mails we've gotten this weekend alone – which we got 380 new ones this weekend, asking how they buy the stock and what's the symbol – is going to be like a f**king rocket ship when it opens up, huh? . . . so you've got to set the rung f**king high because we cant run out here too soon, you know what I mean? . .. Let them reach – if we only sell a couple hundred tomorrow at the top end, that's cool, you know? . . . Because otherwise, we're going to be gone in an hour. I mean literally." Exhibit OO,  BL_20030120c.wav.

83.    The price predictions of Chapman and Morgan were substantially beyond any reasonable valuation of the assets to be acquired by the company. Exhibit J, Deposition of Thomas Lough, p.207:22 – 208:13; 209:20 – 211:10; 212:20 – 213:23.

84.    On the call, Brian Lines asked Wile "[s]o tomorrow morning, were do you want to open this thing?" Wile responded, "[w]ell, north of 10; there's no question about that. I mean, if we open up less than that, we'll have no stock left because the bidding is going to be ferocious on this thing, huh? It's a matter of, we've got the supply. So let's see where the bids come in." Lines then advised that "at the beginning of the game, the game is actually go to bid stock,

right?"  Wile responded, "Oh, I would think so."  Wile agreed to call Lines again shortly before

trading commenced the next day, and that he would leave it in Lines' "hands to handle the ship .

. . [and] not give it away cheap."  *Id.*

85.    Wile also told Brian Lines that Sedona's "directors have resigned.  I became

Chairman of SSSI.  And we put out the announcement, because it was five minutes after

midnight tonight.  But we've already posted it on CITCO [a mining website] and on our web

site."  Wile further told Brian Lines that the next Saturday there would be a meeting of 12

people, including Wile, Park, Chapman and "nine or ten other guys who are very, very, very

very, very senior, established promoters in the mining industry, guys who together, as a group,

were all a part of a big team here.  We're going to make this the biggest play, area play of the

cycle."  *Id.*

86.    On the morning of January 21, almost immediately after Business Wire had posted

the press release announcing Sedona's merger with Renaissance, Wile sent another e-mail to

Brian Lines, attaching copies of the reports on Renaissance issued by each of the newsletter

writers that had been published on the previous day and exclaiming, "Look out baby cause were

comin [sic] on like a hurricane!"  Exhibit SS, Wile January 21, 2003 email re: Analyst Reports.

### F.    Renaissance Offered and Sold Private Placement Shares Using a False and Misleading Offering Memorandum

87.    In mid-January 2003, Renaissance began soliciting investors for its Offering to

raise the $6 million needed to acquire the three Central American gold mines that it publicly

claimed it already owned.  Renaissance planned for the Offering to commence on January 21, the

first day of orchestrated substantial trading in Sedona's stock, as described in paragraphs 99

through 109, below.  Exhibit TT, Renaissance Amended and Restated Offering Memorandum.

88.     Renaissance's Offering called for the issuance of two million restricted shares at $3 per share.  LOM Capital, pursuant to its underwriting agreement with Renaissance, was to receive a seven percent fee as part of the Offering.  *Id*.

89.     As part of the Offering, Renaissance prepared a private offering memorandum ("Offering Memorandum").  Tony Wile drafted or reviewed the Offering Memorandum and caused it to be disseminated to potential U.S. investors.  Exhibit I, Deposition of Anthony Wile, p. 173:22-174:7; Exhibit UU, Investigative Testimony of Steven Erickson, pp. 57:8-57:15; 59:17-59:20.

90.     Renaissance's Offering Memorandum contained several material misrepresentations and omissions.  For example, Renaissance's Offering Memorandum stated that Sedona's last recorded trade had occurred at a price of $5.00 per share (in fact, Sedona had last traded at $0.03 per share in May 2002), and that Sedona's officers and directors had resigned on January 17 and had been replaced by Tony Wile and Renaissance's president.  Exhibit TT, Renaissance Amended and Restated Offering Memorandum; Exhibit M, Deposition of Ian Park, p. 153:16-154:19.  The Offering Memorandum also failed to disclose several material facts regarding the actual cost of acquiring the gold mines from CAMHL, Renaissance's assumption of significant debt from CAMHL, and the terms of CAMHL's acquisition of control over Renaissance's board of directors.  The Offering Memorandum also failed to disclose that LOM principals Brian and Scott Lines owned more than ninety-nine percent of Sedona's outstanding shares, and that Wile was the beneficial owner of at least 75000 additional Renaissance shares issued in the names of two offshore nominees.  Exhibit TT, Renaissance Amended and Restated Offering Memorandum

91.     By no later than January 22, 2003, Brian and Scott Lines had received copies of the Offering Memorandum.  Exhibit VV, January 22, 2003 Email from Wile re: PPM

DOCUMENTS.  However, they failed to correct the omission of material information

concerning their joint ownership and control of Sedona.

92.    Renaissance and others at Tony Wile's direction, including IMG (Renaissance's

"investor relations" firm) solicited prospective investors throughout the U.S., including within

this district, to purchase stock in Renaissance's Offering.  Exhibit WW, Renaissance Private

Placement Solicited investors.  Wile himself solicited investors, and forwarded investor

information to IMG for solicitation.  Exhibit I, Deposition of Anthony Wile, 185:3 – 187:15.

93.    Scott Lines, Brian Lines, and LOM Capital and its employees had not conducted

reasonable due diligence concerning Renaissance and the Central American mines prior to

soliciting their customers to purchase shares in the Offering.  Neither Brian Lines nor Scott Lines

had conducted due diligence.  Exhibit N, Deposition of Brian Lines, at pp. 172:11-172:22.

Exhibit XX, Deposition of Scott Lines, pp. 80:13 to 81:20.  Moreover, Brian Lines told the

individuals responsible for due diligence at LOM that he had already conducted due diligence,

despite the fact that he had not.  He did not request that they conduct any due diligence until

January 23, 2003, shortly after LOM was contacted by the SEC.  Exhibit YY, January 23, 2003

E-mail String re: PPM DOCUMENTS.  However, the only "diligence" that Brian Lines or LOM

had conducted up to that point was having sat for a "presentation" with Renaissance executives.

Exhibit NNN, Brian Lines Responses to SEC's First Set of Interrogatories, Interrogatory No. 5.

94.    In soliciting investors to purchase stock in the private placement, Scott Lines and

Brian Lines made material misstatements to their customers.  During his solicitation calls on or

before January 21, Scott Lines told his customers that Renaissance had already acquired the

Central American mines and that the mines were currently producing.  For example, on January

21, Scott Lines told one LOM customer that Renaissance had already acquired the Central

American mines, was "going to produce 100,000 ounces this year," was "going to achieve $16

million U.S. [dollars] in cash flow," and was "going to IPO it today . . . in the sort of $7 to $8 area." Based on Scott Lines's pitch, the LOM customer agreed to invest $20,000 in the Offering. Scott Lines failed to disclose during that call that he and Brian Lines owned the Sedona shell, and that LOM Capital had not conducted reasonable due diligence concerning Renaissance. *See* Exhibit XX, 20030123D3-4. In fact, Renaissance had not acquired the mines, and in fact needed the Offering funds that Scott Lines was soliciting in order to complete the acquisition and bring them into production.

95.    On January 21, 2003, Brian Lines solicited an LOM client to invest in the Renaissance private placement, representing that the company would produce 250,000 ounces of gold. He told the client the stock is worth $15 per share, while not disclosing Brian Lines' own simultaneous sales. He also agreed to sell the client 10,000 shares of Sedona at $4 per share, but told the investor that the stock was "restricted for ten business days." Exhibit YYY, BL_20030121B1-2. Lines had no basis for the production figures he supplied other than conversations with Wile and Park, and had no basis for his claim that the stock was in any way restricted. Exhibit N, Deposition of Brian Lines, p. 259:5 to 261:3; 263:2 to 264:5. That same day, Brian Lines had a conversation with another investor that Lines Sedona stock to for $4 per share. The investor asked him "when shall we sell this [Sedona] now?" Lines responded that "[i]t is just in the middle of promotion right now . . my deal was with the company really we are not really allowed to sell any stock for a week." Exhibit ZZZ, BL_20030121Y. In fact, there was no deal with the company, and in fact Brian Lines was selling Sedona at the same time. Exhibit N, Deposition of Brian Lines, p. 268:9 to 269:1.

96.    In total, LOM Capital's customers agreed to buy 1.2 million Renaissance shares in the Offering, generating proceeds of approximately $3.3 million and a commission to LOM Capital of approximately $284,000. Exhibit AAAA, Renaissance Subscriptions. Brian Lines

and Scott Lines kept track between themselves of investors in the private placement.  Exhibit BBBB, Email re: Renaissance Mining Placement.

97.    At least one of the LOM customers that Scott Lines solicited resided in the U.S., and was at his U.S. place of business when Scott Lines called to him to solicit him to buy Renaissance Offering shares.  The U.S. customer had maintained an account at LOM Bermuda for several years.  On or about January 21, 2003, Scott Lines told this U.S. customer that Renaissance's stock would open at $7 to $8 per share, and that Renaissance would produce 150,000 ounces of gold in 2003.  Based on Scott Lines's solicitation, this customer agreed to invest $30,000 in Renaissance's Offering.  *See* Exhibit AAA, 20030121A1-2; Exhibit YYY, Deutsch Account Opening Documents.  The customer became a principal of a foreign corporation at the request of LOM.  See Exhibit DDDD, Deposition of Robert Deutsch.

98.    During the week following January 21, 2003, many of the prospective investors whom Renaissance and its agents solicited, and who received Renaissance's false and misleading Offering Memorandum, submitted executed subscription agreements and transferred funds to Renaissance in payment for the stock.  Exhibit WW, Renaissance Private Placement Solicited investors.

### G.    Trading in Sedona

99.    On the morning of January 21, Sedona stock began to trade.  In order to establish a favorable trading price, Brian Lines told Anthony Wile "the first thing you want to do is go out and bid some stock."  Exhibit OO,  BL_20030120c.wav

100.    Brian Lines, despite being in control of approximately 99% of Sedona's outstanding shares, placed a "bid" order for Sedona in pre-market trading.  *See* Exhibit BBB, LOM Sedona DOES Transactions.

101.    He also solicited a trader at U.S. brokerage firm Vfinance to become a market maker in Sedona stock, and used him to place bids in Sedona prior to trading to create the appearance of activity in the stock. *See* Exhibit CCC, BL_20030116C-D.

102.    The scheme to manipulate the price of Sedona's stock was very successful. Shares of Sedona opened at $8.10, and traded in that range for the rest of the day before closing at over $9, trading on a record volume of over 300,000 shares and bloating Sedona's market capitalization to over $45 million. *See* Exhibit QQ, Sedona Stock Price History.

103.    The public trading price of Sedona was substantially beyond any reasonable valuation of the assets to be acquired by the company. Exhibit J, Deposition of Thomas Lough, p.207:22 – 208:13; 209:20 – 211:10; 212:20 – 213:23.

104.    Brian and Scott Lines, who owned ninety-nine percent of Sedona's outstanding shares, supplied the shares to carry out the scheme on January 21 by selling approximately 92,000 shares at prices ranging from $8.95 to $9.45 per share through their LOM Bermuda account in the name of ICH. *See* Exhibit DDD, Sedona Trade Blotter.

105.    Brian and Scott Lines' sales of Sedona stock that day accounted for thirty percent of the total volume traded. Brian Lines told Wile that there were a "few shorts in already." Wile stated "[l]et's put it to the f**kers." Wile suggested "maybe we should wash 100,000 there or something . . . maybe we should do a cross-trade there for 100 or so, get it livened up?" Lines replied "yeah, well, just maybe do just for 50 or something, okay? Because I don't have any paper for a while. I've got 265,000 shares." Exhibit EEE, BL_20030121jj

106.    From January 22 through January 27, 2003, the ICH account sold another 51,000 Sedona shares. In total, Brian and Scott Lines sold 143,000 shares of Sedona stock over the OTC Bulletin Board between January 21 and January 27, and realized profits of approximately $1.36 million. *See* Exhibit DDD, Sedona Trade Blotter

107.   Also, on January 21, Brian and Scott Lines privately sold 100,000 Sedona shares at $4 per share to certain LOM customers, including some of the nominees they had used for the Sedona acquisition.  At the time, Sedona shares were trading at $9 per share. During the following week, several LOM customers sold 16,300 of these shares over the OTC Bulletin Board.  *See* Exhibit DDD, Sedona Trade Blotter.

108.   On or about January 21, Scott Lines spoke to the market maker working with LOM in connection with sales of Sedona stock.  During that call, which occurred in the late afternoon, Scott Lines told him to "get back out there and sell some more SSSI."  Exhibit FFF, 20030121I.

109.   On January 29, 2003, the Commission suspended trading in Sedona's stock because of questions concerning the accuracy and completeness of public information about Sedona and Renaissance.  Exhibit GGG, Notice of Trading Suspension.

### H.    Brian Lines, Scott Lines, and LOM Altered Records to Conceal Their Roles in the Scheme

110.   On or about January 28, 2003, after the Commission had contacted LOM but before the Commission's suspension of trading in Sedona stock, Brian Lines instructed LOM employees to backdate the Sedona share purchase agreements to January 5, 2003, even though the agreements had not been fully executed until about January 28.  Exhibit HHH, E-mail String of January 28, 2003 re: Sedona share certs.

111.   On or about February 5, Brian and Scott Lines, in an attempt to conceal their control over Sedona, instructed LOM employees to reallocate Sedona shares from Brian and Scott Lines's ICH and Largo-Bahamas accounts, which had originally received the shares, into different LOM accounts that bore some relation to the nominees.   Exhibit III, Sedona Reallocation Documents.

112.   Because four of the five nominee companies did not maintain accounts at LOM, Brian and Scott Lines directed LOM employees to credit the shares ostensibly purchased by those nominees to the LOM accounts of certain of their signature directors who had signed the Sedona share purchase agreements.  Exhibit III, Sedona Reallocation Documents.

113.   At the direction of Brian and Scott Lines, LOM employees then backdated LOM's records to falsely show that the accounts of certain of the signature directors had received Sedona shares on January 23, 2003.  In fact, the Sedona shares were not credited to these LOM accounts until about February 5, 2003.  The account statements for the Lines brothers' ICH and Largo-Bahamas accounts were similarly altered to remove evidence that they had received certain Sedona shares.  Exhibit JJJ, Sedona Account Reallocations.

114.   Also at the direction of Brian and Scott Lines, on or about February 4, 2003**,** LOM rescinded the private sale of the 100,000 shares from the Lines brothers' ICH account to numerous LOM customers, including certain signature directors, except for the approximately 16,300 Sedona shares that these LOM customers had already sold over the OTCBB.  Exhibit III, Sedona Reallocation Documents.

115.   In addition, on or about February 4, 2003, Scott Lines sent a letter to Renaissance's U.S. mailing address in Denver, Colorado.  In that letter, Scott Lines stated that LOM Capital was withdrawing its offer to underwrite Renaissance's Offering because "due diligence was not completed to the satisfaction of LOM Capital."  This remarkable letter was sent after LOM Capital's customers, solicited by Scott Lines and others, had agreed to buy 1.2 million Renaissance shares in the Offering for approximately $3.3 million.  Exhibit KKK, LOM Letter Terminating Underwriting.

### I.    The LOM Entities Played a Significant Role in the Sedona Fraud

116.   The Lines brothers' control over the LOM Entities was central to their manipulative scheme.  In their respective roles as the two most senior officers of the LOM Entities during the relevant period, Brian and Scott Lines were able to direct the actions of LOM employees at each step of the fraud.  Exhibit N, Deposition of Brian Lines, p. 32:9 – 32:18.

117.   For example, Brian and/or Scott Lines directed LOM employees to:  (i) use LOM-controlled nominees to sign the Sedona share purchase agreements; (ii) transfer funds into the Lines brothers' ICH account at LOM Bermuda and wire funds from that account to pay for the Sedona shell; (iii) credit the Sedona stock certificates from the Sedona CEO and the Seven Shareholders to the ICH and Largo-Bahamas accounts controlled by Brian and Scott Lines and maintained at LOM Bermuda and LOM Bahamas, respectively; (iv) deliver Sedona stock from LOM Ltd. to DTC, so that they could be sold over the OTCBB; (v) backdate the Sedona share purchase agreements; (vi) allocate Sedona stock to LOM customers and employees at $4 per share; and (vii) reallocate the Sedona shares from the ICH and Largo-Bahamas accounts into other LOM brokerage accounts after the Commission began its investigation, in order to conceal Brian and Scott Lines' beneficial ownership.

118.   Brian and Scott Lines also used LOM Ltd.'s U.S.-based brokerage accounts to sell their Sedona shares.  Answer of LOM Defendants, ¶ 124.

119.   At all relevant times throughout the Sedona scheme, Brian and Scott Lines were control persons of LOM Holdings and its subsidiaries, and LOM Holdings was a control person of subsidiaries LOM Capital, LOM Ltd., LOM Bermuda, LOM Bahamas, and LOM Cayman. Exhibit N, Deposition of Brian Lines, p. 27:2 – 32:18.

## II.   THE SHEP FRAUDULENT SCHEME

120.   Distinct from their conduct involving Sedona, Brian and Scott Lines engaged in similar conduct with respect to an entity now-named SHEP Technologies, Inc.  In particular, the

Lines brothers helped two LOM customers, Todd Peever and James Curtis, to obtain secret

control of Inside Holdings, Inc. ("IHI"), a Canadian public shell company that had a class of

securities registered with the SEC pursuant to Section 12(g) of the Exchange Act.  Exhibit G,

SHEP 20-F, 2002 Annual Report.

121.   On January 3, 2002, Brian Lines, acting through LOM, helped Peever and Curtis to

secretly acquire over eighty-three percent of the outstanding shares of IHI from a group of IHI

officers and directors.  The purchase agreement authorized LOM and Brian Lines to act as

"attorney in fact" on behalf of the "group" of purchasers.  Brian Lines used a group of LOM

nominee companies, including several of the nominees that later were used in the Sedona

transaction, to purchase the IHI shares on behalf of Peever and Curtis, who were the actual

beneficial owners.  Exhibit LLL, IHI Purchase Agreement.

122.   The six nominee companies that executed the IHI purchase agreement were

Gateway and Warwick, which were later used by Brian and Scott Lines in the Sedona

transaction, along with Consensus Investments Ltd. ("Consensus"), Nottinghill Resources Ltd.

("Nottinghill"), SKN Holdings Ltd. ("SKN"), and Aberdeen Holdings Ltd. ("Aberdeen").

Exhibit LLL, IHI Purchase Agreement.

123.   In fact, Peever and Curtis each paid half of the approximately $400,000 IHI

purchase price.  None of the nominees and signature directors contributed any funds toward the

purchase of IHI shares, nor did they beneficially own these shares.   Exhibit SSS, SHEP Wire

Transfers.

124.   By about January 23, 2002, the IHI sellers delivered approximately 5.6 million IHI

shares to Brian Lines and LOM Ltd.  On January 29, 2002, Brian Lines instructed that these

shares be credited in equal amounts to two different LOM Cayman accounts, Golden

Accumulator Ltd. ("Golden") and Nomad Trading, Ltd ("Nomad"). Exhibit MMM, E-mail String re: Acquisition of Control Inside Holdings.

125. The Golden account was beneficially owned by Peever, and the Nomad account was beneficially owned by Curtis. The Nomad account subsequently was transferred from LOM Cayman to LOM Bahamas, in November 2002. Brian and Scott Lines were the co-brokers for both the Golden and Nomad accounts. Deposition of Brian Lines, p. 301:21 – 301:25.

126. On January 29, 2002, Brian Lines instructed an LOM Ltd. employee to charge the Golden and Nomad accounts $500 each for the use of the nominees (Warwick, Consensus, Nottinghill, SKN, and Aberdeen) in the IHI share purchase transaction. Exhibit MMM, E-mail String re: Acquisition of Control Inside Holdings; Exhibit N, Deposition of Brian Lines, p. 296:8 – 304:25.

127. In early 2002, Malcolm Burke, the chief executive officer of SHEP Ltd., a private company that owned certain automobile intellectual property, wanted to acquire a publicly-traded shell company. Exhibit TTT, Deposition of Malcolm Burke, 10:10:33 – 10:10:54.

128. Lines' attorney introduced Burke to Peever and Curtis, who told Burke that IHI was a shell company whose shareholders were looking for an appropriate business to merge into the shell. Exhibit TTT, Deposition of Malcolm Burke, 14:43:02– 14:45:37.

129. Subsequently, Peever and Curtis held themselves out to Burke as third-party intermediaries between SHEP and the group of LOM nominees that purportedly controlled the shell when, in fact, Peever and Curtis themselves controlled the shell. *Id*.

130. In May 2002, IHI agreed to a reverse merger with SHEP. In August 2002, Peever and Curtis sold Brian and Scott Lines 300,000 IHI shares at $0.75 per share through the OTC Bulletin Board (IHI's total volume during the prior four months had only been approximately 21,000 shares). Exhibit G, SHEP 20-F, 2002 Annual Report; Exhibit PPP, SHEP Trade Blotter.

131.   In August 2002, the Lines brothers subscribed to a private placement to purchase 266,000 IHI shares.  By September 2002, the IHI/SHEP merger had closed, and IHI changed its name to SHEP Technologies, Inc. Exhibit UUU, Largo Subscription Agreement; Exhibit G, SHEP 20-F, 2002 Annual Report.

132.   During the first week of December 2002, Burke and Peever met with Brian Lines in Bermuda to discuss LOM's possible role in raising funds for SHEP.  Exhibit TTT, Deposition of Malcolm Burke, 12:08:30– 12:13:57.

133.   From December 3 through December 6, 2002, Peever and Curtis each transferred 300,000 SHEP shares to LOM accounts controlled by Brian and Scott Lines.  Exhibit PPP, SHEP Trade Blotter.

134.   By the end of December 2002, the Lines brothers held at least 1.66 million SHEP shares in two LOM accounts that they co-owned and controlled.  At this point, Peever, Curtis, and the Lines brothers secretly controlled about forty-five percent of SHEP's outstanding shares and approximately eighty percent of SHEP's float.  Exhibit PPP, SHEP Trade Blotter.

135.   From late February through June 2003, Lawrence Isen and two other newsletter writers published a series of highly positive reports about SHEP.   Isen's newsletter was published on his *OTC Journal* website and distributed by e-mail to approximately 1.3 million *OTC Journal* subscribers.  Exhibit VVV, Investigative Testimony of Lawrence Isen, pp. 44, 160-161.

136.   On at least four different occasions, Isen published extremely bullish SHEP recommendations in the *OTC Journal*.  *See* Exhibit WWW, OTC Tout Sheet.  In January and February 2003, Peever and Curtis paid Isen $75,000, and transferred to Isen 100,000 SHEP shares from their LOM Cayman and LOM Bahamas accounts, for his touting. Exhibit PPP, SHEP Trade Blotter; Investigative Testimony of Lawrence Isen, pp. 130-131.

137.   From February 24 through February 26, shortly after Isen had published a report touting SHEP, Scott Lines and Peever had a series of phone conversations in which Peever told Scott Lines that he expected there to be a "ton of buying" in SHEP because of the "promo" that "Larry" (Isen) had done, and was angry that short sellers had prevented him from selling his SHEP shares into the price and volume increase he had expected following the tout.  An excerpt from the transcript of Peever and Scott Lines' telephone conversation on February 24 follows:

Peever:  We must be getting – we haven't sold a f**king share.

SL:      Yeah, I know.  I don't know what that's about.  **Whose stock is that?**

Peever:  **I f**king don't – I think we're getting shorted.  We must be.  You know, 280,000 shares….**

SL:      **Yeah, they must be shorting into you.**

Peever:  **They've got to be shorting into us.**  I mean, f**k, it's been –

    SL:      Didn't you just do a primer?

Peever:  F**k, we just did a – we just did – well, Larry [Isen] just started the launch.  We held off on the European stuff because the market was down five percent Friday and two percent on the open, but yeah, I mean, we got, you know, we've got stuff starting, but f**k, not a very good start.  We were doing better before we started starting.

SL:      Yeah.  They got short sales.  Looks like short sales.

Peever:  It does, doesn't it?

SL:      Yeah, they're shorting into you.  They've got a big volume coming, meeting all the bids and pushing it down.  Lower offer, lower offer, lower offer.

Peever:  Well, f**k.

SL:      Yeah, that's short selling by the market makers, so they always offer lower.

Peever:  Yeah, it's a classic.

SL:      Yeah.

**Peever:  They're on to us.**

**SL:      Yeah.**

*      *      *

Peever:  I mean, Larry I think just brought the f**king shorts to us.

SL:      Maybe.  Maybe the shorts, maybe they keyed off the promoters, you know –

Peever:  Because he just did his blast to a million-three people.

SL:      The shorts then picked it up and leapt all over it.


(Emphasis added).  Exhibit XXX, 20030224A.wav.

138.   On February 26, Peever called Scott Lines and told him that they were going to "give those shorts a kick in the a** today," because Peever had "sopped up" 50,000 or 60,000 shares of SHEP, forcing the short sellers to be "short a couple hundred," meaning the short sellers would be forced to buy SHEP shares in order to cover their short positions.   Exhibit YYY, 20030226A.wav.

139.   From late February through June 2003, the period when the touts were being publicly disseminated, Peever, Curtis, and the Lines brothers sold (or transferred to others, who then sold) approximately four million SHEP shares through the OTC Bulletin Board, yielding total profits of nearly $4 million.  Exhibit PPP, SHEP Trade Blotter.

140.   As of late December 2002, Peever, Curtis, and the Lines brothers collectively and secretly controlled approximately nine million shares of SHEP stock, which, as a group, constituted over forty percent of SHEP's outstanding shares and, more importantly, approximately eighty percent of SHEP's tradable shares.  Exhibit PPP, SHEP Trade Blotter.

141.   Peever, Curtis, and the Lines brothers failed to report their buying and selling activities on Schedules 13D or amendments thereto.  The Lines brothers together controlled over five percent of SHEP's outstanding shares as of September 2002, but failed to file Schedules 13D or amendments thereto.   The Lines brothers likewise failed to report their buying and selling activities with respect to Sedona on Schedules 13D or amendments thereto, or make any

filings pursuant to Section 16(a) of the Exchange Act.  Exhibit CCCC, Declaration of David

Williams ("Williams Decl.").

142.   In late May and June 2003, after Brian Lines had learned of this investigation, he

instructed a U.S. lawyer to file at least five ownership reports with the Commission that were

false and misleading.  Exhibit EEEE, Emails re: SEC Filings.

143.   These filings falsely reported that three entities, that were LOM-controlled

nominees, were the beneficial owners of the SHEP shares held at LOM, and that one of those

nominees was responsible for significant sales of SHEP stock, when in fact, LOM records show

that Peever, Curtis, and the Lines brothers were the beneficial owners of, and had been selling,

virtually all of those SHEP shares from accounts they controlled. ; Exhibit PPP, SHEP Trade

Blotter.  Exhibit FFFF, SEC Filings re SHEP.

144.   With the exception of 50,000 shares that were transferred from the Lines brothers'

accounts to an LOM account in the name of one of the signature directors in December 2002, the

rest of the SHEP shares (totaling about *ten million* shares) were owned and controlled by Peever,

Curtis, and the Lines brothers and held in *their* LOM accounts.   Exhibit PPP, SHEP Trade

Blotter.

145.   Todd Peever and Brian Lines discussed the fact that the unnamed third party

mentioned in the SHEP touts as having paid for the promotion was in fact LOM.  Brian Lines

had advanced the funds to SHEP through ICH in 2003.  Exhibit N, Deposition of Brian Lines, p.

316:8 – 322:14.  Brian Lines stated that they could not disclose that LOM had actually paid for

the promotion because "they think that's pumping and dump.  They get you on everything. So

we just have to come up with some sensible name on that, basically.  Let me think about that.

We've got to be careful on that one.  We've got to be very careful on that one… Even if you are

a non-affiliate or basically, see they don't want… if you're paying for something, or whatever, you can't be selling into it, right?  Stupid f**king rules."  Exhibit DDDD, BL_20030430e.wav.

146.   At all relevant times throughout the IHI/SHEP scheme, Brian and Scott Lines were control persons of LOM Holdings and its subsidiaries, and LOM Holdings was a control person of subsidiaries LOM Ltd., LOM Bermuda, LOM Bahamas, and LOM Cayman.  Exhibit N, Deposition of Brian Lines, p. 27:2 – 32:18.

Dated:  January 25,  2010                              Respectfully submitted,


                                                       __/s/ David Williams_____
                                                       David Williams ("Attorney in Charge")
                                                       Assistant Chief Litigation Counsel
                                                       100 F Street, N.E.
                                                       Washington, D.C. 20549-4631
                                                       (202) 551-4548 (Williams)
                                                       (202) 772-9233 (facsimile)
                                                       Attorneys for Plaintiff,
                                                       Securities and Exchange Commission