```
0001
 1            Park
 2  UNITED STATES DISTRICT COURT
 3  SOUTHERN DISTRICT OF NEW YORK
    -------------------------------x
 4  SECURITIES AND EXCHANGE COMMISSION,
 5         Plaintiff,
 6   v.          07 cv 11387(DLC)
 7  BRIAN N. LINES, et al.,
 8         Defendants.
    -------------------------------x
 9
10
11          IAN GREGORY PARK
12         New York, New York
13       Monday, November 16, 2009
14
15
16
17
18
19
20
21
22
23
24  Reported by: Steven Neil Cohen, RPR
25  Job No. 305368
0002
 1            Park
 2         November 16, 2009
 3           10:01 a.m.
 4
 5      Videotaped Deposition of IAN
 6  GREGORY PARK, taken by Plaintiff, pursuant
 7  to notice, at the offices of Stillman,
 8  Friedman & Schechtman, P.C., 425 Park
 9  Avenue, New York, New York, before Steven
10  Neil Cohen, a Registered Professional
11  Reporter and Notary Public of the State of
12  New York.
13
14
15
16
17
```

18
19
20
21
22
23
24
25

0063
1               Park
2        MR. HARRIS:  Objection to the
3     form.
4        MR. HO:  Objection.
5        MR. NORTMAN:  Objection.
6        THE WITNESS:  Can I make a
7     clarification here, John?
8        MR. HARRIS:  Is it a clarification
9     of your prior testimony?
10       THE WITNESS:  No.
11       MR. HARRIS:  Okay.  Can you answer
12    Mr. Williams' question?
13       THE WITNESS:  Okay.  Then the
14    answer is, yes.
15       MR. HARRIS:  Now, is there a
16    clarification that you need to make?
17       THE WITNESS:  In regards to this
18    letter, I was responsible for the
19    technical paragraphs in this letter and
20    Mr. Wile was responsible for everything
21    else including that paragraph there re:
22    Pubco because I was not involved in the
23    negotiations about Pubco.
24 BY MR. WILLIAMS:
25    Q.   That is a good point.
0064
1               Park
2        The letter appears to be under
3    your signature.  Did you draft the entire
4    letter?
5    A.   No, I did not.
6    Q.   Other than -- did you participate
7    in the drafting of the letter?
8    A.   I participated.  I put in all of
9    the technical paragraphs and Mr. Wile put in
10   most of the structure and lead-in paragraphs

11   there.
12         So we had a joint ownership of the
13   document.
14      Q.   Okay.  Actually why don't we go
15   back to the first page of the document
16   and -- the first page of the letter which is
17   the second page of the exhibit.
18         Can you tell me which paragraphs
19   you drafted and which paragraphs Mr. Tony
20   Wile drafted?
21         MR. HARRIS:  I am sorry.  Looking
22     at which page now?
23         MR. WILLIAMS:  Second page of the
24     exhibit, first page of the letter.
25         MR. HARRIS:  Yes.
0065
 1               Park
 2         THE WITNESS:  The first two
 3     paragraphs would have been drafted by
 4     Mr. Wile.
 5   BY MR. WILLIAMS:
 6      Q.   Okay.
 7      A.   On the second page beginning with
 8   "Another key part is the early structuring,"
 9   that would have been his paragraph.
10         The next paragraph starting with
11   "This network" would have been his
12   paragraph.
13      Q.   Okay.
14      A.   Then the business about, "On the
15   basis of signing a letter with Renaissance
16   and Pubco," that would have been his.
17      Q.   Okay.
18      A.   Then I would have done -- we would
19   have shared in the last one, "Depending on
20   whether it was a corporate issue or a
21   technical issue."
22      Q.   When you say "the last one," you
23   are referring to?
24      A.   The "In consideration for the
25   supplying the RMC assets.


0118
 1               Park
 2   Exhibit Number 8.

3          Exhibit Number 8 is a three-page
4   document marked SEC 706 through SEC 709.
5   Actually, it is a four-page document.
6          The first three pages appear to be
7   a printout of a Renaissance Mining Corp.
8   news release.
9          The final page appears to be a
10  January 6, 2003 draft, perhaps with
11  handwritten notes on it.
12         I am asking you about the first
13  three pages of the exhibit.
14         MR. HARRIS:  Your representation
15    is that the fourth page is not connected
16    to the first three?
17         MR. WILLIAMS:  Yes.
18         THE WITNESS:  What is your
19    question?  Sorry.
20  BY MR. WILLIAMS:
21     Q.   Yes, sir.  Have you seen this
22  press release before?
23     A.   Yes, I have.
24     Q.   As you sit here do you know who
25  drafted this press release?
0119
1                   Park
2      A.   I drafted the technical sections.
3      Q.   Which parts of the release did you
4   draft?
5      A.   The Libertad gold mine, Nicaragua,
6   Bonanza gold mine and concessions, Cerro
7   Quema gold mine and project.
8      Q.   The portion that begins in bold,
9   "La Libertad gold mine-Nicaragua," and then
10  a colon, are you saying you drafted all the
11  paragraphs under that header or some of the
12  paragraphs?
13     A.   You know, all the technical,
14  detailed technical information in here would
15  have been my doing.
16     Q.   Who did you collaborate with in
17  the drafting of this release?
18     A.   With Mr. Wile.
19     Q.   Anyone else?
20     A.   I believe we consulted the CAMHL
21  people as well.
22     Q.   That would be Mr. Martin?

23     A.   And Mr. Lough.
24     Q.   Mr. Lough. Anyone else at CAMHL?
25     A.   No.
0121
 1              Park
 2     Q.   Do you recall who produced the
 3  initial draft?
 4     A.   You know, I don't.
 5     Q.   Would it have been someone on the
 6  Renaissance side or someone on the CAMHL
 7  side?
 8     A.   I don't recall.
 9     Q.   Let me direct your attention to
10  the part of the document that deals with the
11  La Libertad gold mine, do you see that part
12  of the document?
13     A.   Yes.
14     Q.   In the second paragraph it says,
15  "La Libertad mine is to resume production in
16  February and produce 75,000-ounces of gold
17  in 2003, 85,000-ounces of gold in 2004 and
18  2005 and average cash operating cost of
19  $193 per ounce."
20          Do you see that part of the
21  document?
22     A.   Yes.
23     Q.   Did you provide that part of the
24  press release?
25     A.   That would have been in
0121
 1              Park
 2  consultation with Mr. Martin and Mr. Lough.
 3     Q.   These production figures, did
 4  those figures come from Mr. Martin and Mr.
 5  Lough?
 6     A.   Yes.
 7     Q.   How were they produced to you?
 8  Did Mr. Martin tell you what those figures
 9  were or were they given to you in a
10  document?
11     A.   They were given to me in a
12  document. We had extensive documentation on
13  the work that they had done.
14     Q.   What documentation did you have if
15  you recall?
16     A.   Documentation. I mean, I have

17   documents.
18     Q.   When you say "documentation," what
19   type documentation?
20     A.   Cash flows.  Forecasts.
21     Q.   You had cash flows?
22       MR. HARRIS:  Asked and answered.
23       THE WITNESS:  Yes.
24  BY MR. WILLIAMS:
25     Q.   Was this press release issued in

0152
1          Park
2   months he wanted this CAMHL deal and wanted
3   me to bring it to him so that he could
4   finance it.
5     Q.   Let me show you a document that
6   has been marked -- has not been marked.
7       MR. WILLIAMS:  I will ask the
8    court reporter to label it as Exhibit
9    137.
10      (Two-page document, Bates numbered
11  SEC 00460 through SEC 000461 was marked
12  Exhibit 137 for identification)
13  BY MR. WILLIAMS:
14     Q.   Mr. Park, I am going to represent
15  to you that Exhibit 137 is a two-page
16  document, Bates numbered SEC 00460 through
17  SEC 000461.
18      It appears to be 17 January 2003
19  news release of Renaissance Mining
20  Corporation.
21      My question to you, sir, is, have
22  you seen this document before?
23     A.   Yes.
24     Q.   What is this document?
25     A.   It is a document saying Sedona
0153
1          Park
2   Software Solutions to acquire Renaissance
3   Mining.
4     Q.   Do you know who drafted this
5   document?
6     A.   I can't be sure but it wasn't me.
7     Q.   It was someone other than you?
8     A.   Yes.
9     Q.   Do you know if it was someone at

10   Renaissance or some other firm?
11      A.   I don't know.
12      Q.   Do you recall how you came to see
13   this document?
14      A.   I think it was e-mailed to me or
15   faxed to me. I can't remember.
16      Q.   Let me ask you to turn to the
17   second page of the document and the second
18   paragraph from the top, it states, "In
19   addition all officers and directors of SSSI
20   have resigned effective immediately and
21   Renaissance Mining Corp.'s chairman Anthony
22   Wile has assumed the position of chairman of
23   SSSI. Ian Park, Renaissance's president and
24   CEO, has been appointed the new president
25   and CEO of SSSI."
0154
 1                    Park
 2          Mr. Park, of the two sentences
 3   that I just read, were those accurate
 4   statements on about January 17, 2003?
 5      A.   No, they weren't and I guess I
 6   overlooked them. I should have had a
 7   look --
 8          MR. BLOOM: Please speak up.
 9          THE WITNESS: I overlooked them.
10      I should have had a closer look at the
11      document when it was passed by me.
12   BY MR. WILLIAMS:
13      Q.   You indicated that the statements
14   were not accurate. In what respect were the
15   statements inaccurate?
16      A.   Well, to my knowledge, there
17   hadn't been -- you know, I don't remember
18   any board resolutions at that particular
19   time.
20      Q.   You don't remember any Renaissance
21   resolutions?
22      A.   Yes.
23      Q.   Or were you aware of any SSSI
24   board resolutions?
25      A.   No.

0235
 1                    Park
 2   middle of the page, "La Libertad," it says

3   that, "Under the agreement the new company
4   will control 90 percent of the La Libertad."
5       Do you see that?
6   A.  Yes.
7   Q.  Was that the plan that they will
8   acquire?
9   A.  Yes.
10      MR. HARRIS: That they will
11    control?
12      MR. CRIMMINS: Will control.
13    Sorry.
14  BY MR. CRIMMINS:
15  Q.  I see that the heading on the
16  press release says, "Renaissance acquires a
17  major portfolio."
18      Is that inconsistent with what is
19  written in the text that you signed a letter
20  of intent to acquire?
21  A.  Yes, it is.
22  Q.  Do you believe that you deceived
23  the public by issuing this press release?
24      MR. WILLIAMS: Objection.
25      MR. HARRIS: Objection. I mean,
0236
1           Park
2    he didn't issue the press release. So
3    if you rephrase it, I may allow the
4    question.
5  BY MR. CRIMMINS:
6  Q.  Do you believe that in issuing
7  this press release Renaissance did not
8  mislead anybody?
9       MR. WILLIAMS: Objection.
10      THE WITNESS: I overlooked looking
11    at the headline and looked at the text.
12  BY MR. CRIMMINS:
13  Q.  I will ask you to look at 144 when
14  you were questioned by the SEC.
15      MR. HARRIS: If this is for the
16    purpose of refreshing his recollection,
17    that is one thing.
18      If it is for the purpose of
19    contradicting his current testimony, we
20    need talk about that.
21      MR. CRIMMINS: I am hoping it will
22    refresh it. I would rather not impeach.

```
23          MR. WILLIAMS:  Objection.
24          MR. HARRIS:  What page?
25          MR. CRIMMINS:  144.
```