```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2

 3
                SECURITIES AND EXCHANGE       )
 4              COMMISSION,                   )
                                              )
 5                     Plaintiff,             )
                                              )
 6                  v.                        )   Civil Action
                                              )   No. 07 CV 11387
 7              BRIAN N. LINES; SCOTT G.S.    )
                LINES; LOM (HOLDINGS) LTD.;   )
 8              LINES OVERSEAS MANAGEMENT     )
                LTD.; LOM CAPITAL LTD.;       )
 9              LOM SECURITIES (BERMUDA)      )
                LTD.; LOM SECURITIES (CAYMAN) )
10              LTD.; LOM SECURITIES          )
                (BAHAMAS) LTD.; ANTHONY W.    )
11              WILE; WAYNE E. WILE; ROBERT   )
                J. CHAPMAN; WILLIAM TODD      )
12              PEEVER; PHILLIP JAMES CURTIS  )
                AND RYAN G. LEEDS,            )
13                                            )
                       Defendants.            )
14              _____)

15

16                  Videotaped Deposition of JOHN COOPER,

17              VOLUME 1, taken by the Defendants at Blake, Cassels &

18              Graydon, Suite 2600, Three Bentall Centre, 595

19              Burrard Street, Vancouver, British Columbia, Canada,

20              commencing at 12:09 p.m., on August 19, 2009, before

21              LISA C. HANSEN, Official Court Reporter, pursuant to

22              notice.

23

24

25


                                  1
```

```
 1                      A P P E A R A N C E S

 2           FOR THE PLAINTIFF:
                UNITED STATES SECURITIES AND EXCHANGE
 3              COMMISSION
                Room #4221
 4              100 F Street, N.E.
                Washington, D.C.  20549-4010
 5              BY:   DAVID WILLIAMS, Attorney at Law
                BY:   JUSTIN CHRETIEN, Attorney at Law
 6
             FOR DEFENDANT SCOTT G.S. LINES:
 7              K&L GATES
                1601 K Street, N.W.
 8              Washington, D.C.  20006-1600
                BY:   STEPHEN J. CRIMMINS, Attorney at Law
 9
             FOR DEFENDANT BRIAN N. LINES:
10              PATTON BOGGS
                1185 Avenue of the Americas
11              30th Floor
                New York, New York  10036-2603
12              BY:   PHILIP M. SMITH

13           FOR THE LOM DEFENDANTS:
                KELLOGG, HUBER, HANSEN, TODD, EVANS &  FIGEL
14              1615 M Street, N.W.
                Suite 400
15              Washington, D.C.  20036
                BY:  DEREK T. HO, Attorney at Law
16
             FOR THE WITNESS:
17              BREIVIK & COMPANY
                2020 - 650 West Georgia Street
18              Vancouver, British Columbia, Canada
                V6B 4N7
19              BY:  ROBERT E. BREIVIK,
                     Barrister and Solicitor
20
             ALSO PRESENT:  PHILIP WHITFORD, Videographer
21

22

23

24

25


                              2
```

```
13:25:02  1            merger.  The role, as I understood it, of Lines
13:25:13  2            Overseas Management was to ask -- act as an
13:25:16  3            investment advisor, investment banker during this
13:25:21  4            transaction.
13:25:22  5       Q    Okay.  Now, you mentioned that this -- that the
13:25:25  6            agreement is signed by yourself and purportedly also
13:25:29  7            signed by Mr. Tony Wile, but you mentioned that it's
13:25:32  8            on the letterhead of attorneys in Florida, the law
13:25:37  9            firm Newman, Pollock & Klein, and it appears to be
13:25:42 10            signed by Mr. Klein, attorney Jeffrey G. Klein.  Do
13:25:47 11            you know what their role was, the attorneys?
13:25:53 12       A    I'd assume that this is Wile's signature?  Do you
13:25:57 13            read Klein out of that?
13:25:59 14       Q    No, just above, I think, might be Mr. Klein's
13:26:02 15            signature.
13:26:02 16       A    It says Renaissance Mining Corp.
13:26:06 17       Q    Yeah, but if you just -- just go a little bit higher.
13:26:09 18       A    Oh, oh, I see, I see, yeah.
13:26:10 19       Q    Just a little bit higher on the page.
13:26:13 20       A    Yeah.  I had -- I had talked to him on the phone, you
13:26:16 21            know, maybe once or twice.
13:26:18 22       Q    Attorney Jeffrey Klein?
13:26:20 23       A    I believe that is his ...
13:26:24 24       Q    Do you know what role Attorney Klein and his firm,
13:26:28 25            Newman, Pollock & Klein, played in the transaction?
```

```
13:26:32  1   A   Well, they represented Renaissance Mining, as far as
13:26:36  2       I know.
13:26:36  3   Q   Okay.  So they were the lawyers for Renaissance is
13:26:39  4       your understanding?
13:26:40  5   A   That's my understanding.
13:26:42  6   Q   Now, we have this letter of intent that we've been
13:26:49  7       looking at, Exhibit 28, concerning the merger of
13:26:53  8       Sedona and Renaissance, the reverse takeover, the
13:26:57  9       RTO, but my question is, as of this time, it's dated
13:27:01 10       January 14, '03, with the closing having already
13:27:06 11       taken place and your having already delivered the
13:27:09 12       certificates and the corporate books and records and
13:27:11 13       having resigned, as you'd indicated earlier, was
13:27:15 14       there really any doubt that there would be a merger
13:27:18 15       between Renaissance and Sedona?
13:27:22 16   A   No, no.
13:27:23 17   Q   All parties involved favoured it?
13:27:28 18   A   Oh, yes, yeah.
13:27:29 19   Q   And the attorneys were working to get it done?
13:27:32 20   A   Yes.  Now, you know, January the 14th, I -- you know,
13:27:39 21       I'm not -- I'm not sure when -- when we closed the
13:27:41 22       deal and I resigned.  I -- you know, I can't be sure
13:27:45 23       of that.
13:27:47 24   Q   Just to -- just to give you a frame of reference just
13:27:53 25       to maybe help with some of the questions that I'm
```

```
13:27:56  1              asking, if you could look back at your February 2003
13:28:00  2              statement to the SEC, which we've marked as
13:28:03  3              Exhibit 26, and just take a moment to look at pages
13:28:06  4              102 and 103 and see if that refreshes your
13:28:09  5              recollection as to when the closing was.  And that
13:28:12  6              might help you put things in sequence.  It's been
13:28:16  7              some time, I know.  And specifically if you could
13:28:26  8              look at page 102?
13:28:31  9       A      M'mm-hmm.
13:28:31 10       Q      At lines 23 to 25, where it says --
13:28:33 11       A      Oh, yes.
13:28:34 12       Q         "So on January 2nd you are saying that the
13:28:37 13                  transaction between Sedona and Lines closed?
13:28:37 14                  A    The 3rd."
13:28:43 15              And then question at the top of the next page:
13:28:45 16                  "January 2nd or 3rd.  Okay.
13:28:48 17                  A    3rd.  That's when everybody agreed that
13:28:50 18                  this was a done deal."
13:28:52 19              So does that refresh your recollection that that's
13:28:54 20              approximately the closing date?
13:28:56 21       A      Yes, that -- that would -- that would certainly be
13:29:00 22              it, then.
13:29:00 23       Q      Okay.
13:29:01 24       A      Why this is dated January the 14th, I don't know.
13:29:03 25       Q      Okay.
```

```
14:50:53  1           A    Well, you know, once again, these -- these look like
14:50:57  2                closing documents, and whether I created them or my
14:51:02  3                assistant created them, I don't have a specific
14:51:05  4                recollection, but I --
14:51:08  5           Q    Are these documents consistent with the transaction
14:51:11  6                involving the sale of the Renaissance shares -- I
14:51:14  7                mean, the Sedona shares?
14:51:16  8  MR. HO:  Object to form.
14:51:17  9  THE WITNESS:  Generally -- generally speaking, you know, without
14:51:22 10                studying them -- well, let's see.  There's -- money
14:51:32 11                went to Sloan.
14:51:34 12  MR. WILLIAMS:
14:51:34 13           Q    Who is Sloan?
14:51:35 14           A    That's the gentleman from -- the partner of Proskauer
14:51:38 15                Rose who turned up with no money.
14:51:41 16           Q    Okay.  And so why were you paying --
14:51:43 17           A    Because --
14:51:45 18           Q    Why was money being paid to him?
14:51:47 19           A    Because at the time I left the shares with him, he
14:51:50 20                agreed to pay me something like $50,000 on good faith
14:51:59 21                of the closing price.  He later disclosed that he
14:52:04 22                couldn't raise the money and he wanted his $50,000
14:52:08 23                back.  And unless I gave him his $50,000 back, he
14:52:13 24                wasn't going to give me my certs.  He was what we
14:52:17 25                call in the business a swine.
```

```
14:52:20  1              Q    Okay.
14:52:21  2              A    Now --
14:52:21  3              Q    So Mr. --
14:52:22  4              A    -- eventually -- eventually we -- or I settled with
14:52:27  5                   him for 40,000 bucks back.
14:52:30  6              Q    So Mr. Sloan already had the shares of Sedona that
14:52:34  7                   were a part of a reverse merger transaction?
14:52:37  8              A    I -- I believe that he released them to one of my
14:52:41  9                   lawyers acting in Vancouver on the undertaking that,
14:52:45 10                   yeah, he would get paid this $40,000, and when he got
14:52:49 11                   the $40,000, he would release the shares.
14:52:52 12              Q    So as a part of the reverse merger that was involving
14:52:56 13                   Sloan, the shareholders at Sedona had already agreed
14:53:01 14                   to dispose of their interest in the stock prior to
14:53:06 15                   the LOM-related merger?
14:53:08 16              A    They had agreed to dispose of their stock --
14:53:14 17    MR. SMITH:      Objection.
14:53:15 18    THE WITNESS:    -- early in the year.  Sloan was the second time
14:53:18 19                    around.  LOM was the third time around.  Remember, I
14:53:20 20                    failed on the first one; I failed on the second one.
14:53:24 21    MR. WILLIAMS:
14:53:24 22              Q    That's right.  With respect to the first one, you
14:53:27 23                   indicated that -- that the party involved in the
14:53:30 24                   first one had paid a substantial deposit.  Do you
14:53:34 25                   recall that testimony?
```

98

| | | | |
|---|---|---|---|
| 14:53:35 | 1 | A | Yes. |
| 14:53:36 | 2 | Q | And was that deposit in the neighbourhood of |
| 14:53:39 | 3 | | $180,000, do you recall? |
| 14:53:41 | 4 | A | That -- certainly it was over a hundred thousand |
| 14:53:45 | 5 | | dollars I think is my testimony.  It might have been |
| 14:53:50 | 6 | | 180.  You're probably more familiar with the numbers |
| 14:53:52 | 7 | | than I am because I have not reviewed a lot of this |
| 14:53:55 | 8 | | stuff.  But it could have been 180. |
| 14:53:58 | 9 | Q | And you indicated that that money was eventually paid |
| 14:54:02 | 10 | | back to -- to them? |
| 14:54:03 | 11 | A | Most of it or all of it.  I mean, you know, other |
| 14:54:06 | 12 | | than -- other than what I could -- could negotiate |
| 14:54:08 | 13 | | out of it. |
| 14:54:12 | 14 | Q | Okay.  Approximately a hundred thousand was paid |
| 14:54:14 | 15 | | back.  Does that sound right? |
| 14:54:16 | 16 | A | No, no, no, I think it was -- I don't know.  You |
| 14:54:19 | 17 | | know, I can't recall.  Basically a -- a settlement -- |
| 14:54:29 | 18 | | notwithstanding that the deal failed and it was none |
| 14:54:34 | 19 | | of our fault, a settlement had -- had to be reached |
| 14:54:35 | 20 | | for obvious reasons. |
| 14:54:36 | 21 | Q | And who negotiated the settlement? |
| 14:54:39 | 22 | A | I did. |
| 14:54:40 | 23 | Q | And when you were able to -- well, let me just -- you |
| 14:54:52 | 24 | | indicated you don't recall how much money exactly was |
| 14:54:55 | 25 | | paid out -- paid back.  Let me ask you to take a look |

99

```
15:07:34  1              that allows me to characterize what happened, and so
15:07:39  2              I'm trying to get from you what it is that happened,
15:07:39  3              and I hear you saying, well, I had authorization to
15:07:42  4              act on behalf of my shareholders.  I understand
15:07:45  5              that's -- that's your position.  What I'm trying to
15:07:47  6              get to is, in terms of the actual conversations and
15:07:53  7              back and forth between party -- between individuals,
15:07:56  8              between people, that the back and forth was between
15:07:59  9              you and Brian Lines however -- whatever labels that
15:08:02 10              might or might not attach to those interactions.  Is
15:08:06 11              that -- that's all I'm trying to get to.
15:08:09 12         A    Well, you know, I think I've made that -- that fairly
15:08:13 13              clear, but I object to you throwing in this notion
15:08:17 14              that I negotiated something.  I did not negotiate
15:08:20 15              anything.  I was simply acting on the instructions of
15:08:22 16              my shareholders.  It's pretty simple.
15:08:25 17         Q    So from your perspective, was there any -- was there
15:08:28 18              any one individual who negotiated this transaction?
15:08:34 19         A    Excuse me?
15:08:35 20         Q    From your perspective, was there any individual who
15:08:38 21              negotiated this transaction?
15:08:39 22         A    No no, drop that word from your lexicon, I'm not
15:08:44 23              going to rise to it.
15:08:45 24         Q    Because you object to the term "negotiate"?
15:08:48 25         A    Yes, yes, because -- because I -- I have a -- you
```

```
15:08:52  1             know, I have a -- a history of talking with chaps
15:08:55  2             from the SEC.  I went down to Washington to solve a
15:08:59  3             problem that was solvable and it turned out not to be
15:09:02  4             solvable, so I'm -- you know, I'm a little
15:09:07  5             sensitive --
15:09:07  6        Q    Fair enough.
15:09:09  7        A    -- to -- to the way things get manipulated.
15:09:13  8  MR. WILLIAMS:  I'm going to ask the court reporter to label another
15:09:16  9             document as Exhibit number 34 -- 35.  I'm sorry.
15:32:35 10             (EXHIBIT 35 WAS MARKED FOR IDENTIFICATION)
15:09:34 11  MR. WILLIAMS:
15:09:34 12        Q    I'll represent to you that Exhibit Number 35 is a
15:09:37 13             multiple-page document, Bates number SEC18735 through
15:09:44 14             SEC18821.
15:10:08 15  MR. HO:  Just for the record, the document is double-sided, unlike
15:10:11 16             some of the others.
15:10:47 17  MR. WILLIAMS:
15:10:48 18        Q    Have you had a chance to look at the document,
15:10:51 19             Mr. Cooper?
15:10:51 20        A    Briefly.
15:10:52 21        Q    I'm going to ask you to turn to one of what appear to
15:11:02 22             be attached documents that are within the body of
15:11:07 23             this larger exhibit, and, in particular, I'm going to
15:11:11 24             ask you to turn to page SEC18762.
15:11:21 25        A    Okay.
```

```
15:11:24   1        Q    It appears to be an April 14th, 2003 letter, on the
15:11:30   2             letterhead of John E. Cooper.  Is that your signature
15:11:32   3             at the bottom of the page, sir?
15:11:34   4        A    Yes.
15:11:34   5        Q    Okay.  Why did you sign this document?
15:11:37   6        A    Excuse me?
15:11:37   7        Q    Why did you sign this document?
15:11:39   8        A    Why did I sign it?
15:11:41   9        Q    Yes, sir.
15:11:41  10        A    This -- this document was signed on April the 14th
15:12:38  11             at, as I recall, probably at the closing.  It is at
15:12:43  12             least 90 days after when the closing occurred, and
15:12:51  13             part of the closing arrangement was that some of
15:13:01  14             those shares represented by 265,000 shares would
15:13:04  15             become free trading.  This is the same -- this is the
15:13:08  16             follow-up to the same document we discussed earlier.
15:13:12  17             Some of the affiliate shares would be cancelled;
15:13:16  18             others would not be.
15:13:17  19        Q    Okay.  But this document wasn't really signed on
15:13:19  20             April 14th, 2003, was it, sir?
15:13:22  21        A    No.
15:13:22  22        Q    When was it signed?
15:13:24  23        A    Probably on January the 3rd, or at the time of the
15:13:31  24             closing.
15:13:31  25        Q    At the time or shortly before the closing?
```

```
15:13:34   1         A     Pardon?
15:13:34   2         Q     At the time or shortly before the closing?
15:13:37   3         A     Either way.
15:13:38   4         Q     Okay.  And so what was the purpose of signing this
15:13:40   5               document at the time of closing?
15:13:42   6         A     Because -- because the agreement would be made
15:13:53   7               that -- the agreement was made to -- to sell those
15:13:58   8               shares 90 days after the closing of the document --
15:14:04   9         Q     And --
15:14:05  10         A     -- or excuse me, the closing of the transaction.
15:14:08  11         Q     And why was the agreement made to wait 90 days?  What
15:14:12  12               was the point of doing that?
15:14:14  13         A     Because my understanding of the law -- and once again
15:14:16  14               you're asking me a legal question, I'll give you a
15:14:19  15               layman's answer -- my understanding is that 90 days
15:14:22  16               after I cease to be a director, those shares would be
15:14:26  17               free trading as they represented a -- a block of
15:14:30  18               shares that was certainly less than 5 percent of the
15:14:36  19               issued and outstanding.
15:14:37  20         Q     Okay.  But you actually agreed to sell the shares at
15:14:40  21               the time of closing?
15:14:41  22         A     Yes.  It was simply a futures contract, or a futures
15:14:48  23               agreement.
15:14:49  24         Q     I understand.  And let me ask you to turn to
15:15:09  25               page SEC18790.  I'll ask you to look at a document
```

111

```
15:38:29  1              off in the agreement.  That's probably what that's
15:38:34  2              all about, and I reminded Lines to be sure to get
15:38:39  3              that done.
15:38:39  4        Q     And what makes you think that it would have been
15:38:41  5              important to you to have the name of the purchaser?
15:38:44  6              Why would that be important to you?
15:38:46  7        A     Because I was -- I was concerned that the SEC might
15:38:52  8              come through the door and say that these shares were
15:38:57  9              mine and that they were affiliate shares and that
15:39:00 10              they weren't free trading, as you inquire -- as you
15:39:06 11              recall from the initial allegations that were made to
15:39:08 12              me based on my testimony to the SEC in DC.  In other
15:39:14 13              words, you were kind enough to take the information I
15:39:16 14              gave you and turn it on me.
15:39:19 15        Q     Why were you concerned that the SEC would view the
15:39:22 16              shares as yours?
15:39:24 17        A     Hmm?
15:39:25 18        Q     Why were you concerned that the SEC would view the
15:39:27 19              shares as yours?
15:39:29 20        A     Why was I concerned?  Because I was -- I was told
15:39:32 21              that in these kinds of transactions you have to be
15:39:36 22              very, very careful that the nonaffiliate shares go
15:39:39 23              from a nonaffiliate to a nonaffiliate, and that's
15:39:42 24              simply what I was trying to do.  I wanted to make it
15:39:47 25              absolutely clear that I had not purchased the shares
```

124

```
15:39:49   1              on my own behalf and was reselling them on my own
15:39:53   2              behalf.  This is simply the other side of the
15:40:07   3              transaction.
15:40:18   4         Q    One of the things that you testified to earlier today
15:41:46   5              was that you -- you were unhappy, I think it's fair
15:41:54   6              to say, with Cory Dean and his firm?
15:41:57   7         A    I was unhappy with?
15:41:59   8         Q    You were unhappy with Cory Dean and his law firm?
15:42:02   9         A    Yes, correct.
15:42:03  10         Q    And one of the things you said was that you were
15:42:07  11              upset that funds hadn't been disbursed to the
15:42:14  12              shareholders of Sedona because Cory Dean wanted your
15:42:20  13              authorization to transfer the funds.  Do you recall
15:42:22  14              that?
15:42:23  15         A    That's right.  And -- and -- can I answer that?
15:42:31  16         Q    Yes.
15:42:32  17         A    Yeah, okay.  His reason was that I had physically
15:42:42  18              carried those share certificates to his office.
15:42:45  19              There were two -- two legal firms.  One, Maitland &
15:42:49  20              Company, which acted for me, they received the share
15:42:53  21              certificates that were held by the affiliates, but
15:43:01  22              also in that bundle, when all of the documentation,
15:43:05  23              all of the due diligence stuff, the records of the
15:43:08  24              company, a couple of transfer cases, I wasn't about
15:43:11  25              to lack -- to pack those around town.  However, there
```

125

```
15:43:17  1            was share certificates that were to go to Cory Dean,
15:43:22  2            who once again was acting for LOM, and I decided that
15:43:30  3            as Maitland & Company and DuMoulin Black are
15:43:37  4            virtually across the street from one another, I
15:43:39  5            decided I would just tuck them under my arm and drop
15:43:43  6            them off to DuMoulin Black and indeed take the
15:43:46  7            opportunity to meet Cory Dean, because I had not met
15:43:50  8            him before.  When I returned from Mexico some time
15:43:54  9            later, I found that, number one, the disbursements
15:44:03 10            that are outlined in this document had not been made,
15:44:11 11            nor had the share certificates been -- been sent to
15:44:17 12            LOM.  So I asked Mr. Dean what he thought he was
15:44:22 13            doing.
15:44:26 14      Q     Okay.
15:44:29 15      A     And he gave me some legal bafflegab.
15:44:33 16      Q     What was the bafflegab?  I'm sorry?
15:44:37 17      A     The bafflegab was that I had delivered the shares to
15:44:41 18            him.  Therefore, he couldn't take any action on them
15:44:48 19            without my permission, and my permission to do what
15:44:57 20            he wanted was not forthcoming.  So I got a hold of
15:45:02 21            LOM and said, look, get the share certificates and
15:45:06 22            the money over to Maitland and Maitland will do the
15:45:09 23            distribution of the share certificates and the money
15:45:16 24            as was -- as it was contemplated.
15:45:21 25      Q     Did you tell Brian Lines that the reason that you
```

126

```
15:45:24  1              were unhappy with Cory Dean was because Cory Dean
15:45:27  2              wanted to contact your shareholders directly?
15:45:32  3         A    I -- yeah, I seem to recall something about that.
15:45:40  4         Q    Did you --
15:45:41  5         A    Did I mention that today?  I --
15:45:44  6         Q    I don't believe you've mentioned that today.
15:45:47  7         A    No.  Yeah, I -- I don't know.  I don't know how
15:45:57  8              Mr. Dean makes his living, but it certainly isn't in
15:46:01  9              the securities business.
15:46:03 10         Q    But did he want to contact the nonaffiliate
15:46:07 11              shareholders of Sedona directly and you -- and you
15:46:10 12              had an objection to that?
15:46:12 13    MR. HO:  Objection.
15:46:14 14    THE WITNESS:  No, no, no, I -- you know, I didn't say that.  What I
15:46:18 15              said was that he had been sitting on the funds and on
15:46:23 16              the share certificates of Sedona, which -- well,
15:46:29 17              after the closing, and indeed he was sitting on the
15:46:34 18              funds and those shares for at least a week, maybe
15:46:37 19              two weeks.  I was down in Mexico and came back.  And
15:46:42 20              I might have -- I might have asked one of the
15:46:45 21              shareholders, did you get your money, and they
15:46:48 22              probably said no.  And so I checked up on it, and
15:46:53 23              Cory was sitting on the money and the shares.
15:46:58 24    MR. WILLIAMS:
15:46:58 25         Q    Okay.  What I'm going to do now, Mr. Cooper, is play
```

127

```
17:25:34   1                as you have heard in your recordings, to the person
17:25:38   2                who was to give him instructions.  Okay?  Now,
17:25:41   3                whether there was a letter or not, I really can't
17:25:44   4                recall.  This is going back a number of years.  Okay?
17:25:50   5        Q       Let me -- let me continue with the recording where
17:25:53   6                the specifics of the concern that you raise are
17:25:56   7                addressed.
16:27:24   8                (AUDIO RECORDING PLAYED)
17:26:25   9   MR. WILLIAMS:
17:26:26  10        Q       Did Cory Dean write you a letter?
17:26:27  11        A       Yeah, he --
17:26:28  12        Q       In about January 2003?
17:26:29  13        A       He -- he may well have done so.
17:26:32  14        Q       Did you keep that letter?
17:26:35  15   MR. SMITH:  Excuse me.
17:26:35  16   THE WITNESS:  I -- I -- well, as a matter of fact, if it is that
17:26:39  17                kind of letter that evoked that kind of response from
17:26:42  18                me over the telephone, I probably put it in the
17:26:47  19                shredder.
17:26:47  20   MR. WILLIAMS:
17:26:48  21        Q       Fair enough.
17:27:01  22                    I think that I'm just about done, Mr. Cooper,
17:27:03  23                just maybe another couple of minutes.
17:27:10  24                    Let me ask you to take a look at an exhibit
17:27:14  25                that's already been marked as Exhibit 35.  And
```