**1**

```
1            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF NEW YORK
2          Civil Action No. 07 CV 11387 (DLC)
3
4   SECURITIES AND EXCHANGE COMMISSION,     VOLUME I
5              Plaintiff,
6
7   vs.
8   BRIAN N. LINES, ET AL.,
9              Defendants.
10  _____/
11
12
13
14       VIDEOTAPED DEPOSITION OF THE DEFENDANT,
                    BRIAN LINES,
15              TAKEN BY THE PLAINTIFF
             ON MONDAY, NOVEMBER 9, 2009
16
17
18
19
20
21
22
23
24
25
```

**2**

```
1   APPEARANCES:
2
3   U.S. SECURITIES AND EXCHANGE COMMISSION
    100 F Street Northeast
4   Washington, DC  20549-4010
    Phone: (202)551-4953
5   ATTORNEYS FOR THE PLAINTIFF
    BY:  JUSTIN CHRETIEN, ESQUIRE
6         DAVID WILLIAMS, ESQUIRE
7   PATTON BOGGS LLP
    1185 Avenue of the Americas, 30th Floor
8   New York, New York  10036-2603
    Phone: (646)557-5100
9   ATTORNEYS FOR DEFENDANT BRIAN LINES
    BY:  PHILIP M. SMITH, ESQUIRE
10
11  K&L GATES
    1601 K Street Northwest
12  Washington, DC  20006
    Phone: (202)778-9440
13  ATTORNEYS FOR DEFENDANT SCOTT LINES
    BY:  STEPHEN J. CRIMMINS, ESQUIRE
14
15  KELLOGG, HUBER, HANSEN,
    TODD, EVANS & FIGEL, P.L.L.C.
16  1615 M Street Northwest, Suite 400
    Washington, DC  20036
17  Phone: (202)326-7918
    ATTORNEYS FOR DEFENDANTS LOM ENTITIES
18  BY:  REID M. FIGEL, ESQUIRE
         DEREK HO, ESQUIRE
19
20  AKERMAN SENTERFITT
    350 E. Las Olas Boulevard, Suite 1600
21  Fort Lauderdale, Florida  33301-4247
    Phone: (954)463-2700
22  ATTORNEYS FOR DEFENDANT ANTHONY WILE
    BY:  WILLIAM NORTHMAN, ESQUIRE
23        LEONARD BLOOM, ESQUIRE
          (via telephone)
24
25  ALSO PRESENT: Rolf Martin, Videographer.
```

**3**

```
1                    I N D E X
2   WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
3   BRIAN LINES
4   By Mr. Williams     6
5
6
7
8                  E X H I B I T S
9   Plaintiff's 83                      6
10     (All exhibits were retained by Mr. Smith.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1         THE VIDEOTAPED DEPOSITION OF THE
2   PLAINTIFF, BRIAN LINES, TAKEN BY THE PLAINTIFF, IN
3   THE ABOVE-TITLED CAUSE, BEFORE PAMELA GRIMALDI,
4   REGISTERED PROFESSIONAL REPORTER AND NOTARY PU[...]
5   STATE OF FLORIDA AT LARGE, AT 101 SOUTH ROAD,
6   SOUTHAMPTON, BERMUDA ON MONDAY, NOVEMBER 9, 20[...]
7   BEGINNING AT 10:12 A.M., PURSUANT TO THE NOTICE
8   HERETOFORE FILED.
9
10
11         THE VIDEOGRAPHER:  This is Tape 1 of the
12     deposition of Mr. Brian Lines in the matter of
13     Securities and Exchange Commission versus Lines,
14     et al. in the United States District Court,
15     Southern District of New York at the Fairmont
16     Southampton, 101 South Road, Southampton, SN 02,
17     Bermuda.
18         My name is Rolf Martin in association with
19     Reporting and Transcription Services Bermuda Ltd.
20     The court reporter is Pam Grimaldi in association
21     with Reporting and Transcription Services Bermuda
22     Ltd.
23         Would counsel please state their appearances
24     for the record, after which the reporter will
25     swear in the witness.
```

25

```
1    Craig and two other individuals?
2         A    Yeah.  There was a secretary, an
3    administrator, and one other broker.
4         Q    And let's go back to LOM Caymans for a
5    minute.  As time went on, did the staff at LOM Caymans
6    increase or stay roughly the same?
7              MR. FIGEL:   Objection.
8    BY MR. WILLIAMS:
9         Q    Or decrease?
10             MR. FIGEL:   Objection.
11             THE WITNESS:   It increased a little bit.
12   BY MR. WILLIAMS:
13        Q    Is LOM Cayman still in operation today?
14        A    Yes, it is.
15        Q    Today approximately how many people work
16   there?
17             MR. FIGEL:   Objection.
18             THE WITNESS:   I couldn't tell you.  I'm not
19   part of the LOM group anymore.
20   BY MR. WILLIAMS:
21        Q    Okay.  When did you cease to be part of the
22   LOM group?
23        A    Must be four years ago now.
24        Q    Okay.  And at the time that you ceased to be
25   part of the LOM group, at that time how many people
```

26

```
1    worked at LOM Caymans, approximately?
2         A    I'd say maybe seven.
3         Q    And at that time how many people worked for
4    LOM Bahamas?
5         A    Three.
6         Q    So from the time of the inception of LOM
7    Bahamas to the time that you no longer were associated
8    with LOM, the size of that office stayed roughly the
9    same or did it change?
10        A    The Bahamas office?
11        Q    Yes, sir.
12        A    I believe it's still three.
13        Q    Okay.  And you mentioned an individual named
14   Mr. McCulskey ran the Cayman office at the outset?
15        A    That's correct.
16        Q    And did Mr. McCulskey answer to you or anyone
17   else at LOM Bermuda?
18        A    Yeah.  He would have answered to me and
19   Scott.
20        Q    And how about your brother Craig in Bahamas,
21   did he also answer to you or anyone else in LOM
22   Bermuda?
23        A    He'd answer to both Scott and I, yes.
24        Q    And what was — at the inception — and let
25   me know if it changed over time — what was your title
```

27

```
1    at LOM?
2         A    I was the president.
3         Q    Okay.  And were you the president from the
4    inception to the point where you left?
5         A    That's correct.
6         Q    And what was your brother's title?
7         A    He was the managing director.
8         Q    Can you give me a sense of what your job
9    responsibilities were at the inception, and tell me if
10   they changed over time?
11        A    Yeah, they changed over time.  You know, I
12   was a salesman, I tried to get new clients, new
13   accounts, and Scott did, as well, but I would say Scott
14   was more operationally driven.
15        Q    When you say operationally driven, what do
16   you mean by that?
17        A    Just to make sure, apart from the sales,
18   everything else was taken through properly, you know,
19   the systems were adequate.  He'd review certain clients
20   or transactions.  It was a small firm.  We were doing a
21   lot of everything.  At the beginning when we opened up,
22   I was cleaning the toilet.
23        Q    At the point at which — and by the way, can
24   you give me an approximate year in which you left LOM?
25        A    We're in 2009 now?
```

28

```
1         Q    Yeah.
2         A    Four years ago.  I guess, what, 2000 — 2005
3    or '6.
4         Q    2005, '6, something like that.
5              When you left, how many people were employed
6    at LOM Bermuda?
7         A    Over a dozen.  I don't know the exact number.
8         Q    Somewhere between 10 and 20?
9         A    Yeah, I'd say that would be a good call.
10        Q    And how many of the people, by a rough
11   percentage, how many of them were brokers?
12             MR. FIGEL:   Objection.
13             THE WITNESS:   Scott and I were brokers — we
14   probably had six brokers there at the Bermuda
15   office.
16   BY MR. WILLIAMS:
17        Q    And can you give me an indication of the size
18   of your business when you started at LOM?
19        A    When we started, we had no business.
20        Q    And as time went on, did, hopefully, your
21   business increase?
22        A    Yeah.
23        Q    Okay.  And by the time you left, can you give
24   me an idea of the magnitude of business that you did?
25             MR. FIGEL:   Objection.
```

29

1          MR. SMITH:  What do you mean?  Objection to
2    the form.
3    BY MR. WILLIAMS:
4          Q     In terms of number of accounts, say.
5          A     We had a lot of accounts.
6          Q     Can you give me a ballpark in terms of the
7    amount of assets under management?
8          MR. FIGEL:  Objection.
9          MR. SMITH:  Objection.
10   BY MR. WILLIAMS:
11         Q     At the time you left.
12         A     At the time I left it was probably over a
13   billion dollars group-wide.
14         Q     When you say group-wide, you mean all three
15   geographic regions of LOM?
16         A     Yes.  Close to a billion or over a billion.
17         Q     And then the three geographic regions that we
18   talked about, LOM Bermuda, LOM Cayman, and LOM Bahamas,
19   were those the only three office of Lines Overseas
20   Management?
21         A     Yes.  But I'd like to point something out.
22   They did -- they did create a London office after I
23   left.
24         Q     I see.  So after you left, LOM created a
25   London office, as well?

30

1          A     That's correct.
2          Q     But during the period in which you were
3    there, there were only three geographic offices?
4          A     That would be correct.
5          Q     What is LOM Capital?
6          MR. FIGEL:  Objection.
7    BY MR. WILLIAMS:
8          Q     If you know.
9          A     LOM Capital is just the corporate finance
10   arm.
11         Q     What is corporate finance?
12         A     Corporate finance is, depending on -- it's
13   everything that would be nontrading:  You know,
14   structuring, prospectus writing, helping a company
15   restructure its finances, or listing -- listings on the
16   Bermuda Stock Exchange, or any type of structured
17   transaction.
18         Q     When you say structuring, or structure a
19   transaction, what does that mean?
20         A     It means everything -- it means everything to
21   do with the nontrading side of the business.  So
22   prospectuses, offering memorandums.
23         Q     So when you say a prospectus, what do you
24   mean by a prospectus?
25         A     They would help write prospectuses, review

31

1    prospectuses or offering memorandums.
2          Q     When you say prospectus or offering
3    memorandum, are you talking about selling stock?
4          A     Private placement memorandum -- that's
5    correct.  But from a private placement or an offering.
6          Q     And so --
7          A     As opposed to, May I buy a thousand shares of
8    IBM?  So it's definitively different.
9          Q     Okay.  So does LOM Capital operate out of one
10   of the three geographic offices during your tenure
11   there, or somewhere else?
12         A     No.  Just out of the Bermuda office.
13         Q     Okay.  And who was responsible for LOM
14   Capital?
15         MR. FIGEL:  Objection.
16         THE WITNESS:  David Surmon and Zach Collins.
17   BY MR. WILLIAMS:
18         Q     Who is David Surmon?
19         A     David Surmon being the company legal -- he'd
20   be in charge of -- he'd be the company lawyer, in-house
21   company lawyer.
22         Q     And he was in charge of LOM Capital?
23         A     He looked over it, yes.  Zach was doing a lot
24   of work behind it.
25         Q     Who is Zach Collins?

32

1          A     Zach Collins was an American fellow that
2    worked for Mellon Bank doing corporate finance with
3    Mellon Bank.
4          Q     And who, if anyone, did Zach Collins report
5    to?
6          A     He reported to -- well, he reported to my
7    brother.  And me, I guess, but more my brother Scott on
8    the operational level.
9          Q     As between you and your brother, who was --
10   who, if anyone, was senior or higher in the reporting
11   structure during your tenure there?
12         A     We were both equal -- equals, but as I said,
13   Scott was more operations driven and I was more sales.
14   So the way we sort of divided the work was I'd sort of
15   talk to the salesmen, called a conference call, you
16   know, once a week with them, so I would be more the --
17   head of the sales force, and Scott was more the
18   operations guy, head of the operations.
19         Q     And as head of the operations, he would
20   interact, you indicated, I think, with Mr. Collins in
21   terms of the corporate finance aspects.  What other
22   aspects would Scott interact with in terms of
23   operations?
24         MR. FIGEL:  Objection.
25         THE WITNESS:  He'd operate -- he'd interact

41

```
1    four or five years down the road in the business side.
2        Q    Approximately four or five years after you
3    started doing business?
4        A    That's correct.
5        Q    Okay. And who -- was there a person at LOM
6    that was responsible for the Web site during the period
7    in which it was in operation when you were there?
8        A    It would be -- it would have been an IT
9    application.
10       Q    Who was responsible for the content, if you
11   know?
12       A    My brother Scott would have overlooked it.
13       Q    That would be part of the operations?
14       A    That would be part of the operations side.
15   It would have been an IT function, but Scott would have
16   definitely overlooked that side of it.
17       Q    Okay. Did either you or your brother have
18   accounts at LOM?
19       A    Yes, we did.
20       Q    And were those accounts in your names?
21       A    We had accounts in our name, accounts that we
22   controlled in corporate names.
23       Q    With respect to the accounts in your names,
24   you in particular, how many accounts did you have in
25   your name?
```

42

```
1        A    My own name?
2        Q    Yes, sir.
3        A    Just one.
4        Q    And was that an LOM Bahamas account or
5    Bermuda or Cayman?
6        A    That would be a Bermuda account.
7        Q    And was that an account that you used for
8    your own personal trading or for some other purpose?
9        MR. SMITH:  Objection.
10       THE WITNESS:  It was, you know, trade, and
11   wire cash out of it. Just a basic account.
12   BY MR. WILLIAMS:
13       Q    Okay. And you indicate that there were other
14   accounts in corporate names that you controlled.
15       A    That's correct.
16       Q    What were the names of those accounts?
17       A    There was Monashee, Largo Flight.
18       Q    Any others that you recall?
19       A    No.
20       Q    The Monashee account, was that -- do you
21   recall which geographic LOM region that that account
22   was owned -- controlled by?
23       MR. FIGEL:  Objection.
24       MR. SMITH:  Objection. Do you mean where was
25   it?
```

43

```
1        THE WITNESS:  What jurisdiction was it?
2    BY MR. WILLIAMS:
3        Q    Yeah. What jurisdiction was it?
4        A    Bermuda. But saying that, Monashee was a BVI
5    company. But it was a Bermuda account.
6        Q    And when you say BVI, is that British Virgin
7    Islands?
8        A    That's correct.
9        Q    And who formed Monashee? Who formed it, the
10   British Virgin Islands corporation?
11       A    I believe -- I think it was a fellow by the
12   name of Rob Jennings.
13       Q    Who is Rob Jennings?
14       A    He was a corporate administrator in Bermuda
15   way back when.
16       Q    And did Mr. Jennings work for a firm?
17       A    A corporate administration firm.
18       Q    And do you know who directed Mr. Jennings to
19   form the corporation?
20       A    I would have -- I would have directed him.
21       Q    Why did you direct him?
22       A    Why did I direct him to open a corporation
23   up?
24       Q    Yes, sir.
25       A    It was to deal with structuring. I had a
```

44

```
1    trust -- a family trust above it, and he created a
2    company that would be the holding company.
3        Q    When you say you had a trust above it, what
4    do you mean by that?
5        A    The corporation was owned by a trust that
6    family, sort of, were the beneficial owners of.
7        Q    When you say your family --
8        A    My immediate family.
9        Q    Okay. And what was the purpose of the
10   corporation?
11       A    It's just the way things are done. You have
12   a -- you know, you have a corporation under a family
13   trust, and it makes it -- it makes it easier to
14   administer per se for the trust side. Plus it's a
15   limited liability company, also which, I guess, has
16   some bearing.
17       Q    Did the corporation Monashee do any business?
18       A    What kind of business?
19       Q    Any kind.
20       A    There's a holding company.
21       Q    Did the company have any assets?
22       A    Yes.
23       Q    What was its assets?
24       A    Monashee?
25       Q    Yes.
```

45

```
1        A    Monashee held -- number one, it held the LOM
2   stock, and it held pieces of different companies, and
3   had cash and...
4        Q    Other than the account -- I think you said
5   the Monashee account was an LOM Bermuda account; is
6   that right?
7        A    That's correct, yes.
8        Q    Other than the LOM Bermuda account, did
9   Monashee have any other accounts?
10       A    Meaning --
11       Q    Bank, brokerage?
12       A    No, I don't think it did.  There was a
13  brokerage account at LOM.
14       Q    And that was the only account that it had?
15       A    That's correct.
16       Q    I believe you indicated that you controlled
17  the Monashee account?
18       A    Yes.
19       Q    And how about Largo Flight, can you tell me
20  which LOM geographic region that account was held in?
21       A    It was in Cayman.
22       Q    Was it originally in Cayman?
23       A    Was it originally in Cayman?
24       Q    Yes.
25       A    We had one also set up in Bermuda.  We had
```

46

```
1   two Largo Flight accounts:  One was in Bermuda, one wa
2   in Cayman.
3        Q    Where does the name Largo Flight come from,
4   if you recall?
5        A    I don't know.
6        Q    Okay.  Is there a corporation underlying the
7   account?
8             MR. FIGEL:   Objection.
9             THE WITNESS:   The account is a corporation.
10  BY MR. WILLIAMS:
11       Q    And is it likewise a BVI corporation or some
12  other sort of corporation?
13       A    I don't remember.
14       Q    And who are the beneficial owners of Largo
15  Flight?
16       A    Largo Flight would be owned by two family
17  trusts that are for the benefit of both Scott's family
18  and my family, immediate family.
19       Q    Other than the LOM Cayman account that you
20  spoke of and the LOM Bermuda account that you spoke of,
21  to your knowledge, did Largo Flight have any other
22  accounts at any other -- at either LOM or any other
23  institution?
24       A    Never did.
25       Q    And what was the purpose of Largo Flight
```

47

```
1   having an account at LOM Bermuda?
2        A    The purpose?
3        Q    Yes.
4        A    It was an investment company.  It was a
5   holding account for investments.
6        Q    And how about the account at LOM Cayman?
7        A    Same thing; it was just a holding company for
8   investments.
9        Q    Why would Largo Flight have accounts at two
10  different -- both LOM Bermuda and LOM Cayman?
11            MR. FIGEL:   Objection.
12            THE WITNESS:   I don't know.
13  BY MR. WILLIAMS:
14       Q    Okay.
15       A    Just did.
16       Q    Okay.  Did you set up the account at LOM
17  Bermuda or was it someone else?
18       A    I believe the LOM Bermuda was set up and that
19  was the first account that it had.
20       Q    Was it set up by you or someone else?
21       A    It would have been authorized by me.
22       Q    How about the LOM Cayman account?
23       A    It would have been authorized by me, not
24  actually set up, but probably authorized, I guess.
25       Q    If Largo Flight already had an account at
```

48

```
1   Bermuda, why would you authorize a second account, if
2   you recall?
3        A    For any reason, you know.  We were probably
4   trying -- it was a new office, we were probably trying
5   to get some commission.  I don't know.  I don't really
6   recall why it was actually set up there.
7        Q    Who was the broker on the LOM Bermuda account
8   for Largo Flight?
9        A    It was -- they were both BAS accounts.
10       Q    And BAS, again, is Brian and Scott account?
11       A    That's correct.  That was for commission
12  purposes, BAS was coded that way.
13       Q    Let me ask you something about that, the BAS
14  account.  If -- are the commissions divided evenly
15  between you and your brother on accounts that were BAS
16  accounts during the time you were there?
17       A    The relationship we had with the company was
18  30 percent would be shared equally, the BAS side,
19  30 percent would be shared equally between Scott and I,
20  and 70 percent would go to LOM, whether it be LOM
21  Cayman or LOM Bermuda, depending on the code.
22       Q    And so I guess in terms of the BAS accounts,
23  did it make any difference whether you brought the
24  account in to LOM or whether Scott brought the account
25  into LOM, they were all treated the same?
```

**89**

```
 1      Q    So Mr. Peever was one of the investors in
 2   Sedona?
 3      A    That's correct.
 4      Q    And did he invest individually or through
 5   some corporate entity?
 6      A    Well, you have to go back a little bit, but
 7   he was part of the ICH tranche, and he would have
 8   received a third of the 780,000 shares.
 9      Q    He was part of the ICH tranche.  What do you
10   mean by that?
11      A    Meaning he would have had a third of any net
12   proceeds from the ICH account on the ICH tranche of
13   stock they bought.  Let's say 230,000 shares, maybe,
14   give or take a few.
15      Q    Okay.  I thought you said you only used the
16   ICH account for structure.
17      A    Yes.  This was part of -- this was part of
18   the structure.
19      Q    Okay.  So was ICH going to be -- so ICH was
20   going to be an investor in Sedona?
21      A    ICH was going to be an investor in Sedona,
22   yes.
23      Q    And so -- and did you have a conversation
24   with Mr. Way about that?
25      A    Yes.
```

**90**

```
 1      Q    When was that?
 2      A    Probably just before Christmas.
 3      Q    He wasn't at the lunch?
 4      A    Between the 17th and the 21st.
 5      Q    But he wasn't at the lunch?
 6      A    No.  But he was in the LOM building.
 7      Q    So did you have a conversation with him in
 8   the LOM building or somewhere else?
 9      A    It would be in the LOM building.
10      Q    And do you recall having a conversation with
11   him?
12      A    I had some conversation with him, yes.
13      Q    Do you recall having a conversation with him
14   about him investing in Sedona?
15         MR. SMITH:  Objection.
16         THE WITNESS:  He personally wasn't investing
17      in Sedona.
18   BY MR. WILLIAMS:
19      Q    Do you recall having a conversation with him
20   about ICH investing in Sedona?
21      A    Yes.
22      Q    In about December of 2002?
23      A    Yes.  Somewhere between the 17th and the 22
24   or the 21st when I left.
25      Q    Do you recall where that conversation took
```

**91**

```
 1   place inside the LOM building?
 2      A    No.  But it would have been a generic
 3   conversation.
 4      Q    By generic, do you mean generic in the way
 5   that you've described your conversation with
 6   Mr. Winter?
 7      A    Yeah.  ICH is contemplating on buying a piece
 8   of his company, et cetera, et cetera.
 9      Q    You would have said, ICH is contemplating
10   what?
11      A    Buying a chunk of Sedona.
12      Q    Okay.  So you indicated that Mr. Peever put
13   up money.
14      A    Yes.
15      Q    Who else put up money?
16      A    There were three entities that put up the
17   money:  Largo Flight, Monashee, and I believe it was
18   Golden Accumulator.
19      Q    And we've talked about Monashee and Largo
20   Flight.  Who is Golden Accumulator?
21      A    That was a corporation who was directed --
22   Todd Peever directed its -- its being.
23      Q    So did Mr. Peever -- is it fair to say he
24   transacted business through Golden Accumulator?
25      A    That would be correct.
```

**92**

```
 1      Q    And did Golden Accumulator have an account at
 2   LOM?
 3      A    Yes.
 4      Q    Bermuda, Cayman, or Bahamas, do you recall?
 5      A    I don't recall.
 6      Q    But one of them?
 7      A    But one of them.
 8      Q    And was that a, what we discussed earlier, a
 9   BAS account?
10      A    Yes, it was.
11      Q    And so Mr. Peever -- excuse me.  Golden
12   Accumulator put up money, Largo Flight put up money,
13   and Monashee put up money?
14      A    That's correct.
15      Q    How much money did Mr. Redford put up?
16      A    That's probably why we did it -- when the
17   money was being put up, I was in Whistler, Vancouver,
18   so I told Devi, with Todd's consent, Transfer money
19   three ways:  385,000 divided by three in the ICH
20   account.  And all the accounting would have been done
21   in that account, so that was the structuring account
22   per se.  And at this point no one else had put up any
23   money.
24      Q    So Mr. Redford hadn't put up any money?
25      A    Not as of yet.
```

## 93

```
1    Q    And Mr. King hadn't put up any money?
2    A    Not as of yet.
3    Q    And Mr. Smith hadn't put up any money?
4    A    That would be correct.
5    Q    And Mr. Way hadn't put up any money?
6    A    Mr. Way really -- he was a director of ICH.
7  He wasn't expected to put up money.
8    Q    I thought you said that -- maybe I
9  misunderstood you -- that you had spoken to Mr. Way
10 about whether or not he wanted to invest?
11   A    No, I didn't.
12   Q    Okay.  You never had a conversation with
13 Mr. Way about whether or not --
14   A    I said ICH was investing.
15   Q    Yes.
16   A    He was a director of ICH.
17   Q    Well, who --
18   A    He just followed out my -- you know, what we
19 planned to do.
20   Q    So if ICH was investing, who was going to be
21 receiving the benefit from ICH?
22   A    ICH, again, was a structuring account.  It
23 wasn't really an investor.  It was a structuring
24 account.  And the three guys that put up the money
25 were, I guess, Todd, Scott, and I, for the three
```

## 94

```
1  respective accounts, and that's how we purchased the
2  shell to begin with.  That -- meaning all the debits
3  would have come into that account, all the credits
4  would have come into that account, and we would have
5  split everything out later on.
6    Q    So ICH wasn't really investing in Sedona?
7    A    They were investing in Sedona, but it had
8  multiple shareholders in it, meaning three.
9    Q    You lost me.  ICH was investing in Sedona,
10 but --
11   A    ICH bought stock in Sedona, but in this
12 transaction, specific transaction, ICH -- the ICH block
13 was represented by Todd, Scott, and myself were the
14 three entities.  So that ICH block we represented.
15   Q    So the ICH block --
16   A    Of stock.
17   Q    -- you, your brother Scott, and Mr. Peever
18 represented?
19   A    And myself.
20   Q    And so you, your brother Scott, and
21 Mr. Peever put up the money to purchase the shell?
22   A    That's correct.
23   Q    And you testified a few minutes ago that you
24 told Devi to transfer the funds.  Who's Devi?
25   A    Devi would have been my assistant.
```

## 95

```
1    Q    What's Devi's full name?
2    A    Devi Johal.
3    Q    And --
4    A    And if it wasn't Devi, it could have been
5  Sherry.  I don't recall back then, but Sherry is Devi's
6  sister and she used to work with us sometimes too when
7  Devi wasn't there.
8    Q    Sherry is also named --
9    A    Johal.
10   Q    -- Johal?
11   A    Yes.
12   Q    And so you didn't ask Mr. Redford to put up
13 any money?
14        MR. FIGEL:  Objection.
15        THE WITNESS:  I would have asked him to put
16 up money.  We just weren't there yet.
17 BY MR. WILLIAMS:
18   Q    You weren't where?
19   A    I was in Vancouver.  We all funded this
20 structuring account.  He would have been expected to
21 put his pro forma money in.  It just didn't happen.
22 That was the accounting side of it.
23   Q    Okay.  And so all of the money to fund the
24 account came from ICH, and the contributors of the
25 money in the ICH were yourself, Scott Lines, and Todd
```

## 96

```
1  Peever?
2    A    Entities that we controlled, yes.
3    Q    And those three entities funded the entire
4  purchase?
5    A    That's correct, to begin with.
6    Q    You say "to begin with."  Did that change at
7  some point?
8    A    No.  But that was the -- as I said, that was
9  the accounting side of it.  So when I got back on the
10 7th of January, whatever, you know -- that's why we
11 have the accounting account, so we can account for who
12 got stock and who didn't and how much people owe us, et
13 cetera, et cetera.
14   Q    So on January 7, at that point you reached
15 out to Mr. Redford and Mr. King and Mr. Smith to obtain
16 their payment?
17   A    I never did get a chance to reach out to
18 them, no.
19   Q    Why not?
20   A    Because everything sort of turned upside down
21 and the whole structure was annihilated, as you
22 probably know by now, and it was kind of difficult to
23 go back to -- go back to any investor and say, You owe
24 me, whatever it is, 32,000 or $28,000, for nothing.
25 And saying that, I also gave Todd his money back.  I
```

104

```
 1    798,000 shares that Jack Cooper would have sent to me
 2    after 90 days.
 3         Q    So there were a number of different entities
 4    that appear on the purchase agreements for Sedona, and
 5    ICH was one of those entities, right?
 6         A    That's correct.
 7         Q    And your testimony is that your interest in
 8    the transaction was a third of what ICH had?
 9         A    A third of what ICH had and a third of Jack
10    Cooper's stock after 90 days.
11         Q    Through ICH?
12         A    Not through ICH, no.
13         Q    Okay. So the -- we talked about 796,000
14    shares that would come after 90 days?
15         A    That's right.
16         Q    And that would go directly to you, or through
17    some entity? Or what were the mechanics on that, if
18    you recall?
19              MR. FIGEL:   Objection.
20              MR. SMITH:   Objection.
21    BY MR. WILLIAMS:
22         Q    You can answer if you understand the
23    question. It may have been a bad question.
24         A    The mechanics of the transaction were quite
25    simple. A third of ICH stock, 797,000 shares or 98,000
```

105

```
 1    shares, would come from Jack Cooper after 90 days, and
 2    I was to distribute that amongst the three funding
 3    shareholders at the time, which would be Todd -- or the
 4    entities. So in retrospect, Golden Accumulator would
 5    have a third of it --
 6              THE COURT REPORTER:   I'm sorry, who?
 7              THE WITNESS:   Golden Accumulator a third,
 8         Monashee a third, and Largo a third.
 9    BY MR. WILLIAMS:
10         Q    So you, Mr. Peever, and Scott Lines would
11    have a third of the 796,000 shares once it became free
12    trading in 90 days?
13         A    That's correct. Well, we'd -- yes. The
14    simple question is yes -- the simple answer is yes.
15         Q    Okay. Is there some nuance that I'm missing?
16         A    No, no. It's fine.
17         Q    And as the deal was being negotiated --
18         A    Negotiated. The shell purchase?
19         Q    Yeah, the shell purchase.
20         A    With Jack Cooper?
21         Q    Yeah. During the time in which you were
22    negotiating with Mr. Cooper -- first of all, did you
23    negotiate with anyone other than Mr. Cooper with
24    respect to the Sedona share purchase?
25         A    No.
```

106

```
 1         Q    Did anyone other than yourself negotiate on
 2    your side of the transaction, if I can put it that way,
 3    with respect to the Sedona share purchase?
 4              MR. FIGEL:   Objection.
 5              THE WITNESS:   With Jack Cooper? No.
 6    BY MR. WILLIAMS:
 7         Q    Not with Mr. Cooper?
 8         A    Not to my knowledge.
 9         Q    As far as you know.
10              Did you have any conversations with -- you
11    indicated you had conversations with a number of
12    individuals during that period of time: Mr. Redford,
13    Mr. King, Mr. Smith. Did you have any conversations
14    with your brother about the transaction, Scott Lines,
15    your brother?
16         A    I believe -- I believe I did. I might be
17    mistaken.
18         Q    Can you describe the nature of those
19    conversations, if you recall?
20         A    I don't recall. It's seven years ago. We
21    don't talk long and drawn-out about a purchase. Either
22    we do it or we don't. It's not something you think
23    about for hours.
24         Q    Okay. Well, did you have a conversation or
25    conversations with your brother where you asked him if
```

107

```
 1    he wanted to do it or you let him know that you were
 2    doing it?
 3              MR. FIGEL:   Objection.
 4    BY MR. WILLIAMS:
 5         Q    Something related to the transaction --
 6         A    You know, I don't recall, but I usually do
 7    have conversations with him, yeah, but not -- we buy
 8    and sell a lot of securities all the time, so I don't
 9    recall. I don't recall on the exact date. I know I
10    had a conversation with him, but...
11         Q    And what was the conversation?
12         A    That we probably bought a piece of a shell.
13         Q    Did you tell him the name of the shell, do
14    you recall?
15         A    I don't recall.
16         Q    Did you tell him the price?
17         A    Probably did. Wasn't trying to hide anything
18    from him.
19         Q    And did you have a conversation with
20    Mr. Peever about the purchase?
21         A    Yes.
22         Q    And apart from your initial conversation with
23    Mr. Peever where he put you together with Mr. Cooper,
24    were there subsequent conversations with Mr. Peever
25    about the investment?
```

116

1    A    Yes.
2    Q    Who are the voices?
3    A    That's Kevin Winter and I.
4    Q    And when Mr. Winter -- do you recall the part
5    of the conversation where Mr. Winter asked you, Who's
6    going to pay our legal fees, and you said, We are?
7    A    Well, I was -- yeah.
8    Q    By "we," who did you mean?
9    A    Well, someone's going to have to pay legal
10   fees. I mean, that's a big thing when these things
11   blow up, people are wondering who's paying legal fees.
12   And there's always, including me -- you don't want to
13   pay fees.
14   Q    When you say "we are," who did you mean by
15   "we"?
16   A    I guess LOM. They were our clients. We
17   haven't -- it was just in my mind, but I didn't want to
18   have them pay legal fees for some kind of blow-up,
19   basically, they weren't responsible for.
20   Q    And so when he said Gateway, you say, Yeah.
21   Was that Gateway a part of LOM?
22   MR. FIGEL:   Objection.
23   THE WITNESS:   No.
24   BY MR. WILLIAMS:
25   Q    The next recording I'm going play for you is

117

1    a recording labeled 20030529B.wav, which we will refer
2    to as Exhibit 84C. And I'll represent to you that it's
3    been represented to us that this is a conversation on
4    May 29, 2003 between yourself and Mr. Stewart Smith.
5    (Plaintiff's Exhibit 84C was marked for
6    identification.)
7    (Whereupon, recording 84C was played.)
8    BY MR. WILLIAMS:
9    Q    It's kind of hard to hear more than one
10   voice. Did you recognize any of the voices on that
11   recording?
12   A    I recognize mine. I sort of recognize
13   Stewart's. It was very, very limited.
14   Q    Do you recall having a conversation with
15   Mr. Smith in about May of 2003 about this situation?
16   A    Not really. But I'm not sure, so I guess I
17   had a conversation with him.
18   Q    Well, one of the parts, the few parts of that
19   recording that was audible, was -- I believe it was you
20   saying, Just say you bought some stock. Did you hear
21   that part of the recording?
22   A    Yeah.
23   Q    And did you direct Mr. Smith to tell the SEC,
24   Just say you bought some stock?
25   A    No.

118

1    Q    Mr. Lines, the next recording I'm going to
2    play for you is a recording -- a file named
3    20030425B.wav that we will refer to as Exhibit 85 --
4    MR. NORTMAN:   Repeat that, please. You said
5    it very quickly.
6    MR. WILLIAMS:   I'm sorry. 20030425B, as in
7    boy, dot WAV.
8    BY MR. WILLIAMS:
9    Q    Which I'll represent to you has been
10   represented to us to have been an April 25, 2003
11   conversation between yourself and Mr. King.
12   (Plaintiff's Exhibit 84D was marked for
13   identification.)
14   (whereupon, recording 84D was played.)
15   BY MR. WILLIAMS:
16   Q    Mr. Lines, do you recognize the voices on
17   that conversation?
18   A    Yeah.
19   Q    And who is that conversation between?
20   A    That was Richard King and myself.
21   Q    And with respect to the part of the
22   conversation where you told Mr. King to say that he had
23   a discretionary account, what did you mean, a
24   discretionary account?
25   A    I'm just trying to take some of the heat off

119

1    these guys and put it on me, to tell you the truth. I
2    felt responsible that the SEC was phoning all my
3    friends. Not the best position to be put in.
4    Q    What did you mean by discretionary account?
5    A    Discretionary means I would have
6    discretionary authority.
7    Q    And was that the case?
8    A    No.
9    Q    You didn't have discretionary authority over
10   any account of Mr. King?
11   A    No.
12   Q    So you told him to tell the SEC something
13   that wasn't true?
14   A    I didn't tell them to say something that
15   wasn't true, I just said -- I was trying to take the
16   fire off Richard a little bit. I thought that might
17   be -- be a way to do it.
18   Q    The direction --
19   A    Saying that, these are all my childhood
20   friends, so you automatically do have some
21   discretionary authority with them, just some as long as
22   financial -- you know, they don't want me setting them
23   up for financial -- half a million dollars or something
24   on a transaction, but for $50,000, you know, there's
25   somewhat kind of discretionary authority with them that

120

```
 1   I would do what I thought best.  Unspoken discretionary
 2   authority.
 3        Q     I'm not sure I understand how that fits
 4   within this context.
 5             MR. FIGEL:   Objection.
 6             MR. SMITH:   Objection.
 7   BY MR. WILLIAMS:
 8        Q     What do you mean unspoken discretionary
 9   authority?
10        A     Well, your childhood friend.  They are not
11   expecting you to do something that's going to put them
12   in a financial quandary.  So $50,000 is, you know,
13   $50,000.  But they don't want me speaking on a half
14   million dollars for them, I wouldn't think.
15        Q     So you had discretion with respect to their
16   investment in Sedona?
17             MR. FIGEL:   Objection.
18             THE WITNESS:   No, I didn't have discretion on
19        their investment in Sedona.  But I'm just saying,
20        there are some parameters, yeah.  Friendship
21        parameters.  They are hard to explain.
22   BY MR. WILLIAMS:
23        Q     But when you told him to tell the SEC that
24   you had a discretionary account --
25        A     Right.
```

121

```
 1        Q     -- discretionary in what respect?
 2        A     I was just trying to take some of the, you
 3   know, the fire off of him and point it towards me.
 4   Like I did the whole time.
 5        Q     To suggest that he didn't have any
 6   responsibility for the investment in Sedona, or to
 7   suggest something else?
 8             MR. FIGEL:   Objection.
 9             MR. SMITH:   Objection.
10             THE WITNESS:   No, not to suggest anything.
11   BY MR. WILLIAMS:
12        Q     Okay.  Well, take the fire off him how?
13        A     It's the same I did for everyone, you know.
14   I was trying to -- when this thing blew up, I put my
15   hand up and said, I'm responsible for it.  So I'm there
16   taking the heat for everyone.
17        Q     Okay.  But what I'm trying to connect is your
18   statement, Tell them they had a discretionary account,
19   with you taking the heat off people.  How does one
20   relate to the other?
21             MR. FIGEL:   Objection.
22             MR. SMITH:   Objection.
23             THE WITNESS:   I don't know how --
24   BY MR. WILLIAMS:
25        Q     What is it that you're trying -- how are you
```

122

```
 1   trying to take the heat off him by advising him to tell
 2   the SEC that he had a discretionary account?
 3             MR. FIGEL:   Objection.
 4             MR. SMITH:   Objection.
 5   BY MR. WILLIAMS:
 6        Q     You can answer if you --
 7             MR. SMITH:   That's the third time.  I mean,
 8        he told him a number of things.  He didn't tell
 9        him that.  That's the third time you've
10        misrepresented what's on that recording, Dave.
11             MR. WILLIAMS:   Let's play --
12             MR. SMITH:   So let's play it again.
13             MR. WILLIAMS:   Let's play it again.
14             MR. SMITH:   Okay.
15             (Whereupon, a portion of recording 84D was
16        replayed.)
17   BY MR. WILLIAMS:
18        Q     "The best thing to say is that you basically
19   have a discretionary account here, basically."
20        A     You know what I just got from that tape,
21   Mr. Williams, is I've obviously talked to him before
22   about purchasing the shell, Sedona, and he says, I
23   don't remember what you said, Brian.  That was the
24   first conversation we had.  And then we're talking --
25   talking again, and then he said -- then I mentioned
```

123

```
 1   a discretionary.  So all I'm doing is trying to, again,
 2   draw some of the heat off him and put it on me so he
 3   can blame me; that's all I'm telling him.
 4        Q     Blame you by saying --
 5        A     Brian told me to buy it, basically.  I didn't
 6   do anything bad.  That's all I'm telling him.  That's
 7   what comes from that conversation.  He knows he talked
 8   to me, obviously.  He's forgotten what I told him, what
 9   he was buying or whatever.  And now he's in trouble,
10   and I'm just saying, Just say it was all my fault.
11   That's all I'm saying in that conversation.
12        Q     So you believe the conversation indicated
13   that you had had a prior conversation with Mr. King
14   about the investments --
15        A     That's how it starts off.
16        Q     Okay.  That's how it starts off.
17             (Whereupon, a portion of recording 84D was
18        replayed.)
19             THE WITNESS:   There we go.
20   BY MR. WILLIAMS:
21        Q     Is that your reference?
22        A     Yes.
23        Q     He couldn't remember what you said?
24        A     Yeah.  Obviously we had spoken about
25   purchasing this before.  He didn't know -- in one ear
```

136

```
 1    didn't receive it, no.
 2         Q    At about the time of the closing of the
 3    purchase of the Sedona shell --
 4         A    Yes, sir.
 5         Q    -- by that time did you know what, if
 6    anything, the shell would be used for?
 7              MR. FIGEL:  Objection.
 8              MR. SMITH:  Objection.
 9              THE WITNESS:  By the closing?
10         What are we objecting to?
11              MR. SMITH:  I'm objecting to the form of the
12         question.
13    BY MR. WILLIAMS:
14         Q    You can answer if you understand the
15    question.
16         A    Say the question again.
17         Q    Yeah.  By the time of the closing of the
18    Sedona transaction --
19         A    The closing you're saying is, what, 7th of
20    November, 5th of November?  For closing the Sedona
21    transaction?
22         Q    The Sedona Software --
23         A    The 5th of January.  Sorry.
24         Q    January.  The first -- the early part of
25    January.  At about that time did you know what the
```

137

```
 1    shell would be used for?
 2         A    We had an idea by then, yes.
 3         Q    And what was the idea?
 4         A    Again, we purchased a shell, and it was
 5    always -- the intent was always to do a transaction
 6    with a private company.  That's why you buy a shell.
 7    And Tony had given me a call, this is before Christmas,
 8    and the day before I leave he flies to Bermuda with
 9    Mr. Park and explains a deal or a company to me that he
10    thought I might be interested in.
11         Q    You mentioned someone named Tony.  Who is
12    Tony?
13         A    Tony?  Tony would have been the chairman of
14    Renaissance at the time.  Tony Wile was his name.
15         Q    Tony Wile?
16         A    Yes.
17         Q    And what -- how did you come in contact with
18    Mr. Wile with respect to the transaction that you just
19    mentioned?
20         A    He had phoned me up the day before he got
21    here and said, Brian, I've got a great transaction, or
22    a great private company I've been working on, and I'd
23    like you to take a look at it, and didn't say much
24    more, and then showed up at my doorstep the next day.
25         Q    And what -- did he indicate to you what, if
```

138

```
 1    anything, he wanted you to do in connection with the
 2    company that he was working on?
 3              MR. FIGEL:  Objection.
 4              THE WITNESS:  At the beginning?
 5    BY MR. WILLIAMS:
 6         Q    Yes.
 7         A    No.  Just gave me a brief overview.  Probably
 8    December 21.
 9         Q    Okay.  And so this was an in-person meeting
10    here in Bermuda?
11         A    That's correct.
12         Q    And you mentioned someone else named Ian
13    Park?
14         A    Mr. Park, yes.
15         Q    And who else participated in that meeting?
16         A    We had a meeting at LOM that afternoon.  It
17    was just Mr. Park, Tony Wile, and myself.  And then we
18    went for dinner that night.
19         Q    And the meeting was at your office in LOM?
20         A    That's correct.
21         Q    And --
22         A    And for dinner we went to Little Venice, and
23    it was Kevin Winter, myself, Mr. Park, Mr. Wile.
24         Q    And Little Venice, that's the same restaurant
25    that you had mentioned earlier today --
```

139

```
 1         A    Yeah.  It's a famous Italian eatery in
 2    Bermuda.
 3         Q    And that wasn't the same meeting that you
 4    spoke of earlier with --
 5         A    No.  Totally separate meeting.
 6         Q    Okay.
 7         A    This is later on.
 8         Q    Okay.  So this was after that?
 9         A    This was after -- this is, you know, five
10    days later or something, yeah.
11         Q    Okay.  And so you had a meeting at your
12    office with you, Mr. Wile, and Mr. Park, and after that
13    you went to dinner with the same gentlemen, but also
14    including Mr. Winter?
15         A    That's correct.
16         Q    And how long did the meeting last?
17         A    An hour, an hour and 15 minutes.  It was a
18    meeting, brief meeting, you know.  They gave me a small
19    presentation and we went from there.
20         Q    And can you describe what the presentation
21    was?
22         A    It was a computerized presentation on a
23    notebook, and it was a -- talked about the assets they
24    were about to acquire, some past history of the
25    operating mines, other assets they had.  They went
```

140

```
 1  through the board of directors with me, the management
 2  of the company, and what they wanted to do with the
 3  company.
 4       Q    So it was in the nature of like a PowerPoint
 5  presentation?
 6       A    It was a PowerPoint presentation.
 7       Q    And what -- what were they looking for from
 8  you? What is it they wanted you to do, if anything?
 9            MR. FIGEL:  Objection.
10            THE WITNESS:  I'm a financier in a corporate
11       finance role, and they knew I was involved in many
12       Canadian transactions, and so, you know, people
13       usually come to me for money.
14  BY MR. WILLIAMS:
15       Q    So it was your sense that they were coming to
16  you for money?
17       A    They wanted me -- that's what most people
18  come to me for, yes. For an investment opportunity
19  they are showing me.
20       Q    Okay. So was it your sense that Mr. Wile and
21  Mr. Park were coming to you for money?
22       A    Advice and money.
23       Q    Advice in what respect?
24       A    They would know I was part of a lot of
25  Canadian deals, whether it be structuring, private
```

141

```
 1  placements or whatever, and he knew I had been part of
 2  a lot of successful ones up till then, as well. And so
 3  he wanted my advice on how we could finance this thing
 4  and properly organize it.
 5       Q    And did you give him advice on how to finance
 6  the thing?
 7       A    I gave him basic advice, yes. And he was
 8  intent -- he wanted to go the way of the OTC Bulletin
 9  Board, which I wasn't totally against at the time
10  because, you know, we had just bought -- my group had
11  just bought or were in the midst of finishing
12  negotiation on a shell, and so I was open to it.
13       Q    How would going onto the OTC Bulletin Board
14  enable him to raise money?
15       A    You tend to always -- when you're raising
16  money for the public market, you tend to get an
17  exchange listing, either in Canada, the U.S., or
18  England -- not so much the U.S. anymore -- and then you
19  raise money on that company, through private placement
20  or...
21       Q    Okay. So did you provide him any other
22  advice?
23       A    Not that I remember right now.
24       Q    Okay. And so you indicated, at least in your
25  earlier testimony, that Mr. Wile's firm had something
```

142

```
 1  to do with Sedona. What was that?
 2            MR. FIGEL:  Objection.
 3            MR. SMITH:  Objection.
 4            THE WITNESS:  I don't remember talking about,
 5       my former testimony, anything to do with Mr. Wile
 6       yet.
 7  BY MR. WILLIAMS:
 8       Q    I'm sorry.
 9       A    I don't think we ever brought up Mr. Wile
10  yet.
11       Q    Well, I mentioned earlier if you knew at the
12  time of the closing of Sedona what Sedona would be used
13  for, and I think you indicated --
14       A    I didn't indicate that.
15       Q    I apologize. I don't mean to misstate your
16  testimony.
17            Did Sedona have some connection with
18  Mr. Wile's firm ultimately?
19            MR. FIGEL:  Objection.
20            THE WITNESS:  Not that I knew of. Him and
21       Jack Cooper are two independent people altogether.
22       Not connected by any dot or any line.
23  BY MR. WILLIAMS:
24       Q    Right. But what I'm getting as is the Sedona
25  shell would wind up being used in connection with
```

143

```
 1  Renaissance in some way?
 2            MR. FIGEL:  Objection.
 3            MR. NORTMAN:  Objection.
 4            THE WITNESS:  We didn't know that then, not
 5       when we -- when I first started negotiating it.
 6  BY MR. WILLIAMS:
 7       Q    When started negotiating what?
 8       A    The purchase of Sedona.
 9       Q    Going to the --
10            MR. WILLIAMS:  Why don't we go off the record
11       so that the videographer can change the tape.
12            THE WITNESS:  Sure.
13            MR. NORTMAN:  Guys, you're starting to drop
14       your voices. It's very hard to hear.
15            THE WITNESS:  Sorry about that.
16            THE VIDEOGRAPHER:  Off the record at
17       2:36 p.m.
18            (whereupon, a recess was taken.)
19            THE VIDEOGRAPHER:  Tape No. 4 at 2:58 p.m.
20  BY MR. WILLIAMS:
21       Q    Okay. Mr. Lines, there's one document that I
22  meant to cover with you earlier but I overlooked it, so
23  I'm going to go back and cover it now. It pertains to
24  the Sedona shell.
25       A    Right.
```

144

```
1        Q    This is a document that I'll ask the court
2   reporter to label as next in series, Exhibit 87 -- 86.
3             (Plaintiff's Exhibit 86 was marked for
4   identification.)
5   BY MR. WILLIAMS:
6        Q    I'll represent to you that Exhibit 86 is a
7   one-page document Bates No. SEC 001360.  It appears to
8   be a January 7, 2003 email from yourself to Sherry
9   Johal.
10       A    Yes.
11       Q    And do you recognize the document, Mr. Lines?
12       A    Do I recognize this document?
13       Q    Yes, sir.
14       A    I guess it's just an email from me to Sherry.
15       Q    Okay.  In the message body portion of the
16  document it says, "P.S., I'm expecting a package from
17  FedEx certs (Sedona Software).  Please have them
18  deposited to ICH and have them forwarded to vault for
19  DTC."  Do you see that part of the document?
20       A    I do.
21       Q    Do you know what that means?
22       A    It looks like the certificates that
23  Mr. Cooper is FedExing us.
24       Q    When you say "have them deposited to ICH,"
25  what does that mean?
```

145

```
1        A    That they are putting the stock under ICH's
2   account.
3        Q    And you say, "have them forwarded to vault
4   for DTC," what does that mean, "vault for DTC"?
5        A    Sherry gets a certificate, she passes it on
6   to the vault, and the vault does what it does with
7   them, meaning they make sure it's properly signed,
8   making sure it looks good, sends it to a transfer agent
9   or a depository.  Just whatever the vault does.
10       Q    Who's in charge of the vault at LOM Bermuda?
11            MR. FIGEL:   Objection.
12            MR. SMITH:   In January 2003?
13  BY MR. WILLIAMS:
14       Q    In January 2003.
15       A    Back then I believe it was a fella named
16  Cueva.
17            THE COURT REPORTER:   What was the name?
18            THE WITNESS:   Cueva, C-U-E-V-A.
19  BY MR. WILLIAMS:
20       Q    And is his last name Holder?
21       A    Yes, it is.
22       Q    And what does the vault do with respect to,
23  say, a share certificate for Sedona Software?  What
24  would the vault do?
25            MR. FIGEL:   Objection.
```

146

```
1            MR. SMITH:   Objection.
2   BY MR. WILLIAMS:
3        Q    If a share certificate of Sedona Software was
4   sent to the vault for DTC, what would the vault do?
5            MR. FIGEL:   Objection.  Time frame?
6   BY MR. WILLIAMS:
7        Q    In about January 2003.
8        A    Again, they get ahold of the cert and they
9   probably photocopy it, and so -- they photocopy it,
10  they make sure it's logged in the proper account, and
11  they send it to the custodian or the transfer agent
12  for -- to make it into electronic form.
13       Q    What's DTC?
14       A    It's the clearing system.  It's how stocks
15  are cleared, securities are cleared.  It's really
16  taking a physical security and putting it into an
17  electronic form.
18       Q    Okay.  And how would the vault determine
19  whether or not the stock went into the right account?
20            MR. FIGEL:   Objection.
21            MR. SMITH:   Objection.
22  BY MR. WILLIAMS:
23       Q    If you know.
24       A    I'm not the vault operator.  They do what
25  they do.  They do the best they can.
```

147

```
1        Q    Okay.  And above in the email there are
2   directions to transfer -- appears to be directions to
3   transfer funds from an account REDACTED to ICH?
4        A    Yes.
5        Q    And from Golden Accumulator to ICH.  Do you
6   see that part of the document?
7        A    I see that.
8        Q    That account number on the first line, do you
9   recognize that account number?
10       A    Yes, I do.
11       Q    What account is that?
12       A    That's Monashee.
13       Q    Okay.  Now, before we took a break, you spoke
14  of a meeting that you had with Tony Wile and Ian Park
15  in -- sometime in mid to late December 2002.  Do you
16  recall that?
17       A    Yes.
18       Q    And then after the meeting you went out to
19  dinner?
20       A    The day after I went to Whistler, Canada.  I
21  left Bermuda for Vancouver the day after.
22       Q    I see.  So it would have been -- if you left
23  on the 21st, and you're not exactly sure about the
24  date, but if you left on the 21st, then it would have
25  been the 20th?
```

148

1    A    Then it would have been on the 20th, that's
2    correct.
3    Q    How much advance notice did you have of the
4    meeting prior to Mr. Wile and Mr. Park coming to
5    Bermuda?
6    A    He gave me a call the day before.
7    Q    And the call the day before, was that the
8    first you had ever heard of Renaissance?
9    A    That would be correct.
10    Q    And you mentioned that Mr. Wile -- was it
11    Mr. Wile who delivered the presentation or Mr. Park or
12    both?
13    A    Mainly Mr. Park did the talking.
14    Q    Okay.  And Mr. Park talked about --
15    A    The operational aspects of the company.
16    Q    What, if anything, did Mr. Wile talk about?
17    A    He didn't do too much talking.  It's hard to
18    believe, I know.
19    Q    Okay.  And you indicated that the meeting
20    lasted for about an hour, I think you said?
21    A    Yeah, an hour and a bit.
22    Q    And so after the meeting you went out to
23    dinner --
24    A    Went home, get changed, see the kids, and
25    went out for dinner.

149

1    Q    With Mr. Wile and Mr. Park, and also
2    Mr. Winter?
3    A    That's correct.
4    Q    And was any business discussed at the
5    meeting -- at the dinner?  I'm sorry.
6    A    Yeah, we were talking about Renaissance and
7    where they wanted to go with it.  Definite chitchat.
8    Q    And was that Mr. Park telling you where
9    Renaissance wanted to go, or Mr. Wile, or both?
10    A    They were both talking.
11    Q    Okay.  And what, if anything, did they
12    communicate to you about where they wanted Renaissance
13    to go?
14    A    Well, other than going public, they -- when
15    you start a company, there's big dreams all the time,
16    so they had -- they both had big dreams.  They wanted
17    to be an intermediate gold producer.  They had
18    differing ideals on what mines they already had and
19    maybe what else they could purchase.  So they -- you
20    know, they were excited.
21    Q    So they wanted to go public with Renaissance?
22    A    They did want to go public, yes.
23    Q    And was them going public discussed at the
24    meeting?
25    A    Somewhat, yeah.

150

1    Q    And would LOM or yourself have a role in
2    Renaissance going public?
3         MR. FIGEL:  Objection.
4    BY MR. WILLIAMS:
5    Q    As it was presented to you?
6    A    Yeah, you know, I had mentioned we were
7    negotiating on an OTC shell already, and we could
8    possibly make that available for this transaction.
9    And, you know, LOM's role, obviously they would have
10    collected fees by having an agency agreement and to
11    sell the private placement.
12    Q    So you indicated that you had a possible
13    shell corporation available at the meeting with
14    Mr. Wile and Mr. Park?
15    A    There was a -- yeah, there was a possibility
16    of the shell that we had -- negotiating to acquire but
17    hadn't finished or completed acquiring it yet, we would
18    think about the possibility of merging it with
19    Renaissance.
20    Q    And how did that come up?  Did Mr. Wile or
21    Mr. Park ask you if that was available or did you raise
22    it on your own?
23    A    I probably raised it by myself.
24    Q    And what was the reaction to that, if
25    anything?

151

1    A    There's no great -- there's no big reaction.
2    Q    Were they receptive?
3    A    Yeah, they were receptive.  They had come all
4    the way from Florida and Canada to meet me and have
5    dinner with me and introduce me to Renaissance.  They
6    were receptive to what I was talking about, obviously.
7    I would hope so.
8    Q    And were they aware that you had a possible
9    potential shell corporation available before they came
10    to the meeting?
11         MR. FIGEL:  Objection.
12         THE WITNESS:  No, they wouldn't have known
13    that.
14    BY MR. WILLIAMS:
15    Q    You never mentioned it to them on the call
16    prior to the meeting?
17    A    I don't believe so.
18    Q    Okay.  And you indicated that LOM might have
19    a role in a private placement?
20    A    If we were going to raise money, which is
21    what you have to do when you finance these junior
22    mining companies, you know, you're expected to raise
23    money, et cetera.  There would have been a role for LOM
24    to act as agent and collect fees and investment banking
25    fees, et cetera, et cetera.

160

1  distribute information, et cetera, et cetera. That's
2  what a PR firm is for. Public relations.
3       Q      Okay. So in the email here where it says,
4  "This is the start of a massive promotion," you didn't
5  know what that meant?
6       A      I didn't read it. It means nothing to me.
7       Q      You didn't read it?
8       A      No. You've got to realize, I had three
9  transactions going, probably 100 emails a day. You
10 can't read all the stuff you get.
11      Q      Okay. So you don't think you read the email
12 from Mr. Wile?
13      A      No, I don't think I did.
14      Q      Did Mr. Wile ever mention to you an
15 individual named Bob Chapman?
16      A      He mentioned it in passing, I guess.
17      Q      Based on what was mentioned to you, who was
18 Bob Chapman?
19      A      I don't know. It didn't really ring a bell
20 to me. No bells went off. I didn't know who Bob
21 Chapman was. Never heard of the guy before.
22      Q      In the email, Exhibit 87, he mentions a firm
23 called International Mining Group. Do you see that
24 part of the document?
25      A      Where is that?

161

1       Q      The second sentence.
2       A      I see that, yes.
3       Q      And did you -- were you familiar with the
4  firm International Mining Group?
5       A      Never heard of it before.
6       Q      Did Mr. Wile discuss the group International
7  Mining Group with you?
8       A      No.
9       Q      He never discussed International Mining Group
10 with you?
11      A      No.
12      Q      What role, if any, did International Mining
13 Group have in the Renaissance offering, to your
14 knowledge?
15            MR. FIGEL:   Objection.
16            MR. NORTMAN:   Objection.
17            MR. SMITH:   Objection.
18 BY MR. WILLIAMS:
19      Q      You can answer if you know.
20      A      I don't think they had anything to do with
21 it.
22      Q      Have you ever heard of the name Abe Mishal,
23 M-I-S-H-A-L?
24      A      No. Who's that?
25      Q      I'm sorry?

162

1       A      Who is that?
2       Q      I'm not allowed to answer your questions. I
3  can only ask them.
4       A      Okay.
5       Q      I'm going to hand you a document that I'm
6  going to ask --
7            MR. WILLIAMS:   I ask the court reporter to
8       label this as Exhibit 88.
9            (Plaintiff's Exhibit 88 was marked for
10 identification.)
11 BY MR. WILLIAMS:
12      Q      And I'll represent to you that Exhibit
13 Number 88 is a two-page document, Bates No. SEC --
14 three-page document, I'm sorry, SEC 1507 through 1509.
15            MR. NORTMAN:   Is it 88?
16            MR. WILLIAMS:   88, right. The first page is
17      an email communication, appears to be dated
18      January 17, 2003 from Anthony Wile -- from Brian
19      Lines to Anthony Wile, Subject, Re: Renaissance
20      Mining Press Release.
21 BY MR. WILLIAMS:
22      Q      Mr. Lines, have you seen this document
23 before?
24      A      I guess I -- I guess it's come by me, yes.
25      Q      And the press release that's on the second

163

1  and third pages appears to have handwriting on the
2  second page. Do you see that part of the exhibit?
3       A      I do.
4       Q      And do you recognize that handwriting?
5       A      Yes.
6       Q      Whose handwriting is it?
7       A      Scott's.
8       Q      And the first page of the document --
9       A      First page?
10      Q      The first page of the document appears to be
11 an email from yourself to Anthony Wile. Do you see
12 that part of the document?
13      A      I do see it, yes.
14      Q      And did you recall forwarding to Mr. Wile
15 this suggestion of using -- instead of using Lines
16 Overseas Management, you use LOM Capital Ltd.?
17            MR. FIGEL:   Objection.
18            MR. SMITH:   Objection.
19 BY MR. WILLIAMS:
20      Q      You can answer if you recall sending...
21            THE WITNESS:   Why are we objecting?
22            MR. SMITH:   Well, I can't tell you. And
23      that's a short answer. But if you don't
24      understand the question, you need to ask
25      Mr. Williams to rephrase it. But if --

**164**

1       THE WITNESS: Rephrase the question.
2 BY MR. WILLIAMS:
3    Q   Yeah. My question is, do you recall
4 sending -- communicating to Anthony Wile that he should
5 make a change in a Renaissance Mining press release
6 from using Lines Overseas Management to LOM Capital
7 Ltd.?
8       MR. FIGEL: Objection.
9       THE WITNESS: I would have -- obviously
10 emailed it back to him and it would have been
11 just -- would have been more truance (verbatim) to
12 the deal. LOM Management had nothing to do with
13 it. LOM Capital was going to be the agent, which
14 I think this reflects.
15 BY MR. WILLIAMS:
16    Q   But you did review the press release of
17 Renaissance?
18    A   Did I review it?
19    Q   Yes.
20    A   I did not review it.
21    Q   No. Scott Lines reviewed the press release?
22       MR. FIGEL: Objection.
23       THE WITNESS: Not Scott. David Surmon.
24 BY MR. WILLIAMS:
25    Q   Do you see Mr. Surmon's handwriting on the

**165**

1 second page anywhere?
2    A   I don't see his handwriting on the second
3 page, per se. But some of this could be his
4 handwriting, I don't know. But it's been...
5    Q   So did Scott review all the press releases?
6       MR. FIGEL: Objection.
7       MR. SMITH: Objection.
8       MR. CRIMMINS: Objection.
9       THE WITNESS: I wouldn't think so, no.
10 BY MR. WILLIAMS:
11    Q   Why wouldn't you think so?
12       MR. FIGEL: Objection.
13       MR. CRIMMINS: Objection.
14       MR. SMITH: Objection.
15       MR. NORTMAN: Objection.
16       THE WITNESS: They are all objecting.
17 BY MR. WILLIAMS:
18    Q   You can answer unless your attorney tells you
19 not to answer.
20    A   He told me not to answer.
21       MR. SMITH: No, we didn't tell you not to
22 answer. It's a technical objection. Basically
23 he's assuming that Scott reviewed this in his
24 question and that hasn't been established yet, so
25 we're objecting to the form. But if you just

**166**

1 follow along, if you can understand his question,
2 answer to the best of your ability --
3       THE WITNESS: I think, if anything, Scott was
4 trying to make sure that whatever was here was
5 said properly. That's all he would be doing.
6 BY MR. WILLIAMS:
7    Q   And did he do that in connection with all the
8 press releases, as far as you know?
9       MR. FIGEL: Objection.
10       MR. SMITH: Objection.
11 BY MR. WILLIAMS:
12    Q   For Renaissance.
13    A   I don't know. That's only speculation. I
14 doubt it. And I know we talked about this earlier
15 today but I just want to be clear that LOM Capital
16 Ltd. -- you were the president of LOM Capital Ltd., as
17 well, weren't you? Or were you?
18       MR. FIGEL: Objection.
19       THE WITNESS: I don't think so. But I don't
20 know.
21 BY MR. WILLIAMS:
22    Q   What was your relationship with respect to
23 LOM Capital Ltd.?
24    A   My relationship?
25    Q   I mean what was your role, if any.

**167**

1    A   I was -- I didn't really have a role in it.
2    Q   So you weren't a part of LOM Capital Ltd.?
3    A   No. Metaphorically speaking. I was sales
4 and trading, you know. LOM Capital did their own
5 thing. There was Zach Collins, there was David Surmon.
6 They did a wide array of --
7    Q   Okay. I guess I'm just trying to sort of
8 line up the organizational chart. So it's clear, LOM
9 Capital Ltd. is under the umbrella of LOM Holdings; is
10 that right?
11    A   That's correct.
12    Q   And what is your relationship -- you
13 indicated you're the president of LOM. President of
14 which LOM?
15    A   LOM Bermuda.
16    Q   Okay. LOM Bermuda.
17       Do you have any relationship with respect to
18 LOM Holdings?
19    A   Do I have any relationship?
20    Q   Yes.
21    A   I'd be a shareholder.
22    Q   Okay. Who's the president, if any -- if
23 anyone, of LOM Holdings?
24       MR. FIGEL: Objection. Time frame.
25       THE WITNESS: I don't know. Right now I

168

```
1          don't know — back then?
2   BY MR. WILLIAMS:
3      Q    Back in 2003.
4      A    I think there were directors. It wasn't so
5   much — it was the holding company. The operating
6   subsidiaries would be lower.
7          THE COURT REPORTER:  The operating...
8          THE WITNESS:  Subsidiaries.
9   BY MR. WILLIAMS:
10     Q    I believe you indicated earlier that
11  essentially the people, Zach Collins and Mr. Surmon and
12  LOM Capital, reported to your brother Scott; is that
13  right?
14     A    Generally speaking, yes.
15     Q    Was there anyone else that they reported to?
16     A    Well, they report to the management
17  committee, which I was on.
18     Q    Okay.  And so the management committee — was
19  the management committee in a position to oversee the
20  operations of the various entities, LOM entities?
21     A    I don't understand your question.
22     Q    Okay.  I guess what's the relationship
23  between the management committee and, say, LOM Capital?
24     A    Well, the management committee would usually
25  have someone from every division in the management
```

169

```
1   committee.  Not unlike, I'm sure, other companies.
2      Q    Okay.  And so what I'm trying to figure out
3   is you indicated that Mr. Surmon and Mr. —
4      A    Collins.
5      Q    — Collins essentially ran LOM Capital; is
6   that right?
7      A    That's correct.
8      Q    And as I understand it, that they reported up
9   to Scott Lines who was the managing director of LOM,
10  right?
11     A    He'd oversee them, yes.
12     Q    And Mr. Scott Lines was the managing director
13  of which LOM entity?
14     A    LOM Bermuda.
15     Q    In about 2003.  LOM Bermuda.  And did he have
16  a position, a formal position or a role with respect to
17  any other entity?
18     A    Within the LOM group?
19     Q    Yes.
20     A    Well, he was responsible for the LOM group.
21  Like me.
22     Q    You both were responsible for all the
23  entities within the LOM group?
24     A    Anything went wrong, they usually come back
25  to me, yes, or Scott.  When everything goes fine,
```

170

```
1   everything's fine.
2      Q    So you two, as I think you explained it
3   earlier, you two were essentially coequals in charge of
4   the LOM group, and within your structure you had sort
5   of a division of labor where you were primarily on the
6   sales side and he was primarily on the, I guess you
7   could say operations side?
8          MR. FIGEL:  Objection.
9          MR. SMITH:  Objection.
10         MR. NORTMAN:  Objection.
11  BY MR. WILLIAMS:
12     Q    Is that right or am I wrong?
13         MR. FIGEL:  Objection.
14         MR. NORTMAN:  Objection.
15         MR. SMITH:  Objection.
16         THE WITNESS:  We were both — we were both
17  responsible for everything, and we split up the
18  duties to work the best for us.
19         MR. WILLIAMS:  I see.
20         MR. FIGEL:  Mr. Williams, would you mind if I
21  made a brief statement on the record just to make
22  sure you understand an objection that I was
23  pressing?
24         MR. WILLIAMS:  Sure.
25         MR. FIGEL:  And I'm not asking questions.  I
```

171

```
1   just think it's unclear with respect to document
2   88 exactly what was in the email that Mr. Lines
3   received, what was in the email that Mr. Lines
4   transmitted back, and whether there was an
5   attachment, and whether the attachment had any
6   marginalia or iterations to it.
7          MR. NORTMAN:  Who was just talking?  We
8   couldn't hear much of what was said and we
9   couldn't identify the speaker.
10         MR. SMITH:  That was — Bill, it's Phil
11  Smith.  Reid was just pointing out that Exhibit 88
12  is an email, and it's — it has a document
13  attached to it, and the email doesn't indicate
14  that it has attachments, so there was some
15  question as to what this email was responding to
16  and whether it attached the document.
17         MR. NORTMAN:  Okay.  The completeness of the
18  document.
19         MR. SMITH:  I mean, it's not clear.
20         MR. NORTMAN:  Thank you.
21         MR. SMITH:  All right.
22  BY MR. WILLIAMS:
23     Q    As a part of LOM's participation in the
24  Renaissance private placement — first let's go beyond
25  the Renaissance private placement and discuss your
```

172

```
 1  participation in private placements generally in about
 2  early 2003 time frame.  What form of -- were you -- did
 3  your firm have a practice of undertaking any sort of
 4  due diligence with respect to a transaction?
 5          MR. FIGEL:   Objection.
 6          MR. SMITH:   Objection.
 7  BY MR. WILLIAMS:
 8      Q    You can answer if the question is
 9  understandable to you.
10      A    We did due diligence, yes.
11      Q    And what types of things did you do with
12  respect to a private placement like Renaissance in
13  terms of due diligence?
14          MR. FIGEL:   Objection.
15          MR. SMITH:   Objection.
16          MR. NORTMAN:   Objection.
17          THE WITNESS:   Corporate finance was doing --
18          MR. NORTMAN:   Mr. Lines, would you please
19  speak up?  I appreciate it.  I know it's a long
20  day.
21          THE WITNESS:   Corporate finance was doing the
22  due diligence.  I wasn't.
23          MR. NORTMAN:   Thank you.
24  BY MR. WILLIAMS:
25      Q    So that would have been Mr. Collins or
```

173

```
 1  Mr. Surmon that would have been responsible for that?
 2      A    That would be correct.
 3      Q    Okay.  And to your knowledge, are you aware
 4  of any steps that they took to perform the due
 5  diligence?
 6          MR. FIGEL:   Objection.
 7          MR. SMITH:   Objection.
 8          MR. NORTMAN:   Objection.
 9          THE WITNESS:   They object.
10          I know they were talking to the lawyers, the
11  two of them, lawyer speak.
12  BY MR. WILLIAMS:
13      Q    Mr. Surmon and some other lawyer?
14      A    And the Renaissance lawyers.
15      Q    And the Renaissance lawyers.
16      A    Yes.
17      Q    What, if anything -- what, if any, role did
18  Mr. Collins have in the Renaissance transaction, to
19  your knowledge?
20      A    I was not part of LOM corporate finance, but
21  David would maybe -- he'd do some stuff and David would
22  do some stuff.  You know, you usually split up a task.
23      Q    Okay.  So you don't know exactly what
24  Mr. Collins might have done?
25      A    No.  It would be speculative if I told you,
```

174

```
 1  at best.
 2      Q    Okay.  And you indicated that you know that
 3  Mr. Surmon did some work on the offering memorandum.
 4  Do you know if he did anything else?
 5          MR. FIGEL:   Objection.
 6          MR. SMITH:   Objection.
 7  BY MR. WILLIAMS:
 8      Q    Without describing what --
 9      A    I have no idea.  All I know is he was talking
10  to Renaissance lawyers.  Renaissance lawyers were
11  talking to him.  I was not in that part of the
12  equation.
13      Q    Okay.  And so if LOM Capital is doing the --
14  is participating in the private offering, how does the
15  sales side of LOM come into play?
16          MR. FIGEL:   Objection.
17          MR. SMITH:   Objection.
18          THE WITNESS:   There were no sales side yet,
19  number one.  In respect to Renaissance.  We never
20  got down that route.  We went to our clients,
21  tried to get a feeling of whether we could do the
22  deal or not.
23  BY MR. WILLIAMS:
24      Q    So I guess if the sales had never got there,
25  I guess I'm wondering -- when you indicated that there
```

175

```
 1  was a strong -- that you and Scott had determined that
 2  there was strong interest among your clients --
 3      A    Yes.
 4      Q    -- what was the context in which you were
 5  able to ascertain that?
 6          MR. FIGEL:   Objection.
 7          THE WITNESS:   We had felt that up already.
 8  We had spoken to clients, and we had some idea
 9  that we could do this financing quite easily.
10  BY MR. WILLIAMS:
11      Q    Who did you speak to?
12      A    Our clients.
13      Q    Which ones?
14      A    A wide array of them.
15      Q    More than 10?
16      A    Absolutely.
17      Q    Can you ballpark a figure in terms of --
18      A    It would be speculation if I do it right now.
19  It's a long time ago.
20      Q    But it's definitely more than 10?
21          MR. FIGEL:   Objection.
22          THE WITNESS:   Yes, I would say so.  I
23  generally keep things in my head.  Scott writes
24  stuff down.  And I would say many more than 10.
25  BY MR. WILLIAMS:
```

### 295

1   A    I think all these guys knew each other, okay?
2   Kevin and Todd are very good friends.
3   Q    Mr. Winter and Mr. Peever are very good
4   friends?
5   A    That's correct.
6   Q    So when you say you may have seconded it,
7   what do you mean by that?
8   A    Sometimes people do ask me questions, Does
9   this sound right?  And I say, Yeah, you know, go -- I'm
10  not the -- I don't tell these guys what to do, you
11  know.  They do their own things, as well.
12  Q    So you didn't decide that these corporate
13  entities that we see on Schedule B would participate in
14  the IHI share purchase?
15  A    No.  I can add to that a little bit, if you
16  want me to.
17  Q    You can add -- yeah, please, add to it.
18  A    I believe that Mr. Kevin Winter and
19  Mr. Richard King were president and vice president of
20  Inside Holdings, and directors of the corporation.
21  Q    And did that result from their purchasing an
22  interest in the company, or did that precede their
23  purchasing of an interest in the company, do you know?
24        MR. FIGEL:  Objection.
25        THE WITNESS:  I would have no idea.

### 296

1   BY MR. WILLIAMS:
2   Q    Okay.  Mr. Lines, let me show you a document
3   that I will ask the court reporter to label as Exhibit
4   Number 100.
5        (Plaintiff's Exhibit 100 was marked for
6   identification.)
7   BY MR. WILLIAMS:
8   Q    I'll represent to you that Exhibit 100 is a
9   three-page document, appears to be a series of emails,
10  Bates No. SEC 1294 through 1296.  The first page
11  appears to be a -- the final email in the chain appears
12  to be an email from Cueva Holder dated January 30, 2002
13  to someone named Lorreatta, L-O-R-R --
14  A    Are you on the first page?
15  Q    Yeah.  L-O-R-R-E-A-T-T-A, DeShield,
16  D-E-S-H-I-E-L-D, and Natasha Nunes, appearing to
17  forward a subject of Acquisition Control of Inside
18  Holdings, Inc., various shareholders.  Okay.  And
19  Mr. Lines, let me ask you, do you recall this series of
20  emails?
21  A    No.  This is nine years ago.
22  Q    Sure.
23        And let me ask you, who is Lorreatta
24  DeShield, if you know?
25  A    I don't know.

### 297

1   Q    Let me ask you to look at the final email --
2   the third page the document appears to be an email from
3   Lorreatta DeShield to Brian Lines, cc: Cueva Holder,
4   dated January 23, 2002, Subject:  Acquisition of
5   control of Inside Holdings.  It says, "Brian:  Be
6   advised, we received a share cert for the above.  It is
7   1,275,000."
8   A    Sorry.  Where is this?
9   Q    The very last email in the series.
10  A    Last page?
11  Q    Yes, sir.
12  A    Okay.
13        MR. SMITH:  You mean the first email?
14        MR. WILLIAMS:  First email chronologically,
15  yes.
16        THE WITNESS:  All right.
17  BY MR. WILLIAMS:
18  Q    Do you understand what's being communicated
19  in the email?
20  A    Not really.
21  Q    Okay.
22  A    Looks like a difference in shares or
23  something.  I don't know.
24  Q    Okay.  And the next email appears to be from
25  you that same day to Lorreatta DeShield where it says,

### 298

1   "We bought," B-O-T, "400,000 in the market."  Do you
2   see that?
3   A    I do.
4   Q    Do you know what that pertains to?
5   A    Maybe we bought some stock in the market.  I
6   don't know.  It doesn't mean anything.
7   Q    And the next email from Lorreatta DeShield to
8   you January 24 where it says, "Brian, please confirm
9   which account we will be crediting the stock that is
10  placement, and I want to also confirm that we will be
11  reflecting a charge for $500 for each name:  Gateway
12  Research Management, Aberdeen Holdings, SKN Holdings
13  Ltd., Warwick Ventures Ltd., Consensus Investments
14  Ltd."  Do you see that part of the document?
15  A    I do.
16  Q    Do you know what that pertains to?
17  A    What pertains to what?
18  Q    What -- a $500 charge for each name, what
19  does that relate to?
20  A    You know, I believe back then LOM, like every
21  business, works on how to capitalize and -- more fees.
22  And it was just a physical -- deliver a physical and
23  they charge you 500 bucks.
24  Q    Deliver a physical --
25  A    So, you know, they charge you $500 for an ABC

299

```
1    of the stock, a physical.
2           THE COURT REPORTER:  For a what?
3           THE WITNESS:  Physical, physical certificate.
4       So if LOM receives a physical certificate, they
5       charge you $500.
6    BY MR. WILLIAMS:
7       Q    Charge who $500?
8       A    The client.
9       Q    The client who received the certificate?
10      A    Yeah.  Whoever -- whatever client puts in a
11   certificate to their account, and if it's physical, the
12   cage would charge that client $500.
13      Q    Okay.  So if a client deposits a physical
14   security with LOM, you charge them $500?
15      A    That's correct.
16      Q    And is it your belief that that's what's
17   being referenced in that email?
18      A    It sure seems that way, yes.
19      Q    Okay.  Let me ask you to go up to an email,
20   it begins on the first page of the document and
21   continues over to the second page.  It's from
22   Mr. Holder to you, cc: Debbie Johal and also Lorreatta
23   DeShield, sent January 29 at -- 2002 at 9:45 a.m.  And
24   Mr. Holder says, "Brian, what account should we credit
25   the shares in the various nominee names?  Did you not
```

300

```
1    want to charge 500 for use of each nominee name?"  Do
2    you see that part of the document?
3       A    Where is that?
4       Q    I'm sorry.  I was reading an email that began
5    on the bottom of the first page and continued to the
6    top of the second page.
7       A    Okay.
8       Q    And in particular the text of the email from
9    Mr. Holder to yourself, "Brian which account should we
10   credit the shares in the various nominee names?  Did
11   you not want to charge 500 for use of each nominee
12   name?"
13      Do you see that part of the document?
14      A    I do, yes.
15      Q    And did you know what Mr. Holder was
16   referencing when he said "do you not want to charge
17   $500 for the use of each nominee name"?
18      A    Could be for anything, but it looks like it's
19   for, again, a -- changing from, again, the physical
20   certificate delivered in the cage and he's charging
21   $500.
22      Q    What's a nominee name?
23      A    It could mean anything.
24      Q    What does it mean to you?
25      A    Nominee means someone else is -- possibly ha
```

301

```
1    an interest in it, an interest in the underlying
2    beneficial ownership possibly.
3       Q    Do you understand what it means in this
4    context?
5       A    It could mean anything in this context.
6       Q    Do you have an understanding what it means in
7    this context?
8       A    I don't know what it means.
9       Q    You don't know what it means?
10      And you appear to reply on the first page to
11   Mr. Holder's email at about 5:52 p.m. on that same day,
12   and you say, "I believe it will be to two accounts:
13   Golden Accumulator and Nomad on a 50/50 basis."
14      A    That's from the --
15      Q    Yeah.  I'm sorry.  We're going in reverse
16   order back up to the first page.
17      A    Yeah.  Maybe I believed it.  I don't know.
18   He wants to know -- he wants to know whether to charge
19   fees, and I'm going, I don't know.  But it's a
20   possibility that we can charge this account.
21      Q    So the Golden Accumulator account, would that
22   be -- whose account was that?
23      A    I believe that was Todd Peever.
24      Q    And Nomad was whose account?
25      A    I believe it was James Curtis.
```

302

```
1       Q    So why would Mr. Peever and Mr. Curtis'
2    account be being charged in connection with this
3    transaction, if you know?
4       A    I don't know.  If this doc was supposed to go
5    there, a physical certificate, they'd be charged for
6    it.
7       Q    Were Mr. Peever and Mr. Curtis investors in
8    Inside Holdings, as far as you knew?
9       A    I have no idea what Mr. Curtis and Mr. Peever
10   were up to.
11      Q    So you don't know why the stock certificates
12   in the names that we just looked at would be credited
13   to Mr. Peever and Mr. Curtis's account?
14           MR. FIGEL:  Objection.
15           MR. SMITH:  Objection.
16   BY MR. WILLIAMS:
17      Q    Do you know why the names -- stock
18   certificates in the names of the entities that we just
19   looked at would be credited to Mr. Peever or
20   Mr. Curtis's account?
21           MR. FIGEL:  Objection.
22           MR. SMITH:  Objection.
23           THE WITNESS:  Ask the question differently.
24   BY MR. WILLIAMS:
25      Q    Do you know why stock certificates in the
```

303

```
 1   names of the corporate entities that we just looked at
 2   would be --
 3      A     I can only speculate on that.
 4      Q     You don't know?
 5      A     No.
 6      Q     And let me ask you to look at Mr. Holder's
 7   very last email, which is at the very top of page 1,
 8   where he's directing Ms. Nunes, Natasha Nunes, that
 9   "the various shares for Inside Holdings need to be
10   allocated between accounts REDACTED and REDACTED." And
11   he's saying to Lorre, L-O-R-R-E, "You need to put
12   through P3 charges of 500 for each account and credit
13   REDACTED with the offsetting credit for 1,000. Use a
14   narrative such as 'Nominee name charge Re: Inside
15   Holdings.'" Do you see that part of the document?
16      A     I do.
17      Q     What's a nominee name charge it?
18      A     It could be anything.
19      Q     But in this context what is it, if you know?
20      A     Again, I would have thought it was accepting
21   a physical security.
22      Q     A nominee name charge is accepting a physical
23   security?
24      A     Well, that's what I would have looked at it
25   as. It looks like they got instructions to credit the
```

304

```
 1   stock to someone's account.
 2      Q     We just looked at the email communication
 3   where you directed two accounts, Golden Accumulator and
 4   Nomad on a 50/50 basis. And Mr. Holder --
 5      A     I didn't direct that. I said I just believed
 6   these things. So I would have had to have some kind of
 7   documentation to do that.
 8      Q     I see.
 9      A     If that was the case.
10      Q     And the account numbers mentioned in
11   Mr. Holder's ultimate email at the very top of page 1,
12   do those correspond to the account numbers for Golden
13   Accumulator and Nomad?
14      A     I can't speculate on that, but I would assume
15   so.
16         MR. SMITH:  But are you speculating?
17         THE WITNESS:  Yeah. I might be wrong.
18         MR. SMITH:  Just make it clear that if you
19   speculate, tell Mr. Williams that.
20         MR. WILLIAMS:  That's fine.
21   BY MR. WILLIAMS:
22      Q     As you sit here, you don't know what the
23   Golden Accumulator or Nomad Trading account numbers
24   were, do you?
25      A     No, I have no idea.
```

305

```
 1      Q     Okay. I show you another document I'll ask
 2   the court reporter to label as Exhibit 101.
 3         (Plaintiff's Exhibit 101 was marked for
 4   identification.)
 5   BY MR. WILLIAMS:
 6      Q     Exhibit 101 appears to be a one-page
 7   document, Bates No. SEC 1303. Appears to be two
 8   different email communications. The one I want to ask
 9   you about is at the very top of the page from Brian
10   Lines to Bill McCartney, cc: REDACTED and
11   Cueva Holder, Subject, Re: Inside Holdings private
12   placement, 150,000 USD. Do you see that part of the
13   document?
14      A     Yes, I do.
15      Q     And, I'm sorry, this is dated February 5,
16   2002.
17         You appear to be -- who's Bill McCartney?
18      A     I don't know.
19      Q     Do you understand what directions that you're
20   giving here?
21         MR. SMITH:  Objection.
22         THE WITNESS:  Well, the subject is, first of
23   all, a private placement for $150,000 US. Okay.
24   That's the subject matter. This has nothing to do
25   with the subject matter, so...
```

306

```
 1   BY MR. WILLIAMS:
 2      Q     Well, down at the -- let me ask you to look
 3   maybe -- it appears to be -- you initially say, "Kevin
 4   Winter will act as president and director; Eric
 5   Collins, director; Richard King, director. And then
 6   there's -- appears to be Eric Collins, and is that an
 7   address for Mr. Collins?
 8      A     Yes, that would be correct.
 9      Q     Okay. And then there's a listing for
10   Mr. King and below that, is that an address for
11   Mr. King?
12      A     I'm sure it is, yes.
13      Q     Okay. It says: Placement will be taken
14   under Consensus Investments Ltd. (Eric Collins) 75,000
15   USD, and Nottinghill Investments Ltd. (Richard King)
16   75,000 USD. Deliver all shares in corporate names to
17   LOM in Bermuda." Do you see that?
18      A     Yes, I do.
19      Q     What is this statement, "placement will be
20   taken under," and then the listing of those
21   corporations, what does that relate to, if you know?
22      A     I don't remember a $150,000 placement. The
23   only placement I remember is what Largo did, which was
24   I think for 200,000.
25      Q     Okay. Given that it appears to pertain to
```