## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No. 07 cv 11387 (DLC)

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

vs.

BRIAN N. LINES, ET AL.,

        Defendants.
_____/

VIDEOTAPED DEPOSITION OF THE WITNESS,
MALCOLM MOSELEY,
TAKEN BY THE PLAINTIFF
ON THURSDAY, NOVEMBER 12, 2009

## Page 2

APPEARANCES:

U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street Northeast
Washington, DC 20549-4010
Phone: (202)551-4953
ATTORNEYS FOR THE PLAINTIFF
BY: JUSTIN CHRETIEN, ESQUIRE

PATTON BOGGS LLP
1185 Avenue of the Americas, 30th Floor
New York, New York 10036-2603
Phone: (646)557-5100
ATTORNEYS FOR DEFENDANT BRIAN LINES
BY: PHILIP M. SMITH, ESQUIRE

K&L GATES
1601 K Street Northwest
Washington, DC 20006
Phone: (202)778-9440
ATTORNEYS FOR DEFENDANT SCOTT LINES
BY: STEPHEN J. CRIMMINS, ESQUIRE

KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, P.L.L.C.
1615 M Street Northwest, Suite 400
Washington, DC 20036
Phone: (202)326-7918
ATTORNEYS FOR DEFENDANTS LOM ENTITIES
BY: REID M. FIGEL, ESQUIRE

ALSO PRESENT: Rolf Martin, Videographer

## Page 3

### INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| MALCOLM MOSELEY | | | | |
| By Mr. Chretien | 5 | | | |
| By Mr. Figel | | 74 | | |

### EXHIBITS

| | |
|---|---|
| Plaintiff's 119 | 27 |
| Plaintiff's 120, 121, and 122 | 53 |
| Plaintiff's 121A and 121B | 56 |

(All exhibits were retained by Mr. Smith.)

## Page 4

THE VIDEOTAPED DEPOSITION OF THE WITNESS MALCOLM MOSELEY, TAKEN BY THE PLAINTIFF, IN THE ABOVE-TITLED CAUSE, BEFORE PAMELA GRIMALDI, REGISTERED PROFESSIONAL REPORTER AND NOTARY PUBLIC, STATE OF FLORIDA AT LARGE, AT 101 SOUTH ROAD, SOUTHAMPTON, BERMUDA ON THURSDAY, NOVEMBER 12, BEGINNING AT 2:21 P.M., PURSUANT TO THE NOTICE HERETOFORE FILED.

- - -

THE VIDEOGRAPHER: The time is 2:21 p.m. on November 12, 2009. This is Tape 1 of the deposition of Mr. Malcolm Moseley in the matter of Securities and Exchange Commission versus Lines, et al., in the United States District Court, Southern District of New York at the Fairmont Southampton, 101 South Road, Southampton, SN02 Bermuda.

My name is Rolf Martin in association with Reporting and Transcription Services Bermuda Ltd. The court reporter is Pam Grimaldi in association with Reporting and Transcription Services Bermuda Ltd.

Would counsel please state their appearances for the record after which the reporter will affirm the witness.

57

| | | |
|---|---|---|
| 1 | Q | Portrait. |
| 2 | A | Okay. |
| 3 | Q | Have you had a chance to review it? |
| 4 | A | Yes. |
| 5 | Q | Is that an Uptix™ product? |
| 6 | A | Again, it looks like it's data extracted from Uptix™ and put into a spreadsheet. |
| 8 | Q | Okay. Same question with respect to the second half of the exhibit, which begins the landscape layout, 121 bravo. Is that Uptix™ data put into a spreadsheet format? |
| 12 | | MR. FIGEL: Objection. |
| 13 | | THE WITNESS: It looks like it, yes. |
| 14 | BY MR. CHRETIEN: | |
| 15 | Q | Okay. Are you familiar with the ICH account at LOM? |
| 17 | A | No. |
| 18 | Q | Have you ever heard of the ICH account? |
| 19 | A | I've heard of the name as a client. |
| 20 | Q | Are you aware that LOM uses nominee accounts? |
| 22 | | MR. FIGEL: Objection. |
| 23 | | THE WITNESS: Yes. |
| 24 | BY MR. CHRETIEN: | |
| 25 | Q | How would you define a nominee account? |

58

| | | |
|---|---|---|
| 1 | A | LOM uses nominee accounts to take down private placements, typically. |
| 3 | Q | Well, what is a nominee account? |
| 4 | A | A nominee account is a name that we have share certificates registered in. |
| 6 | Q | Why would you want to use a nominee account? |
| 7 | | MR. FIGEL: Objection. |
| 8 | | THE WITNESS: Industry practice. |
| 9 | BY MR. CHRETIEN: | |
| 10 | Q | Does LOM use nominee accounts today? |
| 11 | A | Yes. |
| 12 | Q | Was ICH one of their nominee accounts in the relevant time period? |
| 14 | | MR. SMITH: Objection. |
| 15 | | THE WITNESS: I don't know. |
| 16 | BY MR. CHRETIEN: | |
| 17 | Q | Are there any restrictions on the use of nominee accounts? |
| 19 | | MR. FIGEL: Objection. |
| 20 | | MR. SMITH: Objection. |
| 21 | BY MR. CHRETIEN: | |
| 22 | Q | For LOM. |
| 23 | | MR. FIGEL: Objection. |
| 24 | | MR. SMITH: Objection. |
| 25 | | THE WITNESS: I don't understand the |

59

| | | |
|---|---|---|
| 1 | question. | |
| 2 | BY MR. CHRETIEN: | |
| 3 | Q | Okay. For what purposes, you, as chief executive officer, would a nominee account be used for? |
| 6 | | MR. FIGEL: Objection. |
| 7 | | THE WITNESS: In the time period? |
| 8 | BY MR. CHRETIEN: | |
| 9 | Q | Yes. |
| 10 | A | Typically if we were doing a private placement, for example, let's say we were buying a -- 500,000 shares of ABC Corp., for example. We would typically find out how many of our clients were interested in purchasing it, and then we would take down that 500,000 shares typically in a nominee name. |
| 16 | Q | And you would use the nominee account for convenience, I take it? |
| 18 | A | Yes. |
| 19 | Q | Rather than have individual accounts? |
| 20 | A | Let's say there were 50 accounts. You'd have to fill in 50 private placement documents. Some of them can be, you know, two inches thick. |
| 23 | Q | And would there be -- if there was a -- withdraw that. Is there typically a business or a |

60

| | | |
|---|---|---|
| 1 | corporation behind a nominee account? | |
| 2 | | MR. FIGEL: Objection. |
| 3 | | THE WITNESS: The nominee account would be owned by either an individual or a corporation, yes. |
| 6 | BY MR. CHRETIEN: | |
| 7 | Q | Okay. And at that -- when LOM uses nominee accounts today, does it pay the director of that corporation for that service? |
| 10 | | MR. FIGEL: Objection. |
| 11 | | THE WITNESS: Today? |
| 12 | BY MR. CHRETIEN: | |
| 13 | Q | Yes. |
| 14 | A | No. |
| 15 | Q | Why not? |
| 16 | | MR. FIGEL: Objection. |
| 17 | | THE WITNESS: LOM now uses LOM Nominees to take down all its private placements. May use LOM Securities Bermuda. |
| 20 | BY MR. CHRETIEN: | |
| 21 | Q | Why -- what is an LOM nominee? |
| 22 | A | LOM Nominees is a company that's owned by L Holdings 100 percent. For example, the Bermuda Stock Exchange, you have to hold your shares in a nominee name, LOM Nominees Ltd. |

61

```
 1    Q    When was LOM Nominees Ltd. created?
 2    A    I don't know.
 3    Q    Well, it was after the time period we've been
 4  discussing?
 5         MR. FIGEL:  Objection.
 6         THE WITNESS:  No, I don't believe so.
 7  BY MR. CHRETIEN:
 8    Q    Can you estimate a year?
 9    A    No.
10    Q    Why was it created?
11         MR. FIGEL:  Objection.
12         THE WITNESS:  LOM Nominees Ltd.?
13  BY MR. CHRETIEN:
14    Q    If you know.
15    A    To hold local Bermuda assets.
16    Q    What was wrong with the old way of doing it?
17         MR. FIGEL:  Objection.
18         THE WITNESS:  I don't know.  That's a
19    requirement of the Bermuda Stock Exchange.
20  BY MR. CHRETIEN:
21    Q    So who serves -- the LOM Nominees, then, the
22  nominee accounts are owned by LOM; is that correct?
23         MR. FIGEL:  Objection.
24         THE WITNESS:  LOM Holdings Ltd.
25  BY MR. CHRETIEN:
```

62

```
 1    Q    Okay.  Prior to LOM Nominees Ltd. -- Ltd.'s
 2  existence, LOM used nominee accounts owned by other
 3  entities, correct, or persons?
 4         MR. FIGEL:  Objection.
 5         MR. SMITH:  Objection.
 6         THE WITNESS:  Correct.
 7  BY MR. CHRETIEN:
 8    Q    How did that work?
 9         MR. FIGEL:  Objection.
10         MR. SMITH:  Objection.
11         THE WITNESS:  To take my private placement
12    example, ABC Corp., we've got 50 clients that wish
13    to purchase a private placement, let's say it's a
14    hundred thousand shares, we would then take that
15    hundred thousand shares down in a nominee name.
16  BY MR. CHRETIEN:
17    Q    And if the deal went bad, would you look to
18  the director of the nominee entity to recoup any
19  losses, for example?
20         MR. FIGEL:  Objection.
21         THE WITNESS:  I don't understand if the deal
22    went bad.
23  BY MR. CHRETIEN:
24    Q    Well, what were the responsibilities of a
25  director for a nominee account at LOM?
```

63

```
 1         MR. FIGEL:  Objection.
 2         MR. SMITH:  Objection.
 3  BY MR. CHRETIEN:
 4    Q    If you know.
 5    A    I don't know.
 6    Q    Have you been -- have you used nominee
 7  accounts before in your work as CFO for LOM?
 8         MR. FIGEL:  Before what?
 9  BY MR. CHRETIEN:
10    Q    At any time.
11    A    Yeah, we used them for private placements, as
12  I said earlier.
13    Q    And was it your custom and practice to pay a
14  fee to the director of the nominee entity?
15         MR. FIGEL:  Objection.
16         THE WITNESS:  Yes.
17         MR. SMITH:  Objection.
18  BY MR. CHRETIEN:
19    Q    What was that fee?
20    A    I don't know off the top of my head.  $500, a
21  thousand dollars, something like that.
22    Q    What was the -- what was that -- the purpose
23  of the fee, from your perspective as CFO involved in
24  the transaction?
25         MR. FIGEL:  Objection.
```

64

```
 1         THE WITNESS:  Just repeat the question
 2    again.
 3  BY MR. CHRETIEN:
 4    Q    What was LOM buying with the $500 fee to a
 5  nominee director?
 6         MR. FIGEL:  Objection.
 7         MR. SMITH:  Objection.
 8         THE WITNESS:  Nominee name to take your
 9    private placements down in.
10  BY MR. CHRETIEN:
11    Q    Somebody to sign documents?
12    A    Yes.
13    Q    Did you expect anything else from the nominee
14  directors?
15         MR. FIGEL:  Objection.
16         MR. SMITH:  Objection.
17         THE WITNESS:  I don't know.
18  BY MR. CHRETIEN:
19    Q    Did you have an understanding of the
20  responsibilities of a nominee director?
21         MR. FIGEL:  Objection.
22         MR. SMITH:  Objection.
23         THE WITNESS:  My only dealings is through
24    private placement documents; that's my only
25    dealings with the nominee companies.
```

65

```
 1  BY MR. CHRETIEN:
 2      Q    Okay. In those dealings did you expect the
 3  nominee director to review those private placement
 4  documents?
 5          MR. FIGEL:   Objection.
 6          MR. SMITH:   Objection.
 7          THE WITNESS:   No, I don't know.
 8  BY MR. CHRETIEN:
 9      Q    I'm sorry, is it no or I don't know?
10      A    I don't know.
11      Q    You don't know what your expectations would
12  have been for a nominee director in the transactions
13  you were involved in?
14          MR. FIGEL:   Objection.
15          MR. SMITH:   Objection.
16          THE WITNESS:   I was not involved in using a
17      nominee name. That's typically a sales operation
18      where you look at a private placement, you decide
19      how many of your clients wish to purchase, and
20      then the salesperson would decide the nominee
21      names to take the placement down in.
22  BY MR. CHRETIEN:
23      Q    Why use nominees at all for LOM?
24          MR. FIGEL:   Objection.
25          MR. SMITH:   Objection.
```

66

```
 1          THE WITNESS:   It's more efficient than
 2      filling in individual placements for each client.
 3      And as I say, it's an industry standard that
 4      companies use nominees. For example, our
 5      custodian, all of the assets or the certificates
 6      that we send up to our custodian have to be put
 7      into that custodian's nominee name so that they
 8      can then take those assets and put them into DTC
 9      or CDS, whatever it trades.
10  BY MR. CHRETIEN:
11      Q    You mentioned the executive committee meeting
12  you attended shortly after the Sedona transaction. We
13  won't go into the substance of it because your attorney
14  has claimed attorney-client.
15          MR. FIGEL:   And also because I believe --
16          MR. SMITH:   Wait. I'm sorry. Run that by us
17      again one more time.
18          MR. CHRETIEN:   I don't mean to misstate your
19  position, but I think --
20          MR. SMITH:   It's not my position.
21          MR. CHRETIEN:   Right -- LOM's position that
22  it would contain privileged matters.
23          MR. FIGEL:   What I asked for was a foundation
24  question to determine whether a privilege exists.
25          MR. SMITH:   I don't think there's been any
```

67

```
 1      direction not to answer, at least I haven't heard
 2      one.
 3          MR. CHRETIEN:   Okay. That's fair.
 4  BY MR. CHRETIEN:
 5      Q    Following the executive committee meeting
 6  that we've been discussing, you spoke to auditors about
 7  the subject matter discussed in the executive committee
 8  meeting; is that correct?
 9          MR. FIGEL:   Objection. I usually don't like
10      to make speaking objections, but the testimony is
11      there was an executive committee meeting every
12      week, and we've spoken about several of them, so
13      if you could be a little more specific.
14  BY MR. CHRETIEN:
15      Q    Okay. I'll specify. Executive committee
16  meeting following the halt in trading of Sedona stock
17  that you attended, but which we have not delved into
18  for the reasons we just discussed. Now, following that
19  meeting, subsequent to that meeting, maybe months
20  later, you spoke to auditors, correct?
21      A    Correct. As part of my annual audit process,
22  yes.
23      Q    And you spoke to them about the subject
24  matter of that meeting; is that correct?
25      A    No, not particularly.
```

68

```
 1      Q    Did you to any degree?
 2          MR. FIGEL:   Objection.
 3          MR. SMITH:   Objection.
 4          THE WITNESS:   I don't recall what was
 5      discussed in that meeting.
 6  BY MR. CHRETIEN:
 7      Q    Did you discuss matters with the auditors
 8  that you learned in the executive committee meeting?
 9      A    No. The auditors -- the reason that they
10  looked at this whole SSSI transaction was to put a note
11  into the financial accounts. It's quite a substantial
12  two- or three-page note. And that note was put
13  together with the help of our counsel, as well as
14  compliance, and also the board of directors; they met
15  with the board of directors, as well. And most of the
16  note they put together from documents that were
17  available, public documents that SEC had sent to head
18  of compliance and matters of public record.
19      Q    Okay. With respect to the executive
20  committee meeting that followed, immediately followed
21  the trading halt, I think you mentioned that Mr. Surmon
22  spoke that meeting; is that correct?
23      A    From my recollection, yes.
24      Q    And who else spoke?
25      A    The whole executive talk about various
```

69

```
1   operation issues.
2       Q    So Brian Lines spoke?
3       A    I'm sure he spoke during the meeting, yes.
4       Q    Do you recall what he said?
5       A    No.
6       Q    Scott Lines spoke?
7       A    I'm sure he did, yeah.
8       Q    You don't recall what he said?
9       A    No.
10      Q    What about Donald Lines?
11      A    Donald Lines would have spoken, as well.
12      Q    You don't recall what he said?
13      A    That was seven years ago.  No.
14      Q    Do you recall what anybody said at that
15  executive committee meeting?
16      A    No, not without reviewing minutes and...
17      Q    Where would the minutes be kept?
18      A    In the minute book.
19      Q    And who keeps that?
20      A    Corporate secretary.
21      Q    Who is the corporate secretary now and --
22      A    Still the same.  Water Street Corporate
23  Services.
24           MR. CHRETIEN:  That will be the third
25      undertaking that I request.  I realize you and I
```

70

```
1   will want to talk about it.
2           MR. FIGEL:  I understand you made a request.
3   I make no undertakings.
4           MR. SMITH:  I have to take a break at 4:00.
5   Something I've been putting off all week long.
6           MR. CHRETIEN:  Well, I think we're almost
7   done.
8           MR. SMITH:  Great.
9   BY MR. CHRETIEN:
10      Q    Without trying to belabor this point too
11  much, you testified that LOM now uses an entity -- uses
12  its own nominee accounts, correct, for certain
13  transactions?
14      A    We use LOM Nominees, we use LOM Securities
15  Bermuda, LOM Securities Bahamas, Cayman.
16      Q    But specifically with the use of LOM Nominees
17  Ltd., why not just put it in the name of LOM?
18           MR. FIGEL:  Objection.
19           THE WITNESS:  Which LOM?
20  BY MR. CHRETIEN:
21      Q    Well, any of the -- any of the entities, the
22  appropriate ones, whether it's LOM Securities Bermuda
23  or Bahamas or Cayman?
24           MR. FIGEL:  Objection.
25           MR. SMITH:  Objection.
```

71

```
1           THE WITNESS:  Well, LOM Nominees was
2       specifically set up to hold local Bermuda assets.
3   BY MR. CHRETIEN:
4       Q    Is that the name of the account, LOM
5   Nominees?
6       A    That's name of the company, yes.
7       Q    Okay.  And there are nominee accounts within
8   LOM Nominees?
9       A    No.  That's just one nominee.  That's one
10  company that's called LOM Nominees.  And as I said,
11  it's standard practice with a lot of these companies
12  that -- UBS, for example, and CBIC both have nominee
13  names that you send certificates to and put them in
14  their nominee name.  It just makes it more efficient
15  for them to then get those certificates into electronic
16  form.
17      Q    The Uptix™ system would reflect the use of
18  LOM Nominees by listing a particular purchaser, for
19  example, as LOM Nominees, or would appear as a
20  different name?
21           MR. FIGEL:  Objection.
22           THE WITNESS:  No.  Let's -- as an example, if
23      you take a private placement down for 50,000
24      shares of ABC Corp. in LOM Nominees, those 50,000
25      shares will be reflected in the purchasers'
```

72

```
1       account, so that could be made up of 50 different
2       clients.
3   BY MR. CHRETIEN:
4       Q    Okay.
5       A    LOM then holds the certificate in LOM
6   Nominees.
7       Q    Okay.  Back in the time frame we're
8   discussing, did you know any of the directors of any of
9   the nominee entities that LOM was using?
10           MR. FIGEL:  Objection.
11           MR. SMITH:  Objection.
12           THE WITNESS:  I knew a few of the names,
13      yes.
14  BY MR. CHRETIEN:
15      Q    What were those names?
16           MR. FIGEL:  Objection.
17           MR. SMITH:  Objection.
18           THE WITNESS:  Kevin Winter.
19  BY MR. CHRETIEN:
20      Q    I'm sorry?
21      A    Kevin Winter.  Kevin Way.  Kevin Gunther, I
22  believe.
23      Q    Is everybody a Kevin?
24      A    Or a Scott.
25           That's the only ones that I recall.
```

74

```
 1      Q    Kevin Winter, Kevin Way, and Kevin Gunther?
 2      A    Yes.
 3      Q    And Mr. Winter was associated with what
 4  nominee account?
 5      A    I don't know.
 6           MR. SMITH:  Objection.
 7  BY MR. CHRETIEN:
 8      Q    How about Kevin Way?
 9      A    I don't know.
10      Q    And each of these gentlemen was paid a fee
11  for their services?
12      A    Correct.
13           MR. SMITH:  Objection.
14           MR. FIGEL:  I object to all those questions,
15      as well.  I wasn't quick enough to get it out.
16           MR. CHRETIEN:  That's all I have.  All right.
17      Thank you for coming in today.
18           Do you guys have follow-up?
19           MR. FIGEL:  Can we have just a -- can we go
20      off the record for just a couple minutes?
21           MR. CHRETIEN:  Off the record.
22           THE VIDEOGRAPHER:  Going off the record at
23      3:55 p.m.
24           (A discussion was held off the record.)
25           THE VIDEOGRAPHER:  Going on the record at
```

```
 1      4:03 p.m.
 2                   CROSS EXAMINATION
 3  BY MR. FIGEL:
 4      Q    Mr. Moseley, could you take a look at what
 5  the SEC lawyers have marked as Exhibit 121 alpha and
 6  121 bravo?
 7      A    Was that the landscape or portrait?
 8      Q    One of each.
 9      A    Right.  Okay.  Yep.
10      Q    Looking at the one that is -- I'm not sure I
11  know my landscape from my portrait.  121A, which is the
12  standard.
13      A    Yeah.  That's portrait.
14      Q    You testified that you recognize this as data
15  that would be -- could be obtained from Uptix™.  Do you
16  recall that?
17      A    Correct.
18      Q    Can you tell from the documents that have
19  been Bates numbered ad 121 alpha what criteria was
20  applied to Uptix™ in order to yield the data that's
21  reflected in this data?
22      A    Sure.  They've selected account type --
23  account number, account name, and they've used a date
24  range by the look of it, 1st of December '01 to 19th of
25  April of '04.  There is a transaction type, which is a
```

75

```
 1  unique transaction within Uptix™.  And they've got the
 2  transaction description, which is linked to that
 3  transaction type.  There is the cash security
 4  movements, so cash BMD, which is Bermuda dollars, cash
 5  USD, and a quantity -- the cash amount, which is
 6  quantity, and then a description of what that cash
 7  amount was used for.
 8      Q    And can you tell from this, though,
 9  specifically what criteria -- I understand that's the
10  format -- but what criteria they applied to Uptix™ in
11  order to get this data?
12      A    No, not without seeing the search criteria.
13      Q    And you can't tell that from 121A?
14      A    No.
15      Q    If you take a look at 121B, I have the same
16  question.  Can you tell, aside from the format, what
17  search criteria was applied to Uptix™ in order to
18  generate the report or the data reflected on 121B?
19      A    Without knowing the actual search criteria,
20  no.  I can tell you what items have been pulled out.
21      Q    Mr. Chretien asked you a couple questions
22  about LOM's use of nominees.  Do you recall those?
23      A    Yes.
24      Q    And he asked you questions about Mr. Winter,
25  Mr. Way, and Mr. Gunther.  Do you recall that?
```

76

```
 1      A    You don't know them, yeah.
 2      Q    And as I recall, you testified that you
 3  recognize those names as directors of nominee companies
 4  used by LOM?
 5      A    Yes, correct.
 6      Q    You testified that they were directors of
 7  nominee companies; is that correct?
 8      A    Correct.
 9      Q    So from that is it true that they would have
10  opened an account in the name of the company for which
11  they served as director?
12           MR. CHRETIEN:  Objection.
13           THE WITNESS:  They may have done.  Without
14      access to Uptix™, I wouldn't know.
15  BY MR. FIGEL:
16      Q    But for them to serve as a nominee in
17  connection with an LOM transaction, would the companies
18  for which they had to serve as director have to have
19  opened an account at LOM?
20           MR. CHRETIEN:  Objection.
21           THE WITNESS:  Probably, yes.
22  BY MR. FIGEL:
23      Q    And what types of transactions could LOM have
24  executed in the accounts opened in the names of the
25  companies for which they served as directors?
```