Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3    ----------------------------)

 4    SECURITIES AND EXCHANGE      )

 5    COMMISSION,                  )

 6              Plaintiff,         )   Civil Action No.:

 7    vs.                          )   07 CV 11387 (DLC)

 8    BRIAN N. LINES, ET AL.,      )

 9              Defendants         )

10    ----------------------------)

11         The Videotaped Deposition of CUEVA HOLDER was

12    taken on Thursday, December 3, 2009, commencing at

13    10:02 a.m., at The United States Securities and

14    Exchange Commission, 100 F Street, NE, Washington,

15    DC, before Melissa Gilcrest, RDR, CRR, Notary Public.

16              -    -    -    -    -

17

18

19

20

21

22
```

Cueva Holder

Washington, DC

December 3, 20[..]

### Page 26

1  know?
2  A. I believe Jack Coopers, the shell was
3  Sedona, and so forth.
4  Q. Do you know why Mr. Lines was sending this
5  to you?
6  A. My --
7     MR. SMITH: Objection.
8  Q. You can answer.
9  A. I maintained a list of customers who took
10 part in private placements and specifically private
11 placements.
12 Q. For how long a period did you maintain
13 such a list?
14 A. As part of my role as the vault
15 supervisor.
16 Q. Throughout your tenure as vault
17 supervisor?
18 A. Yes.
19 Q. And what was this list?
20    MR. HO: Objection.
21    MR. SMITH: Objection.
22 A. It was a list of customers that

### Page 27

1  participated in various private placements that LOM
2  dealt with.
3  Q. And how many names approximately were on
4  the list in about early 2003?
5  A. I -- let me see. I believe we had less
6  than ten names.
7  Q. And how was it determined whose names
8  would on the list, if you know?
9  A. I would maintain the list and Brian Lines
10 would suggest -- would advise who would participate
11 in these lists, or he would say who are our customers
12 and I would provide that information.
13 Q. Who would say who are our customers? I
14 didn't follow the last part of our answer.
15    MR. HO: Objection to the form.
16 Q. Could you repeat your answer in terms of
17 how the names on the list were determined?
18    MR. HO: Objection.
19    MR. SMITH: Objection.
20 Q. Strike the question.
21    I ask you again, how were the names on the
22 list determined?

### Page 28

1  A. How were the names determined?
2  Q. Yes.
3  A. In reference to?
4  Q. In reference to -- you indicated there
5  were ten names on the list. Who decided that those
6  names would be on the list?
7     MR. HO: Objection.
8     MR. SMITH: Objection.
9  A. I don't understand the question.
10 Q. Okay. The list of names that you see
11 contained in the email that I just mentioned to you,
12 were those names that were on the list that you spoke
13 of?
14 A. Yes. They -- I maintained the list of
15 investors or -- sorry, purchasers who participated in
16 various private placements.
17 Q. Okay. And going to the first page of the
18 document, it looks like you respond to Mr. Lines
19 later that same day on the 2nd of January, it says
20 Brian, did you want the final name to be Clyde
21 Resources. Do you see that part of the document?
22 A. Right. Yes, I do.

### Page 29

1  Q. How did you come to suggest that name to
2  Brian?
3  A. I kept a list of potential customers and
4  Brian -- I saw the original list of names and I saw
5  that the Clyde Resources was an investor who wasn't
6  on that list, so I suggested to Brian that name is
7  missing.
8  Q. You saw what original list of names?
9  A. Well, from the email before.
10 Q. From the email before, what was it that
11 you noticed?
12 A. Well, I see that these companies are
13 listed as investors, and I saw that Clyde Resources
14 wasn't on that list.
15 Q. And I guess my question is how did you
16 know that Clyde Resources was supposed to be on the
17 list?
18 A. It's because at the time Clyde Resources
19 would be one of the customers who would be
20 participating in these types of deals, so I saw that
21 it wasn't on the list.
22 Q. How did you know that Clyde Resources

## Page 30

1. would be one of the customers that would be
2. participating in this type of deal?
3. A. At that time Clyde was one of a number of
4. investors who participated in several deals that LOM
5. did on behalf of our customers, these customers.
6. Q. When you say on behalf of our customers,
7. who are you --
8. A. These customers here.
9. Q. When you say these customers, who are you
10. referring to in particular?
11. A. Well, the companies, Clyde Resources, ICH,
12. Iguana, Gateway, Warwick, Largo.
13. Q. So when you're referring to customers,
14. you're referring to the corporate entities?
15. A. Yes.
16. Q. How about the individuals, are they
17. customers as well?
18. A. Yes, I believe so.
19. Q. Did you ever have any contact or
20. interaction with any of these individuals?
21. A. On numerous occasions, yes.
22. Q. What would be the context of your contacts

## Page 31

1. with them in about this time frame?
2. A. Specifically if they were participating in
3. these private finances, these private placements,
4. they would be required to come to the offices of LOM
5. to sign subscription agreements or private
6. transaction, private transaction agreements. As the
7. sole directors, they would be required to sign on
8. behalf of these companies.
9. Q. So they had to sign documents?
10. A. That's correct. They were authorized
11. signatories.
12. Q. Were there any other types of contacts
13. that you would have with the individuals as named in
14. Exhibit 162?
15. A. I got to know them all individually just
16. coming into the offices.
17. Q. And with respect to any particular
18. placement, I guess Sedona, for example, do you know
19. how it was determined which of the customers would
20. participate?
21. A. No.
22. Q. And with respect to which of the customers

## Page 32

1. that would participate, where did you get that
2. information from?
3. A. Well, the original email from Brian
4. showing that these are the customers participating.
5. Q. And by the way, do you recall getting the
6. original email from Brian?
7. A. Vaguely. It is six years ago, and we
8. probably dealt with in my time two-300 different
9. private placements, two-300 different issuers.
10. Q. Sure. To the best of your recollection,
11. were there any other conversations, telephone
12. conversations or in-person conversations at about the
13. time of this email on the subject matter of Sedona
14. between you and Brian?
15. MR. SMITH: Objection.
16. A. We would have received in physical share
17. certificates in relationship to Sedona at that time.
18. Q. But prior to that you don't recall any
19. conversations?
20. A. No.
21. Q. On the first page of Exhibit 162, it
22. refers to the sole director of Clyde Resources as

## Page 33

1. Graham Redford. Do you see that part of the
2. document?
3. A. Yes, I do.
4. Q. Who was Graham Redford?
5. A. Graham Redford was a customer of Lines
6. Overseas Management and he was the sole director of
7. Clyde Resources.
8. Q. And did you -- did you ever have a
9. conversation with Mr. Redford about whether or not he
10. wanted to participate in this private placement?
11. A. No.
12. Q. So I guess I'm still a little unclear in
13. terms of what was your basis for suggesting
14. Mr. Redford to Mr. Lines?
15. MR. HO: Objection.
16. MR. SMITH: Objection.
17. A. We did a lot of financings and Clyde
18. Resources was one customer amongst these other
19. customers who participated in various deals at that
20. time.
21. Q. So that was your -- was that your basis?
22. A. Yes.