```
 1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION
 2
 3    In the Matter of:              )
 4                                   )  File No. HO-09634-A
 5    SEDONA SOFTWARE SOLUTIONS, INC. )
 6    WITNESS:   Lawrence David Isen
 7    PAGES:     1 through 358
 8    PLACE:     Securities and Exchange Commission
 9               450 Fifth Street, N.W., Room 1C13
10               Washington, D.C.  20549
11    DATE:      Thursday, August 26, 2004
12
13         The above-entitled matter came on for hearing, pursuant
14    to notice, at 10:05 a.m.
15
16
17
18
19
20
21
22
23
24              Diversified Reporting Services, Inc.
25                        (202) 467-9200
```

```
 1   APPEARANCES:
 2   On behalf of the Securities and Exchange Commission:
 3        KELLY JEANNE ROCK, STAFF ATTORNEY
 4        SCOTT WEISMAN, ESQ.
 5        Securities and Exchange Commission
 6        450 Fifth Street, N.W.
 7        Washington, D.C.   20549
 8        (202) 942-8959
 9
10   On behalf of the Witness:
11        JEANNE M. ROWZEE, ESQ.
12        Law Offices of Jeanne M. Rowzee, Esq.
13        92 Corporate Park, Suite C203
14        Irvine, California   92606
15        (949) 660-9212
16
17
18
19
20
21
22
23
24
25
```

```
 1      Q    -- this Sony DVD-R?
 2      A    I forgot no pointing.  Yes.  The Sony DVD-R in your
 3   left hand right now I am told has the June 30th subscriber
 4   list on it.
 5           MS. ROWZEE:  2004.
 6           THE WITNESS:  June 30, 2004.
 7           BY MS. ROCK:
 8      Q    And you produced this today when you arrived,
 9   correct?
10      A    Correct.
11           MS. ROWZEE:  Can we put on the record where that
12   came from.  We walked in the room with it.
13           MS. ROCK:  Right.
14           BY MS. ROCK:
15      Q    Mr. Isen, you came today into testimony with this
16   disk in your hand, correct?
17      A    Yes.  That's correct.
18      Q    And this was produced, actually, with the efforts
19   of Mr. Kang, correct?
20      A    That is correct.
21      Q    He's at Levelogic?
22      A    That's correct.
23      Q    So you currently have 1.6 million subscribers.
24   How --
25      A    Approximately.  If I could just backtrack and
```

```
 1      Q    You negotiated the arrangements he made with the
 2   company?  I just didn't follow you.  Can you just explain to
 3   me how you came to negotiate your contract with SHEP -- or
 4   for SHEP?
 5      A    Yes.  The contract was negotiated between myself
 6   and Todd Peever and James Curtis in, I would say, around
 7   January of 2003 in my backyard.
 8      Q    Is there a written contract?
 9      A    There's a written contract directly between myself
10   and SHEP Technologies, between Market Byte and SHEP
11   Technologies.
12      Q    Is that the same contract that was negotiated
13   between Peever, Mr. Curtis and yourself in your backyard?
14      A    That was part of it, yes.
15      Q    So there's two parts of the contract?
16      A    There were two parts of the compensation, one
17   contract.
18      Q    Okay.  And the part that was negotiated between
19   Mr. Peever, yourself and Mr. Curtis, what part of the
20   contract does that address?
21      A    Well, we negotiated the whole package.  They were
22   acting on behalf of the company.
23      Q    Mr. Peever, Mr. Curtis has the authority of SHEP to
24   negotiate a contract with you?
25      A    They seemed to at the time.  I don't know whether
```

```
 1   they went back to the company and presented what we agreed
 2   upon or whether they had the authority to enter into it on
 3   behalf of the company, but it ended up becoming what we
 4   agreed upon that day.
 5        Q    Did they give you any indication of their authority
 6   or representation on behalf of the company?
 7        A    Well, when you say "representation," you mean that
 8   they could?  Yes, they could.
 9        Q    They told you that they could?
10        A    Yeah.
11        Q    They told you that they represented the company?
12        A    Yes.  I don't remember if those were the exact
13   words, but they were there empowered to make an arrangement
14   for us to represent the company.
15        Q    Did you draw up a contract at that meeting?
16        A    No.
17        Q    What did you discuss at that meeting regarding the
18   compensation package?
19        A    The exact terms of what it would be.
20        Q    And what were those terms?
21        A    I think they were $75,000 in cash and 100,000
22   shares of free-trading stock.
23        Q    Is that something you requested?
24        A    I think I requested more to start with, and then we
25   negotiated down to that.
```

```
 1   have in the database right now, and he tells me.
 2        Q    And Art is Arthur Kang?
 3        A    Correct.
 4        Q    If you look at paragraph 3 it says, "MB LLC will
 5   continue to release to its subscribers on the selected
 6   newsletter all substantive information; i.e., press releases,
 7   am reports, analyst reports, et cetera, which STLOF has
 8   formally and officially released to the general public for a
 9   six-month period from the date of the original profile."
10             Do you see that?
11        A    Yes.
12        Q    Is that six-month period outlining the time frame
13   for which OTC or Market Byte was employed --
14        A    Yes.
15        Q    -- to cover SHEP?
16        A    Mm-hum.
17        Q    And do you remember when the first publication came
18   out, the first --
19        A    I don't remember the exact date.  February 22nd,
20   maybe.  I'm sure you have it.
21        Q    So the coverage was supposed to go from that
22   February 2003 publication six months out?
23        A    Let's see, March, April, May, June, July, August.
24   Maybe through August.
25        Q    Through August?
```

```
 1      A     September.
 2      Q     And what exactly was Market Byte supposed to be
 3   providing to SHEP other than this original profile?
 4      A     It's our general practice when companies -- we
 5   publish newsletters on companies when they publish news
 6   releases or something else happens.
 7            Say there's, you know, maybe an article about them
 8   in some periodical, or something like that, or there's some
 9   industry related event that I think merits a publication to
10   the subscriber base that relates to the company.
11            So we tend to publish numerous editions on
12   companies throughout the course of covering them.
13      Q     And the company pays you to produce those editions?
14      A     Not on an individual basis, no.  It's an ongoing
15   process, and the more that there is to talk about about the
16   company the more editions I publish.
17      Q     What do you mean when you say they don't pay you
18   per edition?
19      A     What I mean is I might represent ABC Company, and I
20   might publish on them ten times between now and the end of
21   the month.  And I might represent another company, and I
22   might not publish at all on them.  And it's not predicated on
23   how much they pay me.  It's predicated on how much news there
24   is to cover about what's happening with the quo.
25      Q     So do you charge the same fee for every company
```

```
 1    that you represent?
 2         A    No.
 3         Q    How do you determine how much you're going to
 4    charge a company?
 5         A    It's a negotiation between myself and the company.
 6         Q    What kind of factors do you consider when you ask
 7    for a certain fee?
 8         A    The cash side is pretty much always the same these
 9    days.  It was a little more flexible back two years ago, but
10    now it's almost pretty much always the same.
11         Q    And what is the fee?
12         A    $25,000 in cash.  The stock side depends a lot on
13    the market capitalization of the company and my perception of
14    what the stock might be worth and a variety of different
15    kinds of things.
16         Q    Well, let's look back a few years ago when the
17    compensation was -- the cash compensation would vary.  What
18    were the factors that you would consider in charging a
19    company a cash fee?
20         A    Pretty much it would depend on what I could get and
21    whether I was real compelled to cover them.  I mean, the cash
22    side of our compensation package was running $100,000 in a
23    lot of cases prior to the bear market, which started in March
24    2000.  Sort of the guideline was around $100,000 in cash.
25         Q    So you would start out asking for 100,000 and then
```