to below economic levels. Although the particular regulations applicable in each state or province in which operations are conducted vary, these regulations generally apply to all Mineral producers.

*Marketability of Minerals.* The availability of a ready market for any new Minerals discovered by the Company and the price obtained therefor will depend upon numerous factors beyond the control of the Company, including the effect of governmental regulations on the production, transportation and sale of Minerals, imports, new discoveries, the proximity and availability of transportation facilities, marketing of competitive substances, and other matters affecting the availability of a ready market, including fluctuating supply and demand. As a result, future prices for Minerals cannot be predicted with any degree of accuracy and prices may decline from present levels. The Company's interest in producing Minerals will continue to be affected by factors that are beyond the Company's control, the exact effects of which cannot be accurately predicted.

*Operational Hazards.* The Company's operations are subject to all of the risks inherent in Mineral exploration, mining, and production, including extreme weather conditions, pollution, mechanical failures, cratering, and fires. Any of these events could result in damage to or destruction of projects or production facilities or harm to persons and property. The Company intends to maintain insurance coverage. However, it is not fully insured against all risks. The occurrence of an event not fully insured against may have a materially adverse effect on the Company's financial position.

*Competition.* The Mineral industry is highly competitive, and the Company will encounter strong competition from other Mineral extraction companies, many of whom possess much greater financial resources, ability to sell its Minerals and ability to acquire leasehold and other property shares.

*Shortage of Equipment.* In the past, increased mining activities have from time to time created shortages of equipment necessary for the mining or completion of production sites. Such shortages could substantially delay, and/or increase in the costs of, mining and completing production sites.

**TAX CONSIDERATIONS**

**EACH PROSPECTIVE INVESTOR IS URGED TO CONSULT WITH ITS OWN TAX ADVISORS, WITH SPECIFIC REFERENCE TO ITS OWN TAX SITUATION AS IT RELATES TO THE TAX LAWS APPLICABLE TO AN INVESTMENT IN THE COMPANY, INCLUDING THE EFFECT OF POTENTIAL CHANGES IN SUCH TAX LAWS.**

## PRINCIPAL STOCKHOLDERS

The following table sets forth certain information regarding beneficial ownership of the Company's Common Stock as of January 20, 2003, (i) by each stockholder known by the Company to be the beneficial owner of more than 5% of the outstanding Common Stock, (ii) by each Director and Officer, and (iii) by all Directors and Officers of the Company as a group. Except as otherwise indicated, the persons or entities listed below have sole voting and investment power with respect to all shares shown to be beneficially owned by them, except to the extent such power is shared by a spouse under applicable law.

| Name and Address of Beneficial Owner | Number of Shares Beneficially Owned[1] | Percentage of Shares Beneficially Owned[1] | |
|---|---|---|---|
| | | Before Offering | After Offering[2] |
| Anthony W. Wile<br>3168 NW 63rd St<br>Boca Raton, Florida 33496 | 1,075,000[3] | 23.02% | 16.12% |
| Ian G. Park<br>130 Adelaide Street West, Suite 2320<br>Toronto, Ontario M5H 3P5 | 550,000[4] | 11.78% | 8.25% |
| Colin R. Bowdidge<br>56 Temperance Street, 6th Floor<br>Toronto, Ontario M5H 3V5 | 25,000 (vested options) | .54% | .37% |
| Robert Van Tassell<br>421 Riverside Drive NW<br>High River, Alberta T1V 1T5 | 25,000 (vested options) | .54% | .37% |
| David Lager<br>34 Edmund Road<br>Enfield, Nova Scotia B2T 1A8 | 12,500 (vested options) | .27% | .19% |
| William D. Daly<br>8730 Wood Duck Way<br>Blaine, Washington 98230 | 325,000[5] | 6.96% | 4.87% |
| Wile Family Trust<br>3168 NW 63rd St.<br>Boca Raton, Florida 33496 | 1,000,000[6] | 21.41% | 14.99% |
| Latinvest Capital Limited<br>130 Adelaide Street West, Suite 2320<br>Toronto, Ontario M5H 3P5 | 500,000[7] | 10.71% | 7.50% |
| Zodiac Capital Corp.<br>Suite D-2, Elgin Ave.<br>Grand Cayman, Cayman Islands | 750,000 | 16.06% | 11.24% |
| DerryLee Hunter<br>Suite D-2, Elgin Avenue<br>Grand Cayman, Cayman Islands | 375,000 | 8.03% | 5.62% |
| Perry English<br>Box 414<br>Souris, MB R0K 2C0 | 242,000 | 5.18% | 3.63% |
| All Officers/Directors as a group | 2,012,500 | 43.09% | 30.17% |

[1] Beneficial ownership is determined in accordance with the rules of the Securities and Exchange Commission and generally includes voting or investment power with respect to securities.

[2] Assumes all 2,000,000 shares offered in this Offering are sold.

[3] Reflects 75,000 shares subject to purchase under vested stock option agreements, *plus* 1,000,000 held in trust by the Wile Family Trust, over which Mr. Wile together with his spouse has voting and dispositive power as trustee thereof, as to which Mr. Wile disclaims beneficial ownership.

[4] Reflects 50,000 shares subject to purchase under vested stock option agreements, *plus* 500,000 shares held directly by Latinvest Capital Limited, a Canadian limited company controlled by Mr. Park, as to which Mr. Park disclaims beneficial ownership.

[5] Reflects 25,000 shares subject to purchase under vested stock option agreements, *plus* 300,000 shares held directly by Mr. Daly.

[6] Reflects shares held in trust for certain beneficiaries of Mr. Wile and his spouse. Mr. Wile together with his spouse has full voting and dispositive power over the shares held in trust, as trustee thereof, and is deemed to beneficially own such shares, but disclaims beneficial ownership thereof.

[7] Mr. Park holds voting control of the capital of Latinvest Capital Limited, and therefore may be deemed to hold voting power over the Renaissance shares held by Latinvest Capital Limited, and is deemed to beneficially own such shares, but disclaims beneficial ownership thereof.

## CERTAIN RELATIONSHIPS AND AGREEMENTS

Except for stock option agreements and compensation agreements in the ordinary course of business, the Company is not aware that it has any material contractual agreements with any officer, director or greater than 5% beneficial owner (or their affiliates) of the Company's Common Stock.

## TERMS OF CAPITAL STOCK

*The following is a summary of the terms of the Company's capital stock. For additional information, see the Company's Certificate of Incorporation, as amended and Bylaws attached hereto as Exhibits B and C.*

*Renaissance* is a corporation organized under the laws of the State of Delaware. The Company is authorized to issue up to 100,000,000 shares of Common Stock and the Board of Directors is authorized to issue up to 20,000,000 shares of Preferred Stock. Prior to this Offering, 4,457,600 shares of Common Stock were issued and outstanding.

Holders of Common Stock are entitled to vote at any annual or special meeting of the shareholders at which directors are elected or any other matter is put to a vote of the stockholders. Any action that may be taken at a meeting of the stockholders may be taken by means of a written consent signed by all of the shareholders. Each stockholder is entitled to cast one vote for each share of Common Stock held. The Company's Certificate of Incorporation denies preemptive rights to Company stockholders on issuances of additional Common Stock. The Certificate of Incorporation also denies cumulative voting by stockholders in the election of directors.

The Company's Preferred Stock may be issued in series, the rights and preferences of which may be determined by the Board of Directors without a vote of the holders of Common Stock (so called "Blank Check Preferred Stock"). Such rights and preferences may grant voting, dividend, liquidation and other preferential rights to the Preferred Stock which are superior to the voting, dividend and liquidation rights of the Common Stock.

The terms of the capital stock of Renaissance Holding Corp., the parent company survivor in the Merger, will have terms and conditions substantially similar to the terms and conditions of the Company common stock and preferred stock set forth above.

# GLOSSARY

Following is a glossary of terms used in this Memorandum and commonly used in the Mining industry. The terms are reprinted from the BC & Yukon Chamber of Mines glossary of mining terms.

## GEOLOGICAL TERMS

**Silicate:** Most rocks in the world are made up of a small number of silicate minerals ranging from quartz ($SiO_2$) to more complex minerals such as orthoclase feldspar - $KAlSi_3O_8$ - or hornblende - $Ca_2Na(Mg,Fe)_4(Al,Fe,Ti)Si_8O_{22}(OH)_2$.

**Igneous:** Any rock which has crystallized from the molten (magma) state. If the rock crystallizes within the crust, it is said to be intrusive, while if it flows onto the surface, it is extrusive.

**Mafic:** Usually dark coloured silicate mineral containing Fe or Mg (biotite, hornblende, pyroxene), or an igneous rock comprised largely of mafic minerals (basalt, gabbro).

**Felsic:** Light coloured silicate minerals, mainly quartz and feldspar, or an igneous rock comprised largely of felsic minerals (granite, rhyolite).

**Intermediate:** An igneous rock made up of both felsic and mafic minerals (diorite).

**Porphyritic:** An igneous rock in which large crystals of one mineral, usually feldspar, occur in a fine groundmass of other minerals.

**Volcanics:** Volcanic rocks occur as flows, usually mafic lavas because they are more fluid (Hawaii), or pyroclastics, fragmental rocks ranging from fine ash to coarse breccias (angular rock fragments) formed by the explosive eruption of felsic magma (Mt. St. Helens).

**Sedimentary:** Rocks formed by the deposition of layers of clastic rock and mineral grains (sand, silt, clay), usually in an ocean basin, and subsequent compaction and lithification into a solid rock due to the pressure of overlying material.

**Metamorphic:** Any rock type that is subject to high temperatures and pressures, usually because of burial deep in the crust (up to 30 km), resulting in the formation of new minerals. The bulk composition of the rock does not change substantially.

**Tectonic:** Relating to the larger structural features of the earth, such as mountain belts, volcanic chains or ocean basins.

**Subduction:** The process whereby ocean floor is pushed under a continental margin, producing magmatism, volcanism and mountain building.

## ECONOMIC TERMS

**Cut-off:** The cut-off grade is the arbitrarily defined lowest grade which will be mined from an ore deposit, and usually defines the boundary of the ore zone. For example, if the average grade of a porphyry deposit is 0.5% Cu, the cut-off might be 0.2% Cu. Any rock with a grade below 0.2% Cu would be waste. In terms of value, the cut-off is usually equivalent to the mining cost, or the lowest grade of rock which can be mined at a profit.

**Gangue:** Those minerals which occur with the ore minerals but which have no value.

**Grade:** The concentration of each ore metal in a rock sample, usually given as weight percent. If concentrations are extremely low, as with Au, Ag, Pt and others, the concentration may be given in grams per tonne (g/t) or ounces per ton (opt). The grade of an ore deposit is calculated, often employing very sophisticated statistical procedures, as an average of the grades of a very large number of samples collected from throughout the deposit.

**Mineralization:** A general term which usually refers to ore minerals but which often may refer to other metallic minerals such as pyrite.

**Ore:** A mineral or minerals that can be mined and extracted from a rock at a profit.

**Reserves:** The amount of ore in a given deposit, usually quoted as the number of tonnes available at a specific average grade.

**Resources:** Mineralized rock that has not been sufficiently defined to be classified as ore and therefore does not qualify as reserves.

**Waste Rock:** which is not ore. Usually referred to that rock which has to be removed during the normal course of mining in order to get at the ore.

## MINERAL DEPOSIT TERMS

**Alteration:** A change in the mineralogy of the country rock as a result of a chemical reaction with hydrothermal solutions. For example, mafic minerals such as hornblende may alter to chlorite and feldspars may alter to clay. An alteration zone describes rocks which have been altered to a specific group of secondary or alteration minerals.

**Country rock:** The rock which surrounds the ore deposit. Also referred to as wall rock, in particular that rock on either side of a vein.

**Epigenetic:** Ore which has been deposited later than its immediate host rocks, for example a vein. The ore is younger than the host rocks.

**Host rock:** The rock within which the ore deposit occurs.

**Hydrothermal:** Hot fluids, usually mainly water, which may carry metals and other compounds in solution to the site of ore deposition or wall rock alteration.

**Gossan:** A rusty, surficial weathering zone which is caused by the weathering of pyrite to produce secondary iron oxide minerals. Since pyrite is often associated with ore deposits, gossans can be a guide to ore.

**Massive sulphide:** A stratiform (see below), usually lens-shaped ore deposit consisting of at least 80% sulphide minerals.

**Replacement:** A chemical process whereby hydrothermal fluids, passing through permeable rocks, react with the rocks to dissolve original minerals and replace them with ore and/or other gangue minerals.

**Skarn:** A replacement of limestone ($CaCO_3$) or other carbonate-rich rocks adjacent to an intrusive contact by calc-silicate minerals usually by the addition of Si and other elements.

**Syngenetic:** Ore which has been deposited simultaneously with its host rocks, for example placer deposits. The ore is the same age as the host rocks.

**Vein:** A tabular deposit usually formed by deposition of ore and gangue minerals in open spaces within a fault or other structural environment.

## DEPOSIT-SCALE STRUCTURES

**Breccia:** Angular fragments of rock produced by movement along a fault or explosive igneous activity. The material which surrounds the fragments and cements them together is called matrix and might be vein minerals, igneous material or very fine rock fragments.

**Chimney:** Also referred to as a pipe, this is a vertically oriented, cylindrical body, often a breccia, of vein or replacement mineralization.

**Concordant:** Any geologic body, such as an ore deposit, which lies within volcanic or sedimentary bedding and does not cut across the bedding structures. (Also conformable)

**Discordant:** A geologic body, such as a dike or vein, which cuts across primary rock structures, such as bedding.

**Fault:** A planar feature or fracture zone along which displacement has occurred.

**Footwall:** The lower contact of an inclined vein, or the wall rock which lies on the lower side of a dipping (inclined) vein.

**Hangingwall:** The upper contact of an inclined vein.

**Lode, shoot, fissure, stringer:** All refer to mineralized zones within a fault or shear zone or a vein structure.

**Manto:** This is a horizontally oriented chimney-like structure, usually of replacement ore.

**Shear zone:** A planar zone of weakness, similar to a fault, but consisting of several parallel displacement zones, usually over a greater width than a single fault.

**Stockwork:** A large number of small, closely spaced veins, often with multiple orientations, is referred to as a stockwork and sometimes as a stringer zone.

**Stratiform:** An ore deposit which occurs as a specific stratigraphic (or sedimentary) bed. Stratabound An ore deposit which occurs within a specific stratigraphic bed or horizon, but which does not comprise the entire bed.

## DEPOSIT-SCALE TEXTURES

**Banding:** Banding may represent small scale sedimentary layering in a syngenetic deposit such as a massive sulphide or repeated pulses of mineralization in a vein.

**Crustiform banding:** When minerals grow within a vein, they often grow inwards from the vein wall. Several layers of different types of minerals, representing different pulses of hydrothermal fluids passing through the structure, may be observed in a single vein. These bands are often aligned symmetrically away from the center of the vein.

**Comb Structure:** When minerals crystallize inwards from opposite walls of a vein, they often meet in the center to form an interdigitating pattern which has an appearance similar to a rooster's comb.

**Cockscomb:** This is crustiform banding when it surrounds breccia fragments.
**Vug** This is an open space or cavity, usually within a vein.

## COMMON METALLIC MINERALS

| Mineral | Elements |
|---|---|
| Argentite: $Ag_2S$ | Ag - Silver |
| Barite: $BaSO_4$ | Au - Gold |
| Cassiterite: $SnO_2$ | Ba - Barium |
| Chalcopyrite: $CuFeS_2$ | Ca - Calcium |
| Chromite: $FeCr_2O_4$ | Cr - Chrome |
| Cinnabar: HgS | Cu - Copper |
| Electrum: Au+Ag (>20%) | F - Fluorine |
| Fluorite: $CaF_2$ | Fe - Iron |
| Galena: PbS | Hg - Mercury |
| Hematite: $Fe_2O_3$ | Mo - Molybdenum |
| Magnetite: $Fe_3O_4$ | O - Oxygen |
| Molybdenite: $MoS_2$ | Pb - Lead |
| Pyrite: $FeS_2$ | S - Sulfur |
| Pyrrhotite: $Fe_{1-x}S_2$ | Sb - Antimony |
| Scheelite: $CaWO_4$ | Sn - Tin |
| Sphalerite: (ZnFe)S | W - Tungsten |
| Stibnite: $Sb_2S_3$ | Zn - Zinc |
| Tetrahedrite: $(Cu,Fe)12Sb_4S_{13}$ | |

# GENERAL

### Confidentiality of Memorandum

This Memorandum is being furnished to prospective investors on a confidential basis to consider an investment in the Company, and may not be used for any other purpose. The Memorandum may not be reproduced or provided to others without prior written consent of the Company. By accepting delivery of this Memorandum, each prospective investor agrees to the foregoing.

### Additional Information

Statements in this Memorandum are made as of the date set forth on the cover of this Memorandum unless stated otherwise, and neither the delivery of this Memorandum at any time, nor any sale hereunder, shall under any circumstances create an implication that the information contained herein is correct as of any time subsequent to such date. The Company reserves the right to modify any of the terms of the Offering.

Prior to the consummation of the offering, the Company will provide to each prospective investor and such investor's representatives and advisors, if any, the opportunity to ask questions and receive answers concerning the terms and conditions of this offering and to obtain any additional information which the Company may possess or can obtain without unreasonable effort or expense that is necessary to verify the accuracy of the information furnished to such prospective investor. Any such questions should be directed to Anthony W. Wile, William D. Daly, or Ian G. Park. No other persons have been authorized to make any representations concerning this offering and, if given or made, such other information or representations must not be relied upon as having been authorized by the Company.