UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : Case No: 07-CV-11387 (DLC) <br> : |
| BRIAN N. LINES, et al., | : <br> : |
| Defendants. | : <br> : <br> : |

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S REPLY
MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Of Counsel:                          David Williams
Antonia Chion                        Justin Chretien
Yuri B. Zelinsky                     Assistant Chief Litigation Counsel
Vinyard V. Cooke                     Securities and Exchange Commission
Securities and Exchange Commission   100 F Street, N.E.
                                     Washington, D.C. 20549-4030
                                     (202) 551-4548 (Williams)
                                     (202) 772-9233 (facsimile)
                                     williamsdav@sec.gov

March 19, 2010                       Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

Table of Contents......................................................................................................i

I.       Introduction .................................................................................................1

II.      The LOM Opposition.................................................................................1

         A.      The Commission is Entitled To Summary Judgment on Its Fraud Claims....1

         B.      The Commission is Entitled To Summary Judgment on Claimed
                 Violations of the Reporting Provisions............................................12

         C.      The Commission is Entitled To Summary Judgment on Its
                 Section 5 Claims .............................................................................13

         D.      The Commission is Entitled To Summary Judgment on Its
                 Section 15 Claim..............................................................................19

         E.      The Commission's Remedies Are Warranted...................................19

III.     The Wile Opposition..................................................................................20

         A.      Wile Fails To Comply with Local Rule 56.1..................................20

         B.      There Are No Disputes of Material Fact as to The Commission's
                 Fraud Claims..................................................................................22

         C.      There Are No Disputes of Material Fact as to The Commission's
                 Section 5 Claims .............................................................................24

VI.      Conclusion ................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Arias v. Mutual Central Alarm Service*, 202 F.3d 553 (2d Cir. 2000)..............................21

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004)..................................................15

*Hanley v. SEC*, 415 F.2d 589 (2d Cir. 1969).....................................................8

*Matsushita v. Zenith Radio*, 474 U.S. 574 (1986) ................................................3

*Quinn & Co. v. SEC*, 452 F.2d 943 (10th Cir. 1971).........................................13

*Royal Health Care Services, Inc., v. Jefferson-Pilot Life Insurance*, 924 F.2d 215
  (11th Cir. 1991)............................................................................21

*SEC v. Aqua Vie*, 2007 WL 2025231 ...............................................................24

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y. 1998) ...............................13, 14

*SEC v. Cavanagh*, 2004 WL 1594818 (S.D.N.Y. July 16, 2004).....................14

*SEC v. Chinese Consolidated Benev. Association*, 120 F.2d 738 (2d Cir.1941) ..............14

*SEC v. Corporate Relations Group*, 2003 WL 25570113 (M.D. Fl. March 28,
  2003) ...........................................................................................10

*SEC v. Culpepper*, 270 F.2d 241 (2d Cir.1959)...................................................14

*SEC v. eConnect*, 2002 WL 34465925 (C.D. Cal. Dec. 2, 2002) .......................4

*SEC v. Global Express*, 2006 U.S. Dist. LEXIS 96477 (D. Nev. Mar. 28, 2006)..............8

*SEC v. Hasho*, 784 F. Supp. 1059 (S.D.N.Y. 1992) ...........................................23

*SEC v. Holschuh*, 694 F.2d 130 (7thCir. 1982) .................................................17

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005).........................................................16

*SEC v. Lines*, 669 F. Supp. 2d 460 (S.D.N.Y. 2009)...........................................15

*SEC v. Lybrand*, 200 F. Supp. 2d 384 (S.D.N.Y. 2002) ......................................14

*SEC v. Manus*, 1981 WL 1683 (S. D. N.Y. 1981) ........................................4, 16

*SEC v. Milan Capital Group*, No. 00 Civ. 108 (DLC), 2000 WL 1682761
(S.D.N.Y. Nov. 9, 2000) ........................................................................................8, 9

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) .................................................................18

*SEC v. Platforms Wireless International*, 2007 WL 1238707 (S.D. Cal. April 25,
2007) ..........................................................................................................................24

*SEC v. Platforms Wireless International Corp.*, 559 F. Supp. 2d 1091 (S.D. Cal.
2008) ..........................................................................................................................4

*SEC v. Platinum Investment Corp.*, 2006 WL 2707319 (S.D.N.Y. Sep. 20, 2006)............9

*SEC v. Profit Enterprises*, 1992 WL 420904 (D.D.C. Nov. 16, 1992).............................18

*SEC v. Ralston Purina Co.*, 346 U.S. 119 (1953).........................................................13, 18

*SEC v. Rosen*, 2002 WL 34421029 (S.D. Fl.  Feb. 22, 2002)...........................................16

*SEC v. Sierra Brokerage*, 608 F. Supp. 2d 923 (S.D. Ohio 2009)....................................15

*SEC v. Softpoint*, 958 F. Supp. 846 (S.D.N.Y. 1997) .....................................................6, 14

*SEC v. TLC Investments & Trade Co.*, 179 F. Supp. 2d 1149 (C.D. Cal. 2001) ...............24

*SEC v. Wellshire Sec., Inc.*, 737 F. Supp. 251 (S.D.N.Y. 1990)........................................23

*Scott v. Harris*, 550 U.S. 372 (2007) ...........................................................................3, 19

*U.S. v. Rittweger*, 258 F. Supp. 2d 345 (S.D.N.Y. 2003) ..................................................22

*In re WRT Energy Securities Litigation*, 1999 WL 178749 (S.D.N.Y. Mar. 31,
1999) ..........................................................................................................................7

*In re Worldcom, Inc. Sec. Lit.*, 346 F. Supp. 2d 628 (S.D.N.Y. 2004) ...............................6

## STATUTES

15 U.S.C. § 77d(1) ..........................................................................................................13

Fed. R. Civ. P. Rule 56(c) ...........................................................................................3, 10

I.      <u>INTRODUCTION</u>

Defendants Brian Lines, Scott Lines, the defendant LOM entities (collectively "the LOM Defendants,") and Anthony Wile each oppose the Commission's Motion for Partial Summary Judgment.  The consolidated Opposition of Brian Lines, Scott Lines and the LOM entities (the "LOM Opposition"), as well as the Opposition of Anthony Wile ("Wile Opposition"), argue extensively that summary judgment is not warranted in favor of the Commission.  In support of their contentions, the LOM Opposition and the Wile Opposition identify numerous facts relative to the larger fraudulent scheme orchestrated by the defendants that they contend are controverted by evidence – usually in the form of the defendants' own self-serving testimony – and are therefore in dispute in this case.   However, both Oppositions fail to contradict the central contention of the Commission's motion – that even assuming the factual disputes based on evidence are credited in the defendants' favor, the Commission is nevertheless entitled to judgment as a matter of law.  With respect to the particular aspects of the fraudulent scheme identified in the Commission's motion, the material operative facts are not – and cannot – be reasonably disputed, as they are memorialized by the relevant public and private documents, as well as a significant number of recorded conversations involving the defendants themselves. The Commission respectfully submits that its motion should be granted.

II      <u>THE LOM OPPOSITION</u>

    A. *The Commission Is Entitled To Summary Judgment on Its Fraud Claims*

The LOM Opposition suggests that the fact that the Commission has not sought summary judgment based upon the complete universe of conduct involving Brian Lines, Scott Lines and the LOM entities reflects some sort of "dramatic change in position" that amounts to a "tacit admission that the SEC's public accusations against the Lines Defendants were unfounded." LOM Opp. at 23.  However, contrary to the LOM Defendants' assertions, to the extent that the

1

Commission's focus on only a subset of the defendants' misconduct in its motion is an indicative of anything, it reveals only the Commission's acknowledgement that even the most culpable defendants can frequently create material issues of fact precluding summary judgment through little more than their own self-serving denials.

For example, the LOM Opposition contends, in identifying purported disputes of material fact, that "Brian Lines and Scott Lines did not manipulate the price of Sedona stock," questioning the significance of Brian Lines placing a "bid" in the morning of the first day of Sedona's trading on January 21, 2003, despite being in control of almost all of the outstanding shares of Sedona stock. *See* LOM Opp. at 17-18.  The Opposition suggests the conduct was immaterial, and that the document evidencing Brian Lines' bid indicates that the bid was cancelled before it was ever placed in the market. *Id.*  LOM, in their response to the Commission's Rule 56.1 statement, further points to Brian Lines testimony that he never attempted to manipulate the price of Sedona stock. *See* LOM's 56.1 Response, ¶ 99.  Contrary to these suggestions, the evidence at any trial would demonstrate that while the bid by Brian Lines was cancelled and never filled, the bid was cancelled only *after* it was publicly listed, artificially creating the appearance of demand for Sedona stock.  Moreover, the evidence at any trial would include Brian Lines – on tape – directing an individual at LOM's trading desk on January 21, 2003, in reference to Sedona stock, "let's bid it up, okay?  Let's go to whoever I'm bidding through at five, let's move it up to seven.   Buy ten at seven." *See* Exh. A, BL_20030121c.wav.

But the Commission has not sought summary judgment with respect to its manipulation claims.  It has sought summary judgment with respect to its fraud claims only as to the tape-recorded solicitations of investors in Renaissance and Sedona, as well as touting connected with SHEP where Brian Lines has admitted his complicity and scienter on tape.  With respect to this

conduct involving Brian Lines, Scott Lines and the LOM entities, the evidence does not permit even the defendants' denials to create a material issue of fact precluding summary judgment.

It is of course the case that on summary judgment, facts must be viewing in the light most favorable to the nonmoving party. *Matsushita v. Zenith Radio*, 474 U.S. 574, 587-588 (1986). However, there must be a "genuine" dispute as to such facts. Fed. R. Civ. P. Rule 56(c). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, as the Supreme Court explained in *Scott*, where a defendant's version of events is patently contradicted by tape-recorded evidence that indisputably memorialized the conduct, and there is no allegation that the recording was doctored or altered in any way, a court should consider the facts as depicted in the recording – and not as claimed by the defendant – for purposes of summary judgment. *Id.* at 380-381.

Consistent with these principles, the court should reject the LOM Defendants' contention that the fraudulent solicitations involving Scott Lines and Brian Lines and a number of Sedona and Renaissance investors were not actually solicitations, but were instead merely "efforts to gauge 'indications of interest,'" as the contention is flatly contradicted by the recordings of the conversations themselves. *See* Plaintiff's Opposition to Brian Lines and Scott Lines Motion for Partial Summary Judgment, pp. 16-19.

There is likewise no material dispute that Scott Lines and Brian Lines made material misrepresentations. While the LOM Opposition contends that a reasonable trier of fact could conclude that the representations to investors that Renaissance had already acquired the mining properties were not false or misleading given the existence of the letter of intent, *see* LOM Opp. at 24-25, it is undisputed that Renaissance had not, in fact, actually acquired the mining assets at

the time the misrepresentations were made.  *See* LOM's 56.1 Response, ¶ 62.  These were

material misrepresentations.  *SEC v. eConnect*, 2002 WL 34465925, *8 (C.D. Cal. Dec. 2, 2002)

(corporation's misrepresentation of "strategic alliance" with another firm was a material

misrepresentation given existence of only non-binding letter of intent between firms).  Moreover,

it is undisputed that Renaissance did not have the funds to acquire the assets.  *See* LOM's 56.1

Response, ¶¶ 11, 27.  Indeed, the LOM Defendants acknowledge that Renaissance was obligated

to come forward with at least $5 million to purchase the mines, yet had less than $500,000 in

cash assets at the time it signed the letter of intent with CAMHL.  *See* LOM's 56.1 Response, ¶

11.  This apparent inability to acquire the mining assets that Brian Lines and Scott Lines were

representing to investors that the company already owned unquestionably rendered their

representations materially false.  *SEC v. Platforms Wireless International Corp*., 559 F.Supp.2d

1091, 1100 (S.D. Cal. 2008) (granting summary judgment in favor of the Commission on fraud

claims, concluding that detailed press release announcing development of new product was

materially misleading as a matter of law where it failed to disclose that company lacked funds to

actually produce the product).

       Also, notwithstanding the convoluted arguments of the LOM Defendants, *see* LOM Opp.

at 30-31, Scott Lines clearly told an investor – on tape – that Renaissance was going to be

"IPO[ed] today," plainly giving the impression that Renaissance was a publicly tradeable

security, when it indisputably was not.  Pl. St. ¶ 94.  Statements that a security "would be

publicly traded or listed on a national stock exchange are all undoubtedly material to an

investment decision" and therefore material.  *SEC v. Manus*, 1981 WL 1683, *8 (S. D. N.Y.

1981) (granting summary judgment in favor of SEC on fraud claims based on misrepresentations

to investors).

Additionally, Brian Lines falsely claimed to investors that there was a "10-day holding period" with respect to investors' sales of Sedona, while failing to disclose that, contrary to these false representations, Brian Lines and Scott Lines themselves were selling Sedona stock on the market at the very same time they were soliciting this investment. Nevertheless, in yet another argument that is directly contradicted by the tape-recorded evidence, the LOM Defendants dispute the substance and materiality of the statements. *See* LOM Opp. at 35-36. Contrary to the suggestion in the LOM Defendants Opposition, no reasonable trier of fact could conclude that Brian Lines' statement that the Sedona stock was "restricted for ten business days" was anything but a statement of fact where Brian Lines tells an investor – on tape – that "my deal was with the company really we are not really allowed to sell any stock for a week." This was a statement of fact, and it was undisputedly false and without basis. *See* LOM's 56.1 Response, ¶ 95. Moreover, in the context of a conversation where the investor specifically asks Lines "when shall we sell this [Sedona] now?," the artificial limitations on trading were inarguably material.

Further, Scott Lines and Brian Lines made material misrepresentations with respect to the production values of the CAHML mines purportedly acquired by Renaissance. As noted in the Commission's motion, Scott Lines represented to one investor that the mines were going to produce 100,000 ounces that year; to another investor he represented that Renaissance already had assets that would produce 150,000 ounces of gold in 2003. *See* Pl. St. 94; 97. Brian Lines represented to yet another investor a different production value – 250,000 ounces of gold per year. Pl. St. 95. While the LOM Opposition appears to contend that each the production figures that they supplied to investors had some basis, *see* LOM Opp. at 25-27, the Opposition never makes any attempt to reconcile the wildly varying representations to multiple investors during solicitations that each took place on the very same day. Moreover, it is undisputed that the mines did not actually produce anywhere near 100,000 ounces – or 150,000 ounces or 250,000 ounces

– of gold either before or after the representations were made.  *See* LOM's 56.1 Response, ¶ 66.
These gold production figures, key to determining the profitability of a new company like
Renaissance, were indisputably material to potential investors.

The LOM Defendants further dispute that their failure to disclose their substantial
conflict of interest in the transaction – the fact that Brian and Scott Lines directly or indirectly
owned substantial quantities of Sedona stock that would be essentially worthless if the
Renaissance offering was not successful – constituted a material omission.  But as this Court has
previously noted, "Congress recognized that underwriters occupied a unique position that
enabled them to discover and compel disclosure of essential facts about the offering.  Congress
believed that subjecting underwriters to the liability provisions would provide the necessary
incentive to ensure their careful investigation of the offering."  *In re Worldcom, Inc. Sec. Lit.*,
346 F.Supp.2d 628, 662 (S.D.N.Y. 2004).

Consequently, "[i]nformation regarding relationships that undermine the independence of
an underwriter's judgment about the quality of the investment can be material to an investor.  As
a consequence, non-disclosure of an underwriter or issuer's conflicts of interest can constitute
material omissions, even where no regulation expressly compels the disclosure of such conflict."
*Id.* at 689.  As the Court noted, there are particular requirements with respect to the disclosure of
"material relationships with a registrant."  *Id.*

The fact that the LOM Defendants, acting in an underwriting capacity by facilitating the
distribution of Renaissance stock, had a substantial and undisclosed ownership interest in the
public shell entity and stood to secretly profit through such ownership has an obvious and
significant bearing on the LOM Defendants' judgments in making disclosures to potential
investors with respect to the merits of a Renaissance investment.  It was therefore a material
omission.  *See SEC v. Softpoint*, 958 F.Supp. 846, 863 (S.D.N.Y. 1997) (undisclosed payments to

brokerage firm from issuer "raises an inherent conflict of interest" and constitutes material omission supporting grant of summary judgment against defendants on fraud claims).

Also, Brian Lines and Scott Lines made these misrepresentations with scienter. The LOM Opposition disputes the legal proposition that summary judgment on the question of scienter can be granted where a broker fails to conduct due diligence with respect to issuer representations prior to selling that issuer's securities. LOM Opp. at 27-28. In support of this argument, they cite to cases like *In re WRT Energy Securities Litigation*, 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999), where a defendant underwriter actually conducts a due diligence investigation, but fails to turn up asserted improprieties. *Id*. at 10. But this is not a circumstance where LOM conducted substantial due diligence and negligently overlooked certain details. This is a case where the only purported assets that would possibly generate any actual revenue for Renaissance – the CAMHL mines – required at least $5 million to purchase, were encumbered with several million dollars in liabilities, were not currently profitable, and there is no evidence anywhere in the record that LOM had any idea, much less undertook any sort of analysis, of either the nature, ownership, or encumbrances of those actual assets, or inquiry into Renaissance's financial position that would enable it to actually purchase these assets. LOM has identified no due diligence it had actually conducted at the time of the solicitations, other than having meetings with Park and Wile where Brian and Scott Lines received a PowerPoint presentation on Renaissance. *See* LOM 56.1 Resp. 93.[1] In light of the complete absence of any substantial basis for the misrepresentations made to investors, Scott Lines and Brian Lines were reckless.

---

[1] In the LOM Defendants 56.1 Response No. 93, the only reference to materials collected as a part of LOM's due diligence other than meetings with Wile and Park was that "LOM collected publicly available information." The response does not identify what "publicly available information" was collected in reference to Renaissance or CAMHL, both privately held companies.

The LOM Defendants take issue with the Commission's citation to *SEC v. Global Express*, 2006 U.S. Dist. Lexis 96477 (D. Nev. Mar. 28, 2006) for the proposition where a broker makes misrepresentations having failed to conduct any substantial investigation or due diligence as to the accuracy of issuer representations, this can establish scienter for purposes of summary judgment.[2]  However, this legal proposition finds substantial support in the law.  Indeed, this very Court – in granting summary judgment against a broker for failure to conduct due diligence as to the accuracy of his representations – has clearly expressed that "[a] broker is under a duty to investigate the truth of his representations to his clients, because 'by his position he implicitly represents he has an adequate basis for the opinions he renders.'"  *SEC v. Milan Capital Group*, No. 00 Civ. 108 (DLC), 2000 WL 1682761, *5 (S.D.N.Y. Nov. 9, 2000) (*quoting Hanley v. SEC*, 415 F.2d 589, 596 (2d Cir. 1969); *accord, e.g., SEC v. Shainberg*, 316 Fed.Appx. 1 (2d Cir. 2008)("[b]rokers and salesmen are under a duty to investigate, and a salesman cannot deliberately ignore that which he has a duty to know and recklessly state facts about matters of which he is ignorant."); *Abbondante v. SEC*, 209 Fed.Appx. 6 (2d Cir. 2006) (broker's failure to investigate the truth of assertions relating to securities investments satisfies the scienter element of section 10(b) and Rule 10b-5).  "Accordingly, in recommending a company's securities to investors, a broker may not rely solely on materials submitted by the company without independent investigation; this duty to investigate is even greater where promotional materials

---

[2]   As the LOM Defendants note, the decision in *Global Express* was reversed by the Ninth Circuit at 289 Fed. Appx. 183 (9th Cir. 2008).  In its opinion, the Ninth Circuit concluded that there were material questions of fact as to a broker's scienter where there was evidence that the broker was merely a "salesperson who was unaware of the investments in and distributions from" the brokerage firm.  *Id*. at 188.  While the Commission submits that a salesperson "unaware of the investments in and distributions from" the firm is far different than the LOM Defendants here, who indisputably exercised substantial control over the brokerage firm, personally met and negotiated the underwriting letter of intent with the principals of Renaissance, personally marketed the transaction to investors and had a substantial personal financial interest in the public shell used to facilitate the transaction. "Where a defendant plays a central role in marketing an investment, his defense that he was unaware that the investment was a fraud is less credible." *SEC v. Milan Capital Group, Inc.*, 2000 WL 1682761, *5 (S.D.N.Y.2000) (summary judgment granted against salesman who claimed he was duped).  Nevertheless, the Commission should have alerted the Court to this subsequent history and apologizes to the Court for the oversight.

are in some way questionably, for example, by promising unusually high returns." *Milan Capital Group*, 2000 WL 1682761, *5. The amount of independent investigation is also greater with respect to companies of recent origin with no revenues like Renaissance – "[s]ecurities issued by smaller companies of recent origin obviously require more thorough investigation." *SEC v. Platinum Inv. Corp*., 2006 WL 2707319, *2-3 (S.D.N.Y. Sep. 20, 2006) (granting summary judgment against broker on fraud claims based upon failure to investigate).

Again, Renaissance did no business. Renaissance had no revenues whatsoever – as the LOM Defendants acknowledge, the only source of funds the company had was money being taken in from investors. *See* LOM's 56.1 Response, ¶ 11. Before soliciting investors to purchase stock based upon assets that would produce 100,000 – or 150,000 or 250,000 – ounces of gold per year, the LOM Defendants were required to conduct some investigation, independent of what they were told by Wile and Park, as to 1) how the mines had actually produced in the recent past, relative to the exaggerated current claims; 2) the mines' current state of operations; 3) whether the putative sellers held good title to the mining assets; 3) the extent to which the assets were encumbered; and 4) how Renaissance would come up with at least $5 million dollars to purchase the assets that Brian Lines and Scott Lines were busy telling investors the company already owned. Indeed, on the final point the Commission submits that the evidence clearly demonstrates that the LOM Defendants knew that Renaissance had no funds to purchase these assets, and knew that Renaissance was endeavoring to solicit funds from investors to purchase assets while they simultaneously represented to those investors that the assets were already owned. But even viewing the facts in the light most favorable to the LOM Defendants, they were clearly reckless.

Moreover, in connection with SHEP Technologies, the LOM Defendants do not dispute that promotional materials were paid for through funds that came from the ICH account, *see*

LOM's 56.1 Response, ¶ 145, that Brian Lines controlled the ICH account, *see* LOM's 56.1

Response, ¶ 49, and that SHEP shares were sold in accounts controlled by Brian Lines and Scott

Lines during the promotional period.  *See* LOM's 56.1 Response, ¶ 139.  While the LOM

Defendants contend that the funds from ICH in fact represented a loan from Peever and Curtis,

they cite to no documentary evidence of such a loan and identify only Brian Lines' self-serving

testimony as controverting evidence.  Again, summary judgment should be denied only where

there exists a "genuine" dispute as to material facts.  Fed. R. Civ. P. Rule 56(c).  Here, the fact

that LOM supplied the funding for the SHEP promotional materials is plainly established by the

fact that Brian Lines executed a written loan agreement between SHEP and ICH for the funds

advanced, which did not involve either Peever or Curtis.  *See* Exhibit B, Agreement.  Brian Lines

admitted that he himself signed the agreement as "lender" on behalf of ICH.  *See* Exh. C, Dep. of

Brian Lines, 323:1-323:17.

Clearly, the failure to disclose that the LOM Defendants were selling SHEP stock while

paying for promotional activities for the same company was a material omission.  *See SEC v.

Corporate Relations Group*, 2003 WL 25570113, *7 (M.D. Fl. March 28, 2003) ("the fact that

the [] Defendants were selling their stock at the same time they were encouraging their readers to

buy would clearly be material to reasonable investors. . . .").  And Brian Lines knew it – as he

told Peever in a recorded conversation, they could not disclose that LOM had actually paid for

the promotion because "they think that's pumping and dump.  They get you on everything. So

we just have to come up with some sensible name on that, basically.  Let me think about that.

We've got to be careful on that one.  We've got to be very careful on that one… Even if you are

a non-affiliate or basically, see they don't want… if you're paying for something, or whatever,

you can't be selling into it, right?  Stupid f**king rules."  *See* LOM's 56.1 Response, ¶ 145.

Brian Lines' scienter is clear.

The undisputed evidence demonstrates that the LOM Defendants committed fraud, both in connection with the Sedona/Renaissance scheme and the SHEP scheme.  And this substantial weight of evidence is not diminished by the fact that the LOM Defendants transacted their fraud in Bermuda rather than the United States.  Notwithstanding the claims that "LOM is a highly respected broker-dealer, headquartered in Hamilton, Bermuda," LOM Opp. at 6, and that its conduct, which included the use of nominee accounts was "consistent with Bermuda law and standard business practices," LOM Opp. at 16, and was an "arrangement that is fully lawful in Bermuda," LOM Opp. at 20, it should be noted that the LOM Defendants' conduct was carefully scrutinized by LOM's local regulator, the Bermuda Monetary Authority (the "BMA").

11

For these reasons, the Commission's Motion for Partial Summary Judgment on its fraud claims as to the LOM Defendants should be granted.

**B. The Commission Is Entitled To Summary Judgment on Claimed Violations of the Reporting Provisions**

The Commission is also entitled to judgment as a matter of law on the claimed violations of Sections 13(d) and 16(a) of the Exchange Act.  As stated in its motion, the Commission asserts that the undisputed evidence that the LOM Defendants, acting through the nominee corporate entities, at a minimum purchased Sedona stock "as a group" in amounts exceeding 5% and 10% reporting thresholds of Sections 13(d) and 16(a), and undisputedly failed to file such reports in violation of these provisions.

The LOM Defendants in their opposition contend that summary judgment on these claims is not warranted, as the question of whether an agreement existed among the purported purchasers to act together for purposes of acquiring Sedona stock "is a fact-intensive question that cannot be resolved on summary judgment given the existing evidentiary record."  LOM Opp. at 41.  This contention is flatly contradicted by the record.  Even crediting facts in the light most favorable to the LOM Defendants, they admit that "Brian Lines approached a number of friends . . . in an effort to find the six non-affiliate purchasers Cooper required. . . .  Brian Lines discussed the purchase of Sedona with three . . .  investors . . . who expressed willingness to participate through corporate entities through which they customarily transacted business."  *See* LOM's 56.1 Response, ¶¶ 192-193.  By the LOM Defendants' own admission, Brian Lines

obtained the agreement of the other purchasers to participate in the purchase, *see* LOM's 56.1

Response, ¶¶ 192-194, including Scott Lines, *see* LOM's 56.1 Response, ¶ 196, and ultimately

the shares were transferred "to the *group* of purchasers organized by Brian Lines."  LOM's 56.1

Response, ¶ 199 (emphasis supplied).  By the LOM Defendants' own admission, the shares of

Sedona were purchased, at a minimum, as a "group."  There is no material dispute of fact as to

these claims.  Summary judgment should be granted.

       *C.  The Commission Is Entitled To Summary Judgment on Its Section 5 Claims*

       The undisputed facts clearly make out a *prima facie* violation of Section 5: (1) no

registration statement was filed or in effect for either Sedona or Renaissance; (2) the Defendants

sold and offered to sell shares of Sedona and Renaissance stock; and (3) interstate commerce and

the mails were used in connection with the Defendants' offers and sales.  Accordingly, the LOM

Defendants bear the burden of demonstrating that the securities transactions at issue fall within

one of the enumerated exemptions from registration. *SEC v. Ralston Purina Co.*, 346 U.S. 119,

126 (1953).  Exemptions are to be strictly construed, as public policy strongly favors registration.

*Quinn & Co. v. SEC*, 452 F.2d 943, 946 (10th Cir. 1971).  Moreover, Section 5 is a strict liability

provision; no showing of scienter is required.  *E.g., SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361

(S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2nd Cir. 1998).

       The LOM Defendants assert that a trier of fact could somehow conclude that their sales

of Sedona stock qualified for exemption pursuant to Section 4(1) of the Securities Act.  This

provision exempts from the registration requirements those transactions conducted by someone

other than an "issuer, underwriter or dealer." 15 U.S.C. § 77d(1).  The LOM Defendants cannot

demonstrate any entitlement to this exemption.  "The purpose of this exemption is to allow free

trading among individual investors of securities that already have been registered." *Cavanagh*, 1

F. Supp. 2d at 361.   Where, as here, the transactions at issue do not involve market investors, but

rather those engaged in an issuer's unregistered distribution of stock, Section 4(1) does not apply.  *SEC v. Softpoint*, 958 F. Supp. 846, 860-61 (S.D.N.Y. 1997).

The securities laws "define an issuer, with exceptions that have no relevance here, as every person who issues or proposes to issue any security.  An issuer includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.  A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities."  *SEC v. Cavanagh*, 2004 WL 1594818, *20 (S.D.N.Y. July 16, 2004).  Further, "Congress enacted a broad definition of underwriter status in order to 'include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public.'"  *SEC v. Lybrand*, 200 F. Supp. 2d 384, 393 (S.D.N.Y. 2002) (*quoting* Thomas Lee Hazen, The Law of Securities Regulation 431 (4th Ed. 2002)).  The Section 4(1) exemption is intended to "exempt only trading transactions between individual investors with respect to securities already issued and not to exempt distributions by issuers or the acts of individuals who engage in steps necessary to such distributions."  *SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir.1959) (*citing SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir.1941)).  Moreover, "liability extends beyond those who sell stock to all necessary participants in a sale of unregistered stock."  *SEC v. Cavanagh*, 1 F. Supp. 2d at 372.

Here, it is undisputed that all of the Sedona securities purchased were obtained through a single transaction negotiated solely between Jack Cooper – Sedona's CEO, majority shareholder and inarguably a Sedona affiliate – on one side, and Brian Lines on the other.  *See* LOM's 56.1 Response, ¶¶ 33, 34.  Cooper directed the allocation of all shares and directed the transfer of funds in payment – a single payment amount based upon all shares, purportedly affiliate and non-affiliate alike.  *See* Pl. St., Exh. S, T; LOM's 56.1 Response, ¶37.  There is no evidence that

any of the purported "purchasers" – other than Brian Lines and Scott Lines – actually paid for the stock.  *See* LOM's 56.1 Response, ¶¶ 48, 49.  Subsequent to the purchase, Brian Lines inarguably exercised dominion and control over all of the shares of stock received from Cooper. Stock that had purportedly been sold to an individual named Glynn Fisher was credited to and in fact sold from an account in the name of ICH which Brian Lines controlled.  *See* LOM's 56.1 Response, ¶¶ 41, 43, 55, 104.  While the LOM Defendants dispute that the multiple structured agreements here were a single transaction, they completely fail to explain why ICH was selling stock that – according to the documentation – it did not own.  Irrespective of ownership, clearly the LOM Defendants exercised "control" over all of the securities.  Indeed, additional stock that had purportedly been sold to an entity called "Clyde Resources" was credited to the Largo Flight account controlled by Scott Lines and Brian Lines.  See Pl. St., Exh. III, p. 6.  The securities were not credited to the accounts of the nominal purchasers[3] until Febraury 5, 2003.  *Id*.  These subsequent transfers followed the SEC trading suspension and came two days *after* Brian Lines had initiated an extended conversation with the SEC relating to the Sedona transaction.  *See SEC v. Lines*, 669 F.Supp.2d 460, 461-462 (S.D.N.Y. 2009).

The fact that Cooper controlled the sale of securities to Lines Defendants disqualifies all of the sales – affiliate and non-affiliate alike – from the Section 4(1) exemption.  *SEC v. Sierra Brokerage*, 608 F.Supp.2d 923, 949-950, n. 25 (S.D. Ohio 2009) (granting summary judgment for SEC on Section 5 claims, finding transfers from five former director shareholders to 28 additional shareholders did not qualify for 4(1) exemption where affiliate-defendant "controlled the transaction" despite the fact that he was "nominally not the seller"), *citing Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (broker-defendant could not rely on 4(1) exemption for his

---

[3]   Indeed, they were not credited to the accounts of the actual purported corporate purchasers at all.  They were credited to the personal accounts of the individuals that the LOM Defendants used as signature directors, as the corporate entities themselves did not even have LOM accounts.

participation in sale of an unaffiliated private party's shares because the sale was actually controlled by the statutory issuer).  Moreover, the LOM Defendants' exercise of control over all of the Sedona shares, even those purportedly belonging to other purchasers, clearly evidences their underwriter status. *See SEC v. Manus*, 1981 WL 1683, * 5 (where a defendant has the ability to exercise control over stock of various shareholders constituting a substantial percentage of issuer's stock, defendant is "an underwriter because of his status as a person controlling the issuer.")

The LOM Defendants were also statutory underwriters because the Sedona securities were unquestionably purchased with a "view to" distribution.  As the LOM Defendants note, the Sedona entity was a "shell" company with no operating business that was viable only because of its public listing.  *See* LOM's 56.1 Response, ¶ 179.   The LOM Defendants purchased the shell to facilitate in the future a reverse-merger transaction that would make their investment profitable.  *See* LOM's 56.1 Response, ¶¶ 187, 189.  Given that the entity had no present business that would suggest any current investment value, it can only be concluded that the shares of Sedona were purchased to facilitate a subsequent public offering and were therefore purchased "with a view" to public resale.  The LOM Defendants were therefore statutory underwriters.  Where "the profitability of [the defendant's] scheme was based on the sale of securities to the public once the price had been manipulated upwards," the entities controlled by the defendants that acquired the securities from affiliates did so "with a view to distribution, and were therefore underwriters."  *SEC v. Kern*, 425 F. 3d 143, 152-153 (2d Cir. 2005) (affirming grant of summary judgment in favor of SEC on Section 5 claims).

Consequently, the LOM Defendants' subsequent public sales of the Sedona securities did not qualify for any exemption.  *See SEC v. Kern*, 425 F. 3d at 152-153 (market sales six months after purchases part of same "transaction."); *SEC v. Rosen*, 2002 WL 34421029, *5-6 (S.D. Fl.

16

Feb. 22, 2002) (granting summary judgment in favor of SEC on Section 5 claims, holding that where securities are sold to the public only eight months after purchase, they did not "come to rest in the hands of the security holder" and were thus purchased by defendant "with a view to distribution" and defendant was statutory underwriter with respect to public sales).  Moreover, Scott Lines was a "necessary participant" in the Sedona transactions.  The undisputed evidence shows Scott Lines in fact supplied a substantial percentage of the funds used to pay for the Sedona shell;  Scott Lines received the Sedona stock in an account which he jointly controlled with Brian Lines;  Scott Lines was aware of and facilitated his brother's trading, as evidenced by Scott Lines exhortation to LOM's broker to "get back out there and sell some SSSI"; and Scott Lines made multiple solicitations of investors in Renaissance in order to make his unregistered sales of Sedona stock more profitable.  The undisputed facts clearly establish that Scott Lines was a "substantial participant" in the distribution.  Like the defendant in *SEC v. Holschuh*, 694 F.2d 130, 139 (7thCir. 1982)*,* Scott Lines' conduct, "far from being unwitting or *de minimus*, had intimately involved him in the details of numerous stages of a greater plan, of which he had in fact been a designer, and which he knew was calculated toward a hurried issuance of new securities …. [defendant] was a 'necessary participant' and  'substantial factor' in the unlawful sales transactions."  *Holschuh*, 694 F.2d at 140.

Finally, the LOM Defendants are likewise liable for Section 5 violations based upon their solicitations of investors in Renaissance.  Initially, for the reasons previously stated, the Court should reject the LOM Defendants contention that the fraudulent solicitations involving Scott Lines and Brian Lines and Renaissance investors were not actually solicitations but instead merely "efforts to gauge 'indications of interest,'" as the contention is flatly contradicted by the recordings of the conversations themselves.  *See* Plaintiff's Opposition to Brian Lines and Scott Lines Motion for Partial Summary Judgment, p. 16-19.

Moreover, the Section 4(2) exemption does not apply to these transactions.  The LOM Defendants contend that – notwithstanding the fact that the offering did not qualify for the Regulation D "safe harbor" as a result of general solicitations associated with the offering – it may still fall within the Section 4(2) exemption.  *See* LOM Opp. at 51-52.  But the Section 4(2) exemption is likewise unavailable where there is a public offering.  *SEC v. Profit Enterprises*, 1992 WL 420904 (D.D.C. Nov. 16, 1992).  Defendants articulate no factual basis to suggest that the Renaissance offering should be analyzed any differently under Section 4(2) than under Regulation D.  After all, Renaissance disseminated press releases giving the clear impression that it was a publicly traded company and that purchasing shares in Sedona was equivalent to buying stock in Renaissance.  The LOM Defendants were apprised by Anthony Wile of numerous promotional materials being disseminated publicly soliciting investment in the venture.  Scott Lines told one investor that Renaissance itself was being "IPOed."  The offering, as a whole, was clearly a public one.

There is no evidence in the record that would contradict the conclusion that the LOM Defendants' solicitations were a part of the same "transaction" as the public solicitations.  Moreover, "[i]n determining that a security qualifies as a private offering, . . . we must make sure that the offerees are provided with or given access to the information that is material to their investment decision."  *SEC v. Murphy*, 626 F.2d 633, 643 (9th Cir. 1980) (affirming grant of summary judgment on Section 5 claims, concluding Section 4(2) exemption inapplicable to purported private offering).  Based on the repeated misrepresentations and omissions by the LOM Defendants addressed above, investors clearly did not have access to the information material to their investment decision.  These investors were entitled to the protections of the registration provisions of the Securities Act.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).  The LOM Defendants have identified no evidence upon which they can meet their

burden of establishing the applicability of the Section 4(2) exemption.  Summary judgment is therefore warranted.

### D.  The Commission Is Entitled To Summary Judgment on Its Section 15 Claim

The LOM Defendants also oppose summary judgment on the Commission's claimed violation of Section 15(a), largely by contending that Scott Lines did not "attempt to induce the purchase or sale of a security" as proscribed by Section 15(a).  *See* LOM Opp. at 53-55.  As explained in the Commission's Opposition to the LOM Bermuda Motion for Partial Summary Judgment, however, the tape-recorded conversation makes plain that Scott Lines, at a minimum, attempted to induce the purchase of Renaissance securities of a U.S. investor.  Again, where a defendant's version of events is patently contradicted by tape-recorded evidence that indisputably memorialized the conduct, and there is no allegation that the recording was doctored or altered in any way, a court should consider the facts as depicted in the recording – and not as claimed by the defendant – for purposes of summary judgment.  *Scott v. Harris*, 550 U.S. at 380-381.  The conversation reveals that Scott Lines, in fact, solicited the U.S. investor to purchase stock in Renaissance, and there is no material dispute of fact as to the Commission's claim.  Summary judgment is warranted.

### E.  The Commission's Remedies Are Warranted

The LOM Defendants finally contend that the Commission's proposed remedies are not warranted.  But for the reasons stated in the Commission's motion, the equitable relief sought by the Commission is plainly warranted given that certain of the LOM Defendants continue to be substantially involved in the U.S. securities markets, maintain that they have done nothing wrong despite their fraudulent conduct, and indeed have suggested that their fraudulent conduct is a legitimate way of doing business.  The remedies sought by the Commission are wholly appropriate and should be imposed.

19

III.    THE WILE OPPOSITION

The Commission is likewise entitled to entry of summary judgment in its favor as to Anthony Wile as his opposition brief fails to establish by competent evidence any material disputed fact as to his liability for fraud and unlawful sales of unregistered securities.  The undisputed evidence presented by the Commission, including Wile's own phone conversations and emails, overwhelmingly demonstrates that Wile was the central participant in the Sedona stock manipulation scheme.  Wile's opposition is largely a series of repeated, undocumented denials of the Commission's claims and unsupported assertions of innocence or "honest mistakes."  As a result, Wile simply fails to carry his burden of demonstrating there are issues left to be tried by this Court that would prevent the award of summary judgment against him.

Although Wile asserts in his Opposition that he "did not make a single dime from the alleged violations…"  Opposition Brief, at 1, this is no bar to summary judgment.  As more fully discussed in the Commission's Opposition to Wile's own motion for summary judgment, there is substantial evidence that Wile had an arrangement with the LOM Defendants by which he would have profited substantially from the fraudulent and unregistered sale of Sedona stock.  *See* Commission Counter-Statement, ¶¶ 20-23.  The fact that the Commission halted the Defendants' fraudulent scheme before Wile could collect his cut of the profits is not a defense to the violations alleged and proven through the evidence establishing the undisputed material facts.

A.  *Wile Fails to Comply with Local Rule 56.1*

The Commission's initial statement of undisputed facts filed pursuant to Local Rule 56.1(a) ("Commission Statement") contained 119 separate factual paragraphs detailing the Sedona market manipulation and Wile's extensive involvement in the scheme.  In Anthony Wile's Counter-Statement of Facts Pursuant to Local Rule 56.1(b) ("Wile 56.1 Counter-Statement"), there are only twenty-one paragraphs where Wile even attempts to provide

controverting evidence to establish a material fact exists.  *See* Wile 56.1 Counter-Statement, ¶¶ 6, 10, 13, 14, 16, 18, 19, 31, 59, 61, 62, 65, 66, 67, 68, 70, 72, 76, 78, 83 & 92.  None of the facts controverted by Wile are material to his liability for violations of the federal securities laws.

As to the remaining ninety-eight paragraphs in the Commission's 56.1 Statement, Wile either expressly admits the Commission's factual statements are undisputed (25 paragraphs) or baldly denies the facts without providing any controverting evidence or legal authority in support of his position (73 paragraphs).  The failure to provide citations to evidence as required by the Local Rules amounts to an effective admission that there are no factual disputes as to those seventy-three paragraphs.  *See* Local Civil Rule 56.1(c) & (d).

Further, Wile's Rule 56.1 Counter-Statement repeatedly contends that "applicable law" bars the admissibility of evidence in the form of telephone recordings because Wile had no knowledge he was being recorded and gave no consent.  The only authority cited for this recurring objection comes in a footnote to his Opposition Brief to the "Bermuda Telecommunications Act 1986, Title 24, Item 10, Sec. 61(5)."  *See* Wile Opposition, fn.13.

However, there is no evidence that Wile was ever recorded while in Bermuda.  Wile is a Canadian citizen who was residing in Florida during the time when these calls were recorded, there is no reason to believe the Bermuda Telecommunications Act would be applicable here to limit the admissibility of this evidence.  Plainly, recordings made as a regular practice in the ordinary course of business, as LOM concedes were the recordings at issue here, are lawfully obtained under U.S. law, irrespective of consent.  *Arias v. Mutual Central Alarm Service*, 202 F.3d 553, 559 (2d Cir. 2000).  Florida state law is not to the contrary.  *Royal Health Care Servs., Inc., v. Jefferson-Pilot Life Ins.,* 924 F.2d 215, 217-218 (11th Cir. 1991) (no violation of Florida state law were conversations recorded using telephones that record in the ordinary course of business).  Defendants who seek to exclude tape recorded evidence challenging that the

21

recordings were not made in the ordinary course of business bear the burden of proof on that issue. *U.S. v. Rittweger*, 258 F.Supp.2d 345, 352-353 (S.D.N.Y. 2003). Wile makes no such showing here. Bald assertions of legal bars or denials of factual statements without support fail to provide valid grounds for denial of summary judgment.

       *B.  There Are No Disputes of Material Fact as to The Commission's Fraud Claims*

     As noted above, the Commission has sought summary judgment based on only a subset of the wide-ranging fraudulent conduct of the defendants. With respect to Wile, the Commission contends that he inarguably disseminated false statements on the Renaissance website that, by his own admission, gave the false impression that Renaissance had already acquired the assets that it had not acquired. Wile does not dispute the misrepresentations with evidence. *See* Wile's 56.1 Counterstatement, ¶¶ 67-68. In fact, in his Rule 56.1 Counterstatement, Wile candidly admits that, contrary to appearances on the Renaissance website, the "gold mining properties were not yet acquired." *See* Wile's 56.1 Counterstatement, ¶ 67.

     Although Wile in his Opposition tries to sugarcoat these misrepresentations as resulting from Wile's "enthusiasm" or "ebullient promotion[]," the recordings plainly demonstrate that Wile knew what he was doing and intended to take advantage of investors for his own purposes. Wile Opposition, at 1 & 7; *see also* Pl. St., ¶¶ 59-63, 68, 69-70 & 81-82. Indeed, Wile – on tape – referred to the potential investors visiting the Renaissance website as "poor lambs" and "sheep." Pl. St., ¶ 70. Wile was not a financial novice and knew through his years of experience as a securities broker exactly the type of investor confusion would result from his misleading statements about Renaissance and its purported operations. *See* Memorandum in Support of Defendant Anthony Wile's Motion for Summary Judgment, at 3.

     The Commission also contends that Wile made misrepresentations by assembling, coordinating, participating in the drafting, and disseminating the reports created by Chapman,

Morgan and others that contained, among other things, entirely baseless price predictions of $62 per share and $50 per share for purportedly publicly-traded Renaissance stock.  Wile cites to no competent evidence contradicting the facts underlying his responsibility for the misrepresentations.  *See* Wile's 56.1 Counterstatement, ¶¶ 20, 21, 78-86.  Further, contrary the argument in Wile's brief that he was not responsible for the touts, evidence from one of the Sedona touters established that for most of the factual background of his report, he relied on Wile and Ian Park, that Wile provided misleading information about the transaction, and that Wile coordinated the analyst reports so they would all be issued prior to the opening of trading in Sedona on January 21, 2003 ("I believe the intent was that [issuance of the analyst reports] were to coincide with the beginning of trading of Sedona as a public company that incorporated Renaissance.").  *See* Exh. F, Roulston Dep., p. 36:5 – 40:4 & 95:12 – 96:24.

In his brief, Wile also contends that there is a factual question as to the materiality of the price predictions.  But clearly, specific predictions of the future value of speculative or unseasoned securities such as Renaissance or Sedona are inherently fraudulent.  *SEC v. Hasho*, 784 F. Supp. 1059, 1108-09 (S.D.N.Y. 1992) (price guarantees are fraudulent when no reasonable basis for prediction exists); *SEC v. Wellshire Sec., Inc.*, 737 F. Supp. 251, 254-56, 260 (S.D.N.Y. 1990) (unfounded or inflated price predictions made about start-up companies are fraudulent); *In re Charles P. Lawrence*, 43 S.E.C. 607, 610 (1967), *aff'd*, 398 F.2d 276 (1st Cir. 1968) (specific predictions of the future value of speculative or unseasoned securities are inherently fraudulent).

There is also no material dispute as to Wile's scienter.  Notwithstanding Wile's contention in his brief that there was a basis for the Chapman price predictions, he "did not recall" it at his deposition.  Pl. St., Exh. I, Dep. of Anthony Wile, p. 140.  Wile offers no competent evidence to rebut the evidence that in fact the predictions were baseless.  *See* Wile's

56.1 Counterstatement, ¶ 83.  Wile was reckless in disseminating the misstatements relating to the assets of Renaissance both on Renaissance's website and in Wile's public statements, and was reckless in disseminating fraudulent price predictions.  *See SEC v. Aqua Vie*, 2007 WL 2025231, *5 (statements relating to corporate profitability and value adequately demonstrate recklessness where statements are baseless and at odds with factual record); *SEC v. Platforms Wireless Int'l*, 2007 WL 1238707, *7 (S.D. Cal. April 25, 2007) (explaining that defendant's "good-faith belief is not enough to create a genuine issue of fact as to whether he was reckless"); *SEC v. TLC Invs. & Trade Co.*, 179 F. Supp. 2d 1149, 1157 (C.D. Cal. 2001) (granting summary judgment on scienter even though defendant contended that he "did not recklessly represent anything fraudulent" because the "uncontroverted evidence in this case is to the contrary").

Moreover, Wile in his brief makes no effort to distinguish, analyze or even mention the authorities cited by the Commission for the proposition that his material misrepresentations were in connection with the purchase or sale of securities as a matter of law.

Summary judgment is warranted on the fraud claims as to Wile.

C.  *There Are No Disputes of Material Fact as to The Commission's Section 5 Claims*

Wile also violated the registration provisions of the federal securities laws.  For the reasons discussed relative to the LOM Defendants, the undisputed evidence establishes that the Renaissance offering constituted a public offering of securities.  As a part of this offering, Wile violated Sections 5(a) and 5(c) as a "necessary participant" in the offering through his dissemination of January 17 and January 21 press releases and by subsequently offering Renaissance shares through the private placement.  Among other things, beyond disseminating the releases that solicited investment interest by the general public in Renaissance, *see* Pl. St. ¶ 86; Wile's 56.1 Counterstatement, ¶ 86, Wile undisputedly participated in the drafting of an Renaissance Offering Memorandum that contained numerous material misstatements, *see* Pl. St.

24

¶ 90; Wile's 56.1 Counterstatement, ¶ 90, and solicited investors as a part of the Renaissance

offering, *see* Pl. St. ¶ 92; Wile's 56.1 Counterstatement, ¶ 92.

Wile denies his involvement in efforts to solicit purchases of Renaissance and Sedona

stock.  Wile's 56.1 Counterstatement, ¶ 92.  However, the testimony cited by Wile actually

confirms the fact that Wile directly had contacted and communicated with potential investors of

Renaissance and Sedona.  *See*  Exh. E, Wile Dep., p. 187:12 – 187:15.  In addition to Wile's own

admission, there is overwhelming evidence that throughout January 2003, Wile repeatedly

distributed e-mail communications under his own name to potential investors in Renaissance and

Sedona soliciting investments in those entities.  Commission Counter-Statement, ¶¶ 14, 16 & 18.

The Commission is likewise entitled to judgment as a matter of law on its Section 5

claims against Wile.

IV   CONCLUSION

For the reasons set forth above, the Commission respectfully requests that this Court

enter an order granting partial summary judgment for the Commission against Brian Lines, Scott

Lines, each of the LOM entities and Anthony Wile as sought in the Commission's motion.


Dated:  March 19, 2010                    Respectfully submitted,

                                          _/s/ David Williams_____
                                          David Williams
                                          Justin Chretien
                                          Assistant Chief Litigation Counsel
                                          Securities and Exchange Commission
                                          100 F Street, N.E.
                                          Washington, D.C. 20549-4631
                                          (202) 551-4548 (Williams)
                                          (202) 772-9233 (facsimile)
                                          Attorneys for Plaintiff
                                          Securities   and   Exchange   Commission

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 19, 2010, I transmitted via e-mail, pursuant to

agreement between counsel, the foregoing *Plaintiff's Reply in Support of Motion for Partial*

*Summary Judgment* to:

Reid M. Figel, Esq.
Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC
1615 M St, NW, Suite 400
Washington, D.C.   20036
Counsel for LOM (Holdings) Ltd., Lines Overseas Management Ltd., LOM Capital Ltd., LOM
Securities (Bermuda) Ltd., LOM Securities (Cayman) Ltd, LOM Securities (Bahamas) Ltd.

Philip M. Smith, Esq.
Patton Boggs LLP
1185 Avenue of the Americas, 30th Floor
New York, NY  10036
United States of America
Counsel for Defendant Brian Lines

Stephen J. Crimmins, Esq.
K&L Gates LLP
1601 K Street, NW
Washington DC 20006
Counsel for Defendant Scott Lines

Leonard H. Bloom, Esq.
One S.E. Third Avenue, 25th Floor
Miami, Florida 33131
Counsel for Defendant Anthony Wile

Mario Aieta, Esq.
230 Park Avenue, 11th Floor
New York, NY 10169
Counsel for Defenant Wayne E. Wew

s/ David Williams_____
David Williams

27